**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | | |
|---|---|---|
| **CHRISTIE ANDREWS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CASE NO. 3:21-cv-00526** |
| | ) | |
| **v.** | ) | **Judge Eli J. Richardson** |
| | ) | **Magistrate Judge Jefferey S. Frensley** |
| **TRI STAR SPORTS AND** | ) | |
| **ENTERTAINMENT GROUP, INC.,** | ) | |
| | ) | **JURY DEMAND** |
| **Defendant.** | ) | |

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**TRI STAR SPORTS AND ENTERTAINMENT GROUP, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

---

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.01, Defendant Tri Star Sports and

Entertainment Group, Inc. ("Tri Star" or "Defendant") respectfully submits this Memorandum of

Law in Support of its Motion for Summary Judgment.

## I.     INTRODUCTION

Plaintiff Christie Andrews ("Ms. Andrews" or "Plaintiff") was employed by Tri Star for

about six years until March 20, 2020, when the Covid-19 pandemic forced Tri Star to reduce its

workforce by 25%. Plaintiff contends that she was laid off because of a disability and that Tri Star

failed to provide her with a reasonable accommodation. There is no evidence in the record

supporting either of these positions. Rather, the undisputed proof shows that Ms. Andrews is not

disabled, did not require an accommodation, and was laid off as a part of the reduction in force

("RIF").

1

## II.     RELEVANT UNDISPUTED FACTS

### A.     Christie Andrews's Employment

Plaintiff was employed by Tri Star from 2014 until March 20, 2020, when she was laid off as a part of a RIF made necessary by the COVID-19 pandemic.  (Statement of Material Undisputed Facts ("SUMF"), ¶¶ 1-2.)  When her employment ended, Plaintiff was a Team Coordinator/AmEx Liaison working out of the Nashville office.  (SUMF ¶ 3.)  This is an administrative position involving "ancillary support tasks and projects", "scanning, filing and other basic administration to support staff and managers[,]" and ad-hoc administrative duties.  (Position Profile, Exh. 1 to Taylor Decl., Exh. C to SUMF.)  The position is "essentially a team assistant[,]" responsible for tracking and helping with deliverables through the use of checklists, running team meetings, and talking to the team about requests from clients.  (Taylor Dep., Exh. B to SUMF, 12:21-22, 108:17-109:2, 120:1-2; Stephens Dep., Exh. F to SUMF, 9:4-21; Kinder Dep., Exh. D to SUMF, 40:8-20.)

Team coordinators are not permitted to work from home on a permanent or indefinite basis as the position requires regular in-person interaction and collaboration with other team members and access to information that is housed on-site at Tri Star.  (SUMF ¶¶ 5-7.)  Team coordinators are often required to participate in meetings that are not planned in advance, sometimes regarding extremely sensitive client information, making it critical that a team coordinator be physically present in the office every day.  (SUMF ¶ 7.)  As the AmEx liaison, Plaintiff was the point of contact between Tri Star and American Express ("AmEx") to address administrative needs a client may have related to an AmEx credit account.  (Kinder Dep., 57:13-18.)

### B.     Tri Star and the Covid-19 Pandemic

Tri Star is a business management firm that serves athletes and entertainers.  In 2020, it had offices in Nashville, Tennessee and Los Angeles, California, and employed 132 people.

(SUMF ¶ 8.)  It has four divisions or "verticals": business management, accounting, royalties, and touring.  Each provides accounting and financial services to clients.  (Taylor Dep., 50:18-20, 21-25.)  Tri Star earns its revenues through hourly rates, retainers, and commissions.  One major stream of revenue for Tri Star is live entertainment (touring), through which Tri Star is paid solely on commission when the event takes place.  (Kinder Dep., 46:12-25; Taylor Dep., 93:3-24, 94:3-16, 198:18-199:4.)

### C.    The First Round of Layoffs at Tri Star

In March 2020, Tri Star's "[b]usiness came to a screeching halt" because of the Covid-19 pandemic, forcing it to lay off one fourth of its workforce.  (SUMF ¶¶ 9-10, 17; Taylor Dep., 32:3-15, 83:17-84:11.)  Among other effects, the pandemic abruptly halted live events across the United States. (Taylor Dep., 54:21-55:19, 83:22-84:11, 93:1-24, 197:13-199:4; Andrews Dep., 163:23-164:2.)[1]  The cancelation of these shows had a significant financial impact on Tri Star, which forced it to reduce its headcount and reorganize its workforce.  This was "directly tied to the fact that we were going to be in a position where we knew we were losing revenue[.]" (Id.)  The parties agree that this was a time of "pure chaos".  (Taylor Dep., 33:1-7; Andrews Dep., 61:14-22.)  Although some aspects of Tri Star's workload increased at this time due to the "absolute chaos" of the pandemic, it nonetheless experienced a significant financial hit, losing 25% of its revenues because of the complete and sudden loss of income in its touring department.  (SUMF ¶ 9.)

Given the circumstances, it was unavoidable that at least some Tri Star employees would have to work from home, whether it be for childcare or health reasons.  Between March 13 and March 16, 2020, Tri Star determined that only "essential employees" – those generating revenue for the business or necessary to keep the business running – would be able to work from home

---

[1] The touring industry is still not back to its pre-pandemic levels.  (Taylor Dep., 92:18-19.)

