# EXHIBIT A

# Christie Andrews v. Tri Star Sports and Entertainment Group, Inc.

## Christie Andrews
## August 23, 2022

All depositions & exhibits are available for downloading at
<www.brookscourtreporting.com>
Please call or e-mail depo@brookscourtreporting.com if you need a
**Username** and **Password.**



## Mississippi - Louisiana - Tennessee - New York
## 1-800-245-3376

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

CHRISTIE ANDREWS               )
                               )
              PLAINTIFF,       )
                               )
                               )
vs.                            ) CASE NO. 3:21-CV-00526
                               )
TRI STAR SPORTS AND            ) Judge Eli J. Richardson
ENTERTAINMENT GROUP, INC., ) Magistrate Judge
                               )     Jefferey S. Frensley
                               )
              DEFENDANT.       ) JURY DEMAND
                               )

_____

VIDEO DEPOSITION OF CHRISTIE ANDREWS

Taken at the instance of the Defendant at
Arciniegas Law, 1242 Old Hillsboro Road, Franklin,
TN, on Tuesday,
August 23, 2022,
beginning at 9:29 a.m.

----------------------------------------------------
BROOKS COURT REPORTING, INC.
Formerly Cleeton Davis
402 BNA Drive, Suite 108
Nashville, Tennessee 37217
(615) 726-2737
www.brookscourtreporting.com

```
 1   APPEARANCES:
 2
 3   For the Plaintiff:
 4
                 DANIEL E. ARCINIEGAS, ESQ.
 5               Arciniegas Law
                 1242 Old Hillsboro Road
 6               Franklin, TN 37069
                 Daniel@attorneydaniel.com
 7
 8   For the Defendant:
 9
                 ELIZABETH G. HART, ESQ.
10               TARA L. SWAFFORD, ESQ.
                 The Swafford Law Firm, PLLC
11               321 Billingsly Court, Suite 19
                 Franklin, TN 37067
12               betsy@swaffordlawfirm.com
                 tara@swaffordlawfirm.com
13
14   ALSO PRESENT:   Margaret Stephens
15
16   VIDEOGRAPHER:   Sarah Hogue
17
18
19
20
21
22
23
24
25
```

1        Q.    And what college was it?

2        A.    I was at Tallahassee Community College

3    for a while.  I was at Valencia, and then I

4    transferred to Northwest Florida State College,

5    which was where I stopped going.

6        Q.    Okay.  And where did you go to high

7    school?

8        A.    Fort Walton Beach High School.

9        Q.    When did you graduate?

10       A.    2007.

11       Q.    I assume that's in Fort Walton Beach?

12       A.    Yes, ma'am.

13       Q.    What was your -- I guess we're going to

14   kind of work backwards.  We'll talk about your Tri

15   Star employment separately.  Where did you work

16   before Tri Star?

17       A.    Before Tri Star, I worked for Wet-N-Wild

18   Watersports.

19       Q.    And what did you do there?

20       A.    I was the front desk manager.  We only

21   had one desk.  I don't know why we called it front

22   desk manager, but that was just the term we used.

23       Q.    Okay.  And what did you do there?

24       A.    I handled the reservations, I handled

25   the scheduling, I handled the maintenance for the

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 5 of 90 PageID #: 285

Christie Andrews 8/23/2022

1        A.    Yes, it's also a shoe company.
2        Q.    Okay.  And were you in retail,
3    storefront?
4        A.    Uh-huh (affirmative response); yes.
5        Q.    What did you do at Gramercy Theater?
6        A.    I was a principal dancer.
7        Q.    When was that?  Was that in high school
8    or after high school?
9        A.    That was after high school.  That was
10   fall of 2007 and 2008.
11       Q.    And what kind of shows were you in at
12   Gramercy?
13       A.    High School Musical.
14       Q.    Anything else?
15       A.    No.
16       Q.    What role did you have?
17       A.    I was a cheerleader and a principal
18   dancer.
19       Q.    Okay.  And you were the cheer coach at
20   St. Margaret Mary?
21       A.    Yes.  That was in Orlando, Florida.
22       Q.    When was that?
23       A.    That was 2010 and 2011.
24       Q.    One season?
25       A.    One school year.

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 6 of 90 PageID #: 286

Christie Andrews 8/23/2022

```
1        Q.    One school year?
2        A.    Uh-huh (affirmative response).
3        Q.    How old were the girls or boys?
4        A.    It was girls.  I had the Tinies.  They
5   were like -- like kindergarten to fifth grade or
6   fourth grade, and then my middle school girls were
7   fifth grade to eighth grade.
8        Q.    When did you live in New York?
9        A.    I lived in New York from 2000 -- the end
10  of 2008 to -- no, sorry -- the end of 2009 to
11  2010, around May of 2010.
12       Q.    Okay.  And what were you doing up there?
13       A.    I was dancing and working for Magnolia
14  Bakery.
15       Q.    Dancing where?
16       A.    Just in little one-off things for
17  different theaters and stuff like that.
18  Nothing -- nothing permanent.
19       Q.    Okay.  Were you trying to make a career
20  out of dancing?
21       A.    Yeah.  Well, after doing Gramercy and
22  college was really hard, so I thought maybe this
23  was a better avenue.  But then my aunt got sick,
24  so I moved home.
25       Q.    Okay.  Were you dancing enough in New
```

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 7 of 90 PageID #: 287

```
1    haven't talked about?
2         A.    No.
3         Q.    Do you have any certifications, any --
4    did you go to trade school, anything like that?
5         A.    No.
6         Q.    What kind of hobbies do you have?  What
7    do you do for fun?
8         A.    Well, my newest hobby is metal
9    detecting.
10        Q.    Okay.
11        A.    That was kind of like a pandemic hobby
12   that happened.  I go to gymnastics twice a week.
13   Well, I try to go twice a week.  It kind of
14   conflicts with stuff for work, so sometimes it's
15   once a week.  This summer it was hardly at all.  I
16   like caligraphy.  I like my dog.  I like to
17   watercolor.  Stuff like that.  I read a lot.
18        Q.    Where do you do gymnastics?
19        A.    Nashville Gymnastics Training Center.
20        Q.    NGTC?
21        A.    Yes.  Thank you.
22        Q.    Nashville Gymnastics Training Center.
23        A.    Yes.
24        Q.    What does that entail when you go?
25        A.    It's just -- I mean, you mean, like,
```

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 8 of 90 PageID #: 288

 1    mostly just bullet casings.  It wasn't very
 2    interesting.
 3         Q.    Have you ever found anything?
 4         A.    Yeah, I find really great stuff on the
 5    beach, like, just fun stuff that's washed up from
 6    storms or sometimes jewelry that people leave
 7    behind.  That's the good stuff.  And then mostly
 8    pop tops and pens.
 9         Q.    What kind of dog do you have?
10         A.    He's a Maltipoo.
11         Q.    Do you have any other pets?
12         A.    No.
13         Q.    Do you -- outside of gymnastics, do you
14    workout?
15         A.    I used to do like a type of CrossFit and
16    stuff, but I tore my rotator cuff a while back,
17    and I was having, like, flare-ups, so I stopped
18    doing that.
19         Q.    When did you do CrossFit?
20         A.    It was when I was at Tri Star, so I did
21    it for maybe a year when I was there in L.A., and
22    then probably, like, six or seven months here in
23    Nashville.
24         Q.    Okay.  And so 2017, '18?
25         A.    I want to say it was, like, 2019, up

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 9 of 90 PageID #: 289

1    until 2020.
2         Q.    And you stopped because you tore your
3    rotator cuff; is that what you said?
4         A.    No, I stopped going to CrossFit in
5    Nashville because of -- the pandemic shut the,
6    like, gym down, and then I just never went back
7    because then my shoulder was flaring up really
8    bad.
9         Q.    Got you.
10             Okay.   So you were going to CrossFit in
11   Nashville up until the pandemic; is that fair to
12   say?
13        A.    Yes; yes.
14        Q.    Which gym did you go to?
15        A.    Iron Tribe in the Belmont area.
16        Q.    The orange one.
17        A.    Did it have like a specific -- oh, you
18   mean like the --
19        Q.    No, just the sign outside.
20        A.    The logo, yes.   I thought you meant the
21   gyms had different names or different color names.
22        Q.    And have you worked -- outside of
23   gymnastics, have you done any regular workouts
24   since 2020?
25        A.    No.

Christie Andrews 8/23/2022

```
1      Q.   Do you run?
2      A.   No.
3      Q.   Do you still cheer competitively?
4      A.   No.
5      Q.   When did you do that?
6      A.   I cheered competitively until 2007 when
7    I tore my lower left abdominal muscle, and then I
8    took a break from any cheerleading that involved
9    tumbling, so that's how I kind of ended up in High
10   School Musical.  And then I went back to cheering
11   just for exhibition in 2014 in Los Angeles.
12     Q.   Who was that with?
13     A.   Cheer LA.
14     Q.   How long did you do that?
15     A.   I was with Cheer LA from 2014 until I
16   transferred here to Nashville.
17     Q.   2017?
18     A.   Yes.
19     Q.   Did you do any exhibition cheerleading
20   after you moved out of L.A.?
21     A.   No.
22     Q.   So if you're in High School Musical,
23   does that mean you sing also or you just dance?
24     A.   I sing, not well, so I -- I didn't have
25   any solos.  I was just part of the chorus.
```

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 11 of 90 PageID #: 291

1      Q.    Do you play any instruments?
2      A.    No.  Well, a little guitar, but I'm not
3   great.
4      Q.    A little guitar you said?
5      A.    Yeah.  Not great, though.  And that was
6   back in the day.  I don't even know if I could
7   still do it.
8      Q.    All right.  So we've talked about your
9   hobbies.  We talked about kind of working out,
10   your cheerleading history.
11         What else do you like to do for fun?  Do
12   you like to go to bars?
13      A.    I did, like, but I haven't -- ever since
14   the pandemic, like, kind of shut everything down,
15   I never really started being social or going out
16   like that again, just because most of my friends
17   got married and had babies during the pandemic.
18      Q.    Do you like to go out to eat?
19      A.    Uh-huh (affirmative response).
20            MR. ARCINIEGAS:  Is that "yes"?
21            THE WITNESS:  Yes.  Sorry.
22      Q.    (By Ms. Hart)  What about traveling?  Do
23   you like to travel?
24      A.    Yes, I do.
25      Q.    Okay.  Have you traveled anywhere good

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 12 of 90 PageID #: 292

Christie Andrews 8/23/2022

```
 1   recently?
 2        A.   Yes, I went to Spain for my friend's
 3   wedding.
 4        Q.   When was that?
 5        A.   January.
 6        Q.   January of 2022?
 7        A.   Yes.
 8        Q.   Okay.  Have you traveled anywhere else
 9   in January -- in 2022?
10        A.   Yes, we went -- right after Spain, we
11   went on a -- on a cruise.
12        Q.   Who went on a cruise?
13        A.   Me and my friends from the wedding.
14        Q.   Okay.  Same friends?
15        A.   Uh-huh (affirmative response).
16        Q.   And where was the cruise?
17        A.   We went to Nassau, Bahamas; Grand Turk;
18   and one other place, but I -- it was -- there was
19   a pool.  There was not much going on, and it was
20   raining really bad, but I -- I can't remember
21   where it was.
22        Q.   Sure.
23        A.   Sorry.
24        Q.   That's okay.  If you think of it, we'll
25   come back to it.
```

1        A.     Okay.

2        Q.     Have you traveled anywhere else in 2022?

3        A.     No.

4        Q.     And the cruise, was that also in

5    January?

6        A.     Yes.  Yes.  I believe, yes.

7        Q.     Okay.  Was it right after the Spain trip

8    or did you come home for a bit?

9        A.     I came home for a bit.  I had to work.

10   We had the playoffs, and then that kind of

11   determined if I was going to be able to attend

12   with the friends, was whether or not the Titans

13   continued to the Super Bowl, and they did not.

14       Q.     Okay.  So after the playoffs, you went

15   on the cruise?

