# EXHIBIT B

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF TENNESSEE
2              NASHVILLE DIVISION

3
     CHRISTIE ANDREWS,                  )
4                                       )
                 Plaintiff,             )
5                                       )
     vs.                                )  CASE NO.
6                                       )  3:21-cv-00526
     TRI STAR SPORTS AND                )
7    ENTERTAINMENT GROUP, INC.,         )
                                        )
8              Defendant.               )
                                        )
9

10

11

12

13
     VIDEOTAPED DEPOSITION OF:
14
     LOU TAYLOR
15
     Taken on behalf of the Plaintiff
16
     August 24, 2022
17

18

19

20

21

22

23

24

25

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 2 of 50 PageID #: 372

```
 1   APPEARANCES:

 2   For the Plaintiff:

 3        DANIEL ARCINIEGAS, ESQ.
          Arciniegas Law
 4        1242 Old Hillsboro Road
          The Atrium Building
 5        Franklin, Tennessee 37069-9129
          629.777.5339
 6        Daniel@attorneydaniel.com

 7   For the Defendants:

 8        TARA SWAFFORD, ESQ.
          ELIZABETH "BETSY" HART
 9        The Swafford Law Firm, PLLC
          321 Billingsly Court
10        Suite 19
          Franklin, Tennessee 37067
11        615.599.8406
          Betsy@swaffordlawfirm.com
12        Tara@swaffordlawfirm.com

13   Also Present:

14        Peggy Stephens

15

16

17

18

19

20

21

22

23

24

25
```

Case 3:21-cv-00526  Document 40-2  Filed 11/03/22  Page 3 of 50 PageID #: 373

```
 1                A.    As it relates to what?

 2                Q.    Tri Star.

 3                A.    Operational structure as it

 4    relates to what?

 5                Q.    Well, let me ask you this:    How

 6    many offices did you have?

 7                A.    In January of 2020, we had two.

 8                Q.    Okay.  And where were they

 9    located?

10                A.    2955 Sunset Boulevard in Westwood

11    [sic] -- West Hollywood.

12                Q.    Okay?

13                A.    And then 11 Music Circle South in

14    Nashville.

15                Q.    And how many employees were -- do

16    you refer to one office as, like, West Tri Star

17    and the --

18                A.    Uh-huh.

19                Q.    -- one as East Tri Star?

20                A.    We did.

21                Q.    Okay.  And how many employees in

22    2020 were there -- in January of 2020 were there

23    at the West office?

24                A.    I don't know.

25                Q.    Could you give me an
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 4 of 50 PageID #: 374

```
 1              A.      Nashville and LA.

 2              Q.      Okay.  And --

 3              A.      I should say both locations.  One

 4    practice, both locations.

 5              Q.      Fair.

 6              A.      Yeah.

 7              Q.      Okay.  And just to clarify that.

 8    When you say "practice," how would you -- when you

 9    use the word "practice," did --

10              A.      The business management team.

11              Q.      Okay.  And your business

12    management team in general of, like, structure,

13    can you give me that?

14              A.      Uh-huh.  Team coordinators, who

15    are support to the team; staff accountant 1s;

16    senior staff accountants; accounting managers; and

17    then on some teams, business managers.

18              Q.      Okay.  And so let's just jump to

19    it.  What -- what did team coordinators do in

20    2020?

21              A.      They would be the equivalent in

22    normal context of being, like, assistants.

23              Q.      Okay.  How would they assist?

24              A.      Direct client communication,

25    garner internal resources for client needs,
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 5 of 50 PageID #: 375

```
 1    20, 30.

 2           Q.      20 to 30?

 3           A.      Uh-huh.

 4           Q.      Okay.  And some of those

 5    businesses -- those businesses have -- have

 6    employees; fair?

 7           A.      Some, yeah.

 8           Q.      Okay.  And so some of those

 9    employees -- like, what is the scope of, like --

10    or the number of employees people have?

11           A.      Varies.

12           Q.      Okay.  So what's the high end?

13    What's the low end?  Zero to....

14           A.      I -- I wouldn't be able to pull a

15    number.  It would be zero to -- I don't know what

16    the high would be.

17           Q.      What's the highest that you do

18    know?

19           A.      I can think of one off the top of

20    my head that has more than 30 staff.

21           Q.      Okay.  And do you have an idea

22    of, like, the -- the spread within the states, how

23    many clients they have?

24           A.      I don't.

25           Q.      Or sorry.
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 6 of 50 PageID #: 376

```
 1   2020?

 2           A.      No.

 3           Q.      Okay.  Do you recall laying

 4   people off in March of 2020?

 5           A.      I do.

 6           Q.      Okay.  What caused you to lay off

 7   people in March of 2020?

 8           A.      COVID.

 9           Q.      Okay.  Tell me what the

10   considerations -- what was the impetus behind

11   that, other than COVID?

12           A.      COVID pandemic.

13           Q.      Okay.  What -- what about the

14   COVID pandemic led to the layoffs?

15           A.      The whole world shut down.

16           Q.      Okay.

17           A.      Loss of revenue, panic, unknown.

18           Q.      Anything else?

19           A.      Not that I can think of right

20   now.

21           Q.      And so when decid- -- making

22   decisions for the reduction in force, tell me from

23   your point of view how that came -- like, how that

24   was executed, I guess.

