# EXHIBIT D

```
 1    IN THE UNITED STATES DISTRICT COURT
      FOR THE MIDDLE DISTRICT OF TENNESSEE
 2              NASHVILLE DIVISION

 3
      CHRISTIE ANDREWS,              )
 4                                   )
              Plaintiff,             )
 5                                   )
      vs.                            )  CASE NO.
 6                                   )  3:21-cv-00526
      TRI STAR SPORTS AND            )
 7    ENTERTAINMENT GROUP, INC.,     )
                                     )
 8            Defendant.             )
                                     )
 9   _____

10

11

12

13
      VIDEOTAPED DEPOSITION OF:
14
      HEATHER KINDER
15
      Taken on behalf of the Plaintiff
16
      August 25, 2022
17
```

1

```
 1   APPEARANCES:

 2   For the Plaintiff:

 3        **DANIEL ARCINIEGAS, ESQ.**
          Arciniegas Law
 4        1242 Old Hillsboro Road
          The Atrium Building
 5        Franklin, Tennessee 37069-9129
          629.777.5339
 6        Daniel@attorneydaniel.com

 7   For the Defendant:

 8        **TARA SWAFFORD, ESQ.**
          **ELIZABETH "BETSY" HART**
 9        The Swafford Law Firm, PLLC
          321 Billingsly Court
10        Suite 19
          Franklin, Tennessee 37067
11        615.599.8406
          Betsy@swaffordlawfirm.com
12        Tara@swaffordlawfirm.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          A.      I did not.
 2          Q.      Did you ever have an asthma
 3   attack?
 4          A.      I did not.
 5          Q.      Did you know that Christie was a
 6   competitive cheerleader?
 7          A.      I did.
 8          Q.      How did you know that?
 9          A.      She talked about it often.
10          Q.      And you were a cheerleader as
11   well?
12          A.      I was.
13          Q.      Did you guys ever do any, like,
14   cheerleading together?
15          A.      I did not.
16          Q.      Did you ever see Christie
17   cheerlead -- cheerlead?
18          A.      Just what she would share on
19   social media.
20          Q.      Are you friends with Lou Taylor
21   in social media?
22          A.      I am.
23          Q.      What platforms?
24          A.      Instagram and Twitter.
25          Q.      When was your 30th birthday?
```

33

that we offer our clients.

    Q.    What's the benefit?

    A.    Competitors of ours do not have team coordinators. We have them as an added benefit so the accounting team can focus on accounting, and the team coordinators can do the administrative functions.

    Q.    What are the administrative functions?

    A.    Managing task lists, managing checklists, scheduling team meetings, preparing items for clients to pick up, tracking spreadsheets, tracking renewals, updating addresses.

    Q.    Anything else?

    A.    I mean, that's the general, what they did.

    Q.    Okay. Other than administrative tasks, what did TCs do?

    A.    That's it.

    Q.    Do you recall the -- the clients that were in -- assigned to Mr. Luecke's group?

    A.    I do.

    Q.    Okay. Can you give me some of the names?

```
 1            A.     Royalties, touring income,
 2   residuals.
 3            Q.     Anything else?
 4            A.     That's all I can think of.
 5            Q.     And what's the fee structure for
 6   -- of royalties?  Is it commission-based?
 7            A.     It depends on the client's
 8   contract.
 9            Q.     It can be?
10            A.     Correct.
11            Q.     And the same with residuals?
12            A.     Our clients have one contract
13   with us, and it depends on how their contract is
14   structured how are we earn income on them.
15            Q.     Okay.
16            A.     Or how we earn our fees.
17            Q.     So some of them could be a mix of
18   -- some could be retainer, some could be straight
19   commission, some can be a combination of
20   commission and retainer?
21            A.     And fee-based.
22            Q.     And fee-based?
23            A.     No.  And there's usually no
24   combination.  It's either a fee-based, a retainer
25   or the commission.
```

```
 1  it -- the number of AMEXes, is it just dependent
 2  on the number of clients, but also the number of
 3  people that work for them and the numbers in the
 4  family affair?
 5          A.    That's correct.
 6          Q.    So do most of your clients -- do
 7  most Tri Star clients have AMEXes?
 8          A.    I don't know.
 9          Q.    There had never been an AMEX
10  liaison person, as far as you know, until Ms.
11  Andrews, and there hasn't been one since?
12          A.    That's correct.
13          Q.    What do you know about the AMEX
14  liaison duties?
15          A.    I know that she -- if there was
16  an issue with someone's card, she's the one that
17  called AMEX.  And to my understanding, that's all
18  she handled as the AMEX liaison at the time.
19          Q.    So she did that for the seven
20  teams that you described?
21          A.    That's correct.
22          Q.    The seven business management
23  teams?
24          A.    That's correct.
25          Q.    So if the client or anybody's --
```

```
 1   or any client's, whatever dependent, let's put it
 2   that way, needed some help with the AMEX, they
 3   were directed to Christie?
 4           A.      They were not directed to
 5   Christie.
 6           Q.      How was it handled, then?
 7           A.      Internally.  That client would
 8   reach out to their contact within the firm, and
 9   that firm -- person, internally, would talk to
10   Christie.
11           Q.      Why -- what did you see the
12   benefit?  Do you -- why add that step?  Why
13   couldn't that per- -- person or con- -- point of
14   contact handle the AMEX?
15           A.      At the --
16           Q.      Or why is it -- why was that
17   inefficient, I guess?
18           A.      At the time, we had a contact at
19   AMEX that was easy to get ahold of, and Christie
20   had the relationship with him.
21           Q.      What was that?
22           A.      His name was David Rothman.
23           Q.      Rossman [sic]?
24           A.      Rothman.
25           Q.      Rothman.
```

