# EXHIBIT F

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                NASHVILLE DIVISION

 3
     CHRISTIE ANDREWS,              )
 4                                  )
              Plaintiff,            )
 5                                  )
     vs.                            )  CASE NO.
 6                                  )  3:21-cv-00526
     TRI STAR SPORTS AND            )
 7   ENTERTAINMENT GROUP, INC.,     )
                                    )
 8            Defendant.            )
                                    )
 9   _____

10

11

12

13
     VIDEOTAPED DEPOSITION OF:
14
     PEGGY STEPHENS
15
     Taken on behalf of the Plaintiff
16
     August 24, 2022
17

18

19

20

21

22

23

24

25
                                                              1
```

```
 1   APPEARANCES:

 2   For the Plaintiff:

 3       DANIEL ARCINIEGAS, ESQ.
         Arciniegas Law
 4       1242 Old Hillsboro Road
         The Atrium Building
 5       Franklin, Tennessee 37069-9129
         629.777.5339
 6       Daniel@attorneydaniel.com

 7   For the Defendant:

 8       TARA SWAFFORD, ESQ.
         ELIZABETH "BETSY" HART
 9       The Swafford Law Firm, PLLC
         321 Billingsly Court
10       Suite 19
         Franklin, Tennessee 37067
11       615.599.8406
         Betsy@swaffordlawfirm.com
12       Tara@swaffordlawfirm.com

13   Also Present:

14       Peggy Stephens

15

16

17

18

19

20

21

22

23

24

25
```

2

assisting the teams with meeting job deliverables.

Q.    Okay.  Explain.  Expand upon that, please.

A.    So kind of like the title indicates, the team coordinator, they would really project manage the team insofar as managing the deliverables and en- -- and ensuring that if a client e-mail came in or if a trusted advisor e-mailed, was there a response to the e-mail.  It was their job to go: Did someone respond?  Not that they were responsible for the response.  It was their responsibility to ensure a response was given.

Q.    Okay.  How else did they help the team manage the projects?

A.    We have trackers.  We have checklists.  And the team coordinators are responsible for ensuring checklists are completed, that the tracker's set up to track open items for the clients, would be completed in a timely manner.

Q.    And what's the name of that system?

A.    Teams.

Q.    I'm sorry?

| | |
|---|---|
| 1 | Q. Was it within your scope of |
| 2 | authority to tell Mr. Luecke to discipline Ms. |
| 3 | Andrews for excessive tardiness? |
| 4 | A. We had regular conversations with |
| 5 | Ms. Andrews. |
| 6 | Q. And you guys went through the |
| 7 | formal disciplinary process at the times? |
| 8 | A. We would have verbal and we would |
| 9 | do it in e-mail, which was written. Did we |
| 10 | formally write her up? I know that I participated |
| 11 | in a couple of write-ups for her tardiness. Did |
| 12 | we ever take it as far as to fire her? No, we did |
| 13 | not. |
| 14 | Q. Did you -- did you consider the |
| 15 | -- the adjustment to her schedule to be a |
| 16 | reasonable accommodation under the AD- -- ADA? |
| 17 | A. Yes. |
| 18 | Q. Okay. Did you see a Reasonable |
| 19 | Accomodation form completed for that? |
| 20 | A. We had -- yes. I mean, it wasn't |
| 21 | a specific ADA form. Did we have a form that |
| 22 | changed her hours of -- in the office? Yes, that |
| 23 | was a form that we completed, and we made a change |
| 24 | to it to accommodate her. |
| 25 | Q. And when did you first learn that |

```
 1  Ms. Andrews was going to be terminated?
 2          A.      As part of the RIF?
 3          Q.      Uh-huh.
 4          A.      I found out when everyone else
 5  found out.
 6          Q.      So it was announced that: We're
 7  terminating Ms. Andrews?
 8          A.      No.  It was after -- after the
 9  RIF happened.  There was no foreknowledge to
10  anyone.  It was between Lou, and that was really,
11  like, HR for making any sort of payroll
12  adjustments under California law.
13          Q.      Why under California law?
14          A.      Because California law, if you
15  RIF somebody, you have to pay them same day.  So
16  the payroll has to be processed.
17          Q.      But I thought Andrews -- but
18  you're not specifically addressing Andrews?
19  You're just talking about the RIF that impacted a
20  couple --
21          A.      Well, because it was a group of
22  people.  It wasn't just one person.
23          Q.      It's been a long day.  Have we
24  introduced a document under the Protective Order
25  113 yet?  Is that....
```

1 left, did you have a conversation with her?
2 A. I did not.
3 Q. You worked for her -- with her
4 for at least seven years; is that fair?
5 A. That is fair.
6 Q. And you didn't send her, like --
7 or say: It was nice working with you, or anything
8 like that?
9 A. I did not.
10 Q. Would you consider Ms. Andrews
11 for rehire?
12 A. I would not.
13 Q. Why not?
14 A. The -- the difficulty in every,
15 single day work with Christie was too difficult to
16 want to rehire her. It was problematic. It was
17 hard.
18 Q. Can you be more specific for me?
19 A. She was not a good employee,
20 because she was unreliable, undependable for her
21 team. We need people who are dependable.
22 Q. Okay. Any other reasons you
23 wouldn't consider her for employment?
24 A. No.
25 Q. Okay. And have you ever seen a

73