THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **CHRISTIE ANDREWS,** | |
| Plaintiff, | |
| v. | Case No. 3:21-cv-00526 |
| **TRI STAR SPORTS AND ENTERTAINMENT GROUP, INC.** | Judge Eli J. Richardson<br>Magistrate Judge Jeffery S. Frensely |
| Defendant. | JURY DEMAND |

**PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**


Respectfully submitted,


_____

Daniel Arciniegas TBPR. 35853
**ARCINIEGAS LAW**
1242 Old Hillsboro Road
The Atrium Building
Franklin, Tennessee 37069
Telephone: 629.777.5339
Fax: 615.988.9113
Daniel@AttorneyDaniel.com

*Counsel for Plaintiff
Christie Andrews*

## INTRODUCTION

In March 2020, Tri Star Sports and Entertainment Group, Inc. ("TriStar") was required to comply with the Americans with Disabilities Act, as amended in by Americans Disabilities Amendments Act of 2008 ("ADA" or "Act"). By failing to comply with the Act's mandates, TriStar violated the Act's prohibition against discrimination, interference, and retaliation in March of 2020.

Specifically, TriStar violated Andrews's rights under the Act by ignoring Andrews's disability, ignoring Andrews's request for reasonable accommodation, refusing to engage in the interactive process, denying Andrews a reasonable accommodation, classifying Andrews in a way that adversely impacted her status as an employee, utilizing criteria on the basis of disability, denying Andrews her continued employment for requesting a reasonable accommodation, and retaliating against her for proposing a reasonable accommodation request.

TriStar improperly moves to dismiss Christie Andrews's case by asking this Court to ignore Congress's purpose in amending the act which was to restore the intent and protections of the Americans Disabilities Act of 1990. TriStar provides the Court with pre-amendment cases, or more recent cases that rely upon pre-amendment case, that are no longer authoritative. TriStar ignores the facts establishing genuine disputes of material facts. Further, TriStar does not produce any undisputed material facts on which this Court can base an opinion in favor of dismissal by summary judgment.

## The Facts

### Christie Andrews's history of Asthma

Christie Andrews has asthma. Andrews's asthma cannot be cured and is a chronic condition limits the airways in the lungs.[1] Andrews's Asthma is a condition in which Andrews's airways narrow and swell and may produce extra mucus. This makes breathing difficult and triggers coughing and shortness of breath. Andrews's Asthma symptoms[2] can be controlled with mitigating measures that include behavioral modifications, daily medications – including an inhaler. Even with the ameliorative effects of mitigating measures Andrews's breathing remains impaired. Also, Andrews's mitigating measures, taking steroid medication, have non-ameliorative effects that impair her immune system. In March of 2020, Andrews's asthma placed her at increased risk of severe complications if exposed to COVID-19.

In 2014 Andrews disclosed her Asthma to TriStar. (Plaintiff's Exhibit 1). In 2018, Andrews again informed TriStar she had asthma that was triggered by the cold, leading TriStar to change its space heater policy. On January 26, 2018, Steve Krell, e-mailed TriStar management that Andrews had messaged "about being cold and her asthma acting up (not necessarily one causing the other, but seemed related) . . ." TriStar Business Management Director Peggy Stephens forwarded Krell's e-mail stating, "FYI - she is out sick again today. But she change (sic) policy so I'm sure she is happy about that!". (P. Ex. 2).

---

[1] https://www.nhlbi.nih.gov/health/asthma

[2] Asthma signs and symptom include: (1) shortness of breath; (2) chest tightness or pain; (3) wheezing when exhaling, (4) trouble sleeping caused by shortness of breath, coughing or wheezing, (5) coughing or wheezing attacks that are worsened by a respiratory virus, such as cold or the flu. https://www.mayoclinic.org/diseases-conditions/asthma/symptoms-causes/syc-20369653

**Christie Andrew's job and responsibilities**

Andrews started with TriStar as a part-time runner in July 2014 before becoming a full-time administrative assistant. In March of 2017, TriStar paid Andrews moving expenses to continue working as a Client Specialist. Andrews was then made a Team Coordinator.

In July 2019, TriStar approved Andrews to receive a raise. (P. Ex. 6). By March of 2020, Andrews was approaching her sixth year as a TriStar employee. (P. Ex. 2). Andrews's long tenure and experience in both its offices led her to be recognized as a Team Lead for all of TriStar's Team Coordinators. (Deposition of Peggy Stephens 35:25-36:0; Deposition of Christie Andrews 34:10-35:12). TriStar's Director of Business Management, Peggy Stephens, explained that Andrews was a good resource for Team Coordinators to ask questions of because she had experience in both the California and Tennessee offices. (Stephens 36:19-37:09; 39:05-08; Andrews 34:10-35:12).

In March 2020, Andrews was also the American Express Liaison ("Amex Liaison")  for all of TriStar. (Taylor 76:19-77:10). As Amex Liaison, she handled all of the 100+ clients with Amex cards (including business cards issued to employees of clients' business). (Kinder 56:18-57:05).

Team Coordinators' duties and services are not separated by East and West office. (Taylor 66:01-24). Team Coordinators were the equivalent to assistants to the accounting or business manager who would assist by providing to do lists, direct client communication, garnering internal resources for client needs, trusted advisor needs, running the team meetings, tracking the teams' open deliverables that need to be completed either internally for the firm, externally to the trusted advisor, or the client. (Taylor 12:18-13:12). Team Coordinator is a benefit that TriStar offers to TriStar Clients, it allows accounting team to focus on accounting and team coordinators can do administrative functions such as managing task lists, managing checklists, scheduling team

4

meetings, preparing items for clients to pick up, tracking spreadsheets, tracking renewals, updating addresses. (Kinder 39:22-40:14). Team Coordinators essential job functions – manage the team deliverable and track open deliverables – projects assigned by the team. (Taylor 157:16-23). Taylor states that clients are not going to talk to Team Coordinators about contract servicing or taxes. Rather about a license plate, the dog walker tracking renewals, updating addresses. (Taylor 59:17-60; Kinder 39:22-40:14).).

