THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **CHRISTIE ANDREWS,** | |
| Plaintiff, | |
| v. | Case No. 3:21-cv-00526 |
| **TRI STAR SPORTS AND ENTERTAINMENT GROUP, INC.** | Judge Eli J. Richardson<br>Magistrate Judge Jeffery S. Frensely |
| Defendant. | JURY DEMAND |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**STATEMENT OF UNDISPUTED MATERIAL FACTS ( DOC. 40)**

1.      Plaintiff Christie Andrews ("Andrews" or "Plaintiff") was employed full-time by

Tri Star from mid-2014 until March 20, 2020.  (Deposition of Christie Andrews, Aug. 23, 2022

("Andrews Dep."), attached as Exh. A, 27:6-9, 158:17-19.)

> **RESPONSE: Undisputed. Subject to clarification Andrews became a full-time
> employee in August 20, 2014, Andrews completed and submitted the TriStar
> Emergency contact form she had asthma, no albuterol (will induce vomiting), Xopenex
> inhaler. (Plaintiff's Exhibit 1; Andrews 103:01 - 103:15).**

2.      Plaintiff was laid off as a part of a reduction in force ("RIF") on March 20, 2020.

(Deposition of Louise Taylor, Aug. 24, 2022 ("Taylor Dep."), attached as Exh. B, 39:20-40:8,

March 18, 2020 Email, Exh. 17; *see also* Andrews Dep., 158:17-159:4, 162:9-14.)

> **RESPONSE: Disputed. A reduction in force is when a business decides it has no
> further need for the position.  Only Team Coordinators who requested to work from
> were laid off. (Taylor 38:20-39:11). Tri Star retained other Team Coordinators who
> did not submit a request to work from home. (Taylor 38:20 – 39:01). Tri Star admits it
> did not decide to eliminate having an Amex Liaison until after Andrews was
> terminated.**
>
> **A layoff, on the other hand is considered temporary. Tri Star was approved for PPP
> loan based on 155 positions. (Plaintiff's Exhibit 50). Tri Star's completed Andrews**

1

Separation Notice the reason was for a lack of work. However, there was no lack of work. (Taylor 54:20- 55:07). Taylor testified there was no plan, it was an evolving process.  March 20, 2020, is the undisputed date of Andrews employment was terminated. This was the date communicated to the Tennessee Department of Labor.

3.     When her employment ended, Plaintiff was a Team Coordinator/AmEx Liaison

working out of the Nashville office.  (Andrews Dep., 56: 4-10.)

RESPONSE: Disputed. Andrews held the job title of Team Coordinator. TriStar did not have a position of Amex Liaison. Andrews was designated as Amex Liaison and Team Lead for Team Coordinator. There is no job description for the Amex Liaison, Taylor did not know the details of the position. (Taylor 77:20 – 78:04).Andrews regularly worked from home prior to her termination. Andrews served as the Amex Liaison for the entire firm for the clients, clients' family and businesses. (Taylor 76:19 - 77:10; 77:21 - 78:04). Andrews had a laptop so she could handle Amex emergencies at night or weekends. (Kinder 93:13-21). Andrews was allowed to have a laptop and transport it from the office to home each day. (Kinder 94:07-17).

4.     Team coordinator is classified by Tri Star as a "nonessential" position.  (Taylor

Dep., 39:2-5.)

RESPONSE: Disputed. Team Coordinators who were able to report to work were needed because of TriStar had an "increased workload" there was lots of work done, it was chaos. (TriStar 54:20- 55:07).  The increased work load involved – business management work, support work, client communication – "A millions of times. Over and over and over again" with concerns about the pandemic. (Taylor 55:12-19). TriStar did not lay off all Team Coordinators. (Taylor 38:20 – 39:01). Only Team Coordinators who requested to work from were laid off. (Taylor 38:20-39:11). Taylor admits there is no documentation regarding her decision that non-essential work-from-home people were going to be terminated and admits she did not communicate it to anyone. (Taylor 46:13-47:02).

5.     Team coordinators are not permitted to work from home on a permanent or

indefinite basis. (Taylor Dep., 39:2-5, 141:11-13; Andrews Dep. 46:15-47:12.)

RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01 as Andrews did not request to work from home on a permanent basis. (Plaintiff's Exhibit 36 - TriStar's Response to P's First Set of Requests for Admission No. 5).

6.     The team coordinator position requires regular in-person interaction and

2

collaboration with other team members, including through meetings that are not planned in advance, and access to documents and information that is housed on-site at Tri Star. (Taylor Dep., 108:17-109:2; Andrews Dep., 32:11-25, 33:16-34:7, 77:21-23; Declaration of Lou Taylor, Nov. 2, 2022 ("Taylor Decl."), attached as Exh. C, ¶¶ 3-8.)

> **RESPONSE: Disputed. Team Coordinators regularly corroborated with other team members who were not team members. Team Coordinators accessed documents and information remotely. (Plaintiff's Exhibit 47). Team Coordinators' duties and services are not separated by East and West office. (Taylor 66:01-24).**

7.    Team coordinators are required to access sensitive client information, like financials and personal identifying information, to perform their jobs. (Taylor Decl., ¶ 8.)

> **RESPONSE: Disputed. Team Coordinators were the equivalent to assistants to the accounting or business manager who would assist by providing to do lists, direct client communication, garnering internal resources for client needs, trusted advisor needs, running the team meetings, tracking the teams' open deliverables that need to be completed either internally for the firm, externally to the trusted advisor, or the client. (Taylor 12:18-13:12). Whether accessing sensitive information was a "requirement" is in dispute.**

8.    At the beginning of March 2020, prior to the Covid-19 pandemic, Tri Star employed 132 people in two offices – one in Nashville and one in California. (Taylor Dep., 8:5-14; Taylor Decl., ¶ 11.)

> **RESPONSE: According to publicly available documents related to Tri Star's application for a PPP loan was based on 155 positions. (Plaintiff's Exhibit 50).**

9.    The Covid-19 pandemic caused Tri Star to lose 25% of its revenues because of the complete loss of income from its touring department. (Taylor Dep., 54:21-55:19, 83:22-84:11, 93:1-24, 197:13-199:4; Andrews Dep., 163:23-164:2.)

> **RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01 as it is not based on Tri Star's financial condition at the time of the adverse employment decision.**

3

Taylor's decision to terminate non-essential employees with work-from-home requests were in the first round was not based on dollar and cents. (Taylor 39:06-14).

Taylor admits that at first TriStar there were doing projections for eight weeks of cash shortage, and "we all thought we were going to be in this eight weeks." (Taylor 92:09-19). The touring income that disappeared was "planned income" or "prospective income." (Kinder 66:06-13). The touring income that disappeared was "planned income" or "prospective income." (Kinder 66:06-13). Going into 2020 TriStar was looking to fill a lot of positions, because they were goring. (Kinder 47:06-12). As of March 23,2020, TriStar had open requisitions for numerous positions including Team Coordinators including Nashville. (Plaintiff's Exhibit 28).

