```
 1                A.      Nashville and LA.

 2                Q.      Okay.  And --

 3                A.      I should say both locations.  One

 4      practice, both locations.

 5                Q.      Fair.

 6                A.      Yeah.

 7                Q.      Okay.  And just to clarify that.

 8      When you say "practice," how would you -- when you

 9      use the word "practice," did --

10                A.      The business management team.

11                Q.      Okay.  And your business

12      management team in general of, like, structure,

13      can you give me that?

14                A.      Uh-huh.  Team coordinators, who

15      are support to the team; staff accountant 1s;

16      senior staff accountants; accounting managers; and

17      then on some teams, business managers.

18                Q.      Okay.  And so let's just jump to

19      it.  What -- what did team coordinators do in

20      2020?

21                A.      They would be the equivalent in

22      normal context of being, like, assistants.

23                Q.      Okay.  How would they assist?

24                A.      Direct client communication,

25      garner internal resources for client needs,
```

```
 1    trusted advisor needs, run the team meetings,

 2    track the department -- or that particular team's

 3    open deliverables that needed to be completed

 4    either internally for the firm, externally to the

 5    trusted advisor, or the client.

 6            Q.    All right.  And so what does it

 7    mean to track deliverables internally?

 8            A.    It's a to-do list.

 9            Q.    Okay.  And who do they provide

10    the to-do list to?

11            A.    Usually the accounting manager or

12    the business manager.

13            Q.    So the layoffs you did in 2020,

14    was that the first time you've had, like, a layoff

15    process?

16            A.    That's correct.

17            Q.    Okay.  So I know that can be

18    difficult for a business owner in some

19    circumstances.  Did you get some guidance on that?

20            A.    I did not.

21            Q.    Okay.  Did you confer with a

22    labor lawyer?

23            A.    I did.

24            Q.    Okay.  Who was that labor lawyer?

25            A.    Matt Oster.
```

```
 1   operational concern, then Peggy is the Director of
 2   Business Management.  That would flow up to her.
 3           Q.     Okay.  And so let's kind of just
 4   define the Nashville operation --
 5           A.     Uh-huh.
 6           Q.     -- for me a little better.  So we
 7   have the Business Management group, right?
 8           A.     Uh-huh.
 9           Q.     But you have other subunits or
10   business units there?
11           A.     There would be additional
12   verticals:  Tax.  Obviously, Peggy doesn't report
13   into Tax.  Royalties and touring.  There's
14   separate directors for each of those verticals.
15           Q.     Okay.  But -- so I guess better
16   describe for me, because I'm missing the -- or I
17   don't have a good understanding of what you mean
18   what a business management group does.
19           A.     If you would think about it as a
20   finance and an accounting office --
21           Q.     Uh-huh.
22           A.     -- or a multifamily office.  So
23   there's bill pay, financial statements, royalty
24   reporting, tour reporting, house acquisitions,
25   real estate, asset acquisitions, sales, contract
```

Case 3:21-cv-00526   Document 49-2   Filed 12/09/22   Page 3 of 62 PageID #: 803

```
 1    management, contract negotiations.
 2            Q.      And so, roughly, in 2020, how
 3    many clients did y'all have?
 4            A.      Probably 110.
 5            Q.      Something like that?  Okay.
 6            A.      Uh-huh.
 7            Q.      And these are high net worth
 8    clients; fair?
 9            A.      Correct.
10            Q.      And some of the assets, they
11    acquire businesses; is that right?
12            A.      That's correct.
13            Q.      And so kind of give me a
14    spectrum.  I don't know.  Obviously, some clients
15    may not even own a business, but there's some
16    clients that do own businesses.  Like, what --
17    like, what are some -- how many businesses do some
18    clients own?  Like, what's the range in that?
19            A.      I have one who has 23-plus loan
20    outs.
21            Q.      I'm sorry, loan outs?
22            A.      Yeah.  Additional businesses,
23    companies.
24            Q.      Okay.  And they --
25            A.      Could be anywhere from zero to
```

Case 3:21-cv-00526   Document 49-2   Filed 12/09/22   Page 4 of 62 PageID #: 804

```
1   20, 30.
2            Q.     20 to 30?
3            A.     Uh-huh.
4            Q.     Okay.  And some of those
5   businesses -- those businesses have -- have
6   employees; fair?
7            A.     Some, yeah.
8            Q.     Okay.  And so some of those
9   employees -- like, what is the scope of, like --
10  or the number of employees people have?
11           A.     Varies.
12           Q.     Okay.  So what's the high end?
13  What's the low end?  Zero to....
14           A.     I -- I wouldn't be able to pull a
15  number.  It would be zero to -- I don't know what
16  the high would be.
17           Q.     What's the highest that you do
18  know?
19           A.     I can think of one off the top of
20  my head that has more than 30 staff.
21           Q.     Okay.  And do you have an idea
22  of, like, the -- the spread within the states, how
23  many clients they have?
24           A.     I don't.
25           Q.     Or sorry.
```

```
 1              A.      Uh-huh.

 2              Q.      -- do you understand that -- what

 3    a request for a reasonable accommodation is?

 4              A.      I actually do.

 5              Q.      Okay.  What is your understanding

 6    of that?

 7              A.      To make a reasonable accomodation

 8    to meet whatever their need is.

 9              Q.      Okay.  And do you know what that

10    process looks like or what --

11              A.      I do not.

12              Q.      Do you know what that process

13    should look like?

14              A.      I do not.

15              Q.      And do you understand that that's

16    the statute that we're operating under in this

17    lawsuit?

18              A.      Sure.

19              Q.      And have you ever heard of the

20    phrase "interactive process"?

21              A.      I have.

22              Q.      And what do you understand that

23    to be?

24              A.      That somebody needs to have a

25    conversation with the staff member about their
```

disability and reasonable accommodation.

      Q.    Okay.  And do you know anything else about the interactive process?

      A.    I do not.

      Q.    When you were doing the reduction in force, was that a consideration, whether people -- some people might have request for reasonable accommodations?

      A.    I believe we sent a letter asking people if they had a request for work from home.

      Q.    Okay.  And do you know who sent that letter?

      A.    I believe, Yolanda.

      Q.    Okay.  And do you know how long Yolanda had been in your employ at the time that she sent out that letter, roughly?

      A.    Not long.

      Q.    Would you say about a month?

      A.    Yeah, one or two months.

      Q.    Do you know anything about Ms. Simpson's qualification?

      A.    I do not.

      Q.    All right.  And then did you have -- before that letter was sent out, what was your involvement in making sure that that -- well, let

1    me ask you this.

2              Did you have any involvement in

3    that letter before it was sent out?

4              A.    I did.

5              Q.    Okay.  What was your involvement?

6              A.    I can't tell you exactly what my

7    involvement was --

8              Q.    Sure.

9              A.    -- whether I participated in

10   drafting or just reviewed.  I ju- -- really just

11   don't remember.

12             Q.    But your general practice is to

13   review material before it's communicated out?

14             A.    It depends on what it is.

15             Q.    Okay.

16             A.    I mean, obviously, I'm the CEO.

17   I'm not doing everybody's job for them.

18             Q.    So, like, in your close -- like,

19   as the CEO --

20             A.    Uh-huh.

21             Q.    -- of a -- is it fair to

22   characterize your company as a nationwide company?

