| | | |
|---|---|---|
| 1 | A. | My position was eliminated. |
| 2 | Q. | And when did you start there? |
| 3 | A. | February -- I think it was |
| 4 | February 20th of 2020. | |
| 5 | Q. | So you were there for, roughly, |
| 6 | seven months? | |
| 7 | A. | Uh-huh. |
| 8 | Q. | Where do you currently live? |
| 9 | A. | Hermitage. |
| 10 | Q. | Okay. And are -- who do you live |
| 11 | with? | |
| 12 | A. | Family. |
| 13 | Q. | Okay. What is the family last |
| 14 | name other than Simpson? | |
| 15 | A. | It's just Simpson. |
| 16 | Q. | Okay. |
| 17 | A. | Yeah. |
| 18 | Q. | Where do you orig- -- or do you |
| 19 | have other family around here? | |
| 20 | A. | Yes, I do. |
| 21 | Q. | Okay. And what are their last |
| 22 | names? | |
| 23 | A. | Well, Simpson is the primary |
| 24 | name. | |
| 25 | Q. | Right. |

```
 1  understand --
 2           A.     I -- I don't know what they do
 3  with the information after I collect it.
 4           Q.     Okay.
 5           A.     Okay?
 6           Q.     And you said your termination,
 7  that it was September 31st, 2020 from Tri Star,
 8  correct?
 9           A.     Yes.
10           Q.     You were there when they --
11  during the pandemic --
12           A.     Uh-huh.
13           Q.     -- fair?
14           A.     Fair.
15           Q.     When you were -- when there is --
16  what did you start doing in preparation for the
17  pandemic, anything?  As an HR -- in your HR
18  capacity.
19           A.     Yeah.  Honestly -- well, nothing.
20  I -- you know, no one knew what the volume would
21  be, and so there was nothing that I did in
22  preparation.
23           Q.     Nothing knew with the -- no one
24  knew what the what?
25           A.     The volume would be.
```

| | | |
|---|---|---|
| 1 | Q. | What do you mean "the volume"? |
| 2 | A. | You know, that it would affect |
| 3 | the whole world. | |
| 4 | Q. | Okay. And so when did you first |
| 5 | learn about a reduction in force? | |
| 6 | A. | When I came back from vacation. |
| 7 | So I got back from vacation, I think it was, like, | |
| 8 | March the 7th or 8th. | |
| 9 | Q. | Okay. Tell me about that. |
| 10 | A. | I was just told that we were |
| 11 | looking at essential versus nonessential, and that | |
| 12 | I'd receive a list of the -- who would be termed. | |
| 13 | Q. | Okay. And who told you that? |
| 14 | A. | That came from, I believe, |
| 15 | Heather. | |
| 16 | Q. | Heather, who? |
| 17 | A. | Kinder. |
| 18 | Q. | And how did it come to you? |
| 19 | A. | Just word of mouth. |
| 20 | Q. | Well, did she tell -- did it come |
| 21 | out of her, Ms. Kinder's mouth that there would be | |
| 22 | -- | |
| 23 | A. | I don't remember. I'm just |
| 24 | saying, I -- you know, my main point of contact | |
| 25 | was with Heather. | |

1   A. I do.
2   Q. What are those?
3   A. SHRM CP.
4   Q. Anything else?
5   A. That's it.
6   Q. And part of maintain -- you have
7   to maintain those certifications by contin- --
8   completing continuing education requirements?
9   A. Yes.
10  Q. And that's on an annual basis?
11  A. Every three years.
12  Q. When's the last time that you had
13  to complete that?
14  A. It's time for me to do it now.
15  Q. And what's -- do you do those
16  online by video on demand?
17  A. Yes. You can do it online or you
18  can go to webinar seminars.
19  Q. What is your understanding of a
20  Reasonable Accommodation Request under the ADA?
21  A. I do not have a lot of experience
22  with that, because every company I've worked for
23  usually use -- will use a third-party service that
24  handled accommodations.
25  Q. Okay. So what is your limited, I

1  guess, understanding of a Reasonable Accommodation
2  Request under the ADA?
3          A.    If an employee needs to have
4  their job modified based on some medical need,
5  that as long as it doesn't cause a hardship on the
6  employer and it's considered reasonable, then
7  that's something that they would grant.
8          Q.    Are you familiar with the phrase
9  "interactive process"?
10         A.    Yes.
11         Q.    What is your understanding of the
12 interactive process under the ADA?
13         A.    That once you're made aware of a
14 need for an accommodation or a potential need for
15 accommodation, that you have a conversation with
16 the employee and get the appropriate documents to
17 validate that a need is justified.
18         Q.    And who is it that you -- based
19 on your understanding of the ADA, who makes the
20 determination whether an -- an accommodation is
21 needed?
22         A.    Well, based on my experience with
23 third parties, the third-party vendor would make
24 that determination.
25         Q.    Nice answer.