3

indefinitely, and that employees in duplicitous roles and all "nonessential employees" – employees who did not generate revenue for the business or were not necessary to keep the business afloat – who had requested to work from home for any reason would be laid off first.  (Taylor Dep., 38:4-7,20-23, 43:7-8, 44:15-45:5,12-21, 83:24-84:3, 120:2-5, 130:16-19, 174:4-10; Simpson Dep., 110:20-23; SUMF ¶ 11.)  The team coordinator position was classified as nonessential.  (SUMF ¶ 4.)  It is undisputed that Tri Star CEO Lou Taylor was the sole decision maker as to who would be included in the RIF and that she had no knowledge of Plaintiff's asthma at that time.  (SUMF ¶¶ 12, 18.)

In deciding to categorically lay off all nonessential employees who requested to work from home, Ms. Taylor did not consider which employees would fall within that category, why an employee had requested to work from home, or length of service.   The decision was purely economic, with a focus on "saving the business".  (Taylor Dep., 40:5-8, 45:12-46:12, 82:21-83:12, 116:10-12, 117:10-12, 118:6-10; SUMF ¶ 13.)   While Tri Star worked to equip its essential employees to work from home, the rest of the country was doing the same.  Tri Star experienced a laptop shortage during this time, finding it "impossible to get them."  (Kinder Dep., 82:13-14.)  This made equipping any employee for remote work difficult and expensive.  Equipping essential employees to work from home came at a cost of more than $200,000.  (SUMF ¶ 14.)  Similarly equipping nonessential employees would have created an undue financial burden on Tri Star.  (Taylor Dep., 39:19-40:8, 142, 173, 188:9-12.)

While Ms. Taylor was considering which categories of employees to layoff, HR Generalist Yolanda Simpson was fielding inevitable work from home requests and other Covid-19 issues from employees. (Taylor Dep., 53:7-54:3; Simpson Dep., 43:23-35.)  This included collecting medical documentation from employees who had requested to work from home due to a medical

need. (Taylor Dep., 53:7-54:3.) However, the medical documentation was not intended to show that the affected individual was ADA disabled or entitled to an accommodation, only that they had a legitimate concern justifying remote work, should that be available. (*See* id., 117:19-23.)

It is undisputed that Ms. Taylor was the sole decision maker as to which employees were "essential" and which were "nonessential", and that she did not discuss the RIF with anyone at Tri Star until she had already decided who would be laid off. (SUMF ¶ 12.) Plaintiff was classified as a "nonessential employee" who had requested to work from home and was, thus, included in the reduction in force on March 20, 2020. (SUMF ¶ 15.) Her job duties were distributed among remaining employees. (SUMF ¶ 16.) It is undisputed that Ms. Taylor made the decision to include Plaintiff in the RIF on March 16, 2020. (SUMF ¶ 15.)

On the same day that Plaintiff was laid off, nine other Tri Star employees were also laid off as part of the RIF, with an additional four included later in the month. (Taylor Decl., ¶ 12.) Between March and June 2020, a total of 33 employees were laid off because of the Covid-19 pandemic. (SUMF ¶ 17.) This was 25% percent of Tri Star's workforce, which included 132 employees just before the pandemic began. (SUMF ¶ 8.) Plaintiff has produced no evidence disputing this or supporting her subjective belief that she was not a part of this RIF.

### D. Plaintiff's Asthma

Plaintiff identifies her sole disability for this litigation as asthma. (SUMF ¶ 19.) For purposes of summary judgment, Tri Star does not dispute that she has been diagnosed with asthma. However, Plaintiff's asthma does not constitute a disability as defined by the ADA. Plaintiff admits that her asthma has been "well-controlled" at all relevant times. (SUMF ¶ 20.)

Ms. Andrews was diagnosed with asthma in high school during a routine sports physical. (SUMF ¶ 21.) She was a cheerleader both before and after her diagnosis. (SUMF ¶ 28.) She

graduated from high school in 2007, and then worked as a professional dancer and actor in a theater company. In 2009, she moved to New York City to work as a professional dancer. She moved before achieving that goal for reasons unrelated to her health. (SUMF ¶ 22.)

During her employment with Tri Star, Plaintiff participated on an exhibition cheerleading team, which she talked about often. (SUMF ¶ 23.) Up until March 2020, Plaintiff worked out at Crossfit gyms; she has described her Crossfit workouts as 100-200 minutes of exercise with heavy exertion, two to three times per week. (SUMF ¶ 24.) She stopped going because of a rotator cuff injury, not because of her asthma. (Id.) Ms. Andrews now participates in gymnastics two days a week. (SUMF ¶ 25.)

Ms. Andrews admits that her asthma was well-controlled in March 2020 and that there has never been a time when this was not the case. (SUMF ¶¶ 20, 27.) The last time she sought treatment in a hospital related to her asthma was around 2016; she has never been hospitalized overnight for asthma. (SUMF ¶ 26.) When her asthma is triggered, she experiences a cough and a tight chest. Her inhaler relieves the chest tightness, but the cough remains for a few days. Ms. Andrews admits that neither the cough nor her asthma interferes with her ability to function. (Andrews Dep., 109:16-110:17; SUMF ¶ 27.) Ms. Andrews identified the only limitations caused by her asthma as the inability to use cleaning spray (she must use wipes), hike a ridge or participate in a polar plunge in Alaska, go to a sauna, be in cold weather, do cardio-intensive activity, and have a shedding dog. (Andrews Dep., 123:25-125:17; SUMF ¶ 27.) The undisputed proof shows that it does not interfere with her ability to work, travel, sleep or function generally.