16       A.     Yes.

17       Q.     All right.  What about 2021, did you

18   travel anywhere?

19       A.     Yes.  I believe I went to Orlando.  I

20   went to Orlando with my mother.

21       Q.     What did you do in Orlando?

22       A.     I took her -- it was her birthday

23   present.  I took her to the Animal Kingdom lodge.

24       Q.     When was that?

25       A.     December of 2021.

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 14 of 90 PageID #: 294

```
1        Q.    Anywhere else in 2021?
2        A.    I don't think so.  I don't believe so.
3        Q.    Okay.  Did you go to Alaska at some
4    point?
5        A.    Yes.
6        Q.    When was that?
7        A.    That was 2021.  Yes, 2021.  August of
8    2021.
9        Q.    August of 2021.
10       A.    It was supposed to be August of 2020,
11   and it was postponed.
12       Q.    Postponed by you or by the cruise line?
13       A.    The cruise line.
14       Q.    Was it a cruise?  I didn't ask if it was
15   a cruise.  I assumed it was an Alaskan cruise.
16       A.    It was a small boat, called "uncruise."
17       Q.    Okay.
18             MR. ARCINIEGAS:  Wait until the question
19         is finished.
20             THE WITNESS:  Oh, sorry.
21             MR. ARCINIEGAS:  You guys are doing a
22         little of it.
23       Q.    (By Ms. Hart)  Who did you go on that
24   Alaskan cruise with?
25       A.    My mother, and my aunt, and my cousin,
```

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 15 of 90 PageID #: 295

```
 1    her husband, and their three kids.
 2        Q.    Okay.  Family trip?
 3        A.    Yes.
 4        Q.    Anywhere else in 2021?
 5        A.    I don't believe so.
 6        Q.    When did you start working for Tri Star?
 7        A.    I started working for Tri Star in
 8    February of 2014, and then I started working for
 9    them full-time in August of 2014.
10        Q.    All right.  What did you do in
11    February of 2014?  What was your first position?
12        A.    I was a runner.
13        Q.    What does that mean?
14        A.    I ran errands for them around
15    Los Angeles.
16        Q.    And then in August of 2014, you got
17    bumped up to full-time, right?
18        A.    Yes.
19        Q.    Okay.  And what was your position then?
20        A.    Administrative assistant.
21        Q.    And this is all in the L.A. office,
22    correct?
23        A.    Yes, ma'am.
24        Q.    What did you do as the administrative
25    assistant?  Did you work for a certain person?
```

1       Q.    More than five?

2       A.    Yes.

3       Q.    More than 20?

4       A.    No.  Probably somewhere in between 15

5    and 20, I would think.

6       Q.    Okay.  But it varied?

7       A.    Yes.  Sometimes, yeah.

8       Q.    Do you remember when your title changed

9    to team coordinator?

10      A.    No, I can't recall when that was.

11      Q.    Okay.  Tell me about a day in the life

12   of a team coordinator.

13      A.    Okay.  So it was different every day.

14   It was -- because you were -- you were the one

15   who, like, handled the emergencies that came up,

16   too, so you never really knew what your day was

17   going to look like.  You had an idea.  But so some

18   days -- some days you were helping prepare for a

19   financial meeting or attending a financial review

20   meeting, and then other days, you were handling

21   someone moving across the country, or you were

22   handling whatever emergency came up at the time or

23   whatever, or you were just handling your daily --

24   or your, like, annual registration renewals and

25   different stuff.  It was different every day.

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 17 of 90 PageID #: 297

1        Q.    How did the clients get ahold of you to
2   tell you there's an emergency?
3        A.    So it depended on the client.  Like
4   some -- some clients would go through the business
5   manager.  For my team, that was Bryan.  And some
6   clients wanted to, like, contact you directly.
7   But sometimes it was, like, their house manager,
8   their employee that contacted you.  It just -- it
9   really depended on what was happening.
10       Q.    Okay.  If a client or a client
11  representative was trying to get ahold of you
12  directly, how did they get ahold of you?
13       A.    Probably e-mail.
14       Q.    Did they ever call?
15       A.    Not often, no.
16       Q.    Did you collaborate with co-workers?  As
17  a team coordinator, did you collaborate a lot with
18  your co-workers or were you on your own path?
19       A.    Yes.  So well, it would depend on, like,
20  what you were working on.  So, of course, when
21  we're tracking the progress of, like, the -- if we
22  were in tax season or if we were in, like,
23  shareholder payroll-type seasons, we'd be tracking
24  what the accounting team is doing.  So, of course,
25  you're collaborating because it's their project,

Christie Andrews 8/23/2022

1    and you're following it.

2           And then if it was, like, a real estate

3    purchase, of course, you're going to have to

4    collaborate because you're going through different

5    legal documents, you're going through loans and

6    payments and scheduling, and all sorts of things.

7    So, of course, you're collaborating there.

8           And there was other things that would be

9    just me.

10    Q.    Did you supervise anybody as a team

11    coordinator?

12    A.    I was the team lead for team

13    coordinators.

14    Q.    What does that mean?

15    A.    It means that I was their -- I wasn't

16    like their supervisor in the way like Bryan was

17    their business manager, was their supervisor.  But

18    I was their support system and their -- the person

19    that they called when they didn't know what to do,

20    and I helped build the policy and procedure for

21    the team coordinators, and I would handle their

22    training schedules and training them.  And then I

23    was basically there to just support them and help

24    them, because every day you would come up with

25    something that wasn't exactly, like, in the

1      A.    Yes.

2      Q.    Have you violated it?

3      A.    No.

4      Q.    Have you talked to anybody about your

5  work at Tri Star?

6      A.    People that, like, I apply for jobs

7  with, yes.

8      Q.    Okay.  And you just tell them that you

9  worked there?

10      A.    They asked, like, what my

11  responsibilities used to be and all that good

12  stuff, and, like, how I interacted with people or

13  if I had, like, super -- like, manager-type roles

14  and stuff and how I handled stuff like that.

15      Q.    Prior to March 2020, did you know of any

16  team coordinators who worked from home regularly?

17      A.    No.

18      Q.    What about in March 2020?

19      A.    No.  I think Ambra might have worked

20  from home one day, but not -- I don't know if it

21  was, like, a full work-from-home or not.  I think

22  she just was at home one day working.  I think

23  something with her kid.  I'm not sure.

24      Q.    How do you know that?

25      A.    I just remember her having to be home

1    for her kid for something.  I don't remember
2    exactly the circumstances.  Sorry.
3         Q.   That was while you were still employed
4    at Tri Star?
5         A.   Uh-huh (affirmative response); yes.
6         Q.   Are you aware of any other team
7    coordinators who worked from home during March
8    2020?
9         A.   Not that I'm aware, no.
10        Q.   Are you aware of any team coordinators
11   who worked from home after March 2020?
12        A.   I wouldn't know that.
13        Q.   All right.  I'm going to ask you the
14   same questions, but a little bit different --
15        A.   Okay.
16        Q.   -- about people that aren't team
17   coordinators.
18             So other than team coordinators, are you
19   aware of anybody that worked from home prior to
20   March 2020?
21        A.   Yes.
22        Q.   Who was that?
23        A.   Account managers and Peggy and Lou, and
24   I believe Lindsey Herman had worked from home a
25   few times, and maybe Nola had worked from home a

```
 1       Q.    In March 2020, were you the only AmEx
 2    liaison?
 3       A.    Yes.
 4       Q.    So let's just talk about 2020 --
 5       A.    Okay.
 6       Q.    -- the last couple of months of your
 7    employment.
 8             You're a team coordinator and AmEx
 9    liaison, correct?
10       A.    Yes.
11       Q.    You're the only AmEx liaison?
12       A.    Yes.
13       Q.    So how much time are you spending on
14    AmEx on average?  You can -- daily, weekly,
15    monthly.  Whatever is easy for you to quantify.
16       A.    It's so hard to, like, say just because
17    every day would be different.  I would say it was
18    anywhere from, like, 10 percent of my day to
19    60 percent of my day, depending on the day.
20       Q.    Okay.  Did your laptop have a VPN?
21       A.    Yes.
22       Q.    How do you know that?
23       A.    I was told.
24       Q.    By who?
25       A.    By Chris Jaffe, Jaffe, and probably had
```

```
 1    March 14th.
 2         Q.   Where was the funeral?
 3         A.   Prattville, Alabama.
 4         Q.   Did you get to go to that?
 5         A.   Yes.
 6         Q.   Who was the friend that passed away?
 7         A.   He's like an adopted grandpa, I'd say.
 8    I mean, I don't know how else to explain.  He was
 9    Pop-Pop.
10         Q.   Pop-Pop?
11         A.   Yeah.
12         Q.   What was his name?
13         A.   Joel Griswold.
14         Q.   Okay.  And on top of all of that, of
15    course, in March 2020, we have a pandemic
16    happening, correct?
17         A.   Yeah.
18         Q.   Would you agree with me that March 2020
19    was a time of chaos?
20         A.   There was definitely chaos in my life.
21    It seemed like it was chaos in other people's
22    lives, yes, and the world.
23         Q.   What kind of effect, at all, did that
24    have on you?  Were you having trouble sleeping?
25         A.   I'm a bad sleeper, so I -- I always have
```

Jackson
Gulfport

Brooks Court Reporting
1-800-245-3376

Meridian
New Orleans

1    else she said.  Sorry.

2         Q.   Did you talk to any other healthcare

3    providers about your concerns about COVID and

4    asthma?

5         A.   Yes, I spoke to my friend and my --

6    well, she's not my aunt, but I call her "aunt," my

7    Aunt Carla.  She's like -- she's my aunt's best

8    friend.  And I spoke to both of them.

9         Q.   Okay.  Who was your friend that you

10   spoke with?

11        A.   Emily Mara.  She's my best friend.

12        Q.   How do you spell her last name?

13        A.   M-A-R-A.

14        Q.   Is she a healthcare provider?

15        A.   Yes.

16        Q.   What does she do?

17        A.   She's a nurse.

18        Q.   What did you talk to her about?

19        A.   We talked about the pandemic in general,

20   and she told me that I just needed to be really

21   careful and, you know, try to not expose myself

22   unnecessarily and that kind of stuff.  We just --

23   I mean, we talked about it in a general sense of

24   the way and how we both were concerned for

25   different reasons.

1      A.    I think that the way I managed, like,

2    the projects I'm working on, I spend the

3    appropriate amount of time on those projects and

4    not more or less than I should be.

5      Q.    Okay.  Would you agree that you missed

6    an excessive amount of work?

7            MR. ARCINIEGAS:  Object to form.

8            Go ahead.

9            THE WITNESS:  No, I was never without my

10           allotted vacation and sick time, so no.

11     Q.    (By Ms. Hart)  Would you agree that you

12   were late to work often?

13     A.    Yes.

14     Q.    Would you agree with me that your

15   tardiness became an issue?

16           MR. ARCINIEGAS:  Object to form.

17           Go ahead.

18           THE WITNESS:  Became an issue for

19           certain people.  I don't believe it became an

20           issue for me getting my work done.

21     Q.    (By Ms. Hart)  Okay.  You said it

22   "became an issue for certain people."  What do you

23   mean by that?

24     A.    Heather Kinder.

25     Q.    Explain that to me.

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 25 of 90 PageID #: 305

1    A.    Yes, they were.

2    Q.    Did you have a flex schedule at some

3    point?

4    A.    Yes.

5    Q.    Tell me about that.

6    A.    The flex was, like, a -- like, a late

7    arrival-type thing where people could come in late

8    or they could come in early to miss traffic.

9    Q.    And were you on a flex schedule?

10   A.    Yes.

11   Q.    What was your schedule?

12   A.    It was a later -- it was a later option.

13   I don't remember what exactly it was.

14   Q.    Was that something that was offered to

15   everybody?

16   A.    Yes.

17   Q.    In L.A. or Nashville?

18   A.    I don't know about L.A.  In Nashville.

19   Q.    It was when you were in Nashville?

20   A.    Yes; yes.

21   Q.    You were still required to be physically

22   in the office, correct?