25           A.      I spent probably four or five
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 7 of 50 PageID #: 377

```
 1   days thinking through how, as much as I could -- I
 2   mean, nobody knew what was going on, other than it
 3   just being mass chaos, that we were going to have
 4   to reduce workforce and we were going to have to
 5   cut salaries and we were going to have to hanker
 6   down and ride out whatever this was.  Everybody
 7   was panicked at that point in time.
 8            Q.     Okay.  So people had their
 9   salaries cut?
10            A.     Not in March of 2020.  It was
11   just layoffs.
12            Q.     Now, I know -- I want to
13   establish a common vocabulary here.  Was it a
14   reduction in force or layoffs?  Or did -- in -- in
15   terms of your vocabulary, do you distinguish
16   between the two?
17            A.     I don't.
18            Q.     Okay.  So when you say "layoff,"
19   define that from your perspective.  What does that
20   mean?
21            A.     Reduction in workforce, that we
22   were going lay people off.
23            Q.     With the intention of recalling
24   them or not recalling them?
25            A.     I did not have an intention of
```

33

```
 1          Q.    So for the essentials, like -- or
 2   what qualif- -- what were the technical
 3   deliverabl- -- deliverables?
 4          A.    Essential staff, to me, were
 5   people who had to keep the accounting and finance
 6   work for the clients going.  It was mayhem.  It
 7   was absolute insanity.
 8          Q.    So you said accounting and what
 9   else?  I'm sorry.
10          A.    Finance.
11          Q.    Finance?
12          A.    Uh-huh.
13          Q.    Like, taxes and....
14          A.    Yeah, of course.
15          Q.    What else other than taxes?
16          A.    Accounting.  I mean, it was
17   strictly the -- you know, the accounting and
18   finance and tax teams.  They were considered
19   essential to me.
20          Q.    Okay.  Why were team coordinators
21   not considered essential?
22          A.    Because they're not essential to
23   keeping the business going.  Not in that regard.
24          Q.    Okay.  So did y'all lay off all
25   the team coordinators?
```

```
 1          A.      We did not.

 2          Q.      Okay.  So when you were laying

 3   off team coordinators, you had deemed that

 4   position generally as nonessential?

 5          A.      Nonessential, uh-huh.

 6          Q.      What kind of -- what -- what

 7   factors did you use to differentiate within that

 8   group?

 9          A.      Work from -- work-from-home

10   requests for nonessential staff.  I think almost

11   all of them went in the first round.

12          Q.      Okay.  That was based on dollar

13   and cents?

14          A.      No.

15          Q.      Like, you didn't -- when you were

16   looking at the team coordinators, were you

17   reviewing their payroll records or not, or

18   reporting?

19          A.      My first consideration was

20   work-from- home requests.

21          Q.      Okay.  Why is that?

22          A.      Because computers, it was obvious

23   that we were going to have some people that needed

24   to work from home that were essential to keeping

25   the business going.  Computers were a factor.
```

Case 3:21-cv-00526  Document 40-2  Filed 11/03/22  Page 10 of 50 PageID #: 380

```
 1   Obviously, the whole world was mobilizing to try

 2   and get laptops and other things like that.

 3                     And again, when you -- when you

 4   look at work-from-home requests and then you look

 5   at dollars and cents, the first thing that was

 6   going to get cut was going to be work-from-home

 7   requests for nonessential staff.  That was my

 8   benchmark.

 9           Q.     But I'm -- maybe I'm missing you.

10           A.     Uh-huh.

11           Q.     Like, why did you -- how -- you

12   aligned that somehow with dollars and cents?

13           A.     Well, I mean, as you cut

14   work-from-home requests of nonessential staff,

15   their salaries reduce the overall need of salary

16   in the firm.

17           Q.     Okay.  So you're just looking at

18   it as the -- the group?  Anybody that was work

19   from home, that would be a savings?

20           A.     Nonessen- --

21                  MS. SWAFFORD:  Object to the

22           form.

23   BY MR. ARCINIEGAS:

24           Q.     Or -- or a reduced cost?

25           A.     That's right.
```

Case 3:21-cv-00526  Document 40-2  Filed 11/03/22  Page 11 of 50 PageID #: 381

```
 1    gosh, what are we going to do?  What am I going to
 2    do?
 3            Q.     Okay.  But you did have payroll
 4    records reporting when you were going through the
 5    reduction in force decision-making process; fair?
 6            A.     I probably did not at that time.
 7    I made those decisions literally over the --
 8    pretty much so over the weekend.
 9            Q.     Did you consult with Peggy
10    Stephens about layoffs?
11            A.     I did not.
12            Q.     Did you consult with any of your
13    director level --
14            A.     I did not.
15            Q.     But you did receive some
16    information from Yolanda Smith [sic] -- Simpson?
17            A.     I mean, I don't know what you
18    define as information.
19            Q.     Okay.  Well, why don't you tell
20    me what you recall getting from Yolanda Simpson
21    with respect to the reduction in force, or were
22    you ever just tracking with your decision-making?
23            A.     I believe Yolanda was tracking
24    probably during that week requests for work from
25    home.
```

Case 3:21-cv-00526  Document 40-2  Filed 11/03/22  Page 12 of 50 PageID #: 382

```
 1           Q.    Okay.  Was that tracking provided
 2      to you?

 3           A.    I believe via e-mail.

 4           Q.    Okay.  In March of 2020, were you
 5      in LA or here in -- at home?

 6           A.    I was in LA that Thursday and
 7      Friday before the sh- -- I think I was the last
 8      flight out of LAX back to Nashville.  Seriously.
 9      So I was in Nashville on the 20th, March 20th.

10           Q.    So you landed March 20th in
11      Nashville?

12           A.    No.  On -- I got to back up.  I
13      don't know what the date was.

14           Q.    Sure.

15           A.    National -- the -- the national
16      shutdown was on Friday.  So whatever that date was
17      the Friday before the 2- -- the 20th was a Friday.
18      So the Friday before the 20th is when I returned
19      to Nashville, in the evening.  I believe it was
20      the evening.

21                 MS. SWAFFORD:  13th is, I think,
22           what we were talking about.

23                 MR. ARCINIEGAS:  I did the math.

24      BY MR. ARCINIEGAS:

25           Q.    All right.  So that's when you
```

Case 3:21-cv-00526  Document 40-2  Filed 11/03/22  Page 13 of 50 PageID #: 383

```
 1    think -- and then that's the weekend that you
 2    spent, like, making your decisions?
 3              A.      Uh-huh.
 4              Q.      Is that fair?
 5              A.      That's right.
 6              Q.      Okay.  So when you -- when you
 7    looked at the -- well, when you were making these
 8    decisions, you said you had, like, a -- you made
 9    kind of back-of-the-envelope determination?  Like,
10    did you actually have, like, a list of employees
11    that you were -- wanted to lay off?
12              A.      No.  Over the weekend, I was
13    making a decision on how I was going to make my
14    first round of cuts --
15              Q.      Okay.
16              A.      -- of layoffs, reduction in
17    workforce, whatever you want to call it.
18              Q.      Correct.  Okay.
19                      And so you deemed nonessential
20    work-from-home employees as being the first round?
21              A.      That's right.
22              Q.      When you came up with that
23    decision --
24              A.      Uh-huh.
25              Q.      -- did you ask for a list of
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 14 of 50 PageID #: 384

```
 1   those individuals?