1               What was the relationship?  I
2  don't understand the relationship.  Do you know?
3          A.      She had his phone number.
4          Q.      And why was that beneficial for
5  Tri Star?
6          A.      Well, it was beneficial that she
7  had a relationship with him.
8          Q.      But how -- okay.  Well, how did
9  that benefit translate to a benefit for Tri Star
10 and Tri Star's clients?
11         A.      She could easily call AMEX and
12 get someone to pick up the phone and unfreeze a
13 card.  However, that relationship was transitioned
14 to every single team coordinator when she left and
15 everyone was given the opportunity to speak with
16 David, including myself.
17         Q.      What do you mean including
18 yourself?
19         A.      If I needed to call him and say:
20 Can you help me with Lou's card, he would pick up
21 the phone.  So we were all privy to his
22 relationship.
23         Q.      So is it -- is it -- I think I
24 heard some -- some reference to VIP Services with
25 AMEX.  Are you familiar with that phrase?

1	A.	I see: "Status of Laptops."
2	Q.	Okay. So does it mean that they
3	-- all those individuals had laptops?
4	A.	So this is dated June 12th, 2020.
5	Q.	Right, I understand that.
6	A.	So as of June 12th, 2020, this is
7	saying -- saying that these people had laptops
8	with them.
9	Q.	Okay. And so these are people
10	that -- that have -- were -- do you know whether
11	all these people got brand new laptops in -- by
12	June of 2020 or....
13	A.	I do not. I know we had a laptop
14	shortage, and it was impossible to get them.
15	Q.	Right. So, I mean, if there's a
16	shortage and it's hard to get them, like -- and if
17	you don't -- and most people had desktops,
18	wouldn't you guys have been --
19	A.	I don't know if they had new
20	laptops, repurposed laptops, refurbished laptops.
21	I don't know where they got their laptops from,
22	but I know it was not easy.
23	Q.	Do you know -- and there -- Tri
24	Star has employees that are not listed on this
25	list; fair?

```
 1  else, like:  Oh, she's running something for a
 2  client or doing something for a client?
 3          A.    He would tell me -- if she was
 4  doing something for a client, he would have told
 5  me.
 6          Q.    Right.  That's what I'm asking.
 7          A.    But nine out of -- nine times out
 8  of ten, it's because she had personal issues that
 9  couldn't get her to work on time.
10          Q.    So you think you asked about this
11  ten times, or more?
12          A.    I don't recall.
13          Q.    Okay.  So what you're saying is
14  -- the things you do recall is that she had some
15  sort ter- -- personal issue when you asked
16  Mr. Luecke, right?
17          A.    That's correct.
18          Q.    Did you ask what type of personal
19  issue?
20          A.    Yes.
21          Q.    Okay.  And what type of personal
22  issues were you told?
23          A.    She slept in.
24          Q.    Okay.
25          A.    She forgot to set her alarm.  She
```

```
 1  lost her keys.  She lost her contacts.  She forgot
 2  to do something for her dog.  Typically, it was
 3  she slept in.
 4          Q.      And when you reported it to HR,
 5  what did they tell you?
 6          A.      That they were handling it.
 7          Q.      Do you know whether Mr. Luecke or
 8  HR took any other disciplinary steps against Ms.
 9  Andrews between 2019 and March of 2020?
10          A.      I don't know.
11          Q.      Did -- I mean, the purpose of
12  discipline is to help correct certain actions;
13  fair?
14          A.      Correct.
15          Q.      To discourage the continued
16  breaking of that?
17          A.      Correct.
18          Q.      And when the discipline is
19  issued, it's put in as part of their permanent
20  personnel file; fair?
21          A.      It's --
22                  MS. HART:  Object to form.
23  BY MR. ARCINIEGAS:
24          Q.      Or you don't know?
25          A.      I don't know.  If it's turned in,
```

| | |
|---|---|
| 1 | Christie was able to keep her job so long out any |
| 2 | -- with all these performance issues she was |
| 3 | having? |
| 4 | A. You want to know what I think? |
| 5 | Q. Yeah. |
| 6 | A. So in my opinion? |
| 7 | Q. Yeah. |
| 8 | A. In my opinion, the company was |
| 9 | very gracious to her. In my opinion, we liked her |
| 10 | personally, myself included. And in my opinion, |
| 11 | we wanted the best for her, and we made every |
| 12 | single effort we could to help her perform to her |
| 13 | highest ability and to make accommodations for her |
| 14 | so that she could perform to her highest ability. |
| 15 | Q. So other than tardiness and |
| 16 | absence, what was the problem with her -- with Ms. |
| 17 | Andrews' job performance? |
| 18 | A. Because of her tardiness and |
| 19 | absences, she would miss deliverables and |
| 20 | deadlines. |
| 21 | Q. And where is that documented, if |
| 22 | anywhere? |
| 23 | A. It would be documented in her |
| 24 | work product or someone taking over and finishing |
| 25 | something for her. |