**A Global Pandemic Begins**

In March 2020, the Centers for Disease Control and Prevention ("CDC") stated that people who have a serious chronic medical condition like "lung disease," should be considered individuals "who are at a higher risk of getting very sick from this illness."[3] The CDC stated "people with asthma may be at a higher risk of getting very sick from COVID-19. COVID-19 can affect one's respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease.[4]

On March 15, 2020, Andrews contacted her healthcare provider Autumn Nelson ("Nelson") and asked whether there were any precautions she should be taking due to her asthma and COVID-19, because she had seen online that asthmatics were considering not taking their medications. (P. Ex. 7). Andrews's health care provider responded, "the best thing you can do is wash your hands, work from home if you are able." (P. Ex. 7).

---

[3] https://web.archive.org/web/20200314230325/https://www.cdc.gov/coronavirus/2019-ncov/high-risk/high-risk-complications.html

[4] https://web.archive.org/web/20200319123657/https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html

On March 16, 2020, at 8:58 AM Andrews followed up and messaged Nelson, "And don't stop with the meds right?" (P. Ex. 8). That same day Andrews's asthma was trigged by Lysol aerosol spray that impaired her breathing and led her to use her rescue inhaler. (P. Ex. 18). Andrews immediate manager Brian Luecke sent Andrews' home. On March 16, 2020, at 4:27 Andrews sent an e-mail informing HR Generalist Yolanda Simpson that she has a company laptop and that a health care provider friend called her irresponsible for not staying home. (P. Ex. 10). She specifically asked, "may I please be approved to work from home." (P. Ex. 10.)

On March 16, 2020, Peggy Simpson told Taylor that Andrews had requested to work from home. (Deposition of Lou Taylor, 47:13—48:07). Andrews further discussed her asthma with Simpson on the phone the next day. (P. Ex. 15).

**Christie Andrews requests a reasonable accommodation**

On March 17, 2020, at 10:24AM TriStar's Chief of Staff, Heather Kinder, e-mailed TriStar's Human Resource Specialist, Yolanda Simpson, and asked for an updated list of individuals requesting to "Work From Home" and to include "if they have provided appropriate documentation." (P. Ex. 17). That same day at 11:15AM, Simpson responded by e-mail with a word document titled "WFH List 2.15.20.docx." (P. Ex. 17). Included on that list is Christie Adams (sic)[5] and appearing next to her name is "Compromised Immune System." (P. Ex. 17).

On March 17, 2020, at 11:57AM, Kinder forwarded to TriStar's Director of business management an e-mail sent by TriStar's Business Manager Brian Luecke at 10:07AM[6] with the

---

[5] Simpson writes Christie Adams, however, no one at TriStar knows a Christie Adams, TriStar Director of Business Management Peggy Stephens testified it is a safe inference that Simpson was referring to Andrews. (Stephens 70:08-16)
[6] Luecke's e-mail included Simpson, Kinder and Stephens.

subject line "Christie." Luecke e-mails stating that he instructed Christie to take a sick day and stay home. He also reports:

> She has a cough. Hopefully not the Covid virus but who knows. She thinks its from Lysol Spray . . . She does have the ability to work from home since she has laptop primarily for AMEX support after hours. I am sure she would rather work from home than burn sick or vacation days but really it would be irresponsible for her to come into the office. I would recommend that you offer of a work from home situation but in the absence of this I think she should stay away from the office of matter how the time is counted.

(P. Ex. 18).

In Kinder's e-mail forward she writes "So now we are getting complaints about the cleaning products. What do people want!?!?!?!" (P. Ex. 18). Stephens responds,

> Ugh – I know. I do have to say that I know cleaning products do cause some people issues – Christy has so many "ailments" its just crazy.

> Just do the best you can and make decisions based upon the situation and don't worry about pleasing everyone. It's hard for you – I know as I am a pleaser too. But in this situation, someone is going to be unhappy – it's just the hard reality.

> You are doing great. This is being managed well and ignore the "noise" – that is what it is.
> Sorry – I know you feel the pressure.

(P. Ex. 10).

On March 17, 2020, at 3:50PM, Andrews sends an e-mail to Bryan Luecke, Yolanda Simpson, Peggy Stephens, and Heather Kinder with a note from her healthcare provider stating:

> Christie· Andrews has been a patient at our office for several years. She has known **asthma**. Although well controlled, **she would benefit from working at home due to the rising risk of -19**. If you have any questions or concerns, feel free to call our office.

7

(bolding added) (P. Ex. 15).

On March 17, 2020, at 4:05 PM **Simpson wrote to TriStar CEO Lou Taylor:**

Hi Lou,

The following employees have requested to work from home based on compromised immune systems. I have **received doctor's notes** from each person **listed validating that they do have valid concerns**.

\* \* \*

1. REDACTED
2. REDACTED
3. REDACTED
4. REDACTED
5. Christie Adams. (sic)

(bolding added)(P. Ex. 17). Taylor Responded that same day at 7:35PM with, "You and I can review this tomorrow. Thank you." (P. Ex. 19).

On March 18, 2020, at 7:16 PM Taylor sent an e-mail to Bryan Luecke and Peggy Stephens, then cc'd Yolanda Simpson:

The following people requested WFH permissions who qualify under preferential considerations:

**WFH Essential Operational Staff – Preferential Considerations**
REDACTED
REDACTED
REDACTED – will also put on Bret's list.

**WFH - Non Essential Operational Staff – Preferential Considerations**
Christie Andrews – Impending Layoffs

Essential staff above are approved for WFH status and will be provided a laptop. Once the computers are available they will be issued we hope to have everyone a computer on this list by Friday. Please discuss this with your staff.

8

Once the labor lawyer reviews our WFH workpaper I will sign it and you can review the terms and the conditions with your staff and have them sign.