TriStar may receive touring income at the end of the tour or when the venue pays the artist. (Kinder 67:05-17). According to a blog entry dated October 10, 2019 LouTaylor.net – her clients included Florida Georgia Line that according to an article dated October 30, 2019 Pollstar.com finished a $50 million tour. (Plaintiff's Exhibits 48 and 49).

10.    This forced Tri Star to reduce its headcount and reorganize its workforce. (Taylor Dep., 83:22-84:11.)

RESPONSE: Disputed. This is not properly considered a statement of material fact pursuant to Rule 56.01.

Taylor admits that at first TriStar there were doing projections for eight weeks of cash shortage, and "we all thought we were going to be in this eight weeks." (Taylor 92:09-19). The touring income that disappeared was "planned income" or "prospective income." (Kinder 66:06-13). The touring income that disappeared was "planned income" or "prospective income." (Kinder 66:06-13). Going into 2020 TriStar was looking to fill a lot of positions, because they were goring. (Kinder 47:06-12). As of March 23,2020, TriStar had open requisitions for numerous positions including Team Coordinators including Nashville. (Plaintiff's Exhibit 28).

TriStar may receive touring income at the end of the tour or when the venue pays the artist. (Kinder 67:05-17). According to a blog entry dated October 10, 2019 LouTaylor.net – her clients included Florida Georgia Line that according to an article dated October 30, 2019 Pollstar.com finished a $50 million tour. (Plaintiff's Exhibits 48 and 49).

11.    Between March 13 and March 16, 2020, Tri Star determined that all "nonessential" employees who had requested to work from home for any reason would be laid off first. (Taylor Dep., 38:4-7,20-23, 43:7-8, 44:15-45:5,12-21,  83:24-84:3,  120:2-5,  130:16-19,  174:4-10;

4

Deposition of Yolanda Simpson, Aug. 25, 2022 ("Simpson Dep."), attached as Exh. E, 110:20-23.)

> **RESPONSE: Disputed. Taylor claims she made the determination between March 13 and March 16, 202022. Taylor admits there is no documentation and she did not communicate it to anyone that TriStar was terminating non-essential work-from-home until March 18, 2020. [Taylor 46:13-47:02]. Andrews was on a list of employees who were designated as having preferential considerations. [Plaintiff's Exhibit 9,11,15,16,19,20]. Taylor admits that they retained individuals in TriStar's Touring department and allowed some to work from home if they were determined to be essential. (Taylor 84:14-85:06). Only Team Coordinators who requested to work from were laid off. (Taylor 38:20-39:11)**

> **Taylor sent an e-mail on March 18, 2020, stating "non-essential – I will get back to you before EOD tomorrow as we assess how we are going to treat non-essentils that cannot work. This should be kept confidential while I work through these details." (Plaintiff's Exhibits 19 and 20).**

> **March 20, 2020, is the undisputed date of Andrews employment was terminated. This was the date communicated to the Tennessee Department of Labor.**

12.     Tri Star CEO Lou Taylor was the sole decision maker as to who would be included in the RIF.  (Taylor Dep., 43:9-14, 120:14-20; Simpson Dep., 17:10-12, 32:7-12, 110:20-23; Deposition of Peggy Stephens, Aug. 24, 2022 ("Stephens Dep."), attached as Exh. F, 58:25-59:10.)

> **RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01 as Andrews was designated as part of impending layoffs. (Plaintiff's Exhibit 2).**

13.     The decision was purely economic.  (Taylor Dep., 40:5-8, 45:12-46:12, 82:21-83:12, 116:10-12, 117:10-12, 118:6-10.)

> RESPONSE: **Disputed. Team Coordinators who were able to report to work were needed because of TriStar had an "increased workload" there was lots of work done, it was chaos. (Taylor 54:20- 55:07).The increased work load involved – business management work, support work, client communication – "A millions of times. Over and over and over again" with concerns about the pandemic. (Taylor 55:12-19). TriStar did not lay off all Team Coordinators. (Taylor 38:20 – 39:01). Only Team Coordinators who requested to work from were laid off. (Taylor 38:20-39:11).**

5

**Taylor was not aware of undue hardship under the ADA, she did not have any idea of cost of laptop. (Taylor 118:11-19). Taylor's decision to terminate non-essential employees with work-from-home requests were in the first round was not based on dollar and cents. (Taylor 39:06-14).**

14.    Equipping essential employees to work from home cost Tri Star more than $200,000. (Taylor Dep., 39:22-40:2, 120:7-17, 173.)

> **RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01.**

15.    Plaintiff was classified as a "nonessential employee" who had requested to work from home and was, thus, included in the reduction in force. The decision to include Plaintiff in the RIF was made on March 16, 2020. (Taylor Dep., 39:2-20, 46:13-47:2, 120:14-20, Mar. 19, 2020 Email, Exh. 17 to Taylor Dep.; Simpson Dep., 17:10-12, 32:7-12.)

> **RESPONSE: Disputed. On Monday March 16, 2020, HR Generalist Simpson told Taylor that Andrews has submitted a request to work from home request. [Taylor 47:13- 48:07]. Team Coordinators who were able to report work were needed because of TriStar had an "increased workload" there was lots of work done, it was chaos. (Taylor 54:20- 55:07). TriStar did not lay off all Team Coordinators. (Taylor 38:20 – 39:01). Only Team Coordinators who requested to work from were laid off. (Taylor 38:20-39:11). Taylor admits there is no documentation regarding her decision that non-essential work-from-home people were going to be terminated in the first round and that she did not communicate it to anyone. (Taylor 46:13-47:02). Termination is not until an employee is told they are being terminated, because it can always change. (Stephens 61:20-62:11).**

16.    Plaintiff was not replaced; her job duties were distributed among remaining employees. (Taylor Dep., 104:8-12; Deposition of Heather Kinder, Aug. 25, 2022, attached as Exh. D ("Kinder Dep."), 57:13-59:16.)

> **RESPONSE: Disputed. This is not properly considered a statement of material fact pursuant to Rule 56.01. TriStar RIF defense modifies the prima facie standard. As if March 23, 2020TriStar continued advertised for Team Coordinator applicants. Plaintiff's Exhibit 28. TriStar continued to have Team Coordinator applicants.**

17.    Between March and June 2020, a total of 33 employees were laid off because of

6

the Covid-19 pandemic.  (Taylor Decl., ¶ 13.)

> **RESPONSE: Undisputed. This is not properly considered a statement of material fact pursuant to Rule 56.01.**

18.     Ms. Taylor did not know Plaintiff had asthma at the time she was laid off.  (Taylor Dep., 52:12-18, 96:21-23; Andrews Dep., 106:5-7.)

> **RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. Taylor had HR provide e-mails tracking work for home requests and whether they were immune compromised or a doctor saying they needed to be home. (Taylor 43:19 – 44:03; Taylor 53:17-54:04). On March 17, 2020, Simpson sent an e-mail to Taylor with subject line WFH requests included Christie Adams (sic). (Plaintiff's Exhibit 17).**

19.     Plaintiff's sole claimed disability for purposes of this litigation is asthma. (Complaint, ¶ 58; Andrews Dep., 100:25-101:2; Plaintiff's Objections and Responses to First Set of Interrogatories, Exh. 39 to Andrews Dep., Interrogatory No. 17.)