23             A.    I wouldn't say it was nationwide,

24   but, I mean, we're definitely what I would

25   consider, you know, a midsize firm, private firm.

```
 1              Q.    Okay.  Multistate?

 2              A.    Uh-huh.

 3              Q.    You got to say "yes" for the....

 4              A.    Yes.

 5              Q.    And earlier I asked if you knew,

 6   like, the spread of how many states you were

 7   involved in with your clients' businesses, and you

 8   couldn't give me an estimate?

 9              A.    No.

10              Q.    Would you say more than ten?

11              A.    More than ten what?

12              Q.    States.

13              A.    For what?

14              Q.    Your -- the spread of your

15   clients.

16                    You provide business management

17   support to your clients; fair?

18              A.    We do.

19              Q.    Okay.  And what is the spread of

20   -- like, how would you -- would you est- --

21   estimate at least ten states that they're involved

22   in?

23              A.    I wouldn't be able to tell you.

24              Q.    Okay.  Who would be able to tell

25   me?
```

```
1              A.    You'd have to pull the research.
2              Q.    I'm sorry?
3              A.    We'd have to pull and see where
4   -- I mean, we have a hundred clients.  I -- I
5   can't sit here and tell you how many of them have
6   businesses and in what states.
7              Q.    Okay.  So what started the
8   layoffs in January?
9              A.    There were no --
10             MS. SWAFFORD:  Let me object.  To
11             clarify, I -- I think that's incorrect.
12             I don't -- just want to us to have a
13             correct record.
14             MR. ARCINIEGAS:  I -- I mean, I'm
15             just going off your -- the -- what the
16             witness --
17             MS. SWAFFORD:  What she said, I
18             understand.
19             MR. ARCINIEGAS:  Like I said, I'm
20             not trying to mislead anybody.
21             MS. SWAFFORD:  Right.
22             MR. ARCINIEGAS:  I didn't know if
23             that was a new fact or what, so....
24  BY MR. ARCINIEGAS:
25             Q.    Did you lay off people in January
```

that information communicated to you?

         A.     I don't remember.

         Q.     Did you -- was it just verbal conversations or did you actually review the report?

         A.     We had verbal conversations.  I would have reviewed a report of salaries.

         Q.     Anything else?

         A.     No.

         Q.     Did you look at people's performance?

         A.     I did not.

         Q.     Did anybody else look at performance?

         A.     They did not.

         Q.     So was this a -- and I may use phrases, you can feel free --

         A.     Yeah, for sure.

         Q.     -- I think people use different phrases.  But was this more like a dollar and cents, like, bottom-line kind of methodology that you approached it with?

         A.     Yes and no.

         Q.     Okay.  So the "yes" part, explain that?

```
 1            A.     Well, when you look at losing 100

 2   percent of your live business, what becomes logic

 3   is that you're going to have an entire Touring

 4   department that has no work, and we didn't know

 5   what that was going to be.  Eight weeks?  A year?

 6   We're going into two years, three years now.

 7                   So I looked at the Touring

 8   department, see who was highly compensated, was

 9   there duplicity of roles and responsibility.

10            Q.     Okay.

11            A.     Uh-huh.

12            Q.     And then what about with respect

13   to the other departments?

14            A.     Essential -- what I considered

15   essential and nonessential staff.

16            Q.     Okay.  With respect to -- was

17   that something that you -- the separation of

18   essential and nonessential, was that something

19   that was applied to the Touring department or just

20   the other departments?

21            A.     Essential and nonessential was

22   not necessarily departmental.  It was really

23   technical deliverables.

24            Q.     Okay.

25            A.     Uh-huh.
```

```
 1              Q.      So for the essentials, like -- or
 2     what qualif- -- what were the technical
 3     deliverabl- -- deliverables?
 4              A.      Essential staff, to me, were
 5     people who had to keep the accounting and finance
 6     work for the clients going.  It was mayhem.  It
 7     was absolute insanity.
 8              Q.      So you said accounting and what
 9     else?  I'm sorry.
10              A.      Finance.
11              Q.      Finance?
12              A.      Uh-huh.
13              Q.      Like, taxes and....
14              A.      Yeah, of course.
15              Q.      What else other than taxes?
16              A.      Accounting.  I mean, it was
17     strictly the -- you know, the accounting and
18     finance and tax teams.  They were considered
19     essential to me.
20              Q.      Okay.  Why were team coordinators
21     not considered essential?
22              A.      Because they're not essential to
23     keeping the business going.  Not in that regard.
24              Q.      Okay.  So did y'all lay off all
25     the team coordinators?
```

```
 1                A.      We did not.

 2                Q.      Okay.  So when you were laying

 3      off team coordinators, you had deemed that

 4      position generally as nonessential?

 5                A.      Nonessential, uh-huh.

 6                Q.      What kind of -- what -- what

 7      factors did you use to differentiate within that

 8      group?

 9                A.      Work from -- work-from-home

10      requests for nonessential staff.  I think almost

11      all of them went in the first round.

12                Q.      Okay.  That was based on dollar

13      and cents?

14                A.      No.

15                Q.      Like, you didn't -- when you were

16      looking at the team coordinators, were you

17      reviewing their payroll records or not, or

18      reporting?

19                A.      My first consideration was

20      work-from- home requests.

21                Q.      Okay.  Why is that?

22                A.      Because computers, it was obvious

23      that we were going to have some people that needed

24      to work from home that were essential to keeping

25      the business going.  Computers were a factor.
```

```
 1            Q.      Expenditure.

 2                    Was there any, like, preferential

 3     considerations during that process?

 4            A.      The essential staff with

 5     preferential treatment were defined in three

 6     categories:  Single parents or parents who had

 7     childcare needs, people who live with first

 8     responders.  I can't remember the third one.  Let

 9     me see.  Give me a minute.  Childcare needs,

10     people -- oh, who were immune compromised.

11            Q.      So when you had these three

12     categories of --

13            A.      Uh-huh.

14            Q.      -- preferential treat- --

15     consideration --

16            A.      Essential staff, uh-huh.

17            Q.      Okay.  So within the essential

18     staff, you have these preferential considerations.

19     You have these three categories, correct?

20            A.      (No audible response.)

21            Q.      And was -- you gave them in

22     order, but how -- they're -- that's not in the

23     order of ranking of importance or weight, right?

24            A.      No.  That's right.

25            Q.      Okay.  Were they treated equally,
```

```
 1   in your mind?
 2             A.      They were.
 3             Q.      Or weighted equally?
 4             A.      They were.
 5             Q.      And so it -- based on how you're
 6   answering, it seems that you're saying that
 7   preferential considerations was not given to
 8   nonessential employees; is that right?
 9             A.      That's right.
10             Q.      Was that something that was
11   considered for a little while to get -- whether,
12   you know, it -- it was an evolving process; is
13   that fair, the -- the approach to the reduction in
14   force?
15             A.      It was.
16             Q.      Was it a writt- -- like, were
17   there different versions or, like, models that you
18   guys considered?
19             A.      There was no "you guys."  It was
20   me.
21             Q.      Okay.  Well, you had people
22   provide you information, correct?
23             A.      I would say most of it was coming
24   just from online and everybody was in panic.
25   There wasn't, like, consulting.  It was:  Oh, my
```

```
 1  gosh, what are we going to do?  What am I going to

 2  do?

 3             Q.    Okay.  But you did have payroll

 4  records reporting when you were going through the

 5  reduction in force decision-making process; fair?

 6             A.    I probably did not at that time.

 7  I made those decisions literally over the --

 8  pretty much so over the weekend.

 9             Q.    Did you consult with Peggy

10  Stephens about layoffs?

11             A.    I did not.

12             Q.    Did you consult with any of your

13  director level --

14             A.    I did not.

15             Q.    But you did receive some

16  information from Yolanda Smith [sic] -- Simpson?

17             A.    I mean, I don't know what you

18  define as information.

19             Q.    Okay.  Well, why don't you tell

20  me what you recall getting from Yolanda Simpson

21  with respect to the reduction in force, or were

22  you ever just tracking with your decision-making?

23             A.    I believe Yolanda was tracking

24  probably during that week requests for work from

25  home.
```

```
 1              Q.    Okay.  Was that tracking provided
 2    to you?
 3              A.    I believe via e-mail.
 4              Q.    Okay.  In March of 2020, were you
 5    in LA or here in -- at home?
 6              A.    I was in LA that Thursday and
 7    Friday before the sh- -- I think I was the last
 8    flight out of LAX back to Nashville.  Seriously.
 9    So I was in Nashville on the 20th, March 20th.
10              Q.    So you landed March 20th in
11    Nashville?
12              A.    No.  On -- I got to back up.  I
13    don't know what the date was.
14              Q.    Sure.
15              A.    National -- the -- the national
16    shutdown was on Friday.  So whatever that date was
17    the Friday before the 2- -- the 20th was a Friday.
18    So the Friday before the 20th is when I returned
19    to Nashville, in the evening.  I believe it was
20    the evening.
21                    MS. SWAFFORD:  13th is, I think,
22              what we were talking about.
23                    MR. ARCINIEGAS:  I did the math.
24    BY MR. ARCINIEGAS:
25              Q.    All right.  So that's when you
```