1           -- I don't know.
2    BY MR. ARCINIEGAS:
3           Q.    Have you ever heard anybody say
4    there are no magic words required for a Reasonable
5    Accommodation Request?
6           A.    I've never heard anybody say
7    that, except you.
8           Q.    Okay.   When you worked at Tri
9    Star, did you ever see a Reasonable Accomodation
10   form?
11          A.    No.
12          Q.    Did you have -- while at Tri
13   Star, did you ever direct any employees to look at
14   the disability policies in the handbook?
15          A.    No.
16          Q.    While working for Tri Star, did
17   you ever give handbooks to employees?
18          A.    It was electronic, I believe.
19          Q.    Okay.  But my question is:  Did
20   you ever give any printed handbooks to employees?
21          A.    I don't remember.
22          Q.    When you were at Tri Star, did
23   you try to document your conversations with
24   individuals?
25          A.    No.

1      Q.   All right. Do you have -- do you
2 recall having any, like, login credentials under,
3 like, Indeed.com or any other websites where
4 individuals look for job postings?
5      A.   I don't remember having any other
6 sign-ins for other job career posting sites.
7      Q.   What was your understanding of
8 nonessential versus essential employees at Tri
9 Star?
10     A.   I really do not have -- did not
11 have an understanding about that, because that
12 wasn't a decision that I played a part in.
13     Q.   So if you're not involved in --
14 with the decision, you did have involv- --
15 involvement after the decision had been made; is
16 that fair?
17     A.   Yes.
18     Q.   Okay.  And one of the things
19 you've described is, like, keeping track of
20 certain information; is that fair?
21     A.   Yes.
22     Q.   And you collaborated with Ms.
23 Kinder in how to -- to track that information?
24     A.   Yes.
25     Q.   What was your understanding of

| | | |
|---|---|---|
| 1 | A. | I mean, typically, you know, |
| 2 | decisions came from the executive level -- | |
| 3 | Q. | All right. |
| 4 | A. | -- so, you know. |
| 5 | Q. | And who -- who was at the |
| 6 | executive level that would -- you recall having | |
| 7 | discussions regarding COVID-19 work | |
| 8 | accommodations? | |
| 9 | A. | So I don't recall having a |
| 10 | conversation with Lou, but she would make ultimate | |
| 11 | decisions. | |
| 12 | Q. | Okay. |
| 13 | A. | So I'm not sure how the |
| 14 | information got relayed to me. | |
| 15 | Q. | I mean, do you recall ever being |
| 16 | in the same room as Lou? | |
| 17 | A. | Sometimes. |
| 18 | Q. | Okay. |
| 19 | A. | It wasn't often. |
| 20 | Q. | Okay.  Do you recall, like, |
| 21 | trying to figure out what to do as the world came | |
| 22 | down around everybody because of the pandemic? | |
| 23 | A. | Like, it is a blur. |
| 24 | Q. | Did you get in a room and have |
| 25 | any conversations with Lou Taylor about -- during | |

```
 1  documents as well?
 2          A.    Yes.
 3          Q.    I can tell that you're looking at
 4  that 134.  Is 1- -- what -- is 134 a document that
 5  you created?
 6          A.    It looks like it.
 7          Q.    Do you recall -- sitting here
 8  today, do you recall generating it?
 9          A.    No, I don't recall generating it.
10          Q.    Do you see this short list of
11  names here?
12          A.    Yes.
13          Q.    Do you recall having any
14  conversations with any of these people?
15          A.    I remember Miles.
16          Q.    What do you remember about your
17  conversation with Miles?
18          A.    That he was concerned about his
19  fiancée, that she had a compromised immune system.
20          Q.    Oh, you can see it based on the
21  fiancée.  All right.
22                Anything else you remember about
23  that conversation?
24          A.    No.
25          Q.    Do you recall why you were making
```

1  or are you?
2          A.   No, I am aware of that.
3          Q.   Okay.  But you don't know if that
4  -- whether Tri Star was in compliance with that
5  standard?
6          A.   Correct.
7          Q.   Do you recall attending any
8  meeting in which Lou Taylor explained that:
9  "While the company would attempt to accommodate a
10 work-from-home model for high-risk employees, some
11 roles simply could not be performed in the
12 capacity -- in said capacity on an ongoing basis"?
13         A.   I don't remember.
14         Q.   Were some -- do you understand
15 the difference between a layoff and a furlough?
16         A.   No.
17         Q.   Do you recall ever engaging in
18 the interactive process in your role as an HR
19 generalist with Tri Star?
20         A.   No.
21         Q.   Other than the conversation that
22 you had with Ms. Swafford and Ms. Hart this week,
23 have you had conversations with them previously?
24         A.   No.
25         Q.   Has anybody asked you if you

1    Q.   Was there anything particular on
2  that website with reference to how to complete
3  these in the context of a reduction in force or
4  layoffs?
5    A.   I don't remember.  I made the --
6  I made the selection that was -- is most accurate
7  based on what was going on, in my opinion.
8    Q.   Okay.  What is your underst- --
9  what is your understanding of the difference
10 between "lack of work" and "discharge"?
11   A.   Well, because it was
12 nonessential, her job function, as I remember it,
13 it was because we didn't have work for
14 nonessential employees based on the needs of the
15 business.
16   Q.   Okay.  And did you under- -- and
17 who gave -- who informed you that Ms. Andrews was
18 -- who did you rely upon for that?
19   A.   The -- the list that I got, or
20 whatever.  The notification I received as to who
21 was being discharged, whose roles were being
22 eliminated.  And that would have ultimately came
23 from Lou.
24   Q.   Okay.  Those are all the
25 questions I have for you.  Thank you.