### E. Plaintiff's Request to Work from Home

On Sunday, March 15, 2020, Plaintiff contacted her primary health care provider, Nurse Practitioner Autumn Nelson, and asked if she should take any specific precautions related to

Covid-19 and her asthma. (Andrews Dep., 184:12-185:14; Tri Star Medical Group Notes, Exh. 28 to Andrews Dep.) Ms. Nelson responded, "The best thing you can do is wash your hands, work from home if you are able. If you have any symptoms, you need to self-quarantine." (SUMF ¶ 28.) Ms. Nelson did not direct Ms. Andrews to work from home or to stay away from the office. (*See* id.)

On Monday, March 16, 2022, Ms. Andrews reported to work as usual. (Andrews Dep., 158:14-16.) Tri Star employees used Lysol aerosol spray in the office in an effort to combat Covid-19. (SUMF ¶ 29.) According to Plaintiff, she began coughing upon inhaling the aerosol spray and was required to use her inhaler. No one witnessed her using her inhaler that day and Ms. Andrews cannot identify any other time she used her inhaler at Tri Star. (SUMF ¶ 31.) She did not ask anyone to stop using the aerosol spray in the office. After using her inhaler, Ms. Andrews returned to her desk and worked for the remainder of the day. (SUMF ¶¶ 32-33.) She has produced no medical proof that the Lysol spray caused her to develop a cough or the need to use an inhaler. At some point that day, Plaintiff discussed her cough with her direct supervisor Bryan Luecke. She told Mr. Luecke that it was "just asthma because of the Lysol, like it's just a cough from asthma[,]" in response to Mr. Luecke's concern that her cough was a sign that she was Covid positive. (Andrews 130:19-22, 132:16-24.)

On the same day, Human Resources Generalist Yolanda Simpson sent a company-wide email instructing employees to speak with their Director and HR immediately if they felt they needed to work from home, as it was inevitable that some employees would want or need to work remotely. (Mar. 16, 2020 Email, Exh. 13 to Andrews Dep.) Ms. Simpson was tasked with compiling a list of employees who had requested to work from home for their own medical reasons, childcare, or medical reasons of someone who lives with them. (Taylor Dep., 43:23-25, 53:7-

54:3.)  Ms. Simpson was *not* tasked with determining who would ultimately be allowed to work from home, as that decision could be made only by Ms. Taylor.

Plaintiff responded by emailing Ms. Simpson and Mr. Luecke requesting to work from home indefinitely, claiming to have "a doctor who's pissed at me and called me irresponsible for not staying home[.]"  (SUMF ¶¶ 34-35.)  However, Plaintiff admits that this was not true, and that this "doctor" is actually her best friend, Emily Mara, a wound care nurse who does not provide medical treatment to Plaintiff.  (SUMF ¶ 36.)  This request did not mention asthma, Covid-19, or cleaning products.  (SUMF ¶¶ 34-35.)

Ms. Simpson told Plaintiff that she would let her know the next day and to come to work unless she was sick.  Around 5:00 pm that night, Plaintiff responded that she would be in the office the next day.  She did not mention her asthma, a cough, or cleaning products.  (SUMF ¶ 37.)  A few hours later, Plaintiff emailed Ms. Nelson asking for a note that says she has asthma so that she can work from home.  She did not mention her cough, the need to use her inhaler that day, or the aerosol cleaning products. (SUMF ¶ 38.) Ms. Andrews testified that she would have retracted her request to work from home if given the opportunity.  (SUMF ¶ 39.)

The next day, March 17, 2020, Plaintiff called Mr. Luecke and told him that her asthma and cough were getting worse.  Mr. Luecke told her to stay home; Ms. Andrews understood this to be because Mr. Luecke believed she may have Covid-19.  (Andrews Dep., 132:16-24, 151:3-152:7.)  Mr. Luecke emailed Ms. Simpson, Heather Kinder, and Peggy Stephens (all Tri Star employees) later that morning saying he told Plaintiff "to take a sick day and stay at home today" as she has a cough, which she thinks is from Lysol spray.  In the email, Mr. Luecke "recommends" that Plaintiff be given a work from home option "rather than burn a sick or vacation day" that day because of her cough, which is "[h]opefully not the Covid virus[.]".  (Andrews Dep., 158:4-7; Mar.

17, 2020 Email, Exh. 14 to Andrews Dep.)  Plaintiff relies on this email to support her claim that Tri Star, "through Bryan Luecke on its own initiative determined that Plaintiff should perform her duties from her residence".  (Complaint ¶¶ 27-28.)  However, when read as a whole, this email contains nothing more than a recommendation that Plaintiff be allowed to work from home on that day because of her cough. No reasonable jury could find that Mr. Luecke recommended an indefinite work from home option, and it is undisputed that he did not have the authority to allow Ms. Andrews to do this.  It is further undisputed that no other team coordinator worked from home indefinitely prior to or after March 2020.  (SUMF ¶¶ 5, 46.)

Ms. Andrews did not come into the office that day.  (Andrews Dep., 151:3-5.)  That afternoon, she emailed a note from her provider, Ms. Nelson, which states that she has "well-controlled" asthma but would "benefit" from working from home.  (SUMF ¶ 40.)  This is the only medical documentation Plaintiff provided to Tri Star in support of her claim that her asthma requires working from home.  It is also the only medical documentation Plaintiff has produced in this litigation in support of that contention.  Thus, Plaintiff has produced no medical evidence showing that her asthma – or any other condition – prevented her from coming into the office or that she required any accommodation at all.