23   A.    Yes.

24   Q.    Do you agree that you were counseled

25   multiple times about your attendance?

1      A.   No, I'm saying that my -- I'm saying the
2   lack of motivation right here (indicating) was
3   Emory's fault.  I had zero motivation to be around
4   her, but that is not why I was late to work.
5      Q.   Okay.
6           MS. HART:  Do you all want to take a
7      lunch break?
8           MR. ARCINIEGAS:  Whatever you guys want
9      to do.  We're here.
10          MS. HART:  We've got a couple more hours
11     to go.
12          MR. ARCINIEGAS:  Yeah, we can take a
13     break.
14          VIDEOGRAPHER:  Time is 11:55 a.m.  We
15     are off the record.
16          (A lunch break was taken.)
17          VIDEOGRAPHER:  This is the beginning of
18     case file number 4, I apologize.  Time is
19     12:59.  We are back on record.
20     Q.   (By Ms. Hart)  Ms. Andrews, we're back
21  on the record after a lunch break.
22          I want to talk to you now -- we've talked
23  about your employment.  I want to talk to you a
24  little bit about your disability.
25          So you have sued Tri Star based on your

Christie Andrews 8/23/2022

1   disability of asthma, correct?

2        A.    Correct.

3        Q.    How long have you had asthma?

4        A.    Since I was 14 or 15.

5        Q.    When were you diagnosed?

6        A.    That age.

7        Q.    Okay.

8        A.    So the symptoms probably started before

9   that, but I wasn't diagnosed until then.

10       Q.    Who were you diagnosed by?

11       A.    By an ear, nose and throat doctor and

12  asthma specialist in Fort Walton.  I believe his

13  name was Justin Clark.

14       Q.    Did you have an asthma attack at that

15  time?

16       A.    No.  I was referred to him by a doctor

17  out of White-Wilson Medical.  I believe it was a

18  cardiologist that referred me to him.  I had

19  failed a physical and had to go for an EKG, and

20  then I had to wear a 24-hour heart monitor.  And

21  then they -- they were noticing different things

22  that, to them, didn't present as a cardio issue,

23  it presented as a breathing issue.  And then they

24  sent me to the asthma specialist.

25       Q.    What was the physical for?

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 28 of 90 PageID #: 308

1      A.    It was my school sports physical.
2      Q.    Had you noticed any symptoms of asthma
3   before?
4      A.    I thought I was just, like, a really bad
5   runner, is what I thought was happening.  I hadn't
6   experienced anything as far as, like, my normal
7   triggers that I know now to be triggers.
8             I thought that what -- like, I just
9   thought the things that I had experienced in the
10  past were, like, normal things, and I didn't know
11  they weren't normal until the doctors said that's
12  not normal.
13     Q.    Okay.  And what kinds of things do you
14  mean?
15     A.    Like some of my triggers, for instance,
16  are, like, I can't -- like, if, like, wind is
17  blowing in my face, I could, like, not be able to
18  breathe, and, like, that's apparently not a normal
19  thing.  And, like, being in the cold, like, makes
20  everything kind of constrict and be a problem.
21             So I just -- again, I just thought this
22  was, like, what everyone experienced.  I didn't
23  know it was anything to be alarmed about, but --
24  and I had never had a serious attack except for,
25  like, while running.  And that was always -- I

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 29 of 90  PageID #: 309

Christie Andrews 8/23/2022

1    times.  I -- I think it was common knowledge
2    that -- that I have asthma.  I feel like it was --
3    it wasn't something I hid.  It was something that
4    people knew about me.
5         Q.   Do you ever remember specifically
6    telling Lou Taylor that you have asthma?
7         A.   I can't recall.
8         Q.   Did you ever tell Peggy Stephens that
9    you have asthma?
10        A.   I don't remember a specific time that I
11   told Peggy, but I know that Peggy and I tended to
12   talk about, like, different things a lot of times,
13   because we were both going through, like, a health
14   thing at the same time.  So when I would come in,
15   we would talk about things.  So I might have
16   talked about it there, but I can't be sure.
17        Q.   Okay.  What "health thing" were you
18   going through?
19        A.   I was having chronic migraines at the
20   time.
21        Q.   When was that?
22        A.   It was most of 2018, I think, or...
23        Q.   In Nashville?
24        A.   Yes.  Uh-huh (affirmative response).
25        Q.   Are those better now?

1        Q.    A conversation with who?

2        A.    Steve Crowe.

3        Q.    Okay.  Tell me about that conversation.

4        A.    I don't remember it specifically, but I

5    remember I was upset with him because he kept

6    telling me it wasn't cold, and I kept telling him

7    it absolutely is cold; you just moved from Moscow,

8    so you wouldn't know.  But -- and that the cold

9    tended to make me cough and have, like, asthma

10   symptoms.

11       Q.    What type of symptoms?

12       A.    Well, in the cold -- well, so, for the

13   most part, like the beginning of my asthma will

14   manifest as a cough, and then it will progress

15   from there.

16            So in the cold, I tend to start, like,

17   coughing, and then that coughing will lead to,

18   like, the tightness in the chest type symptom.

19       Q.    When you feel a cough coming on or when

20   you start to cough, what do you do?

21       A.    I usually will try to -- if it's -- if I

22   think that it's going to progress to something

23   worse, I take all, like, my normal steps that I

24   know to do, like, controlling the way I breathe

25   and monitoring myself and doing self-checks and

1   deciding where I'm at as far as symptom severity,

2   because I know when I get to, like, a certain

3   point, if I don't use my rescue inhaler, then I'm

4   in trouble.

5        Q.   Okay.  If you use your rescue inhaler

6   when you feel the symptoms coming on, does that

7   get everything back under control?

8        A.   So the rescue inhaler, it just opens the

9   bronchial tubes.  It doesn't, like, relieve the

10  other symptoms as far as, like, the coughing and

11  stuff.  It just opens the bronchial tubes so you

12  can get air.

13            But the other part of that is that you

14  have this overproduction of mucus, and so you

15  continue to cough, because you have to work that

16  mucus out.  So the coughs will last for a few days

17  after the event.

18       Q.   Okay.  Are you able to function with a

19  cough?

20       A.   Uh-huh (affirmative response); yes.

21       Q.   Okay.  And you mentioned triggers

22  earlier, and you talked about wind in your face

23  and it being cold.  What are the other triggers

24  for your asthma?

25       A.   So, like, synthetic fog is one of -- is,

```
1                    I am -- like, I tend to only use the
2     word "attack" when I end up, like, the hospital or
3     having, like, a really bad reaction to it
4     afterwards.  But technically, if we're talking
5     about attacks, anytime that I have to use that
6     rescue inhaler is an attack.
7          Q.   So how often in a week do you use your
8     rescue inhaler?
9          A.   It would depend on what I'm doing, and
10    it would depend on the season and if there's any
11    triggers around.  So, like, in the wintertime, I
12    tend not to use it more than I do in, like, the
13    summer or fall.  But pretty much anytime I am
14    going to exercise, I'm going to do a proactive use
15    of the rescue inhaler, and then if I have
16    additional complications while exercising, I would
17    use it again.
18                   So it could be, you know, once a week or
19    twice a week, or it could be four times a week.
20    It just -- it depends.
21         Q.   Okay.  And have you ever been
22    hospitalized for an asthma attack?
23         A.   Not overnight.
24         Q.   Not overnight.  Okay.
25                   Have you ever been -- gone to the
```

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 33 of 90 PageID #: 313

1    hospital --
2       A.   Yes.
3       Q.   -- for an asthma attack?
4       A.   Yeah.
5       Q.   When?
6       A.   Well, the last one -- well, I was in the
7    hospital in 2016 for -- when I worked at Tri Star
8    for, like, the carbon monoxide went off in my
9    house -- the carbon monoxide alarm went off in my
10   house because I had a carbon monoxide, like, leak.
11   And so I had to go to the hospital, and they
12   weren't sure if my -- the attack that I was having
13   was because of the exposure to the carbon monoxide
14   or from, like, stress, but I was having an episode
15   then.
16            And then before that would have been the
17   2010 incident where I had to use the albuterol in
18   New York.
19       Q.   Okay.  Tell me about that one.
20       A.   I had -- I was living in New York.  It
21   was really cold.  It was during, like, H1N1 or
22   something like that, but I had caught some sort
23   of, like, either the flu or a cold or something,
24   and I -- I had been sick.  I had been coughing,
25   but I, like, I know where I'm at.

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 34 of 90 PageID #: 314

1              And then at some point in that illness,

2    it just got so bad that I couldn't breathe, and

3    the rescue inhaler wasn't doing anything, so I had

4    to go to the emergency room, and that's why I had

5    to use the albuterol because the -- the breathing

6    treatments, the nebulizers that they use, they

7    always use albuterol there, and so I just had to

8    deal with the vomiting.  I knew what was coming.

9         Q.   You knew you were allergic to albuterol

10   in 2010?

11        A.   Yeah.  But when you're -- you know, when

12   your Xopenex isn't working and you can't breathe

13   and you're desperate, that's what you have to do.

14        Q.   When did you first get a rescue inhaler?

15        A.   When I was diagnosed.

16        Q.   Okay.  What other medications do you

17   take for your asthma?

18        A.   Currently, I take Singulair, I take

19   Flonase, and I take Zyrtec.  So to manage the

20   allergies means that I can manage the asthma

21   better.

22        Q.   Okay.  So Zyrtec is for your allergies,

23   correct?

24        A.   Uh-huh (affirmative response).

25        Q.   What about Flonase?

1        A.    Like, I would have shortness of breath
2    if I was up and moving around.
3        Q.    How often does that happen?
4        A.    Well, I guess it would -- it depends on,
5    like -- it happens a lot more often, like, in the
6    winter.  I tend to get sick and get bronchitis
7    more often in the colder months, so -- but in the
8    summertime, I tend to bounce back faster.
9        Q.    Are there any other ways that you --
10   that asthma is debilitating to you, or have we
11   talked about everything?
12             MR. ARCINIEGAS:  Object to form.
13             THE WITNESS:  I mean, I feel like there
14        are a lot of things that I would -- that I
15        would like to do that I choose not to do
16        because I know it would be a problem.
17       Q.    (By Ms. Hart)  Okay.
18       A.    And I don't know, I feel like that every
19   time that I do catch, like, a cold or something
20   simple, it always turns into something worse.  So
21   that's a problem as well.  So it's -- I don't
22   know.  I mean, it's -- there are things I can't do
23   because of it, and there are ways that it makes
24   life harder.
25       Q.    Okay.  You said there's things you would

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 36 of 90 PageID #: 316

1    do but you don't, correct?

2          A.    Correct.

3          Q.    Okay.  Like what?

4          A.    Like, for instance, if we're going back

5    to, like, the trip to Alaska, everyone was doing a

6    polar plunge, and I knew I couldn't do that.  And

7    everyone was doing this really amazing hike up to

8    a ridge, and I knew that wasn't something that I

9    was going to be able to do, so I went on, like, a

10   walkabout with the senior citizens group, and I

11   was the only one there who was, like, moving

12   around, because I had to go with the seniors

13   because I knew I couldn't go on this ridge walk.

14         Q.    Okay.  What else would you do but you

15   don't because of your asthma?

16         A.    I mean, I definitely don't do, like,

17   cardio-intensive things because I know those are

18   problems for me.  And I -- sorry.  Like, I would

19   like a German Shepherd, but I know I can't have a

20   German Shepherd because dog hair is a problem for

21   me.  And, like, different things like that.  I

22   only clean with, like, wipe-type things instead of

23   sprays.  Just different things like this.

24         Q.    Is the dog that's in the room right now

25   that sheds bothering you?