 2           A.     I did not.

 3           Q.     Did you consider the individuals

 4   that fell within that category?

 5           A.     I did not have them at that time.

 6           Q.     Okay.  Did you ever look at them

 7   on a one -- like --

 8           A.     No.

 9           Q.     At any point?

10           A.     Nope.  Not until during the week,

11   once I was notified as to who requested to work

12   from home.

13           Q.     Okay.  So you -- so is there any

14   directive -- is there any documentation showing

15   that you had decided during the weekend that

16   nonessential work-from-home people were going to

17   be the first people to be cut?

18           A.     No.

19           Q.     Did you communicate that to

20   anybody?

21           A.     No.

22           Q.     When did you first communicate

23   that to someone?

24           A.     I don't know.  Monday or Tuesday,

25   maybe.  I don't know.  Yolanda had to know before
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 15 of 50 PageID #: 385

```
 1   I sent the letter out, because we didn't know who
 2   was going to request to work from home.
 3            Q.    I'm sorry, say that again.
 4            A.    I think the letter went out on
 5   the 17th.
 6            Q.    Okay.
 7            A.    On that Tuesday to go:  Who has a
 8   request-from-home need?  It's like I don't -- I
 9   didn't know who did or didn't have a need.
10            Q.    So if I'm hearing you
11   correctly --
12            A.    Uh-huh.
13            Q.    -- you said you didn't know who
14   had a need to work from home --
15            A.    Uh-huh.
16            Q.    -- before Tuesday?
17            A.    With the exception of Christie.
18            Q.    Okay.  What do you mean?
19            A.    Yolanda mentioned it to me on --
20   on the phone on the 16th.
21            Q.    What do you recall about that
22   conversation?
23            A.    That she was getting, you know --
24   she was getting hit left and right like everybody
25   else, because everybody was scared.  You know,
```

Case 3:21-cv-00526  Document 40-2  Filed 11/03/22  Page 16 of 50 PageID #: 386

```
 1          Q.    Right.

 2          A.    Yeah.  And the --

 3          Q.    As a business owner, that is a

 4   very busy time of year for y'all?

 5          A.    Yeah.  We're busy all the time.

 6          Q.    I would gather that.

 7               So, I mean, without getting into

 8   the particulars, but, like, as a business, like,

 9   how would you say, like, your most -- what is your

10   profit centers?  Like, what are the main services

11   that you generate fees from?

12          A.    Business management services.

13          Q.    Okay.  And from there down, how

14   would you say?

15          A.    There is no "there down."  That's

16   what it is.

17          Q.    Okay.  It --

18          A.    Accounting, finance services, all

19   of it ties into each vertical.  So it's accounting

20   and financial services.

21          Q.    And when you say "each vertical,"

22   I just want the record to be clear what you mean

23   by that.

24          A.    Royalties, touring, tax, business

25   management.
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 17 of 50 PageID #: 387

```
1   highly-compensated, duplicative touring people,
2   right?
3              A.      That's right.
4              Q.      Now, the conversation that you
5   had with Ms. Simpson in -- regarding Christie,
6   what else was shared in that conversation, if
7   anything?
8              A.      I could not tell you.
9              Q.      Was there any discussion of the
10  fact that she had asthma?
11             A.      No.
12             Q.      Did you know that she had asthma
13  at any point?
14             A.      Absolutely not.
15             Q.      When did you first learn that
16  Ms. Andrews had asthma?
17             A.      Truthfully, not until all of this
18  happened.
19             Q.      Now, you made, like, the -- the
20  decision of eliminating nonessential
21  work-from-home people.
22             A.      That's right.
23             Q.      Then, was there concerns about
24  that having a negative impact on people with ADA
25  rights?
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 18 of 50 PageID #: 388

```
 1              A.    I was not aware of anybody having
 2    ADA rights at that time.
 3              Q.    What about doctor's notes?
 4              A.    I was aware at the end people
 5    who's [sic], quote/unquote, submitted notes.
 6              Q.    Who do you mean "quote/unquote"?
 7              A.    If somebody submitted a note,
 8    then Yolanda kept track of it.
 9              Q.    Why?
10              A.    To deem whether or not they
11    actually fell into one of the preferential
12    work-from-home requests as an essential staff.
13              Q.    But that information wasn't
14    intended to be tracked for nonessential employees,
15    right?
16              A.    I don't understand the question.
17              Q.    So what I'm hearing from you is
18    that this list that Ms. Simpson was maintaining
19    for you --
20              A.    Uh-huh.
21              Q.    -- was to keep track of notes of
22    work-from-home requests.
23              A.    That's correct.
24              Q.    And notes that also included, you
25    know, medical documents or not?
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 19 of 50 PageID #: 389