Non- Essential – I will get back to you before EOD tomorrow as we assess how we are going to treat non-essentials that cannot work. This should be kept confidential while I work through these details.

Thank you very much and let me know if you have questions.

(Bolding in original) (P. Ex. 20). On March 18, 2020, Bryan Luecke wrote:

Just so you know Christie has a laptop in the office – it is not in her home so we could get that setup straight away.

Christie has been asking for answers so thank you for being sensitive to the timing.

(P. Ex. 23). Taylor responded at 9:34PM by asking "Is she using vacation time right now?" (P. Ex. 23).

On March 19, 2020, Luecke responds to Taylor "She used a sick day and is now out and has 4 vacation days and yes." (P. Ex. 23). Taylor responds to Non-Essentials WFH – Bryan please schedule a time with Yolanda tomorrow to call Christie and discuss her layoff. All non-essential on WFH is being laid off tomorrow." (P. Ex. 21). TriStar sent Andrews a separation notice stating the reason:

5. Reason for Separation:  [x] Lack of Work   [ ] Discharge   [x] Quit

(P. Ex. 25). Simpson removed the "x" in box next to "Quit" when Andrews challenged it.

**<u>Summary of TriStar Pandemic Layoffs</u>**

TriStar terminated three people in Nashville office, including Plaintiff Christie Andrews, on March 20, 2020—all of whom requested to work from home and were classified as "Comprised Immune System." (P. Ex. 32). TriStar retained 4 Team Coordinators in Nashville.[7] (P. Ex. 34).

---

[7] (1) Ambra Baker; (2) Kellee Adamson; (3) Anna Lyons; (4) Nola Douglas Oakley.

Andrews was the only Team Coordinator TriStar terminated from Nashville office. (P. Ex. 34). That same day TriStar terminated two Team Coordinators from Los Angeles that TriStar's records classified as "Compromised Immune System." TriStar retained 6 Team Coordinators in Los Angeles. (P. Ex. 34).

CEO Taylor claimed that TriStar had to reduce its staff of 133 by 25%, resulting in layoffs 32 people. (Declaration of Lou Taylor, Document 40-3, p. 2.) However, this is in direct conflict with TriStar's PPP loan information. TriStar was approved on April 6, 2020, for $1,874,800.00 under the Payroll Protection Act to support 155 employees. (Plaintiff's Exhibit 50).

## THE LAW AND ARGUMENT

### I. STANDARD OF REVIEW

This court must consider the facts in the light most favorable to Andrews drawing all reasonable inference in her favor. Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F. 3d 844, 852 (6th Cir. 2018).

### II. AMERICANS WITH DISABILITIES ACT

Congress passed the Americans with Disabilities Act in 1990 to prohibit discrimination against a qualified individual on the basis of disability in various context of daily life. Congress passed the Americans with Disabilities Act Amendments Act of 2008 to invalidate decisions narrowly defining who qualifies as an individual with disabilities and reaffirming the comprehensive mandate for the elimination of discrimination against individuals with disabilities. *Hostettler v. Coll. of Wooster*, 895 F. 3d 844, 848-49 (6th Cir. 2018); 42 U.S.C. § 12112(a); 42 U.S.C. § 12101(b)(1)(2).

> The primary object of attention in cases brought under the ADA should be **whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition**

**of disability**. The question of whether an individual meets the definition of disability under this part should not demand extensive analysis.

(bolding added) 29 C.F.R. § 1630.1(4).

The Americans with Disabilities Act provides two primary theories of recovery for victims of discrimination. The first theory of recovery, known as "disparate treatment", prohibits intentional acts of discrimination by covered entities. 42 U.S.C. § 12112(a). Alternatively, disabled persons claiming a violation of the ADA may recover under the theory of "disparate impact". 42 U.S.C. § 12112(b); 29 C.F.R. §§ 1630.1, 1630.5, and 1630.7. The ADA defines "disability" in three specific ways. A person is disabled under the ADA when the person has "a physical or mental impairment that substantially limits one or more major life activities," has "a record of such impairment," or is "regarded as having such an impairment." 42 U.S.C. § 12102(1). The definition of disability must be construed broadly. 42 U.S.C. § 12102(4)(A).

### III.   PRIMA FACIE STANDARD

"ADA discrimination claims are analyzed under two different rubrics, depending on whether the Plaintiff relies on 'direct' or 'indirect' evidence of discrimination." *Morrissey v. Laurel Health Care Co.*, 943 F.3d 1032, 1039 (6th Cir. 2019)

### 1.   <u>Direct Method</u>

Under the "direct method" of proof a plaintiff must show (1) that she is an individual with a disability, and (2) that she is otherwise qualified for her job despite the disability "(a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Ferrari v. Ford Motor Co.*, 825 F.3d 885, (6th Cir. 2016) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996).

When an "employer acknowledges that it relied upon the plaintiff's disability in making its employment decision . . . [t]he *McDonnell Douglas* burden shifting approach is unnecessary

because the issue of the employer's intent, the issue for which *McDonnell Douglas* was designed, has been admitted by Defendant . . . and the plaintiff has direct evidence of discrimination on the basis of his or her disability. *Monette*. 90 F.3d at 1182.

## 2.    <u>Indirect Method</u>

On the other hand, the "indirect method" applies the burden-shifting approach of *McDonnel Douglas*. *Id*. at 891-892. The plaintiff must first establish a *prima facie* case of discrimination by showing that they are disabled; they are otherwise qualified for the position, with or without reasonable accommodation; they suffered an adverse employment decision; the employer knew or had reason to know of the plaintiff's disability; and the position remained opened while the employer sought other applicants, or the disabled individual was replaced. *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (reaffirming that "*Monette* states the proper test" under the indirect method).

Because TriStar has asserted "Reduction in Force" as its putative justification for terminating Andrews's employment, Andrews is not required to showing that she was replaced.