> **RESPONSE: Disputed. Plaintiff's sole actual disability for failure to accommodate is Asthma. However, Plaintiff's regarded as is based on TriStar labeling Andrews as immunocompromised. Taylor had HR provide e-mails tracking work for home requests and whether they were immune compromised or a doctor saying they needed to be home. (Taylor 43:19 – 44:03; Taylor 53:17-54:04). On March 17, 2020, Simpson sent an e-mail to Taylor with subject line WFH requests included Christie Adams (sic). In March 2020 TriStar classified Andrews as having a compromised immune system. (Plaintiff's Exhibits 9, 17,19, 20). TriStar has a list including Christie Adams as "compromised immune system" and Taylor admits not knowing an employee by that name, and without prompting asks if that is Christie Andrews. (Taylor 99:15-100:06). TriStar used "Preferential consideration" for single parent or parents who had childcare needs, people who live with first responders, and who were immune compromised. (Taylor 41:02 – 10). On March 18, 2020, TriStar HR Yolanda was reporting that "the following employees have requested work from home based on compromised immune systems and that TriStar had received doctors' notes validating that they had valid concerns, and listed Christie Andrews for consideration. (Taylor 113:11-114:02; 117:03-07; 119:14-21).**

20.     Plaintiff's asthma has been "well-controlled" at all relevant times, and there has never been a time when her asthma was not well-controlled.  (Andrews Dep., 157:3-14, 182:18-183:7.)

7

**RESPONSE: Disputed. Andrews was diagnosed with Asthma when she was 14 or 15 years of age by an ear, nose and throat doctor and asthma specialist – that she was referred to after wearing a 24 hour heart monitor with irregularities that didn't present as a cardio but a respiratory issue. (Andrews 100:25 - 101:24). Andrews deals with her asthma every day to keep it well-controlled. (Andrews 121:02 - 122:07). Andrews is prescribed Singulair (daily), Flonase (daily), and Zyrtec (daily) to manage allergies and asthma. (Andrews 115:14 - 116:09 116:13 - 116:23; 117:10 - 117:24). Andrews carries her rescue inhaler, Xopenx, all the time and she uses it before exercising so that her asthma is kept under control. (Andrews 116:21 – 23; 118:03 - 118:15). Andrews 'asthma is debilitating because it gets in the way of Andrews day to day activities, after an attack, if she does not get over it then she can end up with bronchitis or pneumonia, it can also limits her movement due to shortness of breathe. Andrews to get sick more often. Andrews also choose not to do a lot of things because she knows it might be problem. Andrews also has anxiety about the asthma. (Andrews 121:09 - 122:07; 125:20 - 126:23); Andrews has regular asthma attacks, which include any sort of event requiring the use of her rescue inhaler. (Andrews 112:04 - 113:23). In 2016 Andrews was hospitalized for an asthma attack after being exposed to a carbon monoxide. (Andrews 113:25 - 114:18). When Andrews is exposed to a triggers wind blowing in her face then she would not be able to breath, or the cold cause everything to constrict – Andrews did not know this was an asthma attack she thought it was something everyone experienced. Andrews had serious attacks when running, and she would have to coach herself back into breathing. (102:02 - 103:15). Synthetic fog is a trigger that will immediately require the rescue inhaler. High humidity, stress, exercise. Andrews' allergies exacerbate her asthma but is not an immediate trigger. Cleaning products that hang in the air are a big trigger. Strong smells, perfumes. (Andrews 110:21 - 111:20). Because Andrews carried Xopenx inhaler levalbuterol everywhere Andrews believed her asthma was common knowledge at TriStar. (Andrews 105:12 - 107:11; 107:15 - 108:05).**

21.    Ms. Andrews was diagnosed with asthma in high school during a routine sports physical. (Andrews Dep., 101:3-102:1.)

**RESPONSE: Disputed. Andrews was diagnosed with Asthma when she was 14 or 15 years of age by an ear, nose and throat doctor and asthma specialist – that she was referred to after wearing a 24 hour heart monitor with irregularities that didn't present as a cardio but a respiratory issue. (Andrews 100:25 - 101:24).Andrews deals with her asthma every day to keep it well-controlled. (Andrews 121:02 - 122:07). Andrews is prescribed Singulair (daily), Flonase (daily), and Zyrtec (daily) to manage allergies and asthma. (Andrews 115:14 - 116:09 116:13 - 116:23; 117:10 - 117:24). Andrews carries her rescue inhaler, Xopenx, all the time and she uses it before exercising so that her asthma is kept under control. (Andrews 116:21 – 23; 118:03 - 118:15). Andrews 'asthma is debilitating because it gets in the way of Andrews day to day activities, after an attack, if she does not get over it then she can end up with bronchitis or pneumonia, it can also limits her movement due to shortness of breathe. Andrews to get sick more often. Andrews also choose not to do a lot of things because she knows it might be problem. Andrews also has anxiety about the asthma.**

8

**(Andrews 121:09 - 122:07; 125:20 - 126:23); Andrews has regular asthma attacks, which include any sort of event requiring the use of her rescue inhaler. (Andrews 112:04 - 113:23). In 2016 Andrews was hospitalized for an asthma attack after being exposed to a carbon monoxide. (Andrews 113:25 - 114:18). When Andrews is exposed to a triggers wind blowing in her face then she would not be able to breath, or the cold cause everything to constrict – Andrews did not know this was an asthma attack she thought it was something everyone experienced. Andrews had serious attacks when running, and she would have to coach herself back into breathing. (102:02 - 103:15). Synthetic fog is a trigger that will immediately require the rescue inhaler. High humidity, stress, exercise. Andrews' allergies exacerbate her asthma but is not an immediate trigger. Cleaning products that hang in the air are a big trigger. Strong smells, perfumes. (Andrews 110:21 - 111:20). Because Andrews carried Xopenx inhaler levalbuterol everywhere Andrews believed her asthma was common knowledge at TriStar. (Andrews 105:12 - 107:11; 107:15 - 108:05).**

22.    After her asthma diagnosis, Ms. Andrews was a cheerleader, professional dancer and actor in a theater company, and she moved to New York City to try and become a professional dancer there. (Andrews Dep., 11:6-10, 15:5-18, 16:8-24, 22:6-17, 101:3-102:1.)

> **RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01.**

23.    During her employment with Tri Star, Plaintiff participated on an exhibition cheerleading team, which she talked about often. (Andrews Dep., 22:10-18; Kinder Dep., 33:5-9; Taylor Dep., 166:21-167:7, 168:8-16.)

> **RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01.**

24.    Plaintiff worked out at Crossfit gyms during her employment at Tri Star and as late as March 2020; she has described her Crossfit workouts as 100-200 minutes of exercise with heavy exertion, two to three times per week. (Andrews Dep., 20:13-21:13, 180:14-18.)

> **RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01.**

9

25.     Ms. Andrews now participates in gymnastics two days a week, as long as her schedule allows.  (Andrews Dep., 18:12.)