1    those individuals?

2              A.    I did not.

3              Q.    Did you consider the individuals

4    that fell within that category?

5              A.    I did not have them at that time.

6              Q.    Okay.  Did you ever look at them

7    on a one -- like --

8              A.    No.

9              Q.    At any point?

10             A.    Nope.  Not until during the week,

11   once I was notified as to who requested to work

12   from home.

13             Q.    Okay.  So you -- so is there any

14   directive -- is there any documentation showing

15   that you had decided during the weekend that

16   nonessential work-from-home people were going to

17   be the first people to be cut?

18             A.    No.

19             Q.    Did you communicate that to

20   anybody?

21             A.    No.

22             Q.    When did you first communicate

23   that to someone?

24             A.    I don't know.  Monday or Tuesday,

25   maybe.  I don't know.  Yolanda had to know before

```
 1   I sent the letter out, because we didn't know who

 2   was going to request to work from home.

 3              Q.     I'm sorry, say that again.

 4              A.     I think the letter went out on

 5   the 17th.

 6              Q.     Okay.

 7              A.     On that Tuesday to go:  Who has a

 8   request-from-home need?  It's like I don't -- I

 9   didn't know who did or didn't have a need.

10              Q.     So if I'm hearing you

11   correctly --

12              A.     Uh-huh.

13              Q.     -- you said you didn't know who

14   had a need to work from home --

15              A.     Uh-huh.

16              Q.     -- before Tuesday?

17              A.     With the exception of Christie.

18              Q.     Okay.  What do you mean?

19              A.     Yolanda mentioned it to me on --

20   on the phone on the 16th.

21              Q.     What do you recall about that

22   conversation?

23              A.     That she was getting, you know --

24   she was getting hit left and right like everybody

25   else, because everybody was scared.  You know,
```

```
 1    what are we doing?  You know, I -- it was a
 2    million questions.  What are we doing?  Are we
 3    closing?  You know, staff thought we were going to
 4    close the office.  We had clients who were abroad
 5    that were trying to get home, and she mentioned to
 6    me on that Monday that Christie had requested to
 7    work from home.
 8              Q.    So in terms of people requesting
 9    to work from home --
10              A.    Uh-huh.
11              Q.    -- Christie was the first person
12    that you were aware of?
13              A.    Yes.
14              Q.    Okay.  And that was just in the
15    conversation with Ms. Simpson, correct?
16              A.    Let -- let me correct that for
17    the record.
18              Q.    Sure.
19              A.    I mean, obviously, parents on
20    that Thursday -- at least in LA.  I don't know
21    about Nashville -- they were all called to come
22    pick their kids up.  So it was obvious to me that
23    we were getting ready to go into a time that
24    nobody had been in before.
25                    So I can't sit here and go:  Oh,
```

```
 1              Q.     Right.

 2              A.     Yeah.  And the --

 3              Q.     As a business owner, that is a

 4    very busy time of year for y'all?

 5              A.     Yeah.  We're busy all the time.

 6              Q.     I would gather that.

 7                     So, I mean, without getting into

 8    the particulars, but, like, as a business, like,

 9    how would you say, like, your most -- what is your

10    profit centers?  Like, what are the main services

11    that you generate fees from?

12              A.     Business management services.

13              Q.     Okay.  And from there down, how

14    would you say?

15              A.     There is no "there down."  That's

16    what it is.

17              Q.     Okay.  It --

18              A.     Accounting, finance services, all

19    of it ties into each vertical.  So it's accounting

20    and financial services.

21              Q.     And when you say "each vertical,"

22    I just want the record to be clear what you mean

23    by that.

24              A.     Royalties, touring, tax, business

25    management.
```

```
 1              A.      I was not aware of anybody having
 2    ADA rights at that time.
 3              Q.      What about doctor's notes?
 4              A.      I was aware at the end people
 5    who's [sic], quote/unquote, submitted notes.
 6              Q.      Who do you mean "quote/unquote"?
 7              A.      If somebody submitted a note,
 8    then Yolanda kept track of it.
 9              Q.      Why?
10              A.      To deem whether or not they
11    actually fell into one of the preferential
12    work-from-home requests as an essential staff.
13              Q.      But that information wasn't
14    intended to be tracked for nonessential employees,
15    right?
16              A.      I don't understand the question.
17              Q.      So what I'm hearing from you is
18    that this list that Ms. Simpson was maintaining
19    for you --
20              A.      Uh-huh.
21              Q.      -- was to keep track of notes of
22    work-from-home requests.
23              A.      That's correct.
24              Q.      And notes that also included, you
25    know, medical documents or not?
```

```
 1              A.      Not medical documents, but if

 2     they had immune compromise or a doctor was saying

 3     they needed to be home.

 4              Q.      Okay.  That was a consideration

 5     for the essential employees?

 6              A.      That's right.

 7              Q.      Okay.  But it was not intended to

 8     be a consideration for nonessential employees?

 9              A.      That's correct.

10              Q.      All right.  Was there any concern

11     about legal liability as opposed to that effort?

12              A.      No.

13              Q.      Now, why is a team coordinator

14     who is able to report to work deemed essential?

15              A.      They weren't.

16              Q.      Okay.  Why were they allowed to

17     keep their job?

18              A.      Because they were working in the

19     office.

20              Q.      Well, why is that significant?

21              A.      Because we had an increased

22     workload.

23              Q.      What do you mean "increased

24     workload"?

25              A.      Because it was the pandemic.
```

```
 1    You, in a normal course of business, have things
 2    that are always going on with clients or
 3    operationally.  This was the entire world.  Every
 4    single trusted advisor, every single client, every
 5    one of my staff, every one of the business, it was
 6    absolute chaos.  So there was a lot of work to be
 7    done.
 8              Q.      What do you mean?  I'm still not
 9    following.
10              A.      Just what -- just what I
11    answered.
12              Q.      What type of work was --
13              A.      Business management work, support
14    work, client communication.
15              Q.      So clients were calling and -- or
16    trying to communicate with y'all because they had
17    concerns about the pandemic effects on their --
18              A.      A million times.  Over and over
19    and over and over again.
20              Q.      And on top of that, you were
21    aware that -- you were concerned about the tax
22    obligations, right?  Tax filings?
23              A.      Every duty that the firm is paid
24    to produce is a concern.
25              Q.      And so when the -- who was
```

```
 1   freakin' world shut done.

 2                  THE WITNESS:  Put that on the

 3           record.

 4   BY MR. ARCINIEGAS:

 5           Q.     You're fine.

 6           A.     And I've been told I couldn't

 7   cuss, so that's -- you know, for a New Yorker,

 8   this is like -- I ought to get a medal after today

 9   if I don't do that.  Somebody better be waiting

10   for -- with me for an award.

11                  It was a freaking pandemic.

12           Q.     Right.  But, like, before the

13   pandemic.  Let's start just do -- let's start with

14   something that was less emotional.

15           A.     Yes.

16           Q.     Who was generally tasked with

17   making the --

18           A.     Everybody has a function in doing

19   that.

20           Q.     Sure.  But primarily, who is --

21           A.     There is no primary.  I answered

22   the question.

23           Q.     Okay.  So client -- client

24   service specialists, what are they responsible

25   for, then?
```