### F.    Plaintiff's Layoff

Plaintiff was laid off on March 20, 2020 for lack of work. (SUMF ¶ 2.)  There is no genuine dispute that if she had not been included in the RIF in March 2020, she would have been included in a subsequent round of layoffs within weeks due to her poor work performance.  (SUMF ¶ 41.)  Plaintiff's job duties were redistributed among existing employees.  She was not replaced.  (SUMF ¶ 16.)  Plaintiff is now working at Titans Stadium, where she is expected to be present and working in the stadium during live events.  She did not request any type of accommodation from her current

employer or from any other employer she applied to work for after her employment with Tri Star ended. (Andrews Dep., 209:20-213:19; SUMF ¶ 42.) Since her Tri Star employment ended, Plaintiff has traveled domestically and to Alaska and Spain, and has embarked on a cruise in the Caribbean. (SUMF ¶ 43.)

## III. LAW AND ARGUMENT

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be entered where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1045 (citing Fed. R. Civ. P. 56(c)). All facts and all inferences to be drawn from those facts must be viewed in the light most favorable to Plaintiff. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The Court must consider all material facts, including "those that uniformly cut against the plaintiff." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015). The Supreme Court has explained, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (string citation omitted). Rather, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *Evans v. Nashville Film Institute, LLC*, 2022 WL 2500324, ** 5-6 (M.D. Tenn. July 6, 2022) (quoting *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248)). To demonstrate a *genuine* issue,

10

Plaintiff must "present[] significant probative evidence on which a jury could return a verdict for her." *Ford Motor Co.*, 782 F.3d at 760-61 (citations and internal quotations omitted). No genuine issue exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587 (citing *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). "[I]f the factual context renders [plaintiff's] claim implausible – if the claim is one that simply makes no economic sense – [plaintiff] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Id.* (citing *Cities Service*).

**B.      Plaintiff Cannot Establish ADA Discrimination.**

Plaintiff brings one cause of action against Tri Star – "discrimination in violation of the ADA and failure to provide a reasonable accommodation in violtion [sic] of the ADA." (Complaint, Doc. 1, p. 8.) Within that count, Plaintiff alleges that Tri Star (a) discriminated against her because of an "actual and/or perceived disability"; (b) failed to engage in the interactive process; (c) failed to provide a reasonable accommodation to Plaintiff; and (d) fired Plaintiff because of her need for an accommodation. (Id., ¶ 50.) To prevail on a claim of disability discrimination, Plaintiff must produce either direct or circumstantial evidence that her disability is the "but-for" cause of her termination. *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019); *Evans*, 2022 WL 2500324 at *7.

**1.      No Direct Evidence of Discrimination Exists.**

Evidence is direct when it does not require the fact finder to draw any inferences to conclude that the employee was terminated because of her disability. *Fisher v. Nissan North America Inc.*, 951 F.3d 409, 416 (6th Cir. 2020). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate constitute direct evidence." *Parkhurst v. American*

*Healthways Svcs. LLC*, 2016 WL 4591630, *4 (M.D. Tenn. Sept. 2, 2016) (internal citations and quotations omitted). An isolated statement made by a non-decisionmaker or a statement made by the decisionmaker that is not related to the decision-making process is insufficient. *Id.*; *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544 (6th Cir. 2004). No direct evidence of discrimination exists in this case; thus, to prevail, Plaintiff must produce circumstantial evidence that her disability was the but-for cause of her layoff.

### 2. Plaintiff Cannot Establish a Prima Facie Case of Discrimination.

Where no direct evidence of discrimination exists, a plaintiff can only succeed if she establishes a *prima facie* case by showing "(1) [she] is disabled, (2) [she] is otherwise qualified for the position, with or without reasonable accommodation, (3) [she] suffered an adverse employment action, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced"." *Babb*, 942 F.3d at 319; *Evans*, 2022 WL 2500324 at *7. A plaintiff is not "replaced" when her work is assigned to another employee or employees already working for the employer and performing related work. *Parkhurst*, 2016 WL 4591630 at *6.

For purposes of summary judgment, Tri Star does not dispute that Plaintiff suffered an adverse employment action when she was laid off. However, where, as here, the plaintiff's employment ends through a reduction in force, "the plaintiff must present direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 522 (6th Cir. 2021) (citation and internal quotations omitted); *see also Atanasovski v. Epic Equipment & Engineering, Inc.*, 2021 WL 1253298, *5 (E.D. Mich. Apr. 5, 2021). The Sixth Circuit has explained, "'[t]he guiding principle' in a workforce reduction discrimination case is that 'the evidence must be

12

sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of [her protected status].'" *Atanasovski* 2021 WL 1253298 at *5 (citing *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1466 (6th Cir. 1990)). This is because "[i]n a RIF, qualified employees are going to be discharged." *Brockelhurst v. PPG Indus., Inc.*, 123 F.3d 890, 896 (6th Cir. 1997)).

If Plaintiff establishes a *prima facie* case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its action. *Babb*, 942 F.3d at 320. If Defendant does so, the burden shifts back to Plaintiff to show that the proffered explanation is a pretext for discrimination. *Id*. A plaintiff can establish pretext by showing "that the employer's explanation had no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to motivate the defendant's challenged conduct." *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012). To prove pretext, Plaintiff must produce sufficient evidence for a reasonable jury to conclude "both that the reason was false and that discrimination was the real reason." *Atanasovski* 2021 WL 1253298 at *14 (citation omitted); *Ford Motor Co.*, 782 F.3d at 767. This "is a commonsense inquiry; did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400, n. 4 (6th Cir. 2009). "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation." *Parkhurst*, 2016 WL 4591630 at *8 (internal quotations and citations omitted).