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 37 of 90 PageID #: 317

Christie Andrews 8/23/2022

1      A.    If he was -- if she was up in my face,
2    it would be, yeah.
3      Q.    Okay.
4      A.    Or if I was living, like, in her dander.
5    Like, if she was on the couch and then I was on
6    the couch, yeah, it would be a problem.
7      Q.    But right now, she's probably, what do
8    you say, probably 10, 15 feet away in the crate
9    not bothering you?
10     A.    Yeah.  And it's more like the ones that
11   have, like, the down -- the down-type coats that
12   are the problem, too; for instance, like a German
13   Shepherd.
14     Q.    Are there other things you would do but
15   you don't do because of your asthma?
16     A.    I'm sure there are, but I can't think of
17   them right now.
18     Q.    Okay.
19     A.    Sorry.
20     Q.    All right.  And you also said, "There
21   are things I can't do because of my asthma."
22          What can you not do because of your
23   asthma?
24     A.    I can't be in cold weather for, like,
25   long periods of time.  That's a problem.

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 38 of 90 PageID #: 318

Christie Andrews 8/23/2022

1    episode; is that fair?
2        A.    Yes.
3        Q.    So an episode where you maybe have to
4    use your inhaler?
5        A.    Yes.
6        Q.    Did you ever have an asthma attack like
7    that at Tri Star, at the office?
8        A.    Yes.  On March 16th of 2020, I had an
9    episode where I had to use my rescue inhaler.
10       Q.    Tell me about that.  And we'll get into
11   March 2020, but do tell me about that.
12       A.    It was just an instance of someone was
13   using, like, the Lysol spray, and it was -- it was
14   kind of just hanging in the air for a bit, and it
15   caught me in, like, a way that triggered, and so I
16   started coughing, and I was trying to do all the
17   things I normally do to keep myself under control
18   and to regulate the breathing and whatnot, and it
19   wasn't quite working.  So I -- when I felt, like,
20   the tightness in my chest had reached a certain
21   point, I went to the restroom, and I used my
22   inhaler.
23       Q.    And did that help?
24       A.    It helped with the breathing, itself,
25   but the cough is -- is still going to remain.

1        Q.    Did you see someone spraying Lysol?

2        A.    Yeah.  We had it, like, kind of all over

3    the office that day, because people were cleaning

4    their areas.  They had requested we clean our

5    areas.  And I believe the one -- the moment that

6    kind of set me off was when one of my, like,

7    deskmates, had -- was using the Lysol.  And I

8    think it just kind of sprayed in my direction.  It

9    just was that -- the liquid, like, moisture that

10   hangs when you're using the aerosol, like, it

11   came, and that kind of triggered everything.  That

12   was the start of it.

13       Q.    Who was your deskmate?

14       A.    I can't remember if it was Amanda or

15   Miles that was using the spray at the time.  They

16   sat right next to each other.

17       Q.    Okay.  And you said, "They requested we

18   clean our areas."

19       A.    Uh-huh (affirmative response).

20       Q.    Who's "they"?

21       A.    It was like a staff-wide -- I think it

22   was in a staff-wide e-mail, maybe, or something --

23   I believe it came from Heather, but I can't be

24   sure.  It could have come from someone else.

25   Yolanda maybe.  I can't remember.

```
1       A.    Yes.
2       Q.    -- that day?
3       A.    Uh-huh (affirmative response).
4       Q.    What did you use to clean?
5       A.    I believe I used, like, a Clorox wipe or
6   some sort of wipe.  That's typically what I would
7   gravitate towards.
8       Q.    And the wipes don't bother your asthma?
9       A.    No.  I mean, sometimes if I was to,
10  like, do it in a closed environment, that would be
11  a problem.  But, like, in a -- like, if I were to
12  use it in my car, yeah, because that's, like, a
13  really tight space.  But if it's just here
14  (indicating), like, this wouldn't be so much of a
15  problem unless I put the thing, like, up to my
16  face and smelled it type.
17      Q.    Did anyone see you coughing and using --
18  having to use your inhaler that day?
19      A.    Bryan kept bringing up the cough,
20  because he kept saying, "Are you sure you don't
21  have COVID?"  And I kept saying, "No, I don't have
22  COVID."
23            They wouldn't have seen me using my
24  inhaler.  I tended to do that in the bathroom,
25  because I have to, like, rinse my mouth out
```

```
1    afterwards and spit into the sink, and I don't
2    want to do that in public.
3            If I, like, don't have anywhere to spit
4    or I, you know -- then someone would see me do it.
5    Someone would see me use my inhaler, but I
6    typically would go into the bathroom.
7        Q.   Are you required to spit?  Forgive my
8    ignorance.
9        A.   No, you're not required to spit.  It's
10   just that it -- like, if you -- it's so
11   concentrated, because it's, like, this puff that
12   goes down, so there's a lot that, like, gets left
13   behind in your mouth, and if you swallow that, it
14   just makes you, like, very -- your heart race and
15   you get very jittery.  So you try to avoid it.
16       Q.   Okay.  Is that something that is just
17   personal to you, or did your practitioner tell you
18   that?
19       A.   My doctor when I was, like, around the
20   time of when I was diagnosed taught me how to do
21   that.
22       Q.   Okay.  So Bryan witnessed the cough that
23   day, fair?
24       A.   Uh-huh (affirmative response); yes.
25       Q.   What about anybody else?  Anybody else
```

1   see you coughing?
2        A.    My deskmates would have seen me
3   coughing.
4        Q.    And that's Miles and Amanda?
5        A.    And Kristen Mir, yes.    Amanda Portillo.
6   Miles -- I can't remember Miles' last name, sorry.
7        Q.    That's okay.
8        A.    And Kristen Mir.
9        Q.    Okay.    Did you tell anybody you were
10  going to use the inhaler before you did it?
11       A.    I don't recall.    Sorry, I don't know.
12       Q.    Okay.    And what about after you used the
13  inhaler?    Did you talk to anybody about using the
14  inhaler after you did it?
15       A.    I don't remember.
16       Q.    Okay.    Sort of the same question, but
17  did you talk to anybody about having breathing
18  problems on March 16th?
19       A.    Yes; yes.
20       Q.    Who did you talk to?
21       A.    Well, I talked to Bryan about it because
22  he kept saying it was COVID, and I kept saying,
23  "No, it's just asthma," because of the Lysol,
24  like, it's just a cough from asthma.
25       Q.    After you used the inhaler, then did you

Case 3:21-cv-00526   Document 40-1   Filed 11/03/22   Page 43 of 90   PageID #: 323

Christie Andrews 8/23/2022

```
1    continue working that day?
2         A.    Yes.
3         Q.    And were you able to work a full day?
4         A.    Yes.
5         Q.    Did people stop spraying Lysol?
6         A.    No, I don't think so.
7         Q.    Okay.  So there was more Lysol being
8    sprayed after that?
9         A.    I mean, I can't be sure, but I don't
10   think anyone -- I didn't ask anyone to stop.
11        Q.    Other than the time we just talked about
12   in March 2020, had you ever used your inhaler at
13   Tri Star's offices?
14        A.    I can't remember a specific time, but
15   I'm sure that over the, you know, six years that I
16   was there, I had to use it, you know, probably
17   more than once.
18        Q.    But you can't remember any specific time
19   sitting here today?
20        A.    No; no.
21        Q.    Have you ever talked to any Tri Star
22   employee about your asthma aside from this
23   March 2020 date we just talked about?
24              Have we talked about all those times?
25              MR. ARCINIEGAS:  I'm sorry, can you
```

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 44 of 90 PageID #: 324

1    getting a COVID booster?

2         A.    I can't remember if I -- I can't recall

3    if I did or not.

4         Q.    Okay.   So in March 2020, you requested

5    to work from home, correct?

6         A.    Correct.

7         Q.    What was the reason you wanted to work

8    from home?

9         A.    I wanted to limit my exposure to COVID

10   due to my asthma and the belief at the time that

11   asthma was causing you to have severe symptoms and

12   to be hospitalized.

13        Q.    When you say your "belief at that time,"

14   has your belief changed?

15        A.    Yes.

16        Q.    Okay.   Tell me about that.

17        A.    Well, sometime in the summer months of

18   2020, they started saying that they didn't believe

19   that asthma was a -- was as big of a risk factor

20   as they originally thought.

21        Q.    Who is "they"?

22        A.    The media outlets that were talking

23   about it.

24        Q.    And you said that's the summer of 2020?

25        A.    I believe that's right, yeah.

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 45 of 90 PageID #: 325

Christie Andrews 8/23/2022

| | |
|---|---|
| 1 | Q. And I think you said earlier -- correct |
| 2 | me if I'm wrong -- but I think you said earlier |
| 3 | that you thought your asthma was a big risk for |
| 4 | COVID based on information you heard from the CDC |
| 5 | and the media; is that correct? |
| 6 | A. Uh-huh (affirmative response). |
| 7 | Q. You -- |
| 8 | A. Yes. Sorry. |
| 9 | Q. Were you getting on the CDC's website? |
| 10 | How were you getting this information? |
| 11 | A. I was mostly watching, like, the news in |
| 12 | the morning, and I tend to watch Good Morning |
| 13 | America, so there was that doctor with the blond |
| 14 | hair that's always on Good Morning America |
| 15 | talking. She was kind of giving people the CDC |
| 16 | update. |
| 17 | Q. Okay. So Good Morning America was kind |
| 18 | of your main source of information; is that fair |
| 19 | to say? |
| 20 | A. Yeah, in the mornings, yes. Or News |
| 21 | Channel 5, the local one. I like them. |
| 22 | Q. How long did you want to work from home? |
| 23 | A. Could you rephrase? |
| 24 | Q. Sure. |
| 25 | So you requested to work from home -- |

Christie Andrews 8/23/2022

1      **A.     Yes.**

2          **Q.     -- in March 2020.**

3          **A.     Uh-huh (affirmative response).**

4          **Q.     How long did you want Tri Star to let**

5   **you work from home?**

6          **A.     Oh.   I don't think I had a specific idea**

7   **in mind, because I just -- I had never been in a**

8   **pandemic before.   I didn't understand how long it**

9   **was going to last or anything like that.   So**

10  **just -- I think my thought process was, like, for**

11  **as long as it took to be safe.**

12         **Q.     Okay.   I'm going to show you what's**

13  **going to be marked as Exhibit 12.**

14             **(Exhibit 12 marked for identification.)**

15             **THE WITNESS:   Thank you.**

16         **Q.     (By Ms. Hart)   I just handed you**

17  **Exhibit 12, which is a Tri Star confidential**

18  **document 21.**

19             **MS. HART:   And just note on the record**

20        **that this is a confidential document, so**

21        **we'll need to designate this portion of the**

22        **deposition as confidential as well.**

23         **A.     Okay.**

24         **Q.     (By Ms. Hart)   This is Tri Star's**

25  **Disability Accommodation policy.**

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 47 of 90 PageID #: 327

1   March 16th, 2020.

2           And then you, essentially, forward this

3   e-mail to Bryan Luecke and Yolanda, correct?

4       A.   Yes.

5       Q.   On March 16 at 4:27 p.m.

6       A.   Uh-huh (affirmative response).

7       Q.   Do you --

8           MR. ARCINIEGAS:  I'm sorry, can you all

9       orient me?  Where are we, what page?

10           MS. HART:  142.

11           MR. ARCINIEGAS:  Sorry.  Thank you.

12           MS. HART:  Very bottom.

13       Q.   (By Ms. Hart)  And you say, "Since I

14   already have a company laptop and a doctor who's

15   pissed at me and called me irresponsible for not

16   staying home, may I please be approved to work

17   from home?"

18           Do you remember writing that?

19       A.   I don't remember the, like -- I don't

20   recall writing it, but I know that I did write it.

21       Q.   Okay.  This is your e-mail?

22       A.   Yes; yes.

23       Q.   Okay.  What doctor are you talking

24   about?

25       A.   My best friend, Emily.

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 48 of 90  PageID #: 328

| 1 | Q. | Okay. Is Emily a doctor? |

1      Q.    Okay.  Is Emily a doctor?

2      A.    Well, she's a nurse.  Sorry.

3      Q.    Okay.  But that's who you're talking

4    about?

5      A.    Yes; yes.

6      Q.    Does Emily actually treat you?

7      A.    No.

8      Q.    She doesn't provide medical treatment to

9    you?