```
 1              A.      Not medical documents, but if
 2      they had immune compromise or a doctor was saying
 3      they needed to be home.
 4              Q.      Okay.  That was a consideration
 5      for the essential employees?
 6              A.      That's right.
 7              Q.      Okay.  But it was not intended to
 8      be a consideration for nonessential employees?
 9              A.      That's correct.
10              Q.      All right.  Was there any concern
11      about legal liability as opposed to that effort?
12              A.      No.
13              Q.      Now, why is a team coordinator
14      who is able to report to work deemed essential?
15              A.      They weren't.
16              Q.      Okay.  Why were they allowed to
17      keep their job?
18              A.      Because they were working in the
19      office.
20              Q.      Well, why is that significant?
21              A.      Because we had an increased
22      workload.
23              Q.      What do you mean "increased
24      workload"?
25              A.      Because it was the pandemic.
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 20 of 50 PageID #: 390

```
 1   You, in a normal course of business, have things
 2   that are always going on with clients or
 3   operationally.  This was the entire world.  Every
 4   single trusted advisor, every single client, every
 5   one of my staff, every one of the business, it was
 6   absolute chaos.  So there was a lot of work to be
 7   done.
 8          Q.     What do you mean?  I'm still not
 9   following.
10          A.     Just what -- just what I
11   answered.
12          Q.     What type of work was --
13          A.     Business management work, support
14   work, client communication.
15          Q.     So clients were calling and -- or
16   trying to communicate with y'all because they had
17   concerns about the pandemic effects on their --
18          A.     A million times.  Over and over
19   and over and over again.
20          Q.     And on top of that, you were
21   aware that -- you were concerned about the tax
22   obligations, right?  Tax filings?
23          A.     Every duty that the firm is paid
24   to produce is a concern.
25          Q.     And so when the -- who was
```

Case 3:21-cv-00526  Document 40-2  Filed 11/03/22  Page 21 of 50 PageID #: 391

```
 1              Q.    No worries.

 2              A.    I know some, I don't know some.

 3              Q.    Yeah, that's what I'm trying to

 4    figure out.

 5              A.    Yeah.  Good luck.  I don't know

 6    either.

 7              Q.    Well, I mean, like Christie

 8    Andrews.  Christie Andrews you did know --

 9              A.    Andrews?

10              Q.    -- in 2014?

11              A.    Yeah, of course.

12              Q.    I mean, she was a pretty -- she

13    was there about seven years at that time?  Do you

14    --

15              A.    I -- I'm assuming that's correct,

16    yeah.

17              Q.    I mean, she -- she was one of

18    your -- a long-term employee; is that fair?

19              A.    Yeah, I mean, if she was there

20    that long, I mean, indeed.

21              Q.    Was there given any consideration

22    the fact of the years of service they provided

23    you?

24              A.    No.

25              Q.    Why not?
```

Case 3:21-cv-00526  Document 40-2  Filed 11/03/22  Page 22 of 50 PageID #: 392

1      A.      Because the -- there was a clear
2    deli- -- delineation of essential and nonessential
3    staff, period.
4              Q.      Well, if it -- if the -- was the
5    team coordinators, right?
6              A.      Uh-huh.
7              Q.      There was some that kept their
8    jobs and there's some that didn't, right?
9              A.      The ones who were nonessential
10   who were at the office kept their jobs.
11   Nonessentials who needed to work from home were in
12   the first round of cuts, period.
13             Q.      And so you think that's just a
14   neut- -- a neutral policy?
15             A.      That's right.  You do for -- I
16   mean, again, I can't explain this.  As a firm and
17   the CEO of the company.  So let's say I had 140
18   staff at the time.
19             Q.      Uh-huh.
20             A.      100-plus clients/entities.  We're
21   looking revenue.  We lost 100 percent of our live
22   business.  Business came to a screeching halt.  I
23   had to make a decision on how I was going to make
24   the cuts.  So there was going -- at that point in
25   time, on March 20th, it was going to be

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 23 of 50 PageID #: 393

nonessential requests to work from home,
duplicitous roles, highly-compensated and
duplicitous roles.

It was directly tied to fact that
we were going to be in a position where we knew we
were losing revenue and we were going to have to
make cuts. I didn't go through a list and go:
Oh, this one and that one. I had to come up with
what was going to generate, if possible, revenue
for the firm and who needed to stay in order for
the firm to continue to operate.

We are an essential business. We
weren't a retail store. We were a finance firm.

Q.    So the -- the Touring department
in your business --

A.    That's right.

Q.    -- you retained some of those
employees, right?

A.    We did. We repurposed them into
the business management team.

Q.    Okay. Repurpose, how?

A.    Uh-huh. It means they went into
an accounting function into the business
management team.

Q.    Okay. Any other way they were

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 24 of 50 PageID #: 394

```
 1   essential business, and we were not closing the
 2   doors to the office.
 3           Q.      Okay.
 4           A.      And that if you were able to come
 5   to work, you needed to come to work.  We were in
 6   crisis mode.  We are responsible for the
 7   financials for a lot of people and businesses.
 8           Q.      Was -- was Christie Andrews the
 9   first person who you laid off?
10           A.      No.
11           Q.      Who was the first person?
12           A.      I don't know.  It was a whole
13   group on 3/20.  I think it was, like, 15 people
14   went in the first round.  I think all of the first
15   layoffs were done on that Friday on the 20th.
16           Q.      Okay.  And you didn't participate
17   in any of that?
18           A.      I did not.
19           Q.      All right.  Let me ask you this.
20   If Ms. Andrews had not requested to work from
21   home, would she have kept her job?
22           A.      Probably not.
23           Q.      Why not?
24           A.      Because the next rounds of
25   consideration were performance, and I would have
```

Case 3:21-cv-00526  Document 40-2  Filed 11/03/22  Page 25 of 50 PageID #: 395

| | |
|---|---|
| 1 | ultimately let her go in probably the next round. |
| 2 | Q.     But with respect to the March |
| 3 | 2020 -- the first round -- |
| 4 | A.     Uh-huh. |
| 5 | Q.     -- performance wasn't a factor |
| 6 | there? |
| 7 | A.     That's right. |
| 8 | Q.     Are -- are you aware of anything |
| 9 | -- and this might seem technical, but like |
| 10 | disparate impact discrimination claims, do you |
| 11 | understand what that is? |
| 12 | A.     No. |
| 13 | Q.     Okay. |
| 14 | A.     I just need one minute.  I want |
| 15 | to count this for a second. |
| 16 | Q.     Okay.  You -- do you want a pen |
| 17 | with a paper? |
| 18 | A.     No. |
| 19 | Q.     Okay. |
| 20 | A.     Okay. |
| 21 | Q.     If -- if people needed to take -- |
| 22 | well, strike -- strike that. |
| 23 | You don't have general counsel on |
| 24 | your payroll? |
| 25 | A.     That's correct. |