> Where, as here, an employee is laid off as part of a reduction-in-force (RIF), the fourth requirement is modified and, rather than showing that she was replaced, the plaintiff must present "direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons."

*Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 522 (6th Cir. 2021) (citing *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 420 (6th Cir. 1999) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)).

Once the plaintiff establishes a prima facie case under the indirect method, the burden shifts to the defendant to "offer a legitimate explanation for its action." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996).

## IV. DISABILITY

The ADA defines "disability" in three specific ways. A person is disabled under the ADA when the person has "a physical or mental impairment that substantially limits one or more major life activities," has "a record of such impairment," or is "regarded as having such an impairment." 42 U.S.C. § 12102(1). An employee is regarded as having a disability "if the [employee] establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019) (quoting 42 U.S.C. § 12102(3)(A)). The definition of disability must be construed broadly. 42 U.S.C. § 12102(4)(A).

To justify dismissal of Andrews's ADA claims, TriStar argues that she cannot establish she is disabled under any of the three broad definitions of disability. TriStar contends Andrews's asthma does not qualify as a disability and does only by relying cases that are either pre-Amendment cases, or more recent cases that rely upon pre-Amendment case law[8], and thus not authoritative. (See Doc. 39, Page ID# 258-259). The Sixth Circuit has unequivocally put to rest arguments, such as those TriStar relies on, that rely on analysis of pre-amendment "disability" definitions and case law. *Morrissey v. Laurel Health Care Co.*, 943 F.3d 1032, 1039 (6th Cir. 2019) ("Under the 2008 amendments to the ADA, Congress made clear that the definitions of both 'disability' and 'substantially limits' are to 'be construed broadly in favor of coverage."). TriStar enunciates a standard that fails to account for changes Congress made to 29 C.F.R. § 1630.2(j).[9]

---

[8] TriStar relies heavily on *Gergen v. City of Kentwood*, 2010 wl 2010878, (W.D. Mich. May 18, 2010) and other cases that are all pre-amendment and rely on those Supreme Court cases expressly rejected in the ADAAA.

[9] In *Barlia v. MWI Veterinary Supply, Inc.*, 721 F. App'x 439, 445 (6th Cir. 2018),

1. <u>**ACTUAL DISABILITY**</u>

The ADAAA instructs courts to construe the definition of disability "in favor of broad coverage of individuals." 42 U.S.C. § 12102(4)(A). "The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard." 29 C.F.R. § 1630.2. Major life activities include, but are not limited to, sleeping, caring for oneself, speaking, breathing, concentrating, thinking, communicating, and working. 42 U.S.C. § 12102(2)(A). And "the term 'major' shall not be interpreted strictly to create a demanding standard." 29 C.F.R. § 1630.2(i)(2).

To determine whether a disability substantially limits major life activities, the regulations direct courts to compare the person claiming a disability to "most people in the general population." 29 CFR at § 1630.2(j)(1)(ii). The ADA dictates that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42

---

The ADA also includes a number of rules of construction. Having concluded that the courts were defining "disability" too narrowly, Congress amended the ADA in 2008 to state that the term should be construed "in favor of broad coverage . . ., to the maximum extent permitted by the [ADA's] terms." 42 U.S.C. § 12102(4)(A); ADA Amendments Act ("ADAAA"), Pub. L. No. 110-325, § 2, 122 Stat. 3553 (2008). Moreover, Congress explicitly rejected a number of standards formulated by the Supreme Court, such as the requirement that the impairment be "permanent or long-term" to qualify as a disability under the ADA. 42 U.S.C. § 12102(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."); ADAAA § 2(b)(4) (stating that a purpose of ADAAA is to "reject . . . standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002)," which included the requirement that an impairment's impact be "permanent or long-term" to qualify as a "substantial limitation"). Congress also cautioned that "the question of whether an individual's impairment is a disability . . . should not demand extensive analysis." ADAAA § 2(b)(5).

U.S.C.A. § 12102(4)(D). In addition, the ADA regulations expressly provide that the "effects of an impairment lasting or expected to last fewer than six months can be substantially limiting" for purposes of proving an actual disability. 29 C.F.R. § 1630.2(j)(1)(ix).

TriStar argues that Andrews asthma is not a disability "where a plaintiff . . . is able to engage in almost all normal life activities" or "has location specific medical problem" only. TriStar's argument is flawed because the record includes Andrews's testimony showing that her asthma has substantially limited her breathing since she was a teenager. While TriStar is correct that Andrews has engaged in physical activities while having Asthma, TriStar omits the fact that Andrews relies on mitigating measures to do so. Regardless, TriStar's arguments regarding exercise and cardio are red herrings—the issue is that she is immunocompromised.

It is undisputed that Andrews's asthma was triggered by the Lysol at TriStar's Nashville office. Contrary to TriStar's assertions, however, the limits imposed by Andrews's asthma are not location specific. TriStar's proposed undisputed statement of material fact No. 21[10] recognizes Andrews's asthma has existed since age of 14. Andrews's asthma has continued lifelong, through March 2020 at which time Andrews was 31 years of age.

In March 2020, Andrews's asthma substantially limited her ability to engage in the major life activity of personally engaging with groups of people. Being in the office put Andrews at higher risk of contracting COVID-19 because of the increased exposure to other people. Andrews's asthma raised her risk of having a more severe case of COVID-19 than the general

---

[10] "Ms. Andrews was diagnosed in high school during a routine sports physical." (P. Ex. 9&10).

population. Andrews sought to protect her life and submitted a work-from-home request as invited by TriStar.[11]

TriStar relies on pre-amendment authority like *Sutton v. United Air Lines, Inc*. The ADAAA overruled *Sutton* to make clear that ameliorative effects of mitigating measures may not be taken into consideration in determining whether an individual is disabled. See 42 U.S.C. § 12102(4)(E). See Pub. L. No. 110-325 § 2(b)(2)(2008) (Statement of Purposes for the ADAAA)("to reject the requirement enunciated by the Supreme Court in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999) and its companion cases that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures[.]").