> **RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01.**

26.     Ms. Andrews has never been hospitalized overnight for asthma.  (Andrews Dep., 113:21-115:4.)

> **RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01.In 2016 Andrews was hospitalized for an asthma attack after being exposed to a carbon monoxide. (Andrews 113:25 - 114:18).**

27.     Plaintiff's asthma does not interfere with her ability to function or engage in normal life activities.  (Andrews Dep., 20:15-21:13, 23:25-26:16, 110:5-20, 123:25-125:17, 180:14-18.)

> **RESPONSE: Disputed. Andrews was diagnosed with Asthma when she was 14 or 15 years of age by an ear, nose and throat doctor and asthma specialist – that she was referred to after wearing a 24 hour heart monitor with irregularities that didn't present as a cardio but a respiratory issue. (Andrews 100:25 - 101:24).Andrews deals with her asthma every day to keep it well-controlled. (Andrews 121:02 - 122:07). Andrews is prescribed Singulair (daily), Flonase (daily), and Zyrtec (daily) to manage allergies and asthma. (Andrews 115:14 - 116:09 116:13 - 116:23; 117:10 - 117:24). Andrews carries her rescue inhaler, Xopenx, all the time and she uses it before exercising so that her asthma is kept under control. (Andrews 116:21 – 23; 118:03 - 118:15). Andrews 'asthma is debilitating because it gets in the way of Andrews day to day activities, after an attack, if she does not get over it then she can end up with bronchitis or pneumonia, it can also limits her movement due to shortness of breathe. Andrews to get sick more often. Andrews also choose not to do a lot of things because she knows it might be problem. Andrews also has anxiety about the asthma. (Andrews 121:09 - 122:07; 125:20 - 126:23); Andrews has regular asthma attacks, which include any sort of event requiring the use of her rescue inhaler. (Andrews 112:04 - 113:23). In 2016 Andrews was hospitalized for an asthma attack after being exposed to a carbon monoxide. (Andrews 113:25 - 114:18). When Andrews is exposed to a triggers wind blowing in her face then she would not be able to breath, or the cold cause everything to constrict – Andrews did not know this was an asthma attack she thought it was something everyone experienced. Andrews had serious attacks when running, and she would have to coach herself back into breathing. (102:02 - 103:15). Synthetic fog is a trigger that will immediately require the rescue inhaler. High humidity, stress, exercise. Andrews' allergies exacerbate her asthma but is not**

10

**an immediate trigger. Cleaning products that hang in the air are a big trigger. Strong smells, perfumes. (Andrews 110:21 - 111:20). Because Andrews carried Xopenx inhaler levalbuterol everywhere Andrews believed her asthma was common knowledge at TriStar. (Andrews 105:12 - 107:11; 107:15 - 108:05).**

28.　　On March 16, 2020, Nurse Practitioner Autumn Nelson, Plaintiff's primary health care provider, wrote to Ms. Andrews regarding her asthma and Covid-19, "The best thing you can do is wash your hands, work from home if you are able. If you have any symptoms, you need to self-quarantine." Ms. Nelson did not direct Ms. Andrews to work from home or to avoid going in to the office. (Andrews Dep., 185:15-186:1; Tri Star Medical Group Notes, Exh. 28 to Andrews Dep.)

> **RESPONSE: Disputed. The record shows Andrews' healthcare provider stated "work from home if you are able."**

29.　　On March 16, 2022, Tri Star employees used Lysol aerosol spray in the office in an effort to combat Covid-19. (Andrews Dep., 127:8-128:12.)

> **RESPONSE: Agreed. Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01.**

30.　　Plaintiff began coughing upon breathing in lingering aerosol spray and was required to use her inhaler. (Id.)

> **RESPONSE: Agreed. Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01.**

31.　　No one witnessed her using her inhaler that day and she cannot identify any other time she used her inhaler at Tri Star. (Andrews Dep., 130:23-131:2, 132:25-133:20.)

> **RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01.**

11

32.     Ms. Andrews did not ask anyone to stop using the aerosol spray in the office.

(Andrews Dep., 130:23-131:2, 132:25-133:10.)

> **RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01 as Andrews was told to stay home on March 17, 2020. (Plaintiff's Exhibit 16).**

33.     After using her inhaler, Ms. Andrews returned to her desk and worked for the remainder of the day.  (Id; Andrews Dep., 155:9-11.)

> **RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01.**

34.     That afternoon, Plaintiff requested to work from home indefinitely. (Andrews Dep.,

138:4-6, 139:25-140:11, Mar. 16, 2020, Email, Exh. 13 to Andrews Dep.)

> **RESPONSE: Disputed. This is not properly considered a statement of material fact pursuant to Rule 56.01 as this is not   Defendant's citation does not support the assertion. As written is misleading. Agreed that Andrews e-mail does not specify a period time, but dispute that it is a requested to work from for unlimited time.**

> Since I already have a company laptop and a doctor who is pissed at me and called me irresponsible for not staying home may I please be approved to work from home?

> What do you need from me to approve?

> Is it possible to take my monitors and docking station with me to make work more efficient?

> **Andrews was asking what Tri Star needed to support her request.  Andrews had already been in communication with her health care provider. [Plaintiff's Exhibit 7].**

35.     In support of her request, Plaintiff communicated to Bryan Luecke and Yolanda

Simpson that she had "a doctor who's pissed at me and called me irresponsible for not staying

home[.]" (Andrews Dep., 147:13-22; Mar. 16, 2020 Email, Exh. 13 to Andrews Dep.)

> **RESPONSE: Disputed. This is not properly considered a statement of material fact pursuant to Rule 56.01.**

12

Since I already have a company laptop and a doctor who is pissed at me and called me irresponsible for not staying home may I please be approved to work from home?

What do you need from me to approve?

Is it possible to take my monitors and docking station with me to make work more efficient?

**Andrews was asking what Tri Star needed to support her request. Andrews had already been in communication with her health care provider. [Plaintiff's Exhibit 7].**

36.     This "doctor" is Ms. Andrew's best friend, Emily Mara, a wound care nurse who

does not provide medical treatment to Plaintiff. (Andrews Dep., 64:9-14, 147:13-148:10.)

**RESPONSE: Disputed. This is not properly considered a statement of material fact pursuant to Rule 56.01. On March 16, 2020 Plaintiff had the following exchange:**

Message

Addressed To NELSON,AUTUMN
I've tried to look it up online instead of bothering your office but didn't see alot of info. Are there any precautions you want me to be taking in regards to my asthma and covid-19 besides the normal wash your hands and clean your heavy touch surfaces? The only thing I saw online was people considering not taking their meds. That can't be right, right?

PS. I have been seeing a lot of improvement with the singular. I really didn't think I would but I have, especially in regards to recovery after a workout.

Sorry to have to bug you when your probably really busy,

Christie Andrews

Action Taken

NELSON,AUTUMN  03/16/2020 06:40:05 AM CDT >
The best thing you can do is wash your hands, work from home if you are able. If you have any symptoms, you need to self-quarantine.

**[Plaintiff's Exhibit 7]. Further this e-mail was in response to being sent home and not part of Andrews reasonable accommodation request under the Americans with Disabilities Act.**

37.     Ms. Simpson told Plaintiff to come to work the next day unless she was sick.

Around 5:00 pm on Monday, March 16, 2020, Plaintiff told Ms. Simpson that she would be in the

office the next day.  She did not mention her asthma, a cough, or cleaning products.  (Mar. 16, 2020

Email, Exh. 13 to Andrews Dep.)

**RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01. Andrews immediate manager told Andrews to stay home on March 17,**

13

**2020.**

38.    That night, Plaintiff asked Ms. Nelson for a note that says she has asthma so that she can work from home. She did not mention her cough, the need to use her inhaler that day, or the aerosol cleaning products. (Andrews Dep., 187:5-12; Tri Star Medical Group Notes, Exh. 28 to Andrews Dep.)

   **RESPONSE: Disputed. Andrews message stated:**

> Message
>
> Addressed To NELSON,AUTUMN
> I know your office is probably really busy right now but my employer is requiring a doctor's note saying I have asthma to work from home. Even though I have all the capabilities and have worked from home in the past. Is there anyway yall can send one tomorrow? My email is ChristieAndrews24@gmail.com.
>
> Sorry for bugging y'all again.

39.    Ms. Andrews would have retracted her request to work from home if given the opportunity. (Andrews Dep., 238:10-18.)

   **RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01. Andrews would have considered other reasonable accommodations had Tri Star proposed.**

40.    On March 17, 2022, Ms. Andrews emailed a note from her medical provider, Ms. Nelson, which states that Plaintiff has "well-controlled" asthma and would "benefit" from working from home. This is the only medical documentation Plaintiff provided to Tri Star in support of her request to work from home. (Complaint, ¶ 32; Andrews Dep., 156:12-157:14, 187:13-25, March 17, 2020 Medical Note, Exh. 16 to Andrews Dep.)

   **RESPONSE: Disputed. Andrews healthcare message stated:**

14

Christie Andrews has been a patient at our office for several years. She has known asthma. Although well controlled, she would benefit from working at home due to the rising risk of COVID-19. If you have any questions or concerns, feel free to call our office.

Thank You,

*Autumn Nelson, FNP-BC*

Autumn Nelson, FNP-BC

**[Plaintiff's Exhibit 15]. The complete statement provided "would benefit working at home due to the rising risk of COVID-19."**

**Agree that this is the only medical documentation Andrews provided TriStar, however with qualification this is not properly considered a statement of material fact pursuant to Rule 56.01 given that TriStar conceded it did not engage in the interactive process. [Exhibit # Defendant's Response to Plaintiff's Interrogatory No. 5].**

41.    If Plaintiff had not been included in the RIF in March 2020, she would have been

included in a subsequent round of layoffs.  (Taylor Dep., 88:19-89:2.)

**RESPONSE: Disputed. This is not properly considered a statement of material fact pursuant to Rule 56.01 because the inquiry is whether Tristar complied with its obligations under the ADA at the time of the adverse employment action.**

**Taylor testified that during the reduction in force she looked at a report of salaries, without considering people's performance, looking at duplicity of roles and responsibility, but not for the first round. [Taylor 36:03-15; 36:24 – 37:09; 43:03 – 18; 45:06-17]. Taylor claimed duplicitous and highly compensated employees were eliminated in the second round, did not mention performance. (Taylor 91:01-12).**

42.    Plaintiff did not request any type of accommodation from her current employer or

from any other employer she applied to work for after her employment with Tri Star ended.

(Andrews Dep., 213:17-19, 233:23-234:9.)

**RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01. Andrews received the COVID vaccine. (136:08 - 14).**

43.    Since her Tri Star employment ended, Plaintiff has traveled domestically and

internationally.  (Andrews Dep., 23:25-26:16.)

15

**RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01. Andrews received the COVID vaccine. (136:08 - 14).**

44.     Plaintiff was late to work often during her Tri Star employment.  (Andrews Dep., 75:11-19; Kinder Dep., 118:7-119:3, 128:8-20.)

**RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01. Stephens viewed the adjustment of Andrews schedule as being a reasonable accommodation under the ADA. (Stephens 58:18-24). TriStar does not track tardiness and attendance. (Taylor 168:16-169:01).**

45.     Ms. Andrews's attendance issues were reflected in deliverables that she failed to meet.  (Id; Stephens Dep., 73:19-21.)

**RESPONSE: Disputed. This is not properly considered a statement of material fact pursuant to Rule 56.01. Andrews received a pay increase in 2019, which was not based on loyalty but on performance. (Plaintiff's Deposition Exhibit 23; Kinder 125:21-126:07). Kinder only knows of performance raises and loyalty raises. (Kinder 126:22-127:01).**

46.     No team coordinator has been assigned permanent or indefinite work from home status either before or after March 2020.  (Taylor Dep., 141:11-13; Andrews Dep., 46:15-47:12.)

**RESPONSE: Undisputed for the purpose of ruling on the motion for summary judgment only. This is not properly considered a statement of material fact pursuant to Rule 56.01 as Andrews did not request to work from home on a permanent basis. (Plaintiff's Exhibit 36 - TriStar's Response to P's First Set of Requests for Admission No. 5).**

47.     Equipping any employee to work from home requires secure mobile office equipment.  (Taylor Decl., ¶ 9.)

**RESPONSE: Disputed. TriStar issued Andrews a laptop, with dock, that she would take home with her on weekends and some weeknights, she received approval from Bryan Luecke, by 2020 she was taking it home consistently. (Andrews 040:22 - 042:06 ). Andrews had a laptop so she could handle Amex emergencies at night or weekends. (Kinder 93:13-21). Andrews did not have a VPN. (Stephens 13:20 – 09).**

**Andrews believed Ambra Baker had the same arrangement towards the end of Andrews employment. (Andrews 052:25 – 053:09). Nola, Anna, and Andrews had laptops and believes Nola regularly took her laptop home. (Andrews 052:18 - 053:09).**

16

Kinder regularly worked from home and used a laptop without VPN. (Kinder 30:25-31:08). Andrews was allowed to have a laptop and transport it from the office to home each day. (Kinder 94:07-17). Stephens approved Andrews taking the laptop home to perform her Amex Liaison duties, which did not require a VPN because Andrews could login to AmericanExpress.com. (Stephens 14:20-25; 49:08 - 11). Taylor understood that Andrews already had a laptop, that her manager said could be set up right away and that Andrews could work from home, that Andrews wanted to work from home, and that Luecke wanted Taylor to preferential consideration. (Taylor 104:25-105:19).

<u>**PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS**</u>

Pursuant to Local Rule 56.01(c) Plaintiff as non-movant submits additional facts that are material and contends there exists a genuine issue of fact.

1.  TriStar is a multifamily office, bill pay, financial statements, royalty reporting, tour reporting, house acquisitions, real estate, asset acquisitions, sales, contract management, and contract negotiations. [Taylor 19:14 20:04].

2.  TriStar is a multi-state private firm. [Taylor 29:18-30:04]. In 2020 TriStar had approximately 110 clients. [Taylor 20:02-04]. TriStar provides business management support clients that have businesses with employees in many states.  [Taylor 20:10-21:20; TAAYLOR 30:16-31:06].

**Dispute as to whether Taylor was aware of Andrews
seeking to work from home based on a medical need**

3.  Taylor understood an employer is not to discriminate against people who are disabled, was aware that a staff member is to have conversation with the employee about their disability and reasonable accommodation as part of the engage in the interactive process. (Taylor 27:02-28:01).