57

```
 1              A.    Team coordinators.  I went

 2     through that already.

 3              Q.    Okay.  Do they -- are they

 4     primary contact points for clients or not?

 5              A.    Sometimes and sometimes not.

 6              Q.    Okay.  So some client -- or what

 7     do we call them, team coordinators --

 8              A.    That's right.

 9              Q.    -- would have established

10     relationships with their book of business; is that

11     fair?

12              A.    They don't have a book of

13     business.  They support the team.  But yes, they

14     would have communication with client staff,

15     sometimes clients, trusted advisors.

16              Q.    Right.

17              A.    Uh-huh.

18              Q.    And some -- some clients -- and

19     you -- well, let me -- let's kind of establish

20     something.  You have the main client, and then

21     they have employees that may communicate to your

22     business for their services?

23              A.    That's correct.

24              Q.    And so various levels of people

25     may be coming to y'all to address a client's
```

Case 3:21-cv-00526   Document 49-2   Filed 12/09/22   Page 27 of 62 PageID #: 827

```
 1   issues; is that fair?

 2              A.     That's correct.

 3              Q.     And so they -- over time, they

 4   develop a certain rapport with certain individuals

 5   within your organization; is that fair?

 6              A.     That's correct.

 7              Q.     And then -- so some people may be

 8   more comfortable calling a team coordinator as

 9   opposed to the business manager?

10              A.     Probably not, but --

11              Q.     Okay.

12              A.     -- maybe.

13              Q.     Maybe?

14              A.     Depending on what it is.

15              Q.     Right.

16              A.     Yeah.

17              Q.     Like --

18              A.     They're not going to call a team

19   coordinator and talk about contract servicing or

20   taxes, you know.  They're going to call the team

21   coordinator and go:  My license plate didn't show

22   up.

23              Q.     Right.

24              A.     The dog walker didn't show up.

25   That's what they're going to call the team
```

```
 1    coordinator and talk about.
 2              Q.    Okay.  And maybe other assets?
 3    Like, real estate purchases and all that?
 4              A.    I can't imagine a client calling
 5    a team coordinator about real estate matters,
 6    other than maybe checking off to-do lists, you
 7    know.  Did the inspections come in?  I -- I -- you
 8    know, I -- I don't have an answer for that.
 9              Q.    So there's some documentation
10    that I've seen --
11              A.    Uh-huh.
12              Q.    -- in the course of this
13    litigation that shows that -- or suggests that
14    Ms. Andrews was involved with the onboarding or
15    hiring process.  Were you aware of that?
16              A.    For what?
17              Q.    For several positions.
18              A.    I am not aware of that.
19              Q.    That she was -- well, do you know
20    if somebody -- well, we'll look at it in a minute.
21                    THE COURT REPORTER:  We have
22              about ten minutes left.
23                    MR. ARCINIEGAS:  You guys want to
24              take a break because it's kind of hot in
25              here for me.
```

1          Q.      Okay.  And so what was her job

2    title?  I don't see it here.

3          A.      She was the Royalties manager.

4          Q.      For the East office or West?

5          A.      It doesn't matter what office

6    they're in.  They're --

7          Q.      Why not?

8          A.      Because the East office will

9    render services.  It's a firm, so it's not -- the

10   duties aren't separated necessarily by East and

11   West.

12         Q.      Right.  Okay.

13         A.      Uh-huh.

14         Q.      Okay.  That makes sense to me.

15         A.      She's the Royalties manager,

16   period, for the firm.

17         Q.      Well, what about, like, with

18   clients.  Would a -- a team coordinator performs

19   services based on their location?  Is it limited

20   to, like, if they're in the East office.

21         A.      No, huh-uh.

22         Q.      They're still doing it for the

23   firm?

24         A.      That's right.

25         Q.      Okay.  And then I just want to

1   LogMeIn, Citrix, one of those.  I can't remember.

    2           Q.    Okay.  And so, generally, most

    3   employees at the time, did they desktops; is that

    4   what they're --

    5           A.    Yeah.

    6           Q.    Okay.

    7           A.    Uh-huh.

    8           Q.    But a certain subset of the

    9   employees had laptops; fair?

   10           A.    Yeah, small.  I -- I -- I don't

   11   know how many.  I didn't issue the computers.

   12           Q.    Okay.  And can you think of a

   13   reason why a team coordinator would be issued a

   14   laptop?

   15           A.    Only in an instance where

   16   somebody needed to log in over the weekend or to

   17   reset, you know, a password for something.  I -- I

   18   don't know.

   19           Q.    So there's a job position or

   20   title that's being attributed to my client, AMEX

   21   liaison.

   22           A.    Uh-huh.

   23           Q.    What is your understanding of

   24   that position?