### a. Plaintiff Is Not Disabled.

As a threshold matter, Plaintiff must establish "that she is disabled under the ADA and that her employer knew or had reason to know of her disability." *Thompson*, 985 F.3d at 522 (citations and internal quotations omitted). Plaintiff's own testimony demonstrates that she will be unable

to make this showing, making summary judgment appropriate on this issue alone. "Disability" is defined by the ADA in three ways: 1) a physical or mental impairment that substantially limits one or more of the major life activities; 2) a record of such impairment; or 3) being regarded as having such an impairment. *Id.* at 522-23 (citing 42 U.S.C. § 12102(2)). A major life activity is a task that is "central to most people's daily lives" and includes "such functions as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Starks-Umoja v. Fed. Exp. Corp.*, 341 F. Supp. 2d 979, 991 (W.D. Tenn. 2003) (citing *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 337 (6th Cir. 2002)).

> ### i. Plaintiff does not have an impairment that substantially limits a major life activity.

Under the first definition of disability, "'[i]t is insufficient for individuals . . . to merely submit evidence of a medical diagnosis of an impairment[,]'" as "[m]erely having an impairment does not make Plaintiff disabled for purposes of the ADA." *Starks-Umoja*, 341 F. Supp. 2d at 991, 993 (quoting *Toyota Motor Mfg. Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002)). While asthma *can*, in some circumstances, rise to the level of an ADA disability, the mere fact that Plaintiff has a diagnosis of asthma does not make her "disabled" within the meaning of the ADA. "[T]ransient episodes of breathing difficulty are not sufficient to qualify Plaintiff as 'disabled' within the meaning of the ADA[.]" *Gergen v. City of Kentwood*, 2010 WL 2010878, *5 (W.D. Mich. May 18, 2010).

Plaintiff alleges she is disabled because of her asthma, which "involves obstruction of her airway" and causes "coughing", "bronchitis symptoms", and "pulmonary issues". (Complaint, ¶¶ 15, 24, 25, 50, 58.) For purposes of this motion, Tri Star will assume that Plaintiff is alleging that her asthma impacts the major life activity of breathing. To determine "whether Plaintiff's asthma 'substantially limits' her ability to breath, the Court should consider: (1) the nature and severity of

14

the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact, resulting from the impairment." *Id.* at *2 (citing 29 C.F.R. § 1630.2(j)).

In this Circuit, "[w]here a plaintiff . . . is able to engage in almost all normal life activities" or has "location specific medical problems" only, no ADA disability exists. *Id.* (citing *Ventura v. City of Independence,* 1997 WL 94688, *2 (6th Cir. Mar. 4, 1997) and *Shah v. Upjohn Co.,* 922 F. Supp. 15, 25 (W.D. Mich. 1995)). On the other hand, "the plaintiff's ability to breathe [is] substantially limited where the plaintiff's condition "prevents [her] from participating in a wide range of activities". *Id.* (citing *Russell v. Nat'l Amusements, Inc.,* 2009 WL 262494, *6 (N.D. Ohio Feb. 4, 2009). Other circuits have reached similar conclusions. *See id.* at *3. In general, where an individual's asthma is well-controlled, even if it requires the use of an inhaler, it does not rise to the level of ADA disability. *Ventura v. City of Independence*, 108 F.3d 1378, *2 (6th Cir. Mar. 4 1997); *Riforgiato v. Findlex Corp.*, 2003 WL 21303416, **2-3 (N.D. Ohio June 6, 2003).

Where, as here, "Plaintiff has not demonstrated, or even alleged, that her condition burdens her any appreciable portion of the day as a whole or substantially affects her life outside of work[,]" Plaintiff is not disabled. *Gergen*, 2010 WL 2010878 at *4 (citing *Ventura,* 1997 WL 94688 at *2; *Minnix v. City of Chillicothe,* 2000 WL 191828, *2 (6th Cir. Feb. 10, 2000); *Muller v. Costello,* 187 F.3d 298, 314 (2d Cir. 1999)). Plaintiff is and has been a very active person, participating in cheerleading, gymnastics, Crossfit, and domestic and international travel. Plaintiff admits that her asthma is well-controlled and her healthcare provider agrees. While Plaintiff has identified very specific limitations related to her asthma, she admits she is able to engage in almost all normal life activities and that her asthma does not impact her ability to function. This was true even after the

15

pandemic began as Plaintiff continued to work out and travel internationally after her employment ended and applied for subsequent employment without asking for any type of accommodation.

Plaintiff has put forth no evidence that her asthma substantially limits her breathing, or any other major life activity, even in the context of the Covid-19 pandemic. Thus, there is no genuine dispute that she is not disabled within the meaning of the ADA and cannot establish a *prima facie* case of discrimination.

### ii. Plaintiff has not alleged that she has a record of impairment substantially limiting a major life activity.

To proceed under the second definition of disability, Plaintiff is required to show that she has "'a record of impairment that substantially limited one or more major life activities when compared to most people in the general population, or was misclassified as having had such an impairment.'" *Hale v. Murfreesboro Housing Authority*, 2021 WL 4428216, *4 (M.D. Tenn. Sept. 27, 2021) (quoting *Spence v. Donahoe*, 515 Fed. App'x 561, 569 (6th Cir. 2013) and citing *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 40 (1st Cir. 2018)). As with the first definition, "[t]he existence of an impairment is not sufficient[.]" *Starks-Umoja*, 341 F. Supp. 2d at 993. Plaintiff must produce evidence "of an impairment that has caused her to be substantially limited in any activity that is central to most people's lives." *Id.* She must also produce evidence that Tri Star knew of this record of impairment. *Id.* at 993, FN 15.