10     A.    No.

11     Q.    Okay.

12     A.    And I believe this e-mail was a

13   follow-up to my, like, first requesting

14   everything.

15     Q.    To a verbal request or is there another

16   written request that you know of?

17     A.    I thought there was a written request,

18   but I can't, like, be sure.  But it definitely

19   would have been following -- I mean, we definitely

20   had talked about it verbally before her big e-mail

21   had come out.

22     Q.    So you're saying you talked about it

23   verbally with Bryan and Yolanda?

24     A.    Uh-huh (affirmative response).

25     Q.    Before 3:36 p.m. when Yolanda sent this

Christie Andrews 8/23/2022

```
1              Correct?
2         A.   Yes.
3         Q.   Okay.  So did you come in to work on
4    March 17th?
5         A.   I did not.
6         Q.   How did he tell you to take a sick day?
7         A.   I called him.
8         Q.   Okay.  And what did you tell him?
9         A.   So I had had, like, worsening asthma
10   symptoms overnight, and my cough was getting a lot
11   worse, it wasn't getting, like, better, and he had
12   said before we left that -- or before he left the
13   night before, when he left the office, he said
14   just -- if it gets worse, like, you know, call me
15   and don't come in, because he was still -- he
16   still believed that it was COVID and not asthma.
17        Q.   Okay.  So you called him March 17th?
18        A.   (Witness nods head affirmatively.)
19        Q.   What time, do you remember?
20        A.   I don't know the exact time now.
21        Q.   Okay.  What did you say to him?
22        A.   I told him that -- that I had had
23   problems overnight and that my cough was
24   considerably worse.
25        Q.   And what did he say?
```

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 50 of 90 PageID #: 330

1       A.    He said to be safe, that I needed to
2   stay home.
3       Q.    Okay.
4       A.    And not expose other people if I had it.
5       Q.    Was it a long conversation?
6       A.    No, it would have been a few minutes.  I
7   can't tell you the exact time frame.
8             MS. HART:  We're going to mark this
9        Exhibit 15.
10            (Exhibit 15 marked for identification.)
11            THE WITNESS:  Can we maybe take a break
12       in, like, 15 minutes or so?
13            MS. HART:  Sure.
14       Q.   (By Ms. Hart)  We've marked as
15   Exhibit 15, another e-mail chain that starts with
16   TRISTAR 94.
17            MS. HART:  And this is no longer
18       confidential, although we, obviously, reserve
19       the right to go back and look at the
20       transcript.
21            MR. ARCINIEGAS:  Sure.
22       Q.   (By Ms. Hart)  All right.  And if you
23   flip -- and I'll give you time to look at this
24   one, too, if you want to, but we're going to start
25   at the back of the chain on page 4, which is

1    thought was going to happen was, like, we would be
2    in these shelter in places because that's what I
3    was, like, reading about on the news that day, and
4    so I was afraid that I was going to -- that we
5    were all going to be sheltering in place.
6              So I was, like, I need to prepare now, I
7    need to take home my equipment now and stuff, and
8    so -- but then she said to come, so I was, like,
9    then we're not sheltering in place tomorrow.  So
10   after she said not to take home anything, I just
11   finished my day as normal and went home.
12        Q.   And at some point, did she ask for
13   medical documentation?
14        A.   Yes.
15        Q.   When was that?
16        A.   I believe it was whenever we had first
17   talked about it before these, like, follow-up
18   e-mails, that she would -- said I needed to, like,
19   produce a doctor's note or whatever.
20        Q.   Verbally?
21        A.   I think -- I believe so.  I'm not
22   positive.
23        Q.   Okay.  At some point, you do produce a
24   note from Autumn Nelson, correct?
25        A.   Yes.

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 52 of 90 PageID #: 332

Christie Andrews 8/23/2022

1      Q.    Okay.
2             MS. HART:  And we'll make that
3        Exhibit 16.
4             (Exhibit 16 marked for identification.)
5             MS. HART:  I wrote on it.  I don't have
6        a copy of this one, I'm sorry.
7             MR. ARCINIEGAS:  That's fine.  Just the
8        Bates number, please.
9             MS. HART:  Plaintiff's production 16,
10       actually.
11            MR. ARCINIEGAS:  Nice.
12       Q.    (By Ms. Hart)  I've just handed you what
13    we've marked as Exhibit 16, Plaintiff's
14    production 16.  And this is a note from Tri Star
15    Medical Group.
16            Do you recognize this?
17       A.    Yes.
18       Q.    Okay.  What is this?
19       A.    This is the doctor's note that I
20    provided to Yolanda.
21       Q.    How did you get it to Yolanda?
22       A.    I sent it to her via e-mail.
23            "Per our previous phone call, please
24    find attached..."
25       Q.    Okay.  So this note is dated March 17,

1   2020.

2       A.   Yes.

3       Q.   From Autumn Nelson, and it says,

4   "Christie Andrews has been a patient at our office

5   for several years.  She has known asthma.

6   Although well controlled, she would benefit from

7   working at home due to the rising risk of

8   COVID-19."

9            You agree it says that?

10      A.   Yes.

11      Q.   Do you agree with Ms. Nelson that your

12  asthma was well controlled?

13      A.   Yes, because of my medication, it is

14  well controlled.

15      Q.   Okay.

16      A.   That's what -- in "asthma speak" what

17  "well controlled" means is that I do what I'm

18  supposed to do, and "not controlled" would be that

19  I don't take my medicine and I don't do all the

20  necessary precautions.

21      Q.   Is this the only note from a medical

22  provider that you provided to Tri Star for your

23  asthma and work-from-home request?

24           MR. ARCINIEGAS:  Object to form.

25           MS. HART:  That's a bad question.

```
 1              MR. ARCINIEGAS:  A little vague, but go
 2         ahead.
 3         Q.   (By Ms. Hart)  Did you provide any other
 4    documentation to Tri Star to support your
 5    work-from-home request?
 6         A.   I don't recall.  I think -- I believe it
 7    was just this.
 8         Q.   Okay.  Do you recall that you had been
 9    out of work on Thursday, March 12th, and Friday,
10    March 13th?
11         A.   I recall going to the funeral that
12    weekend, but I thought that I had taken a day off
13    or a half day or left after work to go to Alabama.
14         Q.   Okay.  March 16, 2020, was your last day
15    in the office, correct?
16         A.   Correct.
17         Q.   And then you were laid off on
18    March 20th, 2020, correct?
19         A.   Yes.
20         Q.   Who told you that you were being laid
21    off?
22         A.   Yolanda Simpson.
23         Q.   How did she tell you?
24         A.   Over the phone.
25         Q.   Was anyone else on the phone?
```

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 55 of 90  PageID #: 335

```
1       A.    Bryan.

2       Q.    What did Yolanda say?

3       A.    She said I was being let go due to lack

4   of work.

5       Q.    What else did she say?

6       A.    I don't remember.  I -- I had a coughing

7   fit during it, because the, like -- I was just in

8   shock and stressed, and so I was coughing a lot,

9   so I don't remember everything that was said.  But

10  there wasn't much.  It was a quick phone call.

11      Q.    What did Bryan say on the phone call?

12      A.    Nothing.  He just said that he was --

13  she said, "This is Yolanda with Bryan," and he

14  said, "Hello."  So I knew he was there and in the

15  room.

16      Q.    So what did you say?

17      A.    I said -- I said, "Yolanda, I know you

18  haven't been here very long, and you might not

19  know this, but there's no way that I have a lack

20  of work.  I have plenty of work to do," and that I

21  couldn't believe after giving Tri Star, like, six

22  years of my life, that they would do this to me.

23      Q.    What else did you say?

24      A.    That's what I remember saying.  I

25  don't -- I'm sure there was other things, but I
```

1           Sitting here today, do you believe you

2    were the only person laid off from Tri Star in

3    March 2020?

4         A.    In March of 2020, no.  On March 20th,

5    yes.

6         Q.    Okay.  Explain that to me.

7         A.    I believed I was the only person laid

8    off on March 20th.

9         Q.    Okay.  But sitting here today, do you

10   believe you were the only person laid off in March

11   of 2020?

12        A.    No, I believe others could have been

13   laid off in March of 2020.  I don't know them.  I

14   don't know who they are.

15        Q.    Had you heard that there would be

16   layoffs prior to this conversation with Bryan and

17   Yolanda?

18        A.    No.

19        Q.    Would you agree with me that live events

20   are a big part of Tri Star's revenue?

21             MR. ARCINIEGAS:  Object to form, lack of

22        foundation.

23             THE WITNESS:  I -- sorry.  Could you

24        repeat the question?

25        Q.    (By Ms. Hart)  Would you agree with me

1    that live events are a big part of Tri Star's
2    revenue?
3           MR. ARCINIEGAS:  Object to form, lack of
4      foundation.
5           You can answer.
6           THE WITNESS:  I think they are a part of
7      their revenue but not all of their revenue or
8      a majority of their revenue.  I couldn't tell
9      you because I don't do corporate.
10    Q.    (By Ms. Hart)  Would you agree with me
11    that lots of live events were canceled in
12    March 2020?
13           MR. ARCINIEGAS:  Object to form, calls
14      for speculation, lack of foundation.
15           THE WITNESS:  At the time of me getting
16      fired, I did not know if that was true or
17      not.
18    Q.    (By Ms. Hart)  Right now, sitting here
19    today, would you agree with me --
20    A.    Yes.
21    Q.    Let me finish my question.
22    A.    I'm sorry.
23    Q.    -- lots of live events were canceled in
24    March 2020?
25           MR. ARCINIEGAS:  Same objection.

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 58 of 90 PageID #: 338

1          THE WITNESS:  Either March or April.  I

2     can definitely say yes to April.  I can't

3     recall, like, March, because I was sick for a

4     lot of March.  Or I should say post

5     March 20th.

6          Q.   (By Ms. Hart)  And you may have already

7     answered this, but do you have any knowledge of

8     whether Tri Star lost revenue in March and April

9     of 2020?

10         A.   I do not.

11         Q.   Do you believe you were replaced?

12         A.   Yes.

13         Q.   By who?

14         A.   I don't know the person's name, but I

15     believe they hired someone about a month or so, or

16     maybe more, after -- it takes a while -- the

17     hiring process at Tri Star takes a while, so it

18     could have been more than a month or so, but I

19     believe that they hired someone to replace me,

20     yes.

21         Q.   What is that belief based on?

22         A.   I guess I was told, and because I saw

23     the posting.  I think I was told.

24         Q.   Told by who?

25         A.   I don't remember.  Someone who was still

1      A.    Yes.

2      Q.    Okay.

3            MS. HART:  Let's just include this

4      (indicating) as part of Exhibit 24, so make

5      it a collective.  It's on the same date.

6            THE WITNESS:  Oh, okay.  Sorry.

7      Q.    (By Ms. Hart)  So this is the same date,

8      June 13, 2016.  Is this your handwriting?

9      A.    Yes, this looks like a medical history.

10     Q.    Okay.  And if you flip to the second

11     page of this document, which is Tri Star Third

12     Party 128, and you go down to 10b, "Exercise."

13     A.    Uh-huh (affirmative response).

14     Q.    And you write you do strength and cardio

15     two to three days a week for 100 to 200 minutes,

16     heavy exertion.

17            Do you agree with that?

18     A.    Yes, this is probably CrossFit.

19     Q.    Okay.

20            MS. HART:  Number 25.

21            (Exhibit 25 marked for identification.)

22            THE WITNESS:  Thank you.

23     Q.    (By Ms. Hart)  Exhibit 25 is Tri Star

24     Third Party 136, August 23rd, 2016, another one of

25     Dr. Stein's records.  And the bottom half says,

1      Q.    So November 2016, your asthma is doing
2   well?
3      A.    Yes.
4            MS. HART:   Number 27.
5            (Exhibit 27 marked for identification.)
6            THE WITNESS:   Thank you.
7      Q.    (By Ms. Hart)   Number 27, Tri Star Third
8   Party 154, December 15, 2016.   The second part of
9   Dr. Stein's record here says, "Asthma, controlled
10  well."   Not sure what it says right under
11  "Asthma."   And then it looks to me like it says,
12  "Feels good."
13           Do you agree with that?
14           MR. ARCINIEGAS:   Object to the form,
15      calls for speculation on this one.
16           THE WITNESS:   Yeah, I couldn't tell you
17      what that is.
18      Q.   (By Ms. Hart)   Okay.
19      A.   Because to me one of these looks like
20  QVAR, so that's in reference to my daily
21  medication.   Instead of saying "doing well," it
22  looks like QVAR.   So maybe -- maybe we had changed
23  something in the QVAR.   I don't know.
24      Q.   Okay.
25      A.   So I'm not sure what it says.