Case 3:21-cv-00526  Document 40-2  Filed 11/03/22  Page 26 of 50 PageID #: 396

```
 1   some clients who were wealthy and weren't really

 2   impacted.  They weren't going to have cash flow

 3   short out [sic] -- or shortfalls, and you had

 4   others who were negatively impacted because they

 5   depended on the live business to generate revenue.

 6              Q.    Okay.  So forecasting, is what

 7   you're saying?

 8              A.    Yeah.

 9              Q.    And so how long did that take?

10              A.    I -- it was ongoing.  Again,

11   COVID.  Nobody had ever been through it.  We

12   didn't know if we were doing projections for -- in

13   -- in the beginning, we thought we were doing

14   projections for eight weeks of cash shortage.  We

15   all thought we were going to be in this eight

16   weeks.  And then eight weeks turned into two --

17   two years?  What are we, in two-and-a-half years

18   now?  I mean, the live business still hasn't

19   recovered.

20              Q.    Right.

21              A.    I mean, even the government went

22   into doing, you know, additional announcements and

23   other things that they wanted to shut down.

24              Q.    Were you aware of the CARES Act

25   in early March 2020?
```

Case 3:21-cv-00526  Document 40-2  Filed 11/03/22  Page 27 of 50 PageID #: 397

```
 1              A.     I don't know what that is off the
 2    top of my head right now.
 3              Q.     Okay.  So was there an immediate
 4    dip in the financials of your firm?
 5              A.     Yeah.  We lost 100 percent of the
 6    live business.  I don't know how else to say that.
 7              Q.     Well, I don't --
 8              A.     Nobody was on the road.  Not one
 9    dollar generated from touring.
10              Q.     Sure.  I --
11              A.     Nobody.
12              Q.     I --
13              A.     Zero.
14              Q.     I under- --
15              A.     National shutdown.
16              Q.     I understand that, that it would
17    impact your clients, but how do you generate fees?
18              A.     Commissions on that.  So if
19    you've got a $14 million tour running over eight
20    weeks and you get 5 percent of it, that's $700,000
21    in the toilet, gone.
22              Q.     Okay.
23              A.     So yeah, we lose 100 percent of
24    that revenue.
25              Q.     But at the time of -- the
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 28 of 50 PageID #: 398

```
 1   beginning of March of 2020, that had not happened
 2   yet, or had it?
 3           A.      On March 16th of 2020, the
 4   government shut the world down, and nobody was on
 5   a plane or standing on a stage singing a song.  So
 6   I don't know how else to say it, respectfully.
 7           Q.      I'm --
 8           A.      Earnings, you don't step on the
 9   stage, you don't generate a dollar.
10           Q.      Sure.  And that all happened
11   March 16th?
12           A.      That's right.  Everybody came off
13   the road.  Anybody who was on the road was coming
14   off.  There were people in Europe.  There were
15   last flights.  The planes shut down.  It was
16   chaos.
17           Q.      And that's the day you decided to
18   make -- to terminate people?
19           A.      I decided to terminate people
20   over the weekend.  Everybody was announcing
21   layoffs.
22           Q.      Right.  But --
23           A.      The whole world was announcing
24   layoffs.
25           Q.      Okay.
```

Case 3:21-cv-00526  Document 40-2  Filed 11/03/22  Page 29 of 50 PageID #: 399

```
 1    Disabilities Act?

 2                    MS. SWAFFORD:  Objection, asked

 3           and answered.

 4    BY MR. ARCINIEGAS:

 5           Q.     In -- in 2020, were you aware of

 6    it?

 7           A.     I already answered the question.

 8           Q.     Okay.  What was the answer?  You

 9    were aware of the Americans --

10           A.     I don't know.  Ask her.  She's

11    keeping the record.

12           Q.     What was the -- were you aware --

13           A.     I could not recite that to you.

14    I am aware that there is a American Disabilities

15    Act.

16           Q.     But that did not factor into your

17    decision-making one way or the other?

18           A.     I didn't --

19                    MS. SWAFFORD:  Object to the

20           form.

21                    THE WITNESS:  I didn't even -- as

22           far as I'm aware, we didn't have anybody

23           who was disabled, that I knew of.

24                    (Exhibit 3 was marked.)

25                    MR. ARCINIEGAS:  We'll mark this
```

1   that they were going to be required more than ever

2   to step into what was a national disaster.

3            Q.      Okay.   What were the -- what was

4   the type of financial stuff that Ms. Andrews could

5   not do?

6            A.      Ms. Andrews was not an

7   accountant, nor was she a finance major.

8            Q.      Okay.   But she was responsible

9   for team coordination?

10           A.      Yeah.   Communication,

11  deliverables, to-dos, and all of her work was

12  dispersed within the organization.

13           Q.      All right.

14           A.      I mean, I -- I'm not going to be

15  held to the count here because my eyes are bad,

16  but --

17           Q.      Sure.

18           A.      -- it looks like there's more

19  than 30 people that were laid off, and every

20  single person that I see on this list that was

21  nonessential, duplicitous, there's not one single

22  nonessential person who was not laid off who

23  requested to work from home.   There was no

24  disparity in the decision-making.

25           Q.      Do you see Mr. Luecke writes

```
 1          A.      Uh-huh.

 2          Q.      I didn't highlight that section.

 3   What -- what do you mean "that cannot work"?

 4          A.      I think that stands for the fact

 5   that they weren't going to come into the office

 6   and not work.

 7          Q.      What sensitive information did

 8   Ms. Andrews deal with that she couldn't do at --

 9   from home?

10          A.      Ms. Andrews would not have been

11   allowed to work on anybody's, quote/unquote,

12   account from home.  She wasn't an accounting or

13   finance major.

14          Q.      Yeah, but -- we've established

15   that.

16          A.      Uh-huh.

17          Q.      What I'm asking is what duties

18   did she normally do --

19          A.      Uh-huh.

20          Q.      -- that she couldn't do from

21   home?