The six-month "transitory" part of the "transitory and minor" exception to "regarded as" coverage in § 1630.15(f) **does not apply** to the definition of "disability" under paragraphs (g)(1)(i) (the "actual disability" prong) or (g)(1)(ii) (the "record of" prong) of this section.

## 2. <u>Record of Andrew's A Disability</u>

To have a "record of such impairment," a plaintiff must prove she "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. 1630.2(k). Thus, claims under this theory "would appear to succeed or fail for many of the same reasons as claims under 4§ 12102(2)(A) (based upon an actual impairment), because both require a predicate showing of a mental or physical impairment that substantially limits one or more major life activities." *Edwards v. Ford Motor Co.*, 218 F. Supp.2d 846, 851 (W.D. Ky. 2002); see *Sebest v. Campbell City School Dist. Bd. of Educ.*, 94 Fed. Appx. 320, 326 (6th Cir. 2004).

---

[11] TriStar invited all employees to submit request to work-from-home.

### 3.    "Regarded As" having disability

TriStar admits to specifically terminating Employees who had compromised immune systems and requested work from home. (P. Ex. 42 Taylor Dep. 109:22 – 110:02.) There is no dispute that TriStar relied upon Andrew's disability in making its decision. Under the law, this is direct evidence of discrimination on the basis of Andrews's disability. *Monette*. 90 F.3d at 1182.

TriStar's Business records establish that it knew, had reason to know, and regarded Andrews as disabled because TriStar designated her as "immune-compromised." (P. Ex. 9, 11, 15, 16, 19, and 20.) An employee is "regarded as having a disability "if the [employee] establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Babb* at 942 F.3d 308, 319 (quoting  42 U.S.C. § 12102(3)(A)).

TriStar's argument fails to show material evidence supporting their claim that Andrews did not have a disability and the matter should proceed to trial on those grounds.

### V.    PLAINTIFF WAS QUALIFIED TO PERFORM THE ESSENTIAL FUNCTIONS OF HER POSITION

Defendants have failed to show that there are undisputed material facts supporting their assertion that Plaintiff is not disabled. Plaintiff has produced material facts and evidence that support the argument that she is actually disabled and regarded as disabled. This alone should be enough for Plaintiff to bring her case to a jury. In addition to being disabled, Plaintiff can also show that she was otherwise qualified to perform the essential functions of the position, with or without accommodation.

### 1.    "Qualified individual"

The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such

individual holds or desires. 42 U.S.C. § 12111(B). "Essential functions are fundamental job duties of the employment position the individual with a disability holds." 29 C.F.R. §1630.2(n)(1)(2010).

Andrews is otherwise qualified to be team coordinator because she satisfies all the skill, experience, and education and other job-related selection criteria as evidenced by her long-tenure, her training of other Team Coordinators, designation as Team Lead for other Team Coordinators, raise in June 2019, and TriStar giving Andrews other responsibilities on top of the basic Team Coordinator job duties.

## 2.    "Essential functions" of Andrews's job

A plaintiff must show that they can perform the essential functions of a job with or without an accommodation. "A job function is essential if it's removal would fundamentally alter the position." *Mosby-Meacham v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018). Put another way, essential functions are the core job duties, not the marginal ones. 29 C.F.R. § 1630.2(n)(1). This analysis does not lend itself to categorical rules – it is "highly fact specific." *Mosby-Meacham*, 883 F.3d at 605 (quoting *Hoskins v. Oakland Cty. Sherriff's Dep't*, 227 F.3D 719, 726 (6th Cir. 2000).

TriStar fails to specify an actual duty/task that elevated in-person attendance to that of an essential job duty. A jury could reasonably conclude that in person attendance is not an essential job duty as defined under the act, based on: (1) in-person attendance is not listed as a requirement in the Team Coordinator job description; (2) Team Coordinators corroborated with team, clients, and other stakeholders mostly through e-mail and phone; (3) meetings and conferences were routinely convened with individuals participating remotely; (4) team coordinators [and other team

members] communicated and accessed confidential client information, frequently involving electronic devices, with individuals outside the office setting. (P. Ex 46).

There is a genuine issue of material fact as to whether in-person attendance was an essential function, a marginal job function, or mere pretext.

## VI.   REQUEST FOR REASONABLE ACCOMMODATION

Christie Andrews requested a reasonable accommodation and TriStar denied her request. Under the ADA, if an employer knows that an employee has a disability and needs a reasonable accommodation to perform the essential functions of [his/her] job, the employer must provide [a] reasonable accommodation[s].

Failure to accommodate claims are analyzed "under the direct-evidence framework, which requires that [Plaintiff] establish that (1) she "is disabled," and (2) that she is "'otherwise qualified' for the position despite . . . her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Wyatt v. Nissan North America, Inc.*, 999 F.3d 400 (6th Cir. 2021). Once it has been established that Plaintiff made a request for a reasonable accommodation, "In [the Sixth Circuit], failure to engage in the interactive process is a violation of the ADA only if the plaintiff establishes a prima facie case of failure to accommodate." *Thompson v. Fresh Prods., LLC, 985 F.3d 509, 525 (6th Cir. 2021).*

## 1.   Plaintiff made a request for reasonable accommodation

There is no bright-line test for determining whether an employee's request is sufficiently clear to constitute a qualifying request for an accommodation under the ADA. The ADA does not require employees to "use the magic words 'accommodation' or even 'disability.'" *Leeds v. Potter*, 249 F. App'x 442, 449. Of course, the employee need not use the word "disabled," but the employer

must know enough information about the employee's condition to conclude that he is disabled. Id. A plaintiff's request must only "make it clear from the context that it is being made in order to conform with existing medical restrictions." *Id.* at 449. Relevant information could include, among other things, a diagnosis, a treatment plan, apparent severe symptoms, and physician-imposed work restrictions. *See Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 737-38 (6th Cir. 2015). *Cady v. Remington Arms Co.*, 665 F. App'x 413, 417 (6th Cir. 2016). In *Chaniott v. DCI Donor Servs.*, 481 F. Supp. 3d 712, 726 (M.D. Tenn. 2020) *see also Thompson v. E.I DuPont deNemours & Co.*, 140 F. Supp. 2d 764, 774 n.8 (E.D. Mich. 2001) ("[T]he Court notes that its research has not uncovered a single Sixth Circuit case in which an employee's 'vague' request [for an accommodation] wholly excused the employer from any further inquiry").