4.  On Monday March 16, 2020, HR Generalist Simpson told Taylor that Andrews has submitted a request to work from home request. (Taylor 47:13- 48:07).

5.  On March 16, 2020, Taylor considered reasonable accommodations as part of the reduction in force by having TriStar send a letter asking if people if they had a request for work from home.

18

However, we do realize that some of our employees may have needs arise out of their control that may require some flexibility in scheduling. We will review these requests on a case by case basis. If you can be in the office, we ask that you come in to work. In the event you feel that you need to work from home we ask that you speak with your Director and HR immediately.

There are a few instances that will be given WFH preference which are: School Closings and Employees or Spouse/Partner/Significant Others/Roommates with compromised immune systems. Those who are affected by either of these will be accommodated to the best of our ability. An accommodation may include a change in schedule or the issuance of a Tri Star laptop.

If you do end up working from home, please be aware that this is a benefit afforded to you which will prevent the use of Vacation or Sick Time. You are expected to work 8 hours each day as if you were in the office. Please communicate with your supervisor if anything comes up that may prevent that.

(Plaintiff's Exhibit 29; Taylor 28:05-10).

6.   Before the March 17, 2020, letter was sent out. Taylor was only aware of one person requesting to work from home and it was Andrews. (Taylor 47:13).

7.   Taylor had HR provide e-mails tracking work for home requests and whether they were immune compromised or a doctor saying they needed to be home. (Taylor 43:19 – 44:03; Taylor 53:17-54:04).

8.   Kinder shepherded information between Taylor and Simpson. (Kinder 73:18 – 13). If Taylor needed something Kinder was the primary conduit to get it. (Kinder 47:18-24). Kinder would provide Taylor with printouts of e-mails Kinder received when asked. (Kinder 103:01-20).

9.   Simpson was providing Kinder updates on what people had made requests. (Simpson 73:25-04).

10.  Taylor admits understanding the interactive process involved having a dialogue with TriStar Human Resources with an employee when they bring up a health issue. (Taylor 110:09-111:05).

11.  Taylor admits taking into account whether employees had an immune system issues. (Taylor 109:22 – 110:02).

12.  Taylor claims she did not know considering immune system issue was an obligation under the law. (Taylor 109:22 – 110:05).

19

13. Taylor has never seen documentation from Andrews medical provider, or anyone else, and has never seen a TriStar reasonable accommodation request form – she relied on Yolanda for that information. (Taylor 146:23-147:09).

14. Kinder stated that Taylor knows not to ask questions about what an employee's health issues are. (Kinder 110:02-06).

15. Kinder stated Taylor knows it is not her place to know everything about staff when it comes to medical reasons, if someone has medical issues the whole company does not have to know it, that's between the person and HR. (Kinder 108:23-110:01).

16. Kinder understood it was not her place to have conversations about Andrews' health conditions. (Kinder 107:07-12).

17. On March 17, 2020, Kinder sent requesting an e-mail stating:

> Once you have it ready, please send me an updated list of who is requesting to WFH and please include if they have provided appropriate documentation. Also, be sure to include if their director has approved.
>
> Once received, we will have Lou review and sign off and then start the process of figuring out if they need a laptop, or not.

18. Simpson sent an e-mail to Kinder with subject line RE: Updated list that included an attachment listing Christie Adams (sic) as - Compromised immune system.

19. On March 17, 2020, Andrews spoke with TriStar HR Generalist about asthma. (Plaintiff's 15).

20. On March 17, 2020, Andrews sent an e-mail to Bryan Luecke, Yolanda Simpson, Heather Kinder, Peggy Stephens with attachment from Andrews' health provider:

20

Christie Andrews has been a patient at our office for several years. She has known asthma. Although well controlled, she would benefit from working at home due to the rising risk of COVID-19. If you have any questions or concerns, feel free to call our office.

Thank You,

Autumn Nelson, FNP-BC

(Plaintiff's 15).

21.     On March 17, 2020, Peggy Stephens wrote

> Ugh – I know. I do have to say that I know cleaning products do cause some people issues – Christy has so many "ailments" its just crazy.

(Plaintiff's 16). In response Kinder's e-mail Subj. FW: Christie, where Kinder stated:

> So now we are getting complaints about the cleaning products. What do people want!?!?!?!

(Plaintiff's 16).

22.     On March 17, 2020, Simpson sent an e-mail to Taylor with subject line WFH requests included Christie Adams (sic).

> The following employees have requested to work from home based on compromised immune systems. I have received doctor's notes from each person listed validating that they do have valid concerns.

[Plaintiff's Exhibit 17].

23.     In March 2020 TriStar classified Andrews as having a compromised immune system. [Plaintiff's Exhibit 9, 17,19, 20). TriStar has a list including Christie Adams as "compromised immune system" and Taylor admits not knowing an employee by that name, and without prompting asks if that is Christie Andrews. (Taylor 99:15-100:06). TriStar used "Preferential consideration" for single parent or parents who had childcare needs, people who live with first responders, and who were immune compromised. (Taylor 41:02 – 10).

24.     On March 18, 2020, TriStar HR Yolanda was reporting that "the following employees have

21

requested work from home based on compromised immune systems and that TriStar had received doctors' notes validating that they had valid concerns, and listed Christie Andrews for consideration. (Taylor 113:11-114:02; 117:03-07; 119:14-21).

25. March 19, 2020, is the first time Taylor tells anyone Andrews will be laid off, and the first time it is communicated that all non-essential staff on WFH is being laid off. (Plaintiff's Exhibit 20). The layoffs were not effectuated until March 20, 2020. (Taylor 115:14-20).

26. Taylor admits that at first TriStar there were doing projections for eight weeks of cash shortage, and "we all thought we were going to be in this eight weeks." (Taylor 92:09-19).

27. The reduction-in-force was an evolving process, there was no written plan, there was no consulting what TriStar was going to do, it was all Taylor. (Taylor 42:10 43:02).

28. TriStar submitted a separation notice to the state of Tennessee stating the reason for separation was "Lack of Work."

29. Non-essential Team Coordinators who were able to report to work were needed because of TriStar had an "increased workload" there was lots of work done, it was chaos. (Taylor 54:20- 55:07).

30. The increased work load involved – business management work, support work, client communication – "A millions of times. Over and over and over again" with concerns about the pandemic. (Taylor 55:12-19).

31. Team Coordinators, formerly clients' services specialists, were points of contacts for clients, and Client's trusted advisors and employees. (Taylor 57:23 – 58:08).

### Dispute in person attendance was an essential job for
### Andrews' Team Coordinator/Amex Liaison

32. Team Coordinators' duties and services are not separated by East and West office. (Taylor 66:01-24).

33.     Team Coordinators were the equivalent to assistants to the accounting or business manager who would assist by providing to do lists, direct client communication, garnering internal resources for client needs, trusted advisor needs, running the team meetings, tracking the teams' open deliverables that need to be completed either internally for the firm, externally to the trusted advisor, or the client. (Taylor 12:18-13:12).