   25           A.    I think at that point in time,

```
 1   Christie, you know, was the liaison.  So instead
 2   of having everything within the team hitting VIP
 3   Services at AMEX, Christie would open/close cards
 4   and talk to whoever that service representative
 5   was.
 6           Q.     Okay.  And that would not be
 7   limited to -- that would be firm-wide; is that
 8   fair?
 9           A.     I believe it was firm-wide,
10   uh-huh.
11           Q.     Okay.  Is there a job -- is there
12   an actual, like, written job description for that?
13           A.     For the AMEX liaison?  I don't
14   know.
15           Q.     Who would know that answer?
16           A.     Somebody in HR.
17           Q.     Okay.  Before Christie was AMEX
18   liaison, do you -- did you have anybody else
19   working as an AMEX liaison?
20           A.     I don't believe so.
21           Q.     And the AMEX liaison would be
22   responsible for, you know, those credit card
23   questions for -- for a client's employee as well,
24   right, if it's a business credit card?
25           A.     I don't know if it was so much
```

```
 1    questions.  I think she did the administrative
 2    function of opening the cards, closing them,
 3    reset.  You know, I -- I -- I really don't know
 4    what the detail was.
 5               Q.    Okay.  But you were involved with
 6    the decision to establish somebody as the
 7    designated AMEX liaison?
 8               A.    I don't know if I was.
 9               Q.    Okay.
10               A.    That doesn't sound like something
11    I'd be involved in.
12               Q.    Okay.  So without getting into
13    the details of the tech, you guys have your own
14    servers?
15               A.    We do.
16               Q.    And you can control the level of
17    access an individual can have to those serve --
18               A.    I -- you are talking to the most
19    tech-challenged person in the organization, so
20    good luck with this line of questioning.
21               Q.    Yeah.
22               A.    Have at it.  How long we going to
23    spend doing it, because it's going to be a short
24    section.
25               Q.    We can skip right over it.
```

```
 1              A.      Because the -- there was a clear
 2       deli- -- delineation of essential and nonessential
 3       staff, period.
 4              Q.      Well, if it -- if the -- was the
 5       team coordinators, right?
 6              A.      Uh-huh.
 7              Q.      There was some that kept their
 8       jobs and there's some that didn't, right?
 9              A.      The ones who were nonessential
10       who were at the office kept their jobs.
11       Nonessentials who needed to work from home were in
12       the first round of cuts, period.
13              Q.      And so you think that's just a
14       neut- -- a neutral policy?
15              A.      That's right.  You do for -- I
16       mean, again, I can't explain this.  As a firm and
17       the CEO of the company.  So let's say I had 140
18       staff at the time.
19              Q.      Uh-huh.
20              A.      100-plus clients/entities.  We're
21       looking revenue.  We lost 100 percent of our live
22       business.  Business came to a screeching halt.  I
23       had to make a decision on how I was going to make
24       the cuts.  So there was going -- at that point in
25       time, on March 20th, it was going to be
```

1    nonessential requests to work from home,

2    duplicitous roles, highly-compensated and

3    duplicitous roles.

4              It was directly tied to fact that

5    we were going to be in a position where we knew we

6    were losing revenue and we were going to have to

7    make cuts.  I didn't go through a list and go:

8    Oh, this one and that one.  I had to come up with

9    what was going to generate, if possible, revenue

10   for the firm and who needed to stay in order for

11   the firm to continue to operate.

12             We are an essential business.  We

13   weren't a retail store.  We were a finance firm.

14        Q.    So the -- the Touring department

15   in your business --

16        A.    That's right.

17        Q.    -- you retained some of those

18   employees, right?

19        A.    We did.  We repurposed them into

20   the business management team.

21        Q.    Okay.  Repurpose, how?

22        A.    Uh-huh.  It means they went into

23   an accounting function into the business

24   management team.

25        Q.    Okay.  Any other way they were

```
 1   repurposed?

 2              A.      No.

 3              Q.      Okay.  So would -- so they --

 4   were any of the Touring people allowed to work

 5   from home?

 6              A.      Only if they were essential.

 7              Q.      Okay.

 8              A.      And I don't -- I don't know if

 9   there's anybody on this list that was in Touring

10   that worked from home.  And if they were in

11   Touring, they weren't working in Touring anymore,

12   they were working in business management.

13              Q.      Okay.  Now let me ask you this.

14   Were there people that also voluntarily just left?

15              A.      I'm sure --

16              Q.      Okay.

17              A.      -- there were.  I don't -- I

18   can't recall right now.  There were -- people were

19   scared some.  People just didn't want to come to

20   work.

21              Q.      So when you say "repurposed,"

22   like, isn't there some period of transition for

23   these people to re- -- be repurpose in that way?

24              A.      No.

25              Q.      How come?
```

```
 1              Q.      Well, let me ask you this.  I
 2    mean, what if people didn't request -- like, if
 3    they didn't -- if individuals had not submitted
 4    work-from-home --
 5              A.      Uh-huh.
 6              Q.      -- requests --
 7              A.      Yeah.
 8              Q.      -- I mean, would they have been
 9    eliminated?
10              A.      Yes.  I would have gone with --
11    I, for sure, would have looked at it duplicitous
12    of roles, highly-compensated and performance.
13              Q.      Okay.  So when you repurposed
14    accounts from Touring, you brought them in to be
15    part of the normal, whatever?
16              A.      Business management team.
17              Q.      Business management team.
18              A.      Uh-huh.
19              Q.      They were still performing
20    accounting functions?
21              A.      That's right.
22              Q.      What was -- what was the increase
23    of accounting that needed to be done?
24              A.      Well, at that point in time, it
25    really was more so budget projections.  You had
```