Plaintiff has not alleged that she has a record of impairment and has produced no evidence of such. Rather, Plaintiff's own testimony shows that she had and has a very active lifestyle and that her asthma has been well-controlled at all times. Further, Ms. Taylor testified that she did not know that Plaintiff had asthma until after she filed a charge of discrimination with the EEOC, let alone asthma severe enough to constitute an ADA disability. Plaintiff admits that no one saw her use her inhaler at work and cannot identify any instance in which she disclosed her asthma to Ms.

Taylor. (SUMF ¶ 45.) She was never hospitalized and never missed work because of her asthma during her employment. She never requested an accommodation related to her asthma and, even when she believed the Lysol spray triggered her asthma, did not ask that the product not be used. During her employment, she participated on an exhibition cheerleading squad and worked out at a Crossfit gym. Thus, even if Tri Star knew she had been diagnosed with asthma, it had no reason to believe Plaintiff's asthma ever substantially impaired any activity in her life, thus, she cannot meet the second definition of disability.

### iii. Plaintiff was not regarded as disabled.

To proceed under the third definition of disability, Plaintiff must establish that she was terminated "'because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.'" *Thompson*, 985 F.3d at 523 (quoting *Babb*, 942 F.3d at 319 (quoting 42 U.S.C. § 12102(3)(A)) (emphasis removed from original). An employer can "rebut this showing by pointing to objective evidence 'that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) both transitory and minor.'" *Babb*, 942 F.3d at 319 (string citation omitted).

Again, based on Plaintiff's own testimony, she cannot make this showing. Ms. Taylor, the decision-maker, did not know that Plaintiff had asthma at the time of the reduction in force. Even if she knew, Plaintiff's condition is both minor and transitory. As discussed above, Plaintiff admits that her asthma is well-controlled and that she leads an active lifestyle. She has not required treatment at a hospital because of her asthma in nearly a decade, and travels domestically and internationally, even during the current pandemic. Plaintiff's testimony demonstrates that her asthma is both transitory and minor and has essentially no impact on her ability to live a normal life. Thus, Plaintiff cannot show she is disabled under the third ADA definition.

17

### b. Plaintiff Is Not Otherwise Qualified for the Position.

Even if Plaintiff could show that she is disabled within the meaning of the ADA, she cannot establish the remaining elements of a *prima facie* case. Plaintiff was not qualified for her position, with or without a reasonable accommodation. Plaintiff admits that she was late to work often and that it became an issue in her employment. (SUMF ¶¶ 44-45.) Had Ms. Andrews not been laid off in the first round, she would have been included in the next round for performance. Ms. Andrews was unreliable, and her attendance issues were reflected in deliverables that she failed to meet. (Id., Stephens Dep., 73:19-21.) Plaintiff's inability to arrive on time disqualified her from holding the position of team coordinator and, thus, she cannot show she was otherwise qualified for the job.

Further, as discussed below, being physically present at the office was an essential function of the team coordinator position. Removal of an essential job function is "*per se* unreasonable." *Ford Motor Co.*, 782 F.3d at 761. It is undisputed that team coordinators were not permitted to work from home indefinitely. While Ms. Andrews identifies some team coordinators who she believes were permitted to work from home for a day here and there, she cannot identify a single team coordinator who was assigned permanent or indefinite work from home status, as none exist.

### c. Tri Star Had No Knowledge of Asthma as a Disability.

Ms. Taylor was the sole decision-maker regarding the who, when, and why of the RIF. There is no genuine dispute that Ms. Taylor did not know that Ms. Andrews has asthma until after this litigation began. Further, as discussed above, even if Tri Star knew that Plaintiff had been diagnosed with asthma, it did not rise to the level of an ADA disability. Thus, Tri Star could not have had any knowledge of Plaintiff having asthma as a disability.

18

### d. Plaintiff Was Not Replaced and She Has Produced No Evidence Tending to Indicate that She Was Singled Out for Discharge.

Plaintiff does not genuinely dispute that she was not replaced. While Plaintiff suggests the existence of a job posting for team coordinator online following her termination is evidence that she was replaced, the undisputed proof shows that she was not, and that Tri Star distributed her job duties among remaining employees. Further, Plaintiff has not produced a single piece of evidence that would demonstrate that she was singled out for any impermissible reason. Rather, the unrefuted proof shows that Tri Star laid off 25% of its workforce, and that the first round of layoffs included all nonessential employees who had requested to work from home, regardless of the reason for the request. This was an economic decision to reduce Tri Star's headcount and reorganize in the midst of a global pandemic. Plaintiff's subjective and unsupported belief that she was singled out for termination is not proof that she would not have been laid off "but-for" a disability, and not a shred of objective evidence exists that Tri Star targeted Plaintiff for termination for any unlawful reason.

### e. Tri Star's Proffered Reason

Even if Plaintiff could establish a *prima facie* case of discrimination, which she cannot do, Tri Star has put forth a legitimate non-discriminatory reason for laying off Plaintiff – a reduction in force made necessary by the Covid-19 pandemic. Plaintiff has produced no evidence that would show that this reason is pretextual or that she was singled out because of a disability. The commonsense pretext inquiry leads to but one conclusion – Plaintiff was laid off as part of a reduction in force caused by a global pandemic, and not for any other reason. No reasonable jury could find otherwise.