1          Q.    It does show a box "Well controlled"
2     next to "Asthma."
3                Do you see that?
4          A.    Yes.  My asthma is well controlled.
5          Q.    Is well controlled.  Okay.
6                MR. ARCINIEGAS:  Do you mind if we take
7          a break?
8                MS. HART:  Sure.
9                VIDEOGRAPHER:  Time is 2:58.  We are off
10         the record.
11                (A short break was taken.)
12                VIDEOGRAPHER:  This is the beginning of
13         case file number 6.  Time is 3:16.  We are
14         back on record.
15         Q.    (By Ms. Hart)  All right.  Ms. Andrews,
16    we're almost done going through these medical
17    records.  I know it's tedious.
18                Has there been a time since you moved to
19    Nashville that you would describe your asthma as not
20    well controlled?
21         A.    Not -- not so much as not well
22    controlled.  I just felt like it was not doing --
23    I didn't feel like the medication that I was on
24    was working the way I needed it to anymore, and
25    that's when we made the switch to the Singulair.

```
1        Q.    When was that?
2        A.    I believe that was toward the beginning
3   of 2020.
4        Q.    And when you started taking Singulair,
5   would you say your asthma was under control?
6        A.    Yeah, I saw a lot of improvement from
7   the QVAR to the Singulair.  Yeah.
8             MS. HART:  We're going to mark this
9        Exhibit 28.
10            (Exhibit 28 marked for identification.)
11            THE WITNESS:  Thank you.
12       Q.    (By Ms. Hart)  We've marked as
13  Exhibit 28, a medical document that you produced,
14  Plaintiff's PHI71.
15       A.    Okay.
16       Q.    All right.  And if you turn to the last
17  page, which is 74 in the Bates number, it looks
18  like at the top of the page on March 15th, 2020,
19  at 2:19 p.m., you -- do you leave a message or did
20  you send a typed message to Autumn Nelson?
21       A.    This would be a typed message.
22       Q.    So describe this to me.  What is this?
23       A.    This was me reaching out to her
24  regarding the -- using the medication, because I
25  had been hearing that the steroids were causing
```

1    people to have worse cases of COVID if they caught

2    it, so I was -- or making them more susceptible to

3    catching it, one of those.  And I was just asking

4    her if she thought I should continue taking my

5    meds as normal.  I just -- I just wanted to know

6    what I should be doing to protect myself.

7        Q.   Okay.  So your message is -- we won't

8    read the whole thing, but at the end of the first

9    line, "Are there any precautions you want me to be

10    taking in regards to my asthma and COVID-19

11    besides the normal wash your hands and clean your

12    heavy touch surfaces?"

13        Correct?

14    A.   Correct.

15    Q.   So this is March 15, 2020.

16        And then the next message is Autumn's

17    response to you, correct?

18    A.   Yes.

19    Q.   And it's March 16th, 2020, 6:40.  I

20    think that's 6:40 a.m.

21    A.   Yes.

22    Q.   And she says, "The best thing you can do

23    is wash your hands, work from home if you are

24    able.  If you have any symptoms, you need to

25    self-quarantine."  Correct?

1          A.     Correct.

2                 Yeah, it says a.m. right here

3     (indicating).  "Action taken, a.m."

4          Q.     Oh, I see it.  Right above, yeah.  Thank

5     you.

6                 Did you speak to Autumn Nelson on

7     March 15th or March 16th?

8                 MR. ARCINIEGAS:  Object to form, vague.

9          Q.     (By Ms. Hart)  Did you have any verbal

10    conversations with Autumn?

11         A.     No, I did not.  On the 15th?  No, I did

12    not.

13         Q.     What about on the 16th?

14         A.     I don't recall if I -- I don't believe I

15    talked to her, but I couldn't be positive.  But I

16    believe I e-mailed or messaged with her on the

17    16th.

18         Q.     Okay.  And on the next page, the page

19    before that, 73 at the bottom.

20         A.     Okay.

21         Q.     March 16th, 8:58 a.m., you write to

22    Autumn Nelson, "Thank you.  And don't stop with

23    the meds, right?"

24                And she responds, "Correct."

25                Do you agree with me?

Case 3:21-cv-00526  Document 40-1  Filed 11/03/22  Page 65 of 90 PageID #: 345

```
1        A.    Yes.

2        Q.    Had you stopped any of your meds at that

3    point?

4        A.    No.

5        Q.    And then if you'll flip to the page

6    before that, 72 at the bottom, March 16, 2020,

7    6:45 p.m., you write to Autumn Nelson, "I know

8    your office is probably really busy right now, but

9    my employer is requiring a doctor's note saying I

10   have asthma to work from home."

11              Did you write that?

12       A.    Yes, I did.

13       Q.    Okay.  And then Autumn Nelson responds

14   on March 17th at 7:13 in the morning, "To Whom It

15   May Concern, Christie Andrews has been a patient

16   at our office for several years.  She has known

17   asthma.  Although well controlled, she would

18   benefit from working at home due to the rising

19   risk of COVID-19."

20              And we've seen that message before,

21   because that's the note you provided to Tri Star,

22   correct?

23       A.    Yes.  I think she's sending it to Kelly.

24   Kelly is her nurse.  So she sent that to Kelly for

25   Kelly to print.
```

```
 1              MS. HART:  I'm going to mark this as
 2         Exhibit 33.
 3              (Exhibit 33 marked for identification.)
 4              THE WITNESS:  Thank you.
 5         Q.   (By Ms. Hart)  Exhibit 33 is a document
 6    that you produced of Plaintiff's Production 121.
 7              Is this a current copy of your resumé?
 8         A.   Yes, it is.
 9         Q.   Is premium services your current
10    position at Titans?
11         A.   Yes.  I should update the resumé,
12    itself, but this is my current version.  But I'm
13    now the premium services supervisor.
14         Q.   Okay.  But otherwise this is accurate?
15         A.   Yes.
16         Q.   And the Titans' job is the first
17    full-time job you had?
18         A.   It's part-time.
19         Q.   It's part-time?  Okay.
20              Tell me about your job with the Titans.
21         A.   So I started off as a premium services
22    assistant, so it's a part-time position that
23    provides concierge services to the suite holders.
24         Q.   So what does that mean?  Are you in the
25    suite during events?
```

1      A.     No.  So we are, like, overseeing the
2  floors.  During the events, they have their own
3  suite attendant.
4      Q.    Okay.  And give me an example of, like,
5  some of the tasks you do when you're working.
6      A.     In my current position or in that first
7  position?
8      Q.    Let's do the first one, and then we'll
9  do your current.
10     A.     In the first one, it would be just to
11  monitor suites and security issues, address any
12  problems that people had, you know, talk to
13  catering, and -- for any different type of issue
14  or demand, preparing the gifting and the
15  activations.  If someone has, like, a special
16  event, we would prepare for whatever special event
17  that would be.  Things of that nature.
18     Q.    Okay.  And when you were the premium
19  services assistant, how many hours were you
20  working per week?
21     A.     That would depend on the event schedule.
22  So if we had a football game that week, it would
23  be more hours.  If it was -- like, then if it was
24  a concert that week or if we had nothing that
25  week.  So it could be anywhere from, you know,

1    less than 10 to around 30, just depending on the
2    week.
3         Q.   Okay.  And do you -- in the premium
4    services assistant position, did you work every
5    Titans game, home game?
6         A.   I worked every home game except for the
7    one that I was at the wedding for and the one that
8    I was -- had bronchitis for -- oh, no, that was
9    the NHL series.  So for the home games, just -- I
10   only missed one.
11        Q.   Okay.  And then what's the expectation
12   for other events that happen at Titans' stadium?
13   Are you expected to work every event?  Is it
14   optional?
15        A.   It's -- well, we kind of went through,
16   like, a phase where management was, like, it
17   should -- it's got to be every event, and then --
18   but before that, it wasn't, and then we got new
19   management, so now that's brand-new as in, like,
20   in the last couple of weeks, so I'm not sure what
21   their expectation is.  But so far, it seems like
22   it's -- they're not expecting the assistants to
23   work every single event if they're not available.
24        Q.   And what were you being paid as the
25   premium services assistant?

1       A.      15 an hour.

2       Q.      Did you also get tips?

3       A.      No.

4       Q.      All right.  And what is your position

5   now?  What's it called?

6       A.      Premium services supervisor.

7       Q.      How is that different from premium

8   services assistant?

9       A.      So I'm now the supervisor of all the

10  premium services assistants, and I act as a

11  liaison between the assistants and the stadium

12  operations.  So if we have a housekeeping need or

13  a maintenance need, I'm the one that liaises

14  between the two groups.

15      Q.      Okay.  And what's your rate of pay now?

16      A.      17 an hour.

17      Q.      How many hours are you working a week?

18      A.      About the same amount as the assistant

19  role, maybe a little bit more, but nowhere -- not

20  over -- not over 35.

21      Q.      Okay.  So 10 to 35 hours a week; is that

22  fair?

23      A.      Yes.

24      Q.      And is the expectation for working

25  events the same as it was the premium services

Christie Andrews 8/23/2022

1    assistant?

2        A.    Yes.

3        Q.    So right now, you don't know what the

4    expectation is going to be?

5        A.    Right.   There's two supervisors, and one

6    has missed two events so far in the last, like,

7    month, so -- and they were okay with that.  So I

8    don't know what the new expectation is or policy

9    of the new managers.

10        Q.    And I think I know the answer to this,

11    but working from home would not be an option for

12    this position, correct?

13        A.    There are some things that I do at home,

14    but, like, on event days now.  But when I do,

15    like, the gifting inventory, I can do that at

16    home, because it's all in spreadsheets and stuff.

17        Q.    Did you request any type of disability

18    accommodation with the Titans?

19        A.    No.

20        Q.    Did you receive any tips as a premium

21    services supervisor?

22        A.    I do not.

23        Q.    Do you have benefits?

24        A.    No.

25        Q.    Do you have health insurance currently?

1    can see it says Interrogatory Number 10.

2              Have you seen this document before?

3      A.   Yes, this is the jobs that I applied to,

4    the log that I was keeping.  It does need to be --

5    oh, no, it doesn't need to be supplemented.  Or

6    yes, it does.

7      Q.   And you started working for the Titans

8    in, what did you say, July of '22?

9      A.   '21, July of '21.

10     Q.   July of '21.  Okay.

11              And have you applied for additional jobs

12   since February of 2022?

13     A.   Yes.

14     Q.   Okay.  We need to get this updated,

15   supplemented.

16     A.   Okay.

17     Q.   And are these jobs -- these jobs are not

18   all work-from-home, correct?

19     A.   No.

20     Q.   Are some work-from-home and some not; is

21   that fair to say?

22     A.   Yes, that's fair to say.

23     Q.   Okay.  Did you request any type of

24   accommodation for any job you applied for after

25   you got laid off from Tri Star?

1      A.    I only applied to remote jobs at the
2   beginning, and then -- and then further on down
3   the road, I started -- I think sometime in July, I
4   started applying for, like, in-person jobs.
5      Q.    July 2020?
6      A.    Somewhere around then.
7      Q.    Summer of 2020, started adding in-person
8   jobs; is that fair to say?
9      A.    Yes, yes.
10     Q.    Have you had any counseling related to
11  your layoff, any mental health treatment?
12     A.    No.
13     Q.    Have you been back to Centerstone for
14  any mental health treatment since you were laid
15  off?
16     A.    No.
17     Q.    Have you received any mental health
18  treatment at all since you were laid off?
19     A.    Just as it goes to my ADHD and the sleep
20  center when I was still going.
21     Q.    Okay.
22           MS. HART:  This will be Exhibit 37.
23           (Exhibit 37 marked for identification.)
24     Q.    (By Ms. Hart)  Exhibit 37 is a document
25  that you produced, Plaintiff's Supplemental

1       A.    Yeah, I don't think she had fired

2   anyone.  I think that was a threat, and she had to

3   make good on the threat.