22          A.      She was responsible for managing

23   the deliverables, running the team meetings,

24   tracking the deliverables, talking to the team

25   about requests that were needed from the trusted
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 32 of 50 PageID #: 402

```
 1   advisors or the clients.  It is -- it's a
 2   communications position.
 3              Q.     Right.  And communications
 4   position involved both offices; fair?
 5              A.     Uh-huh, it did.
 6              Q.     So people could communicate from
 7   -- with the West office and the East office?
 8              A.     That's right.
 9              Q.     Using e-mail and telephones,
10   right?
11              A.     It's not dividing the teams, and
12   that's not your decision to make.  It is my
13   decision --
14              Q.     I agree.
15              A.     -- as a firm that the information
16   for the clients would be in the firm, and either
17   you were working and supporting the team or you
18   were not.
19              Q.     Okay.
20              A.     That is a decision as a business
21   owner in America that I get to make.
22              Q.     And for -- for certain categories
23   of individuals, you took into account whether they
24   had an immune system issue; fair?
25              A.     Uh-huh.
```

Case 3:21-cv-00526  Document 40-2  Filed 11/03/22  Page 33 of 50 PageID #: 403

```
 1              you mean by effectuated.   What do you
 2              mean by that?
 3   BY MR. ARCINIEGAS:
 4         Q.    Well, you hadn't told any --
 5         A.    What position --
 6         Q.    You hadn't told any of your
 7   staff?
 8         A.    That's right.
 9         Q.    You hadn't -- you hadn't told
10   your HR person?
11         A.    That's right.
12         Q.    It was something that you had in
13   your head --
14         A.    That's right.
15         Q.    -- fair?
16         A.    Yep.
17         Q.    And here, on doctor's 18th --
18         A.    Uh-huh.
19         Q.    -- you know, your HR person is
20   telling you these individuals have a -- in fact,
21   let's look at the actual language that she uses.
22         A.    Uh-huh.
23         Q.    I'm looking at Plaintiff's
24   Exhibit 5.
25         A.    Yeah.
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 34 of 50 PageID #: 404

```
 1            Q.    It's the one with 123.

 2            A.    Yeah.

 3            Q.    And it says:  "I have received

 4    doctors' notes from each person listed validating

 5    that they do have valid concerns."

 6                  Do you see that?

 7            A.    Uh-huh.

 8            Q.    Did that factor into any of the

 9    layoff decisions?

10            A.    No.  Nonessential staff was going

11    to be cut in the first round that requested work

12    from home.  It was an economic decision.

13            Q.    Okay.  It -- there was no

14    consideration of the ADA requirements?

15            A.    I did not know anybody to have a,

16    quote/unquote, disability that worked for Tri

17    Star.

18            Q.    Okay.  But if you look --

19            A.    They had a note that says they

20    had valid concerns.  That doesn't spell out these

21    are people who fall within an ADA guideline.  They

22    are nonessential staff who requested to work from

23    home.  I could have just said I'm going lay off

24    nonessential staff as a first round and just taken

25    those folks off.
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 35 of 50 PageID #: 405

```
 1            Q.     I'm sorry.  Say that part again.
 2            A.     I would have just taken off the
 3    first round of nonessentials.  That's -- it was --
 4    we needed some people to be in the firm, and work
 5    from home was a cost element.
 6                   Laptops, then again, VPNs,
 7    equipping essential staff to generate revenue, if
 8    there was going to be revenue for the business,
 9    was preferential.  It was about saving the
10    business.
11            Q.     Right.  So what I -- and I don't
12    -- let me ask you this.  Are you familiar with the
13    phrase undue hardship within the context --
14            A.     No.
15            Q.     -- of the Americans with
16    Disabilities Act?
17            A.     No.
18            Q.     What was the cost of a laptop?
19            A.     I have no idea.
20            Q.     Okay.  Let me ask you this.  And
21    I -- and I understand that this was a -- or I'm
22    sensing that this is somewhat tense here, but I
23    want to --
24            A.     Oh, no --
25            Q.     I want to --
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 36 of 50 PageID #: 406

```
 1   have a receptionist.  You have essentially a team
 2   assistant.  They're not essential to the business
 3   to generate revenue.  It was a decision to reduce
 4   the workforce by what was going to support the
 5   business.  They don't support the business.
 6                   And you're talking about one
 7   laptop.  It wasn't one laptop.  It was VPNs,
 8   security scramble.  Everybody in America was
 9   trying to get a bloody laptop.  I -- we weren't
10   the only organization requiring IT support at that
11   point in time.  I mean, I get that you need to do
12   this for your client --
13              Q.      Uh-huh.
14              A.      -- but the bottom line was, the
15   decision was, that anybody we needed to spend
16   money on to equip to work from home as a
17   nonessential staff, we were not keeping.
18              Q.      Okay.
19              A.      And there's no "we."  That was my
20   decision.
21              Q.      I'll hand you Plaintiff's Exhibit
22   6.
23              A.      Yeah.
24                   (Exhibit 6 was marked.)
25                   MS. SWAFFORD:  Have a copy?
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 37 of 50 PageID #: 407

```
 1          A.      Somewhere in the midst of the
 2    week, I knew that she was the person who had not
 3    come to work Thursday and Friday before the
 4    shutdown.
 5          Q.      So you're talking about the week
 6    prior to the --
 7          A.      That's right.
 8          Q.      Okay.  Just making sure.  That's
 9    when you'd learned of it?
10          A.      That's right.
11          Q.      Okay.  But what does -- you --
12    you knew that Ms. -- from your conversation from
13    Ms. Simpson, that Christie was one of the first --
14    was the first person to request to work from home
15    on that Monday; fair?
16          A.      I -- I wouldn't say the first
17    person.  I tend to remember that that was the
18    first I re- -- obviously knew people were going to
19    request to work from home.  I just remember her
20    talking to me about Christie.  I think she was
21    following up pretty consistently with everybody.
22          Q.      With respect to the
23    work-from-home requests?
24          A.      That's right, and having not come
25    in prior to the shutdown.
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 38 of 50 PageID #: 408

```
 1    accommodation, to the extent permitted by law."