In satisfying her duty to propose a reasonable accommodation to her employer, a plaintiff must request the accommodation and provide either actual or constructive notice that the request is linked to a disability. See *Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 828 (S.D. Ohio 2004) ("A person alleging a disability protected by the ADA must establish that his employer had either actual or constructive notice of the disability."); *Russell v. Nat'l Amusements, Inc.*, No. 3:07-cv-3216, 2009 U.S. Dist. LEXIS 11598, 2009 WL 262494, *13 (N.D. Ohio Feb. 4, 2009) ("By making this request, and linking it to an impairment, Russell sufficiently requested a 'reasonable accommodation.'"). Simply asking for continued employment can be a sufficient request for an accommodation. *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000); see e.g. *Burress v. City of Franklin*, 809 F. Supp. 2d 795, 813 (M.D. Tenn. 2011) (concluding an employee's conversation with the explaining that he planned to return to work but would require a light-duty position for a period of time to the HR Director satisfied the requirement that he request an accommodation and also triggered the City's obligation to engage in a good-

faith discussion of possible accommodations); *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004) (finding that "a factfinder could infer that [plaintiff's] letter constituted a request for an accommodation" based on the context in which the letter was written).

In *EEOC v. Red Roof Inns, Inc.*, No. 3:20-cv-381, 2022 U.S. Dist. LEXIS 146956, at *34 (S.D. Ohio Aug. 16, 2022) (court concluded an email exchange itself could support a finding that a request for accommodation is inferred from the context, the court also held one could find that HR understood the employee's initial email to her as a request for an accommodation due to his blindness and that she then preemptively proposed an accommodation for employee (JAWS) and shot it down—all in one sentence).

"What matters under the ADA," at least with regard to the initial notice of a disability and the request for accommodation, "are not formalisms about the manner of the request, but whether the [disabled person] provides the [regulated entity] with enough information that, under the circumstances, the [entity] can be fairly said to know of both the disability and desire for an accommodation." *Allen v. Middle Tenn. Sch. of Anesthesia, Inc.*, No. 3:20-cv-00903, 2022 U.S. Dist. LEXIS 189966, at *19-20 (M.D. Tenn. Oct. 18, 2022); citing (*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999).

There can be little doubt that that a reasonable juror could conclude that Andrews's request to work from home, her conversation with Simpson, followed with her submission of a medical note, triggered TriStar's obligation to engage in the interactive process. (P. Ex. 15.) Andrews was therefore entitled to an interactive process built around "communication and good-faith exploration of possible accommodations" by both the employee and employer. *Kleiber*, 485 F.3d at 871 (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000)). As part of that good faith process, an "employer[] may require documentation supporting an employee's requested

accommodation" under the ADA. *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 812 (6th Cir. 2020).

Christie Andrews requested an accommodation that offered her protection due to her asthma putting her at greater risk from COVID-19 – to limit her possible exposure. Even with the constraints imposed by a pandemic, some accommodations may meet an employee's needs on a temporary basis without causing an undue hardship on TriStar.

Andrews proposed a teleworking accommodation, an arrangement TriStar communicated was a possible available benefit. Neither Andrews nor her health provider ever communicated anything that could be reasonably interpreted as showing that teleworking was the only acceptable accommodation.

Any time an employee requests a reasonable accommodation, the employer is entitled to understand the disability-related limitation that necessitates an accommodation. If there is disability-related limitation that the employer can effectively address the need with a form of accommodation at the workplace, other than teleworking, then the employer can choose that alternative.

TriStar references Andrews's testimony, that she would have rescinded the telework arrangement and would return to work as if it somehow undermined her need for a reasonable accommodation. It does not. It demonstrates the importance of employment, and her willingness to entertain possible alternate accommodations.

The governing regulations at 29 C.F.R. §1630.9(b) state, "it is unlawful for a covered entity to deny employment opportunities to an otherwise qualified job applicant or employee with a disability based on the need of such covered entity to make reasonable accommodation to such individual's physical or mental impairment." In other words, an employer cannot prefer a qualified

individual without a disability over an equally qualified individual with a disability merely because the individual with a disability will require a reasonable accommodation. An individual's need for an accommodation cannot enter the employer's employment decision unless the accommodation would impose an undue hardship on the employer.

As with any accommodation request, TriStar could have asked questions to determine whether the condition is a disability (it did not); discuss with the employee how the reasonable accommodation would assist her and enable her to keep working (it did not); explore alternative accommodations that may effectively meet her needs (it did not); and request medical documentation if needed (it did not). The ball was in TriStar's court to propose alternative accommodations: temporary job restructuring of marginal job duties, temporary transfers to a different position, or modifying the work schedule may have permitted Andrews to safely perform the essential job functions Team Coordinator/Amex Liaison.

**2.    TriStar failed to engage in the Interactive Process.**

"Failure to engage in the interactive process is a violation of the ADA . . . if the plaintiff establishes a prima facie case of failure to accommodate." *Thompson v. Fresh Prods., LLC, 985 F.3d 509, 525 (6th Cir. 2021)*. Employer's obligations:

> A covered entity is required, absent undue hardship, to provide a reasonable accommodation to an otherwise qualified individual who meets the definition of disability under the "actual disability" prong (§ 1630.2(g)(1)(i)), or "record of" prong (§ 1630.2(g)(1)(ii)), but is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the "regarded as" prong (§ 1630.2(g)(1)(iii)).