34.     Team Coordinators essential job functions – manage the team deliverable and track open deliverables – projects assigned by the team. (Taylor 157:16-23).

35.     Taylor states that clients are not going to talk to Team Coordinators about contract servicing or taxes. Rather about a license plate, the dog walker (Taylor 59:17- 60).

36.     Team Coordinator is a benefit that TriStar offers to TriStar Clients, it allows accounting team to focus on accounting and team coordinators can do administrative functions such as managing task lists, managing checklists, scheduling team meetings, preparing items for clients to pick up, tracking spreadsheets, tracking renewals, updating addresses. (Kinder 39:22-40:14).

37.     Team Coordinators provided concierge services to clients and this was a benefit that TriStar competitors did not offer. It could include calling the dog walker, setting up utilities, changing your address, booking an appointment at the DMV, passport renewals. (Kinder 50:08-51:01; 54:05-13).

38.     Team coordinators bill their time. (Kinder 54:14-22).

39.     Andrews served as the Amex Liaison for the entire firm for the clients, clients' family and businesses. (Taylor 76:19 - 77:10; 77:21 - 78:04).

40.     Andrews did the Amex Liasion work for any client, client's employees that had an Amex. (Kinder 55:25 – 57:05). If there was an issue with an Amex Card for any of the clients managed by the 7 business management team, then Andrews would call up Amex and

23

handled the issue. (Kinder 57:13-24). Andrews had a relationship with the Amex liaison. (Kinder 59:04-07).

41. There is no job description for the Amex Liaison, Taylor did not know the details of the position. (Taylor 77:20 – 78:04).

42. Taylor did not interact with Andrews on a day-to-day basis. (Taylor 21:20).

43. Andrews had a laptop so she could handle Amex emergencies at night or weekends. (Kinder 93:13-21). Andrews was allowed to have a laptop and transport it from the office to home each day. (Kinder 94:07-17).

44. In 2019 there was an adjustment to Andrews scheduled start time. (Kinder 105).

45. Kinder understood that "accommodation" is associated with ADA. (Kinder 107:12-16).

46. In 2019 the HR's e-mail provided "discuss the seriousness of the situation with your healthcare providers and build a support team to help manage any conditions that are contributing to this behavior" and Kinder knew Andrews was having sleep issues and had headaches. (Kinder 107:17 – 108:12).

47. Taylor understood that Andrews already had a laptop, that her manager said could be set up right away, that Andrews could work from home, that Andrews wanted to work from home, and that Luecke wanted Taylor to provide preferential consideration. (Taylor 104:25-105:19).

48. Amber Baker was a team coordinator for the business management team, like Andrews. (Kinder 39:02 – 07).

**TriStar knew or had reason to know Andrews' asthma qualifies as an actual disability, requiring her to take medication daily**

49. Andrews was diagnosed with Asthma when she was 14 or 15 years of age by an ear, nose and throat doctor and asthma specialist – that she was referred to after wearing a 24 hour

24

heart monitor with irregularities that didn't present as a cardio but a respiratory issue. (Andrews 100:25 - 101:24).

50. Andrews deals with her asthma every day to keep it well-controlled. (121:02 - 122:07). Andrews is prescribed Singulair (daily), Flonase (daily), and Zyrtec (daily) to manage allergies and asthma. (Andrews 115:14 - 116:09 116:13 - 116:23; 117:10 - 117:24). Andrews carries her rescue inhaler, Xopenx, all the time and she uses it before exercising so that her asthma is kept under control. (Andrews 116:21 – 23; 118:03 - 118:15).

51. Andrews 'asthma is debilitating because it gets in the way of Andrews day to day activities, after an attack, if she does not get over it then she can end up with bronchitis or pneumonia, it can also limits her movement due to shortness of breathe. Andrews to get sick more often. Andrews also choose not to do a lot of things because she knows it might be problem. Andrews also has anxiety about the asthma. (Andrews 121:09 - 122:07; 125:20 - 126:23).

52. Andrews has regular asthma attacks, which include any sort of event requiring the use of her rescue inhaler. (Andrews 112:04 - 113:23). In 2016 Andrews was hospitalized for an asthma attack after being exposed to a carbon monoxide. (Andrews 113:25 - 114:18).

53. When Andrews is exposed to a triggers wind blowing in her face then she would not be able to breath, or the cold cause everything to constrict – Andrews did not know this was an asthma attack she thought it was something everyone experienced. Andrews had serious attacks when running, and she would have to coach herself back into breathing. (102:02 - 103:15). Synthetic fog is a trigger that will immediately require the rescue inhaler.

54. High humidity, stress, exercise. Andrews' allergies exacerbate her asthma but is not an immediate trigger. Cleaning products that hang in the air are a big trigger. Strong smells, perfumes. (Andrews 110:21 - 111:20).

55. Because Andrews carried Xopenx inhaler levalbuterol everywhere Andrews believed her

25

asthma was common knowledge at TriStar. (Andrews 105:12 - 107:11; 107:15 - 108:05).

56. On August 20, 2014, Andrews completed and submitted the TriStar Emergency contact form she had asthma, no albuterol (will induce vomiting), Xopenex inhaler. (Exhibit #) (Amdrews 103:01 - 103:15).

57. Stephens testified she does not recall knowing Andrews ever having asthma. (Stephens 20:08-14). However, Stephens did receive an e-mail from Stephen Krell where he stating Andrews had sent a message "being cold and her asthma acting up" and responding, "she changed policy, so I'm sure she is happy about that!" (Stephens 52:05-53:03). Stephens acknowledged that it is being communicated that Andrews has asthma. (Stephens 53:17-21).

58. Andrews discussed her Asthma with TriStar management during the heater issue because Andrews' asthma would manifest itself when she was cold, starting with coughs and progressing to chest tightness, requiring her to focus on controlling her breathing, using her rescue inhaler, otherwise she would be in trouble. Andrews 'rescue inhaler does not relieve the coughing, it just opens the bronchial tubes, and causes a ramp up in production in mucus, which will last a couple of days after an event. (Andrews 108:20 - 110:17).

59. Kinder was aware of the space heater situation in 2020.  Steve e-mailed the HR director being cold affected Andrews' asthma. (Kinder 96:04-98:03).

60. On March 16, 2020, Andrews had an episode that required her to use her rescue inhaler. Someone was using Lysol spray, it was hanging in the air, and triggered her asthma, causing coughing, she tried regulating her breathing, she felt chest tightness, and it reached a point that she went to bathroom to use inhaler. (Andrews 127:06 - 127:22).

**Andrews was otherwise qualified for her position,
with or without a reasonable accommodation**.

61. Stephens considered Andrews a good employee when she showed up and focused on her job. (Stephens 17:23 – 07). In July 2019 Andrews was being recommended for a raise, and

that the loyalty raise was being skipped. (Kinder 125:21-126:07). Kinder only knows of performance raises and loyalty raises. (Kinder 126:22-127:01).