| | |
|---|---|
| 1 | some clients who were wealthy and weren't really |
| 2 | impacted.  They weren't going to have cash flow |
| 3 | short out [sic] -- or shortfalls, and you had |
| 4 | others who were negatively impacted because they |
| 5 | depended on the live business to generate revenue. |
| 6 | Q.    Okay.  So forecasting, is what |
| 7 | you're saying? |
| 8 | A.    Yeah. |
| 9 | Q.    And so how long did that take? |
| 10 | A.    I -- it was ongoing.  Again, |
| 11 | COVID.  Nobody had ever been through it.  We |
| 12 | didn't know if we were doing projections for -- in |
| 13 | -- in the beginning, we thought we were doing |
| 14 | projections for eight weeks of cash shortage.  We |
| 15 | all thought we were going to be in this eight |
| 16 | weeks.  And then eight weeks turned into two -- |
| 17 | two years?  What are we, in two-and-a-half years |
| 18 | now?  I mean, the live business still hasn't |
| 19 | recovered. |
| 20 | Q.    Right. |
| 21 | A.    I mean, even the government went |
| 22 | into doing, you know, additional announcements and |
| 23 | other things that they wanted to shut down. |
| 24 | Q.    Were you aware of the CARES Act |
| 25 | in early March 2020? |

```
 1              A.      I don't know what that is off the
 2    top of my head right now.
 3              Q.      Okay.  So was there an immediate
 4    dip in the financials of your firm?
 5              A.      Yeah.  We lost 100 percent of the
 6    live business.  I don't know how else to say that.
 7              Q.      Well, I don't --
 8              A.      Nobody was on the road.  Not one
 9    dollar generated from touring.
10              Q.      Sure.  I --
11              A.      Nobody.
12              Q.      I --
13              A.      Zero.
14              Q.      I under- --
15              A.      National shutdown.
16              Q.      I understand that, that it would
17    impact your clients, but how do you generate fees?
18              A.      Commissions on that.  So if
19    you've got a $14 million tour running over eight
20    weeks and you get 5 percent of it, that's $700,000
21    in the toilet, gone.
22              Q.      Okay.
23              A.      So yeah, we lose 100 percent of
24    that revenue.
25              Q.      But at the time of -- the
```

```
 1              A.      Yep.

 2              Q.      Okay.  And these are in sequence,

 3      so I'm assuming --

 4              A.      Uh-huh.

 5              Q.      -- this is the Word doc that's

 6      referenced on 132.

 7              A.      Yeah, I don't -- I don't know who

 8      produced this.

 9              Q.      Okay.  Have you seen 134 before?

10              A.      I have seen it at some point in

11      time.

12              Q.      Do you recall whether that was in

13      March of 2020?

14              A.      I don't -- I -- I don't know.

15              Q.      Okay.  And do you see here on No.

16      7, Christie Adams?

17              A.      I do.

18              Q.      Do you know who Christie Adams

19      is?

20              A.      I have no idea.

21              Q.      So it says here with Christie

22      Adams, "compromised immune system."

23              A.      Uh-huh.

24              Q.      So that's one of those

25      preferential considerations?
```

```
 1              A.     Yes, if she was essential.

 2              Q.     Okay.

 3              A.     I don't know who that is.  Is

 4    that Christie Andrews?

 5              Q.     (Gestures.)

 6              A.     I don't know.

 7                     MR. ARCINIEGAS:  We'll mark this

 8              as the next exhibit.

 9                     THE COURT REPORTER:  4.

10                     (Exhibit 4 was marked.)

11                     MR. ARCINIEGAS:  And for the

12              record --

13    BY MR. ARCINIEGAS:

14              Q.     Can you identify the Bates

15    numbers for the record?

16              A.     135.

17              Q.     Okay.  All right.  Just take your

18    time to review it.

19              A.     (Witness reviews document.)

20    Yeah.

21              Q.     All right.  So here there's an

22    e-mail from you, right?  Do you see that?

23              A.     Indeed.

24              Q.     And:  "The following people

25    requested WFH permission to qualify under
```

1  here:  "Just so you know, Christie has a laptop in

2  the office.  It is not in her home, so we could

3  get that set up straight away.  Christie has been

4  asking for answers" --

5          A.     Uh-huh.

6          Q.     -- "so thank you for being

7  sensitive to the timing."

8          A.     Instead.

9          Q.     What did you understand -- did

10 you have have a conversation with him about this?

11         A.     I do not.

12         Q.     What did you understand him to be

13 saying when he wrote this?

14         A.     That she had a laptop with her

15 and that she could work from home, and that he

16 wanted me to give consideration to her.

17         Q.     So he's asking for some

18 preferential consideration?

19         A.     That's right.

20         Q.     Okay.  Now, if you turn to the

21 136.

22         A.     Uh-huh.

23         Q.     So there's a work-from-home

24 paperwork that --

25         A.     Uh-huh.

```
 1   advisors or the clients.  It is -- it's a
 2   communications position.
 3               Q.    Right.  And communications
 4   position involved both offices; fair?
 5               A.    Uh-huh, it did.
 6               Q.    So people could communicate from
 7   -- with the West office and the East office?
 8               A.    That's right.
 9               Q.    Using e-mail and telephones,
10   right?
11               A.    It's not dividing the teams, and
12   that's not your decision to make.  It is my
13   decision --
14               Q.    I agree.
15               A.    -- as a firm that the information
16   for the clients would be in the firm, and either
17   you were working and supporting the team or you
18   were not.
19               Q.    Okay.
20               A.    That is a decision as a business
21   owner in America that I get to make.
22               Q.    And for -- for certain categories
23   of individuals, you took into account whether they
24   had an immune system issue; fair?
25               A.    Uh-huh.
```

```
 1              Q.     Correct?

 2              A.     Yeah, that's correct.

 3              Q.     Okay.  Did you understand that to

 4   be an obligation under the law?

 5              A.     I did not.

 6              Q.     Okay.  Is it your basic

 7   understanding not to take into -- or is it your

 8   basic understanding that -- well, let's go back.

 9                     Earlier, we talked about the

10   interactive process, right?

11              A.     Uh-huh.

12              Q.     You understood that?

13              A.     I do.

14              Q.     And your understanding is if

15   somebody brings up a health issue, then there's

16   supposed to be this dialogue; is that fair?

17              A.     That's correct.

18              Q.     It's not a dialogue that you

19   specifically engage in, but you expected people in

20   your employ --

21              A.     Uh-huh.

22              Q.     -- primarily the HR people to --

23              A.     That's right.

24              Q.     -- engaged in that dialogue; is

25   that fair?
```

```
 1                  A.      Uh-huh, that's correct.

 2                  Q.      And you ultimately understand

 3       that your -- that the company is responsible to do

 4       that as a whole?

 5                  A.      I am.

 6                  Q.      Now, you have no more -- I didn't

 7       receive anymore e-mails regarding the reduction in

 8       force that relate to you.

 9                  A.      Uh-huh.

10                  Q.      Is that because mostly you relied

11       on Heather Kinder to be, like, the communications

12       piece?

13                  A.      I don't understand the question.

14                  Q.      My understanding of Ms. Kinder's

15       role --

16                  A.      Yeah.

17                  Q.      -- is to be the go-between

18       between you and management.

19                  A.      I -- I don't know that I would

20       say go-between.  I -- I don't understand what you

21       mean by that.

22                  Q.      Okay.  Well, then, define again

23       --

24                  A.      If somebody wants to have a

25       meeting with me, they're going to call Heather to
```

```
1        A.      Uh-huh.

2        Q.      Did you talk to her on the 18th?

3        A.      I don't know.

4        Q.      It says here:  "Hi, Lou.  The

5   following employees have requested to work from

6   home based on compromised immune systems.  I have

7   received doctor's notes from each person listed

8   validating that they do have validated concerns."

9                Do you see that?

10       A.      I do.

11       Q.      And, again, we have No. 5,

12  Christie Adams.  Do you understand that to be

13  Christie Andrews?

14       A.      I would -- I would assu- -- I

15  don't know who Christie Adams, so we'd have to

16  look at the staffing list.

17       Q.      Okay.  And what -- and number --

18  you see No. 3,              ?

19       A.      I do.

20       Q.      And that's also a typo, you

21  think?  It should be              [sic]?

22       A.      That's right, uh-huh.

23       Q.      Is it -- it appears that Ms.

24  Simpson has no idea about your --

25       A.      That's correct.
```

```
 1              Q.       -- decision, right?

 2              A.       That's right.

 3              Q.       Is there anything in writing that

 4    we can see that reflects that you made the

 5    decision on March 16th --

 6              A.       Yeah.

 7              Q.       -- or March 17th?

 8              A.       The e-mail you just gave me, I --

 9    when I responded then, I had already made the

10    decision over the weekend.

11              Q.       Which e-mail are you referring --

12              A.       And how that was class- --

13              Q.       Which -- which e-mail are you --

14              A.       Where it says that I said on

15    March 18th at 7:00 p.m.  Again, they've asked

16    about Christie Andrews, and I said:  "She's in

17    pending layoff."

18              Q.       Right.  But that e-mail is asking

19    --

20              A.       As the CEO of the company --

21              Q.       Okay.

22              A.       -- it was my discretion when to

23    advise who was getting laid off and who wasn't.

24    Again, it was March 16th.  Mass chaos, loss of

25    revenue, full shutdown of -- of the entertainment
```

business, 100 percent.  Staff losing their mind,

and I honestly was doing everything I could to

just hold my mind together.  I didn't have to run

around and tell everybody what my plan was.