### 3. Plaintiff's Allegation of Failure to Accommodate or Engage in the Interactive Process Is Inapplicable.

Plaintiff alleges that Tri Star failed to engage in the interactive process and to provide a reasonable accommodation. To succeed on this claim, Plaintiff must establish that she requested a reasonable accommodation, that a reasonable accommodation would have been possible, and that Tri Star failed to provide it. [2] *See Thompson*, 985 F.3d at 525; *see also Arndt v. Ford Motor Co.*, 247 F. Supp. 3d 832, 850 (E.D. Mich. 2017). Plaintiff must put forth direct evidence – evidence that "does not require the court to draw any inferences to conclude . . . the employer failed to accommodate[.]" *See Fisher*, 951 F.3d at 416-17; *Tchankpa v. Ascena Retail Group, Inc.,* 951 F.3d 805, 811 (6th Cir. 2020). Under the direct evidence test, Plaintiff "'bears the burden of establishing (1) that [s]he is disabled, and (2) that [s]he is 'otherwise qualified' for the position despite [her] disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation.'" *Fisher,* 951 F.3d at 417 (quoting *Kleiber v. Honda of Am. Mfg., Inc.,* 485 F.3d 862, 868 (6th Cir. 2007)); *see also Tchankpa,* 951 F.3d at 811-12. Plaintiff must demonstrate that the accommodation she has requested is objectively reasonable. *See Fisher*, 951 F.3d at 419; *Tchankpa*, 951 F.3d at 812; *Thompson*, 985 F.3d at 525. If she does so, the burden of production shifts to the employer to show "that a challenged job criterion is essential, and therefore, a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer." *Eyster v. Metropolitan Nashville Airport Authority*, 479 F. Supp. 3d 706, 715 (M. D. Tenn. 2020).

An accommodation that would remove an essential function of the job is *per se* unreasonable. *Id.*; *Bush v. Compass Group USA, Inc.,* 683 Fed. Appx. 440, 449 (6th Cir. 2017);

---

[2] Failure to *engage* in the interactive process is not itself an independent cause of action. *Thompson*, 985 F.3d at 525.

*Thompson*, 985 F.3d at 525. To determine "whether a job function is essential, 'consideration shall be given to the employer's judgment' and any written description of the job prepared by the employer. Courts should also consider the consequences of not requiring the employee to perform the function and the work experience of past employees in the same or similar jobs." *Id.* (citing *Rorrer* at 1039) (citing 29 C.F.R. § 1630.2(n)(3) (internal quotations omitted) and 42 U.S.C. § 12111(8)).[3]

### a. Plaintiff Did Not Request a Reasonable Accommodation.

To establish a claim for failure to accommodate, Plaintiff must first show that she requested a reasonable accommodation. This Plaintiff cannot do. Plaintiff relies on her March 16, 2022 email to Yolanda Simpson and Bryan Luecke and the note from Autumn Nelson as the only proof that she requested and required an accommodation for her asthma. However, neither constitutes a request for a reasonable accommodation. The email to Ms. Simpson and Mr. Luecke only asks that she be approved to work from home because a "doctor" is "pissed at her and called her irresponsible for not staying home". Ms. Andrews admits that this was a lie and that no such doctor exists. Ms. Andrews further admits that this is based on her best friend Emily's belief that the public had a duty to stay home during the pandemic. (Andrews Dep., 64:2-65:12.) Thus, the request to work from home was based on a perceived social responsibility, not a medical need. This does not constitute a request for an accommodation under the ADA.

Further, the note from Ms. Nelson states (1) that Ms. Andrews's asthma is "well-controlled" – in other words, not a disability – and (2) that she would "benefit" from working from home. This statement could apply to every working human in the United States in March 2020.

---

[3] An employer is not required to provide a reasonable accommodation to or engage in the interactive process with an employee who is only "regarded as" having a disability. *Stinson v. Nissan North America Inc.*, 2019 WL 6174841, *9 (M.D. Tenn. Nov. 20, 2019).

In no way does it communicate that Ms. Andrews had a special condition that required her to work from home or prevented her from performing her job functions without this accommodation. While the note contains a medical diagnosis, it is not a request for a reasonable accommodation. *See Tchankpa*, 951 F.3d 805 at 813.

Even if either communication constituted an accommodation request as defined by the ADA, the requested accommodation was neither necessary nor reasonable. A requested accommodation "must be 'necessary' considering the employee's physical limitations" and "should logically be linked to enabling the individual with a disability to overcome limitations or barriers [s]he faces due to the disability." *Id.*; *Wohler v. Toledo Stamping & Mfg. Co.*, 1997 WL 603422, *6 (6th Cir. Sept. 30, 1997).

Ms. Andrews has produced no medical proof that it was necessary for her to work from home, admits that had she been given the opportunity to retract her request to work from home, she would have done so, and has not requested any type of accommodation – including working from home – from any actual or potential employer since her Tri Star employment ended. In other words, she did not *need* to work from home. She wanted to work from home. A desire is not the same as a need. While the "ADA requires employers to reasonably accommodate their disabled employees; it does not endow all disabled persons with a job – or job schedule – of their choosing." *Ford Motor Co.*, 782 F.3d at 757. "[A] disabled employee cannot ask to work from home for convenience and then sue under the ADA if that request is denied." *Tchankpa*, 951 F.3d at 812. Based on Plaintiff's own proof, working from home was not a necessary accommodation.