4       Q.    And do you have personal knowledge that

5   you were the first person in the company to be let

6   go?

7       A.    No.

8       Q.    It's an assumption?

9       A.    Yes.

10      Q.    Okay.  And then, "She was not given a

11  chance to retract her request to work from home."

12           So did you tell the EEOC you weren't

13  given a chance to take it back?

14      A.    Yes.

15      Q.    Would you have taken it back if you were

16  given the opportunity?

17      A.    I didn't want to get fired, so yes, I

18  think I probably would have.

19      Q.    All right.

20           MS. HART:  I'm going to make the

21      Complaint Exhibit 38.

22           (Exhibit 38 marked for identification.)

23           THE WITNESS:  Thank you.

24      Q.    (By Ms. Hart)  I've just handed you the

25  Complaint that you filed against Tri Star Sports

## Betsy Hart

| | |
|---|---|
| **From:** | Bryan Luecke |
| **Sent:** | Tuesday, June 22, 2021 1:53 PM |
| **To:** | Lou Taylor; Heather Kinder; Peggy Stephens |
| **Subject:** | Re: COVID -19 Work from Home Update |

**From:** Christie Andrews █████████ ████████ >
**Sent:** Monday, March 16, 2020 5:00 PM
**To:** Yolanda Simpson █████████ ████████ >
**Cc:** Bryan Luecke <█████████ ████████ >
**Subject:** RE: COVID -19 Work from Home Update

Ok Ill be here, I just wanted to make sure that's what you meant by tomorrow.

**Christie Andrews**
*Team Coordinator, Business Management*
████████ ████
████████ Direct

**From:** Yolanda Simpson ·█████████ ████████ >
**Sent:** Monday, March 16, 2020 4:57 PM
**To:** Christie Andrews █████████ ████████ ·
**Subject:** RE: COVID -19 Work from Home Update

What time do you get off today? I am in the middle of several COVID-19 issues and I have not time to address yours. I may be able to before you leave if you are leaving late. If not I will have to follow up with you tomorrow. If I have to follow up tomorrow then come to work unless you are sick.

Warm Regards,

**Yolanda Simpson SHRM-CP**
*Generalist, Human Resources*
████████ ████
████████ Direct

**From:** Christie Andrews <█████████ ████████ ·
**Sent:** Monday, March 16, 2020 4:55 PM
**To:** Yolanda Simpson <█████████ ████████ >; Bryan Luecke <█████████ ████████ >
**Subject:** RE: COVID -19 Work from Home Update

So don't work from home tomorrow?

**Christie Andrews**

EXHIBIT 13

Andrews
8/23/22
Ginger H. Brooks
CRR, RPR, CCR, RSA

1

*Team Coordinator, Business Management*

████████ ████████
████████ Direct

**From:** Yolanda Simpson ·████████ ████████
**Sent:** Monday, March 16, 2020 4:48 PM
**To:** Bryan Luecke <████████ ████████ >; Christie Andrews ·████████ ████████ ·
**Subject:** RE: COVID -19 Work from Home Update

Hi Christie,

Unfortunately, you cannot take any other equipment with you to work from home other than your laptop. Let me speak with Bryan and I will follow up with you by tomorrow.

Warm Regards,

*Yolanda Simpson SHRM-CP*
*Generalist, Human Resources*

████████ ████████
████████ Direct

**From:** Bryan Luecke ·████████ ████████ >
**Sent:** Monday, March 16, 2020 4:32 PM
**To:** Christie Andrews <████████ ████████ >; Yolanda Simpson ·████████ ████████ >
**Subject:** RE: COVID -19 Work from Home Update

Based on below it would be up to Yolanda, Peggy and Lou

**Bryan W. Luecke, CPA**
*Business Manager*

████████
████████ Direct

**From:** Christie Andrews <████████ ████████ >
**Sent:** Monday, March 16, 2020 4:27 PM
**To:** Bryan Luecke ·████████ >; Yolanda Simpson <████████ ████████
**Subject:** RE: COVID -19 Work from Home Update

Since I already have a company laptop and a doctor who is pissed at me and called me irresponsible for not staying home may I please be approved to work from home?

What do you need from me to approve?

Is it possible to take my monitors and docking station with me to make work more efficient?

**Christie Andrews**

2

*Team Coordinator, Business Management*

█████████████
██████████ Direct

**From:** Yolanda Simpson █████████████████ >
**Sent:** Monday, March 16, 2020 3:36 PM
**To:** Staff < ████████████ >; Shawna Pettigrew ▾ ██████████████ >
**Cc:** Heather Kinder < ██████████ ▸
**Subject:** COVID -19 Work from Home Update
**Importance:** High

Tri Star,

Your safety and the safety of your families is paramount in our discussions and plans. Therefore, it is time for us to reassess our plan in response to the changing circumstances that COVID-19 is demanding. We are a business management firm the middle of tax season and as such it is not feasible for the offices to close. There are other industries faced with the same dilemma we are, such as first responders, restaurants, grocery stores... We are sympathetic to the uncertainty these circumstances have caused and we are responding as quickly as possible.

However, we do realize that some of our employees may have needs arise out of their control that may require some flexibility in scheduling. We will review these requests on a case by case basis. If you can be in the office, we ask that you come in to work. In the event you feel that you need to work from home we ask that you speak with your Director and HR immediately.

There are a few instances that will be given WFH preference which are: School Closings and Employees or Spouse/Partner/Significant Others/Roommates with compromised immune systems. Those who are affected by either of these will be accommodated to the best of our ability. An accommodation may include a change in schedule or the issuance of a Tri Star laptop.

If you do end up working from home, please be aware that this is a benefit afforded to you which will prevent the use of Vacation or Sick Time. You are expected to work 8 hours each day as if you were in the office. Please communicate with your supervisor if anything comes up that may prevent that.

As a reminder, under **No Circumstances** should anyone work from home on your personal laptop. You must be approved to work from home by your Director and Lou with a letter signed off by Human Resources and have secure log on credentials.

Additionally, we are pleased to announce that the previous concerns about exposure were unfounded. Our offices have not been compromised and we want to try and keep it that way!

To, minimize delivery traffic within the offices we ask that you consider bringing your lunch over the next couple of weeks. However, if you would like to go out to lunch, we ask that you go pick up your meal. The LA office has hired an Office Hospitality & Upkeep associate named Jacqueline Pedrogo who will assist with daily cleaning. The Nashville office has Beatrice cleaning five days a week to disinfect the office daily for as long as needed.

Lastly, the nature of our business is stressful, it's tax season, and COVID-19 has added more stress into our busy lives. We are concerned about your total well-being. Attached is a flyer that provides information about our Employee Assistance Program. This service provides free counselling with a licensed professional. Please take advantage of these services if you feel it will help. Any questions please see Human Resources for assistance.

Best,

Yolanda Simpson

3

TRI STAR CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER 000743

Warm Regards,

*Yolanda Simpson SHRM-CP*
*Generalist, Human Resources*

███████████████

████████ Direct

TRI STAR SPORTS AND ENTERTAINMENT GROUP
BUSINESS MANAGEMENT • TAX

**LOS ANGELES**                  **NASHVILLE**
9255 Sunset Blvd.                11 Music Circle South
2nd Floor                        Nashville, TN 37203
W. Hollywood, CA 90069
T: 323.284.7600                  T: 615.309.0969

the right PLACE  •  the right PEOPLE  •  the right PLAN

instagram/twitter: @tristarteam

TRI STAR Case 2:20-cv-04018 Document SUBJECT TO PROTECTIVE Filed 02/09/21 Page 13 of 90 ORDER 008144

**From:** Bryan Luecke <
**Sent:** Tuesday, March 17, 2020 10:07 AM
**To:** Yolanda Simpson <                    ; Heather Kinder                         Peggy Stephens
                    >
**Cc:** Christie Andrews
**Subject:** Christie

I have told Christie to take a sick day and stay at home today.

She has a cough. Hopefully not the Covid virus but who knows. She thinks its from Lysol spray.

I will also point out that Miles was coughing yesterday and sits just across from her so it is a little concerning to me.

She does have the ability to work from home since she has a laptop primarily for AMEX support after hours.

I am sure she would rather work from home than burn a sick or vacation day but really it would be irresponsible for her to come into the office.

I would recommend that you offer up a work from home situation but in the absence of this I think she should stay away from the office no matter how the time is counted.

Regards

**Bryan W. Luecke, CPA**

*Business Manager*

Direct

TRI STAR SPORTS AND ENTERTAINMENT GROUP
BUSINESS MANAGEMENT •TAX



EXHIBIT 14

Andrews
8/23/22
Ginger H. Brooks
CRR, RPR, CCR, RSA

Plaintiff's Production 000019

**LOS ANGELES**
9255 Sunset Blvd.
2nd Floor
W. Hollywood, CA 90069
T: 323.284.7600

**NASHVILLE**
11 Music Circle South
Nashville, TN 37203

T: 615.309.0969

the right Pᴇᴀᴄᴇ • the right Pᴇᴏᴘʟᴇ • the right Pʟᴀɴ

instagram/twitter: @tristarteam

### TRI STAR SPORTS AND ENTERTAINMENT GROUP
### BUSINESS MANAGEMENT • TAX

**LOS ANGELES**
9255 Sunset Blvd.
2nd Floor
W. Hollywood, CA 90069
T. 323.284.7600

Pᴇᴏᴘʟᴇ
• THE
RIGHT
Pʟᴀɴ

instagram/twitter: @tristarteam

--

*Confidential and Privileged:* This message contains
information which may be confidential and privileged. Unless
you are addressee (or authorized to receive for addressee),
you may not use, copy or disclose to anyone the message or
any information contained in this message. If you have
received this message in error, please advise the sender by
reply e-mail or reply to ⬛ and delete
the message.

*Transfer of Funds:* It is the policy of Tri Star Sports &
Entertainment Group, Inc. that wire instructions and/or
directions to transfer funds are always to be in a password-
protected attachment where the password is provided by a
separate means of communication such as phone or text.
Please be advised that funds should not be transferred or
processed based on written instructions received in a non-
secure manner.

*IRS Circular 230:* Under requirements imposed by the IRS
Circular 230, we inform you that, if any advice concerning one
or more U.S. federal tax issues is contained in this
communication (including any attachments), such advice was
not intended or written to be used, and cannot be used by
you or any other taxpayer for the purpose of (1) avoiding
penalties under the Internal Revenue code or (2) promoting,
marketing or recommending to another party any transaction
or tax-related matter addressed herein.

Plaintiff's Production 000020

# M Gmail

C A <

## Fwd: COVID-19 Update

**Christie Andrews** ·
To:

Fri, Mar 20, 2020 at 12:41 PM

Get Outlook for iOS

**From:** Yolanda Simpson ·
**Sent:** Thursday, March 19, 2020 10:13 AM
**Subject:** COVID-19 Update

Tri Star Team,

This communication is to check the pulse of the team and provide a few reminders and expectations to help provide a safe work environment for us all.

Lou and the team are working diligently through the list of WFH employees to get the requests accommodated. Also, Lou is providing updates to the managers about who and when laptops will be ready for distribution. As previously, communicated in this first round of WFM employees we are fulfilling requests for essential employees with compromised immune systems, employees who live with people who have compromised immune systems, and parents of children who have schools that are closed. We have a plan and we are working through our plan!

In order to keep our work environment as safe as possible we need each employee to be socially responsible. What does this mean? Simply don't expose yourself unnecessarily to crowds of people or places where you risk additional exposure. The grocery store, gas station and work are expected. Out of respect for your work family please curtail any extracurricular activities until the CDC releases us to return to our normal activities.