 2              A.      Uh-huh.

 3              Q.      When -- do you -- well, let me

 4    ask you this.  I don't think we've established

 5    this.  Do you understand that a work-from-home

 6    request can be considered a reasonable request for

 7    accommodation?

 8                      MS. SWAFFORD:  Object to the

 9              form.

10                      THE WITNESS:  I don't know if it

11              is or isn't.  It's not for us.  We don't

12              allow nonessential staff to work from

13              home.

14    BY MR. ARCINIEGAS:

15              Q.      Right.  But you understand that

16    there's, like, the law and then the -- how the law

17    has been interpreted by the courts.

18              A.      Uh-huh.

19              Q.      Did you make any effort to

20    ascertain whether the courts have viewed that a

21    work-from-home request can, in some

22    circumstances --

23              A.      Uh-huh.

24              Q.      -- qualify as a reasonable

25    accommodation?
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 39 of 50 PageID #: 409

```
 1                        MS. SWAFFORD:  Objection, calls
 2              for a legal conclusion.
 3                        THE WITNESS:  I don't know.
 4    BY MR. ARCINIEGAS:
 5              Q.    I'm just asking if you -- so you
 6    haven't done that, is what I'm hearing?
 7              A.    I -- I do know the next sentence
 8    says:  "Some, but not all, of the factors that Tri
 9    Star consider -- will consider are cost, effect,
10    and accommodation will have on the current
11    established policies and a burden on the
12    operations, includes other employees, determining
13    a reasonable accommodation."
14              Q.    Right.
15              A.    So as it related to COVID, it was
16    a burden for us to even consider work from home
17    for nonessential staff.
18              Q.    Right.
19              A.    It was a financial burden.
20    Uh-huh.
21              Q.    Let me ask you this.  Do you have
22    -- other than this disability accommodation policy
23    here --
24              A.    Uh-huh.
25              Q.    -- do you have any -- have you
```

Case 3:21-cv-00526  Document 40-2  Filed 11/03/22  Page 40 of 50 PageID #: 410

```
 1    that there's different types of relief that can be
 2    awarded by a jury if my client's successful?
 3         A.    Yes.
 4         Q.    Do you understand that
 5    reinstatement is one of those?
 6         A.    Yes.
 7         Q.    If a Court ordered her to be
 8    reinstated --
 9         A.    Uh-huh.
10         Q.    -- you would abide by that order,
11    correct?
12         A.    Of course.
13         Q.    Okay.  Do you think that Ms.
14    Andrews' asthma does not qualify as a disability
15    under the ADA?
16              MS. SWAFFORD:  Objection, calls
17          for a legal conclusion.
18              THE WITNESS:  I don't know.
19    BY MR. ARCINIEGAS:
20         Q.    Okay.
21         A.    Also, I never knew Christie to
22    have asthma.  She competitively cheered and was
23    pretty proud about that, so would not have been
24    something even on my mind.
25         Q.    How did you -- so you knew that
```

```
 1   she was competitively cheered?

 2          A.      I did.

 3          Q.      How did you know that?

 4          A.      She would talk about it.  She

 5   would request time off.  Sometimes they were

 6   travel competitions.  Sometimes she would coach.

 7   Sometimes she was in parades.

 8          Q.      Did you ever see her

 9   competitively cheer?

10          A.      I did not.

11          Q.      Do you know what other kind of

12   activities she was involved in?

13          A.      I do not.

14          Q.      But that's the basis of why you

15   think -- you don't think she would likely qualify

16   for disability?

17                  MS. SWAFFORD:  Object to the

18          form, misstates --

19                  THE WITNESS:  That's not what

20          I --

21                  MS. SWAFFORD:  -- the witness

22          said.

23   BY MR. ARCINIEGAS:

24          Q.      You correct me, then.  I didn't

25   mean to misstate.
```

Case 3:21-cv-00526  Document 40-2  Filed 11/03/22  Page 42 of 50 PageID #: 412

```
 1          A.      I -- I don't understand your
 2   question.
 3          Q.      Why did you bring up the
 4   competitive cheering?
 5          A.      Because you asked me did I
 6   understand that she had a disability as it related
 7   to asthma, and I said I wouldn't have thought
 8   that.  I didn't know she had a disability for
 9   asthma because she competitively cheered.
10          Q.      And you knew that before you made
11   the decision to terminate her?
12          A.      That I knew what?
13          Q.      That she comp- --
14          A.      That she competitively cheered?
15          Q.      Yeah.
16          A.      Yeah.  Of course.
17          Q.      Sorry.  So let me ask you this.
18   Tardiness and attendance is very important to Tri
19   Star, correct?
20          A.      Indeed.
21          Q.      Okay.  How do you guys track that
22   on a regular basis in 2017, 2018, 2019, 2020?
23          A.      I mean, I don't know that we,
24   quote/unquote, track it.  People have to input
25   their time into a system and they report to a
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 43 of 50 PageID #: 413

```
 1              Q.     And what do you base that
 2    knowledge on?
 3              A.     You said for me to recall
 4    roughly, and I remember consistently talking about
 5    it being a 220-some-odd-thousand-dollar lift for
 6    security protocols, VPNs.  Computers were at a
 7    premium.  Legal expenses to document the work from
 8    home.  I mean, it was a heavy lift for the firm,
 9    and we lost money.
10              Q.     Did you -- did you buy the
11    equipment or did you lease it?
12              A.     We bought the equipment.
13              Q.     Okay.  Do you remember the
14    vendor?
15              A.     I imagine we would have done it
16    through Nashville Computer.
17              Q.     And who -- you may not know, but
18    who's the point of contact over there or
19    individuals that you know from Nashville Computer?
20              A.     I don't know his --
21                     THE WITNESS:  What's Josh's last
22              name?
23                     I don't know.
24    BY MR. ARCINIEGAS:
25              Q.     Josh something?
```

```
 1          A.       Josh.   We would have ordered it

 2   through him.   I can't remember the owner's name

 3   right now.