29 C.F.R. § 1630.9(e). Denial of a reasonable accommodation involves analysis under the direct method of proof when an employer fails to provide a reasonable accommodation and asserts an affirmative defense, like undue hardship.

TriStar did not communicate to Andrews that it viewed her request as unreasonable because it deemed Team Coordinator's essential job duties to include in-person attendance. TriStar did not propose an alternative accommodation in response to Andrews proposed request. TriStar admits it did not engage in the interactive process. No communications from Andrews, her immediate supervisor, or her healthcare provider requested work-from-home arrangement for perpetuity. This is the type of misunderstanding that the interactive process is supposed to clarify. TriStar could have proposed an end date for a temporary work from home accommodation.

The regulations provide, in instances when neither the individual requesting the accommodation, nor the employer can readily identify the appropriate accommodation, that an employer may need to initiate a more defined problem solving process that involves an individualized assessment of both the particular job at issue and the specific physical limitations of the particular individual in the need of reasonable accommodation.[12] According, to TriStar's own policy, if that dialogue fails to yield options, then TriStar will access external resources.

TriStar already had laptops on hand and has failed to produce evidence that providing Andrews' a VPN would have imposed an undue hardship. The fact that TriStar was able to procure laptops and provide other employees with remote access establishes a genuine issue of fact as to whether providing similar facilities to Andrews would have presented a "significant difficulty or

---

[12] (1) analyze the particular job involved and determine its purpose and essential functions; (2) consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation; (3) in consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and (4) consider the preference of the individual be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer. 29 C.F.R. pt. 1630, app. § 1630.9.

expense" to TriStar as required in establishing an undue hardship. In fact, TriStar had already provided Andrews with a laptop that she used from home to address after-hours AMEX issues.

TriStar has not presented any evidence that it would have been significantly more difficult due to the pandemic to provide Andrews with temporary assignments, to remove marginal functions, or hire temporary workers for specialized positions. TriStar made temporary assignments for individuals without disabilities from its Touring department. TriStar shifted Andrews's job functions to other employees after it terminated her employment but has not presented any evidence why it could not have reassigned Andrews' marginal in-person job duties as part of reasonable accommodation.

The Team Coordinator position exists to perform non-accounting and non-financial services from accountants. This is viewed as a benefit offered to TriStar's client. Additionally, Team Coordinators exist to help keep track of accounting deliverables and communications with clients. TriStar claims in person attendance is necessary for "so that meetings can be scheduled at a moments notice, that team meeting coordinators are required to collaborate regularly with other team members to complete their tasks, and that team coordinators need immediate access to highly confidential client information that is housed on-site at TriStar." Notably, TriStar does not cite to the written Team Coordinator job description, as it did not list in-person attendance as a requirement. Andrews directs the Court's attention to several postings for a TriStar Coordinator position that do not list in-person attendance as being a job function. Further Taylor did not interact with Andrews on a day-to-day basis. (Taylor 21:20).

Ms. Andrews submits evidence that she and other TriStar team members have been able to corroborate via e-mail, phone, and video conference. (P. Ex. 46). Andrews submits evidence that she and others in similar jobs had access to all information electronically. Moreover, TriStar

retained all other Team Coordinators in the Nashville office, meaning that the physical in-person component of Andrews job could be distributed temporarily or even for a protracted timeframe. Taylor testified she did not know Andrews's job duties, making her testimony here irrelevant. Taylor testified there was no individualized analysis.

In *Thompson v. E.I. Dupont deNemours & Co.*, 140 F. Supp. 2d 764, 775 (E.D. Mich. 2001) the defendant maintained, like TriStar maintains in this litigation, that it had already evaluated Plaintiff's situation before entertaining accommodation requests. The interactive process would have little meaning if it was interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome." *Taylor*, 184 F.3d at 315. *Thompson v. E.I. Dupont deNemours & Co.*, 140 F. Supp. 2d 764, 774 (E.D. Mich. 2001).

Christie Andrews clearly made a request for accommodation. It is also undisputed that TriStar failed to take steps to communicate with Andrews regarding alternatives. TriStar's denial of the reasonable accommodation was therefore direct violation of the ADA and this case should proceed to trial.

## VII. TERMINATION

TriStar discriminated against Christie Andrews by denying her reasonable accommodation and failing to engage in the interactive process. TriStar also discriminated against Andrews when it denied her access to continued employment and ignoring its own policies regarding the ADA. and by using the pandemic and a reduction in force as pretext for her termination. (P. Ex. 4 – TriStar Handbook).

## 1. Disparate Impact

It is unlawful for a covered entity to use standards, criteria, or methods of administration, which are not job-related and consistent with business necessity, and:

(a) That have the effect of discriminating on the basis of disability; or
(b) That perpetuate the discrimination of others who are subject to common administrative control.

29 C.F.R. § 1630.7. Similarly, It is unlawful for a covered entity to use qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities, on the basis of disability, unless the standard, test, or other selection criteria, as used by the covered entity, is shown to be job related for the position in question and is consistent with business necessity. 29 C.F.R. § 1630.10(a).

Here, TriStar claims that it made layoff decisions based on whether or not non-essential employees requested to work from home. There is no proof that TriStar told its employees whether they would be considered "non-essential" or not. TriStar also asked all employees requesting to work from home to provide a physician's note to justify their request. Not only did this have the effect of discriminating on the basis of disability, it was a blatant "bait and switch." When TriStar asked its employees to indicate whether they needed to work from home and to provide medical proof of that need, it gave no indication that Employees would be fired if they made such a request. Christie Andrews and other employees with compromised immune systems were given no indication that their request would be grounds for termination.