**The steroid medications Andrews's prescribed to control her asthma – Flonase (daily) and Rescue inhaler (regularly) – comprised her immune system leaving her susceptible to Serious Complications if exposed to COVID-19**

62. Andrews spoke to her healthcare provider because she was concerned after hearing reports that steroids for asthma could make her more susceptible to catching the virus because it depleted her immune system. Andrews asked if she should change the way she took her medication, and other general guidance. (Andrews 061:23 - 063:07). Andrews' steroid medication was her rescue inhaler, and Flonase. (Andrews 063:11 - 063:19).

63. Andrews believed that asthma posed a big risk for COVID based on news reporting and CDC information. (Andrews 139:01 - 139:16). Andrews' healthcare provider instructed her to continue taking her daily medication. Andrews also spoke with family members and family friends who were healthcare professionals that recommended Andrews stay at home (Andrews 063:23 - 065:12; 065:21 - 066:08; 066:15 - 067:01).

64. Andrews has a history of difficulty sleeping, it was exacerbated with concerns over the pandemic, at the time the CDC and media were saying that people with asthma were at risk of severe complications from COVID. Andrews had concerns of being exposed and being hospitalized. (Andrews 061:23 - 063:07).

65. On March 20, 2020, Andrews went to urgent care to confirm it was not COVID and have them listen to Andrews lungs to confirm she did not have bronchitis or something of that nature.(Andrews 119:03 - 120:05; 120:14 - 120:24)

**Pretext**

66. TriStar's policy that if an employee advises Human Resources the need for accommodation, and Human Resources will provide a request for accommodation form. (Plaintiff's Exhibit 3;

27

Taylor 137:04-11). TriStar's policy says that the accommodation request will be discussed with the employee and the employee's managers." (Plaintiff's Exhibit 3; Taylor 137:19-25). TriStar's policy says employer may be required to provide documentation supporting a disability, including all certification." (Plaintiff's Exhibit 3; Taylor 138:10-14).

67. TriStar's policy "if a reasonable, appropriate accommodation is readily available the request will be approved and the accommodation implemented." (Plaintiff's Exhibit 3; Taylor 138:10-139:04).

68. TriStar's policy states "and when accommodation is not readily ascertainable, the matter will be pursued further with the assistance of appropriate external resources." (Plaintiff's Exhibit 3; Taylor 139:05-09).

69. Taylor does not know what is meant by "appropriate external resources" but HR is expected to know what that meant and they have access to both labor lawyers. (Plaintiff's Exhibit 3; Taylor 139:10-18).

70. According to TriStar policy "(a)ll requests for accommodation need to be approved by the CEO." (Plaintiff's Exhibit 3; Taylor 139:25-05).

71. TriStar states "TriStar will consider the requests but reserves the right to offer its own accommodation, to the extent permitted by law." (Plaintiff's Exhibit 3; Taylor 140:22-141:01).

72. Taylor admits that she is not HR person for TriStar, but there has always been a professional and then counsel for drafting a policy, review, or what gets extended. (Taylor 142:24-143:06).

73. Taylor is responsible for the policies in the Employee handbook. (Plaintiffs exhibit 8; Taylor 132:12-17).

**TriStar's Human Resources During the Pandemic**

74. Yolanda Simpson was TriStar's Human Resources Generalist. Simpson was TriStar HR generalist starting in February 2020 and until she was terminated September 31, 2020. (Defendant's Initial Disclosures p. 1; Simpson 9:1-04; 16:03-09).

75. Simpson's understanding of the ADA's interactive process is that once you're made aware of a need for an accommodation or potential need for accommodation, that you have a conversation with the employee and get appropriate documents to validate that a need is justified. (Simpson 27:08-17).

76. Simpson's understanding of reasonable accommodation request under the ADA is if an employee needs their job modified on some medical need, that as long as it doesn't cause a hardship on the employer, and it considered reasonable, then that's something they would grant." (Simpson 26:25-27:07).

77. Simpson does not recall ever engaging in the interactive process as an HR generalist for TriStar. (Simpson 102:17-20).

78. Simpson never saw a reasonable accommodation form while working for TriStar. (Simpson 29:08-11).

79. Simpson does not recall having any conversation with Taylor regarding COVID-19 work accommodations. (Simpson 70:05-11).

80. Simpson does not recall ever engaging in the interactive process while as an HR generalist for TriStar. (Simpson 102:17-20).

81.

### Genuine Dispute as to Whether the Decision to Terminate Andrews was Purely Economic as TriStar retained Touring Employees

82. Business management services is TriStar's profit center – its accounting and financial services – they were all intertwined. (Taylor 50:06-20).

29

83. TriStar compensation structure includes commissions, monthly retainers, or fee-based. (Kinder 43:24-44:18; 46:17-25).

84. TriStar generates fees by providing services other than touring, including: Business management, royalties, tax, and concierge family office services. (Kinder 45:05-15; 48:08-14).

85. TriStar has clients that are nontouring – actors, actresses, models and high net worth families. (Kinder 62:20-63:05).

86. Taylor decision to terminate non-essential employees with work-from-home requests were in the first round was not based on dollar and cents. (Taylor 39:06-14).

87. Nonessential employees who needed to work from home were terminated in the first round, while nonessential employees who were at the office kept their jobs.  (Taylor 83:07-12).

88. TriStar had an entire touring department that had no work. (Taylor 36:24 - 37: 09).

89. Taylor admits that they retained individuals in TriStar's Touring department and allowed some to work from home if they were determined to be essential. (Taylor 84:14-85:06).

90. Taylor states that TriStar generates revenue from touring through commissions and gave the example that if a $14 million tour was set for eight weeks, and the commission is 5% then that would be $700,000 lost. (Taylor 93:16-24).

91. TriStar may receive touring income at the end of the tour or when the venue pays the artist. (Kinder 67:05-17).

92. According to a post dated October 10, 2019 LouTaylor.net – her clients included Florida Georgia Line that according to an article dated October 30, 2019 Pollstar.com finished a $50 million tour. (Plaintiff's Exhibits 48 and 49).

93. The touring income that disappeared was "planned income" or "prospective income." (Kinder 66:06-13).

30

94.    Going into 2020 TriStar was looking to fill a lot of positions, because they were goring.

       (Plaintiff's Exhibit 28 Kinder 47:06-12).

95.    As of March 23,2020, TriStar had open requisitions for numerous positions including Team

       Coordinators including Nashville. (Plaintiff's Exhibit 28).

**CERTIFICATE OF SERVICE**

I hereby certify that on Friday, December 9, 2022, I electronically served the foregoing PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS ( DOC. 40) via CM/ECF:


Tara L. Swafford, BPR # 17577
Thomas Anthony Swafford, BPR # 17578
Elizabeth G. Hart, BPR # 030070
The Swafford Law Firm, PLLC
207 Third Avenue North
Franklin, Tennessee 37064
Tel: (615) 599-8406
Fax: (615) 807-2355
Tara@swaffordlawfirm.com
Tony@swaffordlawfirm.com
Betsy@swaffordlawfirm.com


Attorneys for Tri Star Sports and Entertainment Group, Inc.

Respectfully  submitted,

_____

Daniel Arciniegas, BPR #35853
**ARCINIEGAS LAW**
1242 Old Hillsboro Road
The Atrium Building
Franklin, Tennessee 37069
T. 629.777.5339
Daniel@AttorneyDaniel.com