That's why we did the layoffs on March 20th, at

the end of the week.

        Q.    And so --

        A.    And most of these people are

nonessential.  I mean, I don't know █████████

I'd have to look at the list.  But ██████ was

accounting, and all the others were nonessential

staff that are on Yolanda's list on the 17th.  And

that came as a response to the letter on the 16th.

        Q.    Right.  But the -- the decision

hadn't been effectuated until the 20th --

        A.    Uh-huh.

        Q.    -- is that fair?

        A.    Yeah.

        Q.    I mean, that's fair?

        A.    Uh-huh.

        Q.    There's not a dispute?

        MS. SWAFFORD:  Well --

        THE WITNESS:  No, that's not

true.

        MS. SWAFFORD:  -- it depends what

```
 1            Q.     It's the one with 123.

 2            A.     Yeah.

 3            Q.     And it says:  "I have received

 4  doctors' notes from each person listed validating

 5  that they do have valid concerns."

 6                   Do you see that?

 7            A.     Uh-huh.

 8            Q.     Did that factor into any of the

 9  layoff decisions?

10            A.     No.  Nonessential staff was going

11  to be cut in the first round that requested work

12  from home.  It was an economic decision.

13            Q.     Okay.  It -- there was no

14  consideration of the ADA requirements?

15            A.     I did not know anybody to have a,

16  quote/unquote, disability that worked for Tri

17  Star.

18            Q.     Okay.  But if you look --

19            A.     They had a note that says they

20  had valid concerns.  That doesn't spell out these

21  are people who fall within an ADA guideline.  They

22  are nonessential staff who requested to work from

23  home.  I could have just said I'm going lay off

24  nonessential staff as a first round and just taken

25  those folks off.
```

```
 1              Q.     I'm sorry.  Say that part again.
 2              A.     I would have just taken off the
 3    first round of nonessentials.  That's -- it was --
 4    we needed some people to be in the firm, and work
 5    from home was a cost element.
 6                     Laptops, then again, VPNs,
 7    equipping essential staff to generate revenue, if
 8    there was going to be revenue for the business,
 9    was preferential.  It was about saving the
10    business.
11              Q.     Right.  So what I -- and I don't
12    -- let me ask you this.  Are you familiar with the
13    phrase undue hardship within the context --
14              A.     No.
15              Q.     -- of the Americans with
16    Disabilities Act?
17              A.     No.
18              Q.     What was the cost of a laptop?
19              A.     I have no idea.
20              Q.     Okay.  Let me ask you this.  And
21    I -- and I understand that this was a -- or I'm
22    sensing that this is somewhat tense here, but I
23    want to --
24              A.     Oh, no --
25              Q.     I want to --
```

```
1              A.      You don't know what tense is.

2              Q.      Maybe I -- maybe I'm too --

3              A.      We haven't scratched that

4     surface.

5              Q.      Maybe I'm too sheltered.

6                      But if you look at 123.

7              A.      Yeah.  I know exactly what it

8     says.

9              Q.      Okay.

10             A.      Uh-huh.

11             Q.      So I'll just read it for the

12    record.

13             A.      Okay.

14             Q.      It says:  "The following

15    employees have requested to work from home based

16    on compromised immune systems."

17             A.      Uh-huh.

18             Q.      "I have received doctor's notes

19    from each person listed validating that they do

20    have valid concerns."

21             A.      Uh-huh.

22             Q.      There was no consideration of the

23    ADA at that point?

24             A.      I -- I -- again, I don't

25    understand your question.  The decision was:  You
```

```
 1              A.    Uh-huh.

 2              Q.    -- is this something that you

 3   helped craft?

 4              A.    It's not.  The labor lawyer did

 5   it.

 6              Q.    And which one was that, the --

 7              A.    I'm assuming it's a collective

 8   effort between --

 9              Q.    The two?

10              A.    -- Nashville, uh-huh, lawyer and

11   the LA lawyer.

12              Q.    Okay.  Before it was finally

13   issued, was it something that you reviewed and had

14   okayed?

15              A.    Well, the final signoff would

16   obviously be the labor lawyer.  But yes, I mean,

17   ultimately, I would be responsible for it.

18              Q.    If you would go to page 114

19   [sic].

20              A.    (Witness complies.)

21              MS. SWAFFORD:  Page 14?

22              THE WITNESS:  I don't have that.

23   BY MR. ARCINIEGAS:

24              Q.    I mean, sorry, 14.  Sorry.

25              MS. SWAFFORD:  Or page 9 of the
```

```
 1            A.      I wouldn't be qualified to say
 2    what qualifies that.   I mean, I -- I just don't
 3    know.
 4            Q.      What do you mean you're not
 5    qualified?
 6            A.      Because I'm not an HR person.
 7    It's not my role or responsibility.   The policy
 8    says in and of itself says they advise Human
 9    Resources the need for accommodation, and Human
10    Resources will provide a Request for Accomodation
11    form.
12            Q.      Okay.   Have you ever seen a Tri
13    Star Request for Accommodation form?
14            A.      I have not.
15            Q.      Do you know a -- I mean, other
16    than this policy, did -- is it your belief that
17    there is a Request for Accomodation form?
18            A.      I'm assuming there is.
19            Q.      Okay.   And then if you read the
20    next bullet point:  "According to the policy, the
21    accommodation request will be discussed with the
22    employee and the employee's managers."
23            A.      Uh-huh.
24            Q.      You have to say "yes."
25            A.      Yes.
```

```
 1              Q.     Okay.  And so if Ms. Anderson

 2     [sic] submitted a Reasonable Accommodation

 3     Request, that would be discussed amongst who,

 4     according to this policy?

 5              A.     It would have been discussed

 6     amongst HR and her supervisor.

 7              Q.     Okay.  And what about with her?

 8              A.     Yeah, I assume that would include

 9     her.

10              Q.     Okay.  And so the employee --

11     next bullet point says:  "The employee may be

12     required to provide documentation supporting a

13     disability, including medical certification."

14              A.     Okay.

15              Q.     Okay.  Is there a Medical

16     Certification form that you guys have?

17              A.     I don't know.

18              Q.     "If a reasonable, appropriate

19     accommodation is readily available, the request

20     will be approved and the accommodation

21     implemented."

22                     Do you read that?

23              A.     Uh-huh.

24              Q.     And you agree that that's your

25     policy?
```

```
 1              A.      Indeed.

 2              Q.      And that would have been the

 3    policy in 2020 as well?

 4              A.      It would have.

 5              Q.      Okay.  "And when accommodation is

 6    not readily ascertainable, the matter will be

 7    pursued further with the assistance of appropriate

 8    external resources."

 9              A.      Uh-huh.

10              Q.      What are the appropriate external

11    resources that you as a company have used?

12              A.      I have no idea.

13              Q.      Okay.  Again, who would know that

14    information, HR?

15              A.      That's correct.

16              Q.      When you have a change in HR

17    people --

18              A.      Uh-huh.

19              Q.      -- who trains the HR person, or

20    what training do you provide them?

21              A.      Well, I mean, we have all of the

22    policies and procedures, they're documented, and

23    they also have the resources of counsel.  So they

24    rely heavily on both lawyers.

25              Q.      Okay.  And then if you look at
```

```
 1   the last bullet point, it says:  "All Requests for
 2   Accommodation need to be approved by the CEO."
 3              A.     Uh-huh.
 4              Q.     That would be you?
 5              A.     It would.
 6              Q.     Okay.  And so when you review and
 7   approve Reasonable Accommodation Requests, do you
 8   review Request for Accommodation forms?
 9              A.     I don't know that this is
10   currently the policy, if this was the handbook.
11   It's dated 2018, so I'm not sure if that's what we
12   were using in 2020.  So I don't know if I'm
13   signing off on it.  I don't ever recall signing
14   off on a form.  I don't think we've ever had been
15   before.
16              Q.     Okay.  But this is -- you -- you
17   recognize this is a handbook dated 2018; fair?
18              A.     Yeah.
19              Q.     And you don't know if there -- do
20   you -- do you think there had been a revision?
21              A.     I don't know.
22              Q.     Okay.  And if you read the next
23   paragraph:  "Tri Star will consider the request
24   but reserves the right to offer its own
25   accommodation, to the extent permitted by law."
```

```
 1              for a legal conclusion.

 2                   THE WITNESS:  I don't know.

 3   BY MR. ARCINIEGAS:

 4         Q.    I'm just asking if you -- so you

 5   haven't done that, is what I'm hearing?

 6         A.    I -- I do know the next sentence

 7   says:  "Some, but not all, of the factors that Tri

 8   Star consider -- will consider are cost, effect,

 9   and accommodation will have on the current

10   established policies and a burden on the

11   operations, includes other employees, determining

12   a reasonable accommodation."

13         Q.    Right.

14         A.    So as it related to COVID, it was

15   a burden for us to even consider work from home

16   for nonessential staff.

17         Q.    Right.

18         A.    It was a financial burden.

19   Uh-huh.

20         Q.    Let me ask you this.  Do you have

21   -- other than this disability accommodation policy

22   here --

23         A.    Uh-huh.

24         Q.    -- do you have any -- have you

25   ever looked at any other material that relates to
```

```
 1   --
 2              A.     I am not the HR person for Tri
 3   Star.  There has always been a professional and
 4   then counsel that I rely on for drafting a policy,
 5   review, or what gets extended.  So my knowledge is
 6   only -- only expands to what counsel says.
 7              Q.     One second.
 8                     And the sentence after the one
 9   you just read:  "Tri Star does not retaliate
10   against employees who request accommodations for
11   disabilities.  "
12              A.     That's correct.
13              Q.     And you stand by that policy,
14   correct?
15              A.     That's correct.  Nor have been
16   ever been accused of such --
17              Q.     Okay.
18              A.     -- in 30 years.
19              Q.     Actually, let's just do this on
20   mass.
21                     (Exhibit 9 was marked.)
22                     MS. SWAFFORD:  This is 9?
23                     THE COURT REPORTER:  9.
24   BY MR. ARCINIEGAS:
25              Q.     Okay.  Let me hand you what we'll
```