The request to work from home was also not reasonable as it would have required the elimination of an essential function of Plaintiff's job – to be physically present in the office – and thus, *per se* unreasonable. On-site attendance at the worksite is presumed to be an essential job

function.  *Id.* at 813.  The general rule is "that regularly attending work on-site is essential to most jobs, especially the interactive ones" as "'most jobs require the kind of teamwork, personal interaction, and supervision that simply cannot be had in a home office situation.'"  *Ford Motor Co.*, 782 F.3d at 761 (quoting *Rauen v. U.S. Tobacco Mfg. L.P.*, 319 F.3d 891, 896 (7th Cir. 2003)).

The Sixth Circuit has succinctly stated that "[r]egular, in-person attendance is an essential function – and a prerequisite to essential functions – of most jobs, especially the interactive ones. That's the same rule that case law from around the country, the [ADA]'s language, its regulations, and the EEOC guidance all point toward."  *Id.* at 762.  A request to work from home may be deemed unreasonable where the job calls for "impromptu team meetings" or "when, among other things, the job requires 'face-to-face interaction and coordination of work with other employees,' 'in-person interaction with outside colleagues, clients, or customers,' and 'immediate access to documents or other information located only in the workplace.'"  *Id.* (citation omitted).  The fact that an employee may be able to perform some portion of her job duties from home does not negate the essential nature of the in-person attendance requirement.  *See id.*

To demonstrate that her request to work from home indefinitely was objectively reasonable, Plaintiff must produce evidence "indicating that [hers] was one of those exceptional cases where [s]he could have 'performed at home without a substantial reduction in quality of [her] performance.'"  *Smith v. Ameritech*, 129 F.3d 857, 867 (6th Cir. 1997) (quoting *Vande Zande v. Wisconsin*, 44 F.3d 538, 545 (7th Cir. 1995)).  This she cannot do.

In-person attendance is an essential function of the team coordinator position.  Ms. Andrews' subjective belief that she could perform her job remotely does not create a genuine issue of material fact, as courts "do not allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience."  *Ford Motor Co.*, 782 F.3d at

763-64 (citations and internal quotations omitted). If the contrary were true, "every failure-to-accommodate claim involving essential functions would go to trial because all employees who *request* their employer to exempt an essential function *think* they can work without that essential function." *Id.* at 764 (emphasis in original). Even Ms. Andrews's access to a company laptop is insufficient to overcome Tri Star's position that regular, in-person attendance is an essential function of the team coordinator position, as "technologies – email, computers, telephone, and limited video conferencing – were equally available when courts around the county uniformly held that on-site attendance is essential for interactive jobs." *Id.* at 765. It is undisputed that team coordinators are required to be physically present in the office so that meetings can be scheduled at a moment's notice, that team coordinators are required to collaborate regularly with other team members to complete their tasks, and that team coordinators need immediate access to highly confidential client information that is housed on-site at Tri Star. These job duties make regular in-person attendance absolutely essential. Relieving Ms. Andrews of the requirement that she be physically present in the office would eliminate an essential job function; thus, the request to work from home is *per se* unreasonable. Likewise, if she is truly unable to be physically present because of her disability, she is not qualified for the position.

### b. Allowing Team Coordinators to Work Remotely Would Create an Undue Hardship on Tri Star.

Additionally, allowing team coordinators to work from home would create an undue hardship on Tri Star, making the requested accommodation unreasonable. Tri Star spent hundreds of thousands of dollars equipping its essential employees to work remotely; allowing nonessential employees to work from home would have been an additional major expense to Tri Star at a time when it had lost 25% of its revenue. Further, team coordinators are required to access sensitive client information, like financials and personal identifying information, to perform their jobs.

24

Equipping any employee to work from home requires mobile office equipment with strict security features. While Tri Star was able to outfit certain essential employees with appropriate equipment so that those employees who were necessary to keep the business afloat could continue to work, adding nonessential employees to this list of people accessing Tri Star's systems remotely would have increased its risk of compromise substantially and unnecessarily. In addition to the security concerns, equipping nonessential employees to work from home did not make economic sense.

Moreover, it is undisputed that the team coordinator position requires regular in-person interaction with other employees, including meetings that are scheduled in real-time. This would be difficult or impossible were team coordinators not physically present in the office. Thus, allowing nonessential employees to work remotely would have created an undue hardship on Tri Star. Further, any dialogue about a possible accommodation would have been futile as there is no genuine dispute that Plaintiff would have been laid off within weeks had she not been included in the first round.

## IV. CONCLUSION

Plaintiff's claims fail as her own undisputed testimony prevents her from making the threshold showing that she is disabled within the meaning of the ADA. Even if she could, her claims still fail as the undisputed proof shows that she was laid off because of the Covid-19 pandemic and not because of any disability. For the reasons stated above, Tri Star respectfully requests that this Court enter summary judgment in its favor as to all claims against it.

25

Respectfully Submitted,

/s/ Elizabeth G. Hart
THE SWAFFORD LAW FIRM, PLLC
Tara L. Swafford BPR # 17577
Thomas Anthony Swafford, BPR # 17578
Elizabeth G. Hart, BPR # 30070
321 Billingsly Court, Suite 19
Franklin, Tennessee 37067
Telephone: (615) 599-8406
Facsimile: (615) 807-2355
tara@swaffordlawfirm.com
tony@swaffordlawfirm.com
betsy@swaffordlawfirm.com

*Attorneys for Tri Star Sports &
Entertainment Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served via the Court's Electronic Filing System on:

Daniel Eduardo Arciniegas
Arciniegas Law
1242 Old Hillsboro Road
The Atrium Building
Franklin Tennessee 37069
Daniel@attorneydaniel.com

on this 3rd day of November 2022.

/s/      Elizabeth G. Hart
Elizabeth G. Hart

26