To adhere to the Social Distancing suggestion by the CDC we are reviewing the floorplans in both offices to rearrange some seating for those who share spaces. Additionally, we are considering two shifts i.e. 7am-3pm and 2pm-10pm. If the split shift approach is something you would like to do, please communicate this to your Director or Human Resources by Noon on this Friday 3/20.

Thank you in advance and if you have any questions please reach out.

Sincerely,

Yolanda

Generalist, Human Resources

Warm Regards,

**_Yolanda Simpson SHRM-CP_**

_Generalist, Human Resources_

Plaintiff's Production 000021

Direct

**TRI STAR SPORTS AND ENTERTAINMENT GROUP**
**BUSINESS MANAGEMENT • TAX**

LOS ANGELES
9255 Sunset Blvd.
2nd Floor
W. Hollywood, CA 90069
T: 323.284.7600

NASHVILLE
11 Music Circle South
Nashville, TN 37203

T: 615.309.0969

the right PLACE • the right PEOPLE • the right PLAN

instagram/twitter: @tristarteam

**TRI STAR SPORTS AND ENTERTAINMENT GROUP**
**BUSINESS MANAGEMENT • TAX**

LOS ANGELES
9255 Sunset Blvd.
2nd Floor
W. Hollywood, CA 90069
T: 323.284.7600

PEOPLE
• THE
RIGHT
PLAN

instagram/twitter: @tristarteam

--

*Confidential and Privileged:* This message contains
information which may be confidential and privileged. Unless
you are addressee (or authorized to receive for addressee),
you may not use, copy or disclose to anyone the message or
any information contained in this message. If you have
received this message in error, please advise the sender by
reply e-mail or reply to                          and delete
the message.

*Transfer of Funds:* It is the policy of Tri Star Sports &
Entertainment Group, Inc. that wire instructions and/or
directions to transfer funds are always to be in a password-
protected attachment where the password is provided by a
separate means of communication such as phone or text.
Please be advised that funds should not be transferred or
processed based on written instructions received in a non-
secure manner.

*IRS Circular 230:* Under requirements imposed by the IRS
Circular 230, we inform you that, if any advice concerning one
or more U.S. federal tax issues is contained in this
communication (including any attachments), such advice was
not intended or written to be used, and cannot be used by
you or any other taxpayer for the purpose of (1) avoiding
penalties under the Internal Revenue code or (2) promoting,
marketing or recommending to another party any transaction
or tax-related matter addressed herein.

Per our previous phone call please find the attached document requested from my Doctor.



**TRI★STAR MEDICAL GROUP**

Date: 03/17/2020

Patient: Andrews, Christie

DOB

To Whom It May Concern,

George L. Holmes, III, M.D.
Robert G. Bishop, Jr., M.D.
Matthew L. Brust, M.D.
Steven P. Johnson, M.D.
Christopher D. Holloway, M.D.
Keren Holmes, M.D.
Shannon McDonald, MD
Daniel Hartman, D.O.
Meredith Schweitzer, D.O.
J. Matthew Ducey, M.D.
Kathryn Fordham, FNP-BC
Jonathan Lee, FNP-BC
Gabriela Lee, FNP-BC
Tracy J. Osborne, MD
Autumn Nelson, FNP

Christie Andrews has been a patient at our office for several years. She has known asthma. Although well controlled, she would benefit from working at home due to the rising risk of COVID-19. If you have any questions or concerns, feel free to call our office.

Thank You,

Autumn Nelson, FNP-BC

**Family Practice Associates
of Southern Hills**
397 Wallace Road
Bldg C-100
Nashville, TN 37211
615.834.6166
Fax: 615.781.9755

**Brentwood East
Family Medicine**
6716 Nolensville Pike
Suite 100 & 210
Brentwood, TN 37027
615.941.7501
Fax: 615.941.7502

**Family Practice at
The Crossings**
5380 Hickory
Hollow Parkway
Suite 100
Antioch, TN 37013
615.731.8390
Fax: 615.731.8391



EXHIBIT 16
Andrews
8/23/22
Ginger H. Brooks
CRR, RPR, CCR, RSA



**TRI★STAR MEDICAL GROUP**
**Family Practice Associates**
**of Southern Hills**

Andrews, Christie

Provider: NELSON, AUTUMN

**Telephone Encounter**

**Answered by**   BENTLEY, VICKI

Date: 03/17/2020
Time: 10:43 AM

**Caller**   pt

**Reason**   ryc

**Message**   ryc/

**Action Taken**   BENTLEY,VICKI  03/17/2020 10:43:35 AM CDT >
SPIRES,KELLY  03/17/2020 11:04:38 AM CDT > Pt advised note is ready for pick up

Patient: Andrews, Christie   DOB:                Provider: NELSON, AUTUMN   03/17/2020

*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*



EXHIBIT 28
Andrews
8/23/22
Ginger H. Brooks
CRR, RPR, CCR, RSA

CONFIDENTIAL INFORMATION
PROTECTED HEALTH INFORMATION   P's PHI000071



# Andrews, Christie

Provider: NELSON, AUTUMN

---

**Web Encounter**

| | | |
|---|---|---|
| **Answered by** | NELSON, AUTUMN | Date: 03/16/2020 |
| | | Time: 06:45 PM |

**Caller**  Christie Andrews

**Reason**  Dr Note Request

**Message**
Addressed To NELSON,AUTUMN
I know your office is probably really busy right now but my employer is requiring a doctor's note saying I have asthma to work from home. Even though I have all the capabilities and have worked from home in the past. Is there anyway yall can send one tomorrow? My email is

Sorry for bugging y'all again.

**Action Taken**
NELSON,AUTUMN  03/17/2020 07:13:51 AM CDT > To Whom It May Concern,

Christie Andrews has been a patient at our office for several years. She has known asthma. Although well controlled, she would benefit from working at home due to the rising risk of COVID-19. If you have any questions or concerns, feel free to call our office.

Thank You,
Autumn Nelson, FNP-BC

I dont think we can email but she can pick up.
SPIRES,KELLY  03/17/2020 08:30:09 AM CDT > Printed, LVM for pt to come pick up letter

---

Patient: Andrews, Christie  DOB:  Provider: NELSON, AUTUMN  03/16/2020

*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

CONFIDENTIAL INFORMATION  P's PHI000072
PROTECTED HEALTH INFORMATION



# Andrews, Christie

**TRI☆STAR MEDICAL GROUP**
**Family Practice Associates**
**of Southern Hills**

**Provider: NELSON, AUTUMN**

### Web Encounter

| | |
|---|---|
| **Answered by** | NELSON, AUTUMN |

Date: 03/16/2020
Time: 08:58 AM

**Caller** Christie Andrews

**Reason** RE: Asthma Questions

**Message** Addressed To NELSON,AUTUMN
Thank you. And don't stop with the meds right?

**Action Taken** NELSON,AUTUMN 03/16/2020 09:02:26 AM CDT >
NELSON,AUTUMN 03/16/2020 09:02:27 AM CDT > Correct.

## eMessages

| | |
|---|---|
| **From:** | NELSON,AUTUMN |
| **Created:** | 2020-03-16 09:02:23 |
| **Sent:** | |
| **Subject:** | RE:RE: Asthma Questions |
| **Message:** | Correct. |

**Patient: Andrews, Christie   DOB:**　　　　**Provider: NELSON, AUTUMN**　03/16/2020

*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

CONFIDENTIAL INFORMATION   P's PHI000073
PROTECTED HEALTH INFORMATION



# Andrews, Christie

**TRI★STAR MEDICAL GROUP**
**Family Practice Associates**
**of Southern Hills**

Provider: NELSON, AUTUMN

**Web Encounter**

**Answered by**   NELSON, AUTUMN

Date: 03/15/2020
Time: 02:19 PM

**Caller**   Christie Andrews

**Reason**   Asthma Question

**Message**   Addressed To NELSON,AUTUMN
I've tried to look it up online instead of bothering your office but didn't see alot of info. Are there any precautions you want me to be taking in regards to my asthma and covid-19 besides the normal wash your hands and clean your heavy touch surfaces? The only thing I saw online was people considering not taking their meds. That can't be right, right?

PS. I have been seeing a lot of improvement with the singular. I really didn't think I would but I have, especially in regards to recovery after a workout.

Sorry to have to bug you when your probably really busy,

Christie Andrews

**Action Taken**   NELSON,AUTUMN 03/16/2020 06:40:05 AM CDT >
The best thing you can do is wash your hands, work from home if you are able. If you have any symptoms, you need to self-quarantine.

## eMessages

**From:**   NELSON,AUTUMN

**Created:**   2020-03-16 06:40:05

**Sent:**

**Subject:**   RE:Asthma Question

**Message:**   The best thing you can do is wash your hands, work from home if you are able. If you have any symptoms, you need to self-quarantine.

Patient: Andrews, Christie   DOB:   Provider: NELSON, AUTUMN   03/15/2020

*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*   P's PHI000074

CONFIDENTIAL INFORMATION
PROTECTED HEALTH INFORMATION

https://hcapsecwpr... 2/22/2022

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | |
|---|---|
| **CHRISTIE ANDREWS,** | ) |
| | ) |
| **Plaintiff,** | )    **CASE NO. 3:21-cv-00526** |
| | ) |
| **v.** | )    **Judge Eli J. Richardson** |
| | )    **Magistrate Judge Jefferey S. Frensley** |
| **TRI STAR SPORTS AND** | ) |
| **ENTERTAINMENT GROUP, INC.,** | )    **JURY DEMAND** |
| ) | |
| **Defendant.** | ) |

## PLAINTIFF'S OBJECTIONS AND RESPONSES TO
## DEFENDANT'S FIRST SET OF INTERROGATORIES
## AND REQUESTS FOR PRODUCTION OF DOCUMENTS

### GENERAL OBJECTIONS

Plaintiff objects to each discovery request to the extent that it may be interpreted as

calling for the production of documents or information which is privileged, including the

attorney-client privilege and the work product privilege. The only documents not produced

for these reasons in response to Defendant's discovery requests are:

A. Those documents which include correspondence or similar communications from Plaintiff to

his counsel, documents prepared at the request of counsel for the Plaintiff for the purpose of

this litigation in correspondence and documents created by counsel for Plaintiff and sent to

Plaintiff as part of this litigation; and documents obtained by Plaintiff's counsel from

sources other than the Plaintiff which constitutes attorney work product. These answers are

made by Plaintiff, subject to and without in any way waiving, or intending to waive any of

the following:

     i.    The confidentiality of answers and or documents produced;

1



EXHIBIT 39

Andrews
8/23/22
Ginger H. Brooks
CRR, RPR, CCR, RSA

ii.  All questions as to competency, relevancy, materiality, privilege, and admissibility

as evidence for any purpose of any other documents referred to for answers given, or

the subject matter thereof, in any subsequent proceeding in or at the trial of this

action or any other action.

iii.  The right to object to other discovery procedures involving or relating to the subject

matter.

B.  The right at any time to revise correct or clarify any of the answers set forth herein or

documents produced or refer to here in.

C.  Plaintiff will produce documents for review by defense counsel at a mutually agreeable time

in place.

2

**communication was unsuccessful, state why.**

**RESPONSE:** Plaintiff objects to the extent this calls for information protected from discovery under attorney client privilege or the work product doctrine. Plaintiff objects to this request on the grounds that is vague and overly broad. Plaintiff is producing emails she believes contain information responsive to this interrogatory. Plaintiff reserves the right to supplement her response to this request.

**INTERROGATORY NO. 17: Identify and describe your disability as alleged in paragraph 10 of the Complaint.**

**RESPONSE:**

Asthma.

**INTERROGATORY NO. 18: Identify the "other employees who were not disabled" and the "other disabled employees" as described in paragraph 13 of the Complaint.**

Plaintiff objects to this interrogatory to the extent it calls for information protected by attorney client privilege and the work product doctrine. Without waiving these objections Plaintiff's complaint references individuals who were permitted to work from home.

12