 4                I sent the letter because the

 5   clients are adverse to people working from home on

 6   their stuff, so that's why it clearly says

 7   "accounting, finance and tax," and that we took

 8   highest level of security measures.   Because it

 9   just wasn't avoidable at this point in time during

10   the pandemic.

11          Q.       Why wasn't it?

12          A.       What's that?

13          Q.       What did you say, avoidable?

14          A.       Wasn't avoidable.

15          Q.       Okay.   Turn it around.

16                MS. SWAFFORD:   We've been going

17            another hour.   How much longer do you

18            think we've got?   I mean, it's the lunch

19            hour and I'm just trying to figure

20            out --

21                MR. ARCINIEGAS:   We can do lunch.

22            You want to do that?   We can do a quick

23            lunch?

24                MS. SWAFFORD:   Well, I don't

25            know.   I'm just asking --
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 45 of 50 PageID #: 415

```
 1   request pending, it's only -- or it was -- let me
 2   ask you --
 3            A.      All the layoffs happened 3/20.
 4   So nobody was privy to the -- the letter went out
 5   whatever date that was, I think the 16th, to go
 6   make your request known; what are we dealing with
 7   here.
 8            Q.      Okay.
 9            A.      The decision that we were not
10   going to be able to bear the burden of expense for
11   nonessential staff to work from home was made over
12   the weekend.  The staff was not notified until the
13   20th, in the afternoon.  We did it -- I believe,
14   we did it at the end of the day.
15            Q.      Sure.
16            A.      Yeah.
17            Q.      But the people who were
18   eliminated in that first, was it people who were
19   actually on work from home?
20            A.      Well, some people just -- I
21   guess, just didn't come in.  I think Christie was
22   one of them.  You know, they just weren't --
23   weren't coming in.  So I -- I can't tell you off
24   of the top of my head if there were ones who just
25   didn't come back.  I don't remember that.  I would
```

188

```
 1              A.     I -- I can't recall -- they were
 2    very -- it wasn't like the -- the other preparers
 3    or institutions who got paid.  They took that
 4    amount.  It was -- it was much more reduced.
 5              Q.     Okay.  And then --
 6              A.     I want to say -- I bet was less
 7    than $20,000 to do hundreds of them.  And not only
 8    do them once, but I think we did them two or three
 9    times, yeah, because the rules kept changing.  And
10    none of the institutions had a system in which to
11    actually process them, so everybody was scrambling
12    to try to figure out how to get it in the systems.
13              Q.     Companywide there wasn't a lack
14    of work, was there?
15              A.     No.
16              Q.     But you -- have you seen the
17    Separation Notices in this case that were filed
18    with the Tenn- -- the Tennessee Department of
19    Labor?
20              A.     I have not.
21              Q.     Are you aware that they indicate
22    that they were -- that the reason for the layoff
23    was lack of work?
24              A.     Lack of work, to me, globally is
25    the fact when you lose, you know, more than a
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 47 of 50 PageID #: 417

1    cuts.  Lack of work is not tangible work.  We did
2    more work than we've already done, given the lift
3    of COVID.
4                    So lack of work, to me, is if you
5    suddenly have clients not paying you, it's lack of
6    work 'cause we don't have the revenue to pay
7    people.  And in March of 2020, nobody was talking
8    about PPP.
9                Q.    Well, I mean --
10               A.    And I continued to make layoffs.
11               Q.    And -- and so clients weren't
12   paying y'all?
13               A.    No, I wouldn't say that, but we
14   obviously lost 100 percent of the commission
15   business on live, because that came to a
16   standstill.
17               Q.    But were there other fees that
18   you collected through the touring?
19               A.    No.
20               Q.    So it just 100
21   percent commission?
22               A.    Touring is commission-based,
23   uh-huh.  I use the example, if you have a $14
24   million tour rolling and it doesn't roll and you
25   generate $700,000 of that, all of those tours came

```
 1    generate $700,000 of that, all of those tours came

 2    off immediately, all live came to 100 percent

 3    halt.  And, in fact, Tri Star is just having

 4    clients start to go back out now.

 5              Q.    Were any employees getting raises

 6    after doctor's 30, 2020?

 7              A.    I don't believe so.  There were

 8    some highly compensated that in the -- I think,

 9    the last round of layoffs, instead of -- we had

10    some layoffs, and then we did have some

11    highly-compensated folks that took a 25 or a 30

12    percent reduction in salary.

13              Q.    Were there some employ- --

14    nonessential work from home -- or nonessential

15    employees who submitted work-from-home requests

16    that later retracted that request that were

17    allowed to continue employment, or you don't know?

18              A.    I don't know.

19              Q.    Who would know that information?

20              A.    Probably, Yolanda.

21              Q.    Let me ask you this.

22              A.    Yeah.

23              Q.    Was there any difference in your

24    decision-making for layoff purposes between

25    employees located California versus Tennessee?
```

Case 3:21-cv-00526   Document 40-2   Filed 11/03/22   Page 49 of 50 PageID #: 419

## Betsy Hart

| | |
|---|---|
| **From:** | Lou Taylor |
| **Sent:** | Wednesday, December 15, 2021 12:30 PM |
| **To:** | Heather Kinder |
| **Subject:** | Fw: Non-essentials WFH |

**From:** Lou Taylor ⟨████████████⟩
**Sent:** Thursday, March 19, 2020 5:58 PM
**To:** Bryan Luecke ⟨████████████⟩; Yolanda Simpson ⟨████████████⟩
**Cc:** Peggy Stephens <pstephens@team-tristar.com>
**Subject:** Non-essentials WFH

Bryan please schedule a time with Yolanda tomorrow to call Christie and discuss her layoff. All non essential staff on WFH is being laid off tomorrow

Coram Deo,
**Lou Taylor**
████████████

1

**EXHIBIT 17**
**WITNESS:** Taylor
**DATE:** 8-24-22
**CARISSA L. BOONE, RPR**

TRISTAR00106