## 2. **Pretext**

Plaintiff can demonstrate pretext by showing that the Defendant's justification "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Jackson*, 814 F.3d at 779 (6th Cir. 2016) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). Plaintiff must present "enough

evidence to . . . rebut, but not disprove" Tyco's proffered rationale. *Yazdian v. ConMed Endoscopic Techs.*, Inc., 793 F.3d 634, 651 (6th Cir. 2015) (quoting *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 957 (6th Cir. 2014)). Plaintiff must demonstrate by a preponderance of the evidence that one of the three Dews prongs is met. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

In their Motion for Summary Judgment Memorandum, TriStar claims the decision to terminate Andrews was purely economic. Taylor, however, testified her decision to terminate Andrews was not based on dollar and cents–it was based on individuals who requested to work from home. (Taylor 39:06-14). The record includes facts from which it can be reasonably inferred that TriStar's overall budget and economic resources at the time of the decision were healthy. For example, of March 23, 2020, TriStar was advertising for multiple positions. Another example, TriStar paid out of pocket $200k laptops and VPNs. Another example, is according to public reports that one of TriStar's public disclosed clients had completed a $50 million tour in October of 2019. Finally, TriStar has not presented documentary evidence as to its overall budget at the time or economic resources meant accommodating Andrews posed a significant expense.

An employer may not unilaterally determine who is similarly situated to a plaintiff alleging employment discrimination. *Bobo v. United Parcel Service, Inc.*, 665 F.3d 741, 749 (6th Cir. 2012) (holding that the district court "improperly restricted the scope of discovery when it allowed UPS to determine unilaterally that the only Caucasian, non-military supervisor who was similarly situated to Bobo was Ronnie Wallace.") Whether individuals a plaintiff identifies are similarly situated is a jury question. Id. at 757 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).

TriStar argues that allowing Andrews to work from home would have been an undue hardship. (P's Memorandum in Support of MSJ, p. 5.) Initially, TriStar claimed the reason it terminated Andrews' employment was due to a lack of work. However, that was contradicted by Taylor's testimony that there was an increased workload.

TriStar points to the laptop shortage and the amount of money it cost to find and provide laptops as justification for this. (*Id.*) TriStar points to the sensitive information Andrews dealt with as an issue. (*Id.*) Finally, TriStar argues that Andrews would have been fired a few weeks later if she had not been part of initial layoffs. (*Id.*)

These arguments are in direct conflict with the proof before the court. Prior to the pandemic, Andrews had the ability to work from home and handled sensitive payment data associated with the AMEX account. (Exhibit A, Document 40-1, p. 79.) In a March 17, 2020 email, Bryan Leucke states that Andrews "does have the ability to work from home since she has a laptop primarily for AMEX support after hours." (Exhibit A, Document 40-1, p. 79.)

CEO Taylor also tried to justify Andrews's termination on a financial basis. She claimed, based on her own lost revenue projections, that TriStar had to reduce its staff of 133 by 25%, resulting layoffs 32 people. (Taylor Deposition Page Line Cite; Declaration of Lou Taylor, Document 40-3, p. 2.) On April 6, 2020, less than three weeks after Andrews's layoff, TriStar was approved for $1,874,800 under the Payroll Protection Act. The TriStar application provided that $1,614,800 would be for payroll to support 155 jobs. There is no evidence showing that TriStar offered to bring back any former staff after the PPP was approved.

Further, TriStar claiming "it had lost 25% of its revenue" as of March 2020 is false. TriStar has various revenue streams, including several wholly independent of Touring. TriStar's receives

it cuts after artist get paid. Meaning, TriStar's touring revenue is realized during or after the tour. Accordingly, TriStar's 2019 revenue or income is the relevant inquiry.

At the time TriStar determined to lay off Andrews, Taylor explained TriStar was performing forecasts based on an 8-week of cash shortage. (Taylor 92:09-19). Kinder explained that the "lost income" at that time was lost <u>planned</u> income. (Kinder 66:06-13). Meaning, TriStar was not likely anticipating a loss of 25% of its revenue at the time it decided to terminate Andrews' employment.

Further suggesting the decision was other than something than purely economic is that TriStar made no effort to recall Andrews or other laid off employees even though TriStar was approved for $1.7 in Payroll Payment Protection funds based on 155 positions as of April 9, 2020. A reasonable juror could infer that it is more economic for an employer to recall recently laid-off employees than hiring and training new employees.,

Taylor provided inconsistent testimony as to whether she considered the ADA in her decision-making. It is not in dispute that TriStar had a written ADA policy that it did not follow. The fact that Peggy Simpson, TriStar's Human Resource person, testified she did not engage in interactive process between March 2020 and September 2020, at the height off the COVID-19 pandemic, with multiple employees requesting to work from home due to being personally immune compromised is shocking. A reasonable juror could infer that a wholesale absence of engaging in the interactive process is evidence of TriStar's intentional and willful dereliction of its employer's obligations under the ADAAA.

Right before terminating Andrews, Taylor asked Luecke if Andrews was on sick leave. Asking this question could lead a juror to infer that Taylor was aware of possible legal

ramifications and wanted to confirm her legal exposure before making her decision to terminate Andrews' employment.

TriStar's rebuttal to the EEOC is inconsistent with many of the positions that TriStar has taken in this litigation. (P. Ex. 35).

<u>**CONCLUSION**</u>

TriStar failed to show there is no genuine dispute as to any material fact and is therefore not entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). Accepting TriStar's narrative would require this Court to view the facts in the light most favorable to TriStar and to assume that Lou Taylor is a credible witness, which, this Court cannot do at the summary stage. *Baum*, 764 F. App.'x at 547.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on Thursday, December 8, 2022, I electronically filed the foregoing MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted,

Daniel Arciniegas TBPR. 35853
**ARCINIEGAS LAW**
1242 Old Hillsboro Road
The Atrium Building
Franklin, Tennessee 37069
Telephone: 629.777.5339
Fax: 615.988.9113
Daniel@AttorneyDaniel.com

*Counsel for Plaintiff*
*CHRISTIE ANDREWS*