BY MR. ARCINIEGAS:

        Q.    Hand you what I'll mark as Plaintiff's Exhibit 10.  If you'll go to the page after 13.

        A.    Uh-huh.

        Q.    Is that your signature?

        A.    It is.

        Q.    Okay.  And you understand what it means when it says you -- the verifica- -- to verify this document?

        A.    I do.

        Q.    Okay.

        THE COURT REPORTER:  11.

        (Exhibit 11 was marked.)

BY MR. ARCINIEGAS:

        Q.    Okay.  Have you seen this document before?

        A.    I'm sure I have.

        Q.    If you look at RFA --

        A.    Uh-huh.

        Q.    -- Request for Admission, 1.

        A.    Uh-huh.

        Q.    Have you ever seen any medical documentation from Ms. Andrews' medical provider?

        A.    I have not.

```
 1              Q.     When you were doing the

 2    reduction-in-force --

 3              A.     Uh-huh.

 4              Q.     -- process, did you look at

 5    anybody's medical provider's documents?

 6              A.     I don't believe I did.

 7              Q.     Did you rely on somebody else for

 8    that information?

 9              A.     Yolanda.

10              Q.     Okay.  When did Ms. Simpson's

11    employment end with y'all?

12              A.     I don't recall.

13              Q.     Did -- has she come back to work

14    for y'all?

15              A.     No, she has not.

16              Q.     Has she come back to perform any

17    types of services for you?

18              A.     She has not.

19              Q.     When's the last time you talked

20    to Ms. Simpson?

21              A.     I don't recall.

22              Q.     Do you think -- have you spoken

23    to her in the last year?

24              A.     No.

25              Q.     Here it says -- if you look at
```

```
 1              Q.     And so you understand when you --
 2              A.     Yep.
 3              Q.     -- write:  "I, Lou Taylor, under
 4   penalty of perjury that the answers" --
 5              A.     I do.
 6              Q.     You understand the consequences
 7   of that?
 8              A.     Yes.
 9              Q.     What is your understanding of the
10   essential job functions of a team coordinator?
11              A.     I've already answered the
12   question.
13              Q.     What are the essential job
14   functions of a team coordinator?
15              A.     I already answered the question.
16              Q.     Can you please answer it, my
17   question.  What are the essential job functions of
18   a team coordinator?
19              A.     Manage the team deliverables,
20   track open deliverables --
21              Q.     Okay.
22              A.     -- projects as assigned by the
23   team.
24              Q.     So do you recall taking some
25   screenshots of Ms. Andrews' Instagram?
```

1  question.

2          Q.      Why did you bring up the

3  competitive cheering?

4          A.      Because you asked me did I

5  understand that she had a disability as it related

6  to asthma, and I said I wouldn't have thought

7  that.  I didn't know she had a disability for

8  asthma because she competitively cheered.

9          Q.      And you knew that before you made

10  the decision to terminate her?

11          A.      That I knew what?

12          Q.      That she comp- --

13          A.      That she competitively cheered?

14          Q.      Yeah.

15          A.      Yeah.  Of course.

16          Q.      Sorry.  So let me ask you this.

17  Tardiness and attendance is very important to Tri

18  Star, correct?

19          A.      Indeed.

20          Q.      Okay.  How do you guys track that

21  on a regular basis in 2017, 2018, 2019, 2020?

22          A.      I mean, I don't know that we,

23  quote/unquote, track it.  People have to input

24  their time into a system and they report to a

25  manager.  Christie always had a manager that she