```
 1  offices?
 2          A.   I don't believe so, but I don't
 3  know.
 4          Q.   Okay.  Do you know what -- do
 5  team coordinators have Dell laptops?
 6          A.   I don't know.
 7          Q.   Do team coordinators have
 8  laptops?
 9          A.   Team coordinators have access to
10  laptops, because they are required in team
11  meetings.  That does not mean they all have one.
12          Q.   So some team coordinators are
13  issued laptops?
14                MS. SWAFFORD:  When are we
15           talking about?  Time frame here?
16           Because it's -- you're going back and
17           forth.  I don't know that we're being
18           clear.
19  BY MR. ARCINIEGAS:
20          Q.   Well, let me ask you this.  Did
21  Christie Andrews have a laptop issued to her in
22  2020, or you don't remember that?
23          A.   She had access to a laptop, yes.
24  That has been established.
25          Q.   Okay.  And so did it -- was that
```

```
 1  VPN ready or not?
 2          A.    My understanding is it did not
 3  have a VPN.
 4          Q.    And what did you base that
 5  understanding on?
 6          A.    On conversations with
 7  individuals.
 8          Q.    Which individuals?
 9          A.    Robin Greenhill.
10          Q.    Okay.  Who else?
11          A.    That's it.
12          Q.    And when did you have those
13  conversations with Robin Greenhill about the VPN
14  on Christie Andrews' computer or not?
15          A.    I don't know.
16          Q.    And why were you having that
17  conversation?
18          A.    Because I believe that was part
19  of the lawsuit.
20          Q.    Did you ever approve Christie
21  Andrews taking a laptop home?
22          A.    Yes.
23          Q.    Okay.  Why is that?
24          A.    She was our American Express
25  liaison.  It was part of her job duties.
```

| | |
|---|---|
| 1 | Q. You have to say "yes" or "no." |
| 2 | A. Yes. |
| 3 | Q. Okay. If the staff did not ask |
| 4 | for a performance review, y'all didn't provide |
| 5 | one? |
| 6 | A. That's -- that's not true, they |
| 7 | just were not at regular intervals. |
| 8 | Q. Other than performance reviews, |
| 9 | how did you give team coordinators feedback as to |
| 10 | their performance prior to March 2020? |
| 11 | A. Based upon the completion of job |
| 12 | duties. |
| 13 | Q. Okay. What does that mean? |
| 14 | A. When a client makes a request, if |
| 15 | the client is not answered, they will let myself, |
| 16 | Lou, somebody know that they are unhappy. The |
| 17 | feedback is fairly immediate, and then with have |
| 18 | to step in to find out why. Why didn't this get |
| 19 | done? So that's how the job is monitored. |
| 20 | Q. So client complaints? |
| 21 | A. Yes. Or client kudos. It works |
| 22 | both ways. |
| 23 | Q. Okay. Now, did you consider Ms. |
| 24 | Andrews a good employee in 2020? |
| 25 | A. When Ms. Andrews showed up to her |

1  Q. Okay. Did Ms. Simpson have a
2  manager in March of 2020?
3  A. Well, I that you that was
4  Donaciano Ponce de Leon. She was the generalist,
5  he was the manager.
6  Q. In March of 2020?
7  A. I don't know.
8  Q. When did you first learn that Ms.
9  Andrews had asthma?
10  A. I don't recall knowing Ms.
11  Andrews having asthma as a problem.
12  Q. And do you recall Ms. Andrews
13  having coughing as a problem?
14  A. No.
15  Q. And you worked in the Nashville
16  office in 2020?
17  A. Yes.
18  Q. And that's the only office you
19  worked in? That's the one you're main stationed
20  at?
21  A. That's where my main station is,
22  yes.
23  Q. And did you go to work -- in
24  2020, were you going to work to the office every
25  day?

1    A.    I've participated at -- on most
2  all positions companywide.
3         Q.    Including team coordinators?
4         A.    Yes.
5         Q.    And so were you involved in the
6  hiring of any team coordinators in 2020?
7         A.    I don't know.
8         Q.    What would you need to re- -- or
9  how would you go about refreshing your memory?
10        A.    Well, 2020 was COVID.  I don't
11 think we were -- after March, we were not focussed
12 on hiring.  We were focussed on other things.
13        Q.    Okay.  What about in February
14 2020, were y'all onboarding people at that point?
15        A.    We are always onboarding people.
16 We always have open positions.
17        Q.    Okay.  Were -- when you have a
18 new team coordinator, what's the process of -- who
19 trains them?
20        A.    Multiple people train.
21        Q.    Okay.  Did Christie Andrews ever
22 train team coordinators?
23        A.    I don't know.  I'm sure she did.
24 I don't know.  I don't recall, specifically.
25        Q.    Was Christie Andrews a team lead

1  for the team -- team coordinators?
2          A.   Yes.
3          Q.   Okay.  Who else was a team lead
4  for TCs?
5          A.   Back in 2020, I can't recall.
6          Q.   Okay.  Were you -- you have a
7  team lead for TCs.  Was there usu- -- was there
8  more than one, or just one team lead?
9          A.   I don't recall.
10         Q.   Okay.  Are -- are you on any
11 medication that's affecting your ability to
12 remember things?
13         A.   No.
14         Q.   You -- I mean, it -- I'm -- it
15 sounded facetious, and I didn't mean that.  But
16 that -- you've heard that question being asked of
17 people before, right, during depositions?
18         A.   (Witness moves head up and down.)
19         Q.   So, like, the team lead, you
20 don't recall there being more than one in 2020?
21         A.   No.
22         Q.   Okay.  So tell me what a team
23 lead of TCs does.
24         A.   Well.
25         Q.   Or did in 2020.

36

1   A. Sure. One of the reasons we
2   picked Christie to be a team lead in our Nashville
3   office is because she did work in the LA office.
4   And in the LA office, for the state of California,
5   there are specific functions to help make team
6   coordinators successful. Because Christie had
7   experience in both offices, she was a good
8   resource for team coordinators to ask questions
9   of, to help them accomplish their jobs.
10          Q. What types of questions?
11          A. How to set up utilities. There
12  are specific things in LA County for utilities. I
13  can't give you specifics. That's one of them.
14          Q. Okay. What else?
15          A. DMV connections, making
16  appointments for clients. These are things our
17  team coordinators did. Make appointments,
18  coordinate utilities.
19          Q. Are they client-facing positions,
20  team coordinators?
21          A. Not always.
22          Q. Okay. So if I hear you correctly
23  -- well, let me ask you this. How long was
24  Christie a team lead?
25          A. How long was she a team lead? I

37

```
 1  don't know.
 2          Q.    Did she receive additional pay
 3  for being a team lead?
 4          A.    I don't know.
 5          Q.    Who would -- I mean, who -- who
 6  makes decisions with -- with respect to increases
 7  in pay?
 8          A.    I probably would have.
 9          Q.    So did you ever recommend that
10  Ms. Andrews get an increase in pay?
11          A.    I can't remember.
12          Q.    Okay.  All right.  So Ms. Andrews
13  was a team lead.  Was she ever given the title of
14  team lead?
15          A.    I don't know.
16          Q.    Okay.  So you're the business
17  director, and you don't know if she was ever given
18  the title of team lead, officially?
19          A.    Well, would we call her a team
20  lead?  Would they ask her questions?  Potentially.
21  Do I know if her exact title was team lead, I
22  don't know.  We'd have to go HR records.  This is
23  not things I keep up with.
24          Q.    Did Christie ever ask you to be
25  officially given the title of team lead?
```

1    A.    She never talked to me about it.
2    Q.    Did she ever talk to Bryan
3  Luecke, as far as you know, about that?
4    A.    I don't know.
5    Q.    Was Ms. Andrews good at being a
6  team lead?
7    A.    She could answer people's
8  question, yes.
9    Q.    Did you guys ever come up with,
10 like, written Standard Operating Procedures for
11 team coordinators?
12   A.    Yes.
13   Q.    Are those in place today?
14   A.    Yes.
15   Q.    Okay.  And did you have a role in
16 drafting those?
17   A.    No.
18   Q.    Okay.  Who did?
19   A.    Amber Baker.
20   Q.    Okay.  Who else?
21   A.    Heather Kinder --
22   Q.    Okay.
23   A.    -- Anna Miller, Nola Douglas.
24 That is our most recent team coordinator book.
25   Q.    Okay.  And those were revisions

1    Q.   All right.  I mean, you agree --
2 you -- you see here where Bryan is asking for
3 permission to allow Ms. Andrews to work from home,
4 essentially?  Do you recognize that, or do you
5 dispute that?
6    A.   I -- yes, I see that in the
7 e-mail, yes.
8    Q.   Okay.  And if I understood your
9 testimony earlier, doing the AMEX component of her
10 job didn't require a VPN?
11    A.   Correct.
12    Q.   Okay.  What was your role in
13 responding to the EEOC investigation?
14    A.   Zero responsibility.
15    Q.   I asked what was your role, not
16 your responsibility.
17    A.   I had zero role.
18    Q.   Okay.  Well, were you not
19 providing information to HR?
20    A.   I was not, to the best of my
21 recollection.
22    Q.   Who's Anna Miller?
23    A.   She was my executive assistant.
24    Q.   Okay.  Is she still employed by
25 Tri Star?

1    Q.    Okay.  And you see where it says
2  -- sorry -- "by the way, and this is more of [sic]
3  for HJ" -- who's HJ?
4       A.    Heather Harper.
5       Q.    Okay.  "... and Peggy.  Christie
6  was pretty upset about at the space heater policy
7  I just sent out the other day (not allowing them)
8  and said something to me in a Skype message about
9  being cold and her asthma acting up (not
10 necessarily one causing the other, but seemed
11 related), and I haven't seen her since the
12 afternoon.  She went home."
13           And then you respond:  "FYI, she
14 is out sick again today, but the change policy --
15 she changed policy, so I'm sure she is happy about
16 that!"
17           Is that sarcasm?
18      A.    I have no idea what the -- the
19 policy change was related to, because that's not
20 this e-mail, so I don't know what that's related
21 to.  But I was letting her manager know that she
22 was out sick again.
23           I'd have to figure what that
24 policy change was.  And I'm not generally a
25 sarcastic employer, so I would say that I'm

```
 1  probably genuine in thinking Christie's happy
 2  about something.  But I don't know what that is.
 3  We'd need those -- those e-mails.
 4          Q.      So, I mean, when you look at
 5  Plaintiff's Exhibit 6 where you say:  "Ugh, I
 6  know.  It's just crazy," and you make commons like
 7  that, that's not being sarcastic or is that being
 8  sarcastic?
 9          A.      That's not being sarcastic.
10          Q.      Is that being --
11          A.      I'm being --
12          Q.      -- flippant about an com- -- an
13  employee's complaint --
14          A.      No.
15          Q.      -- or excuse?
16          A.      No, that's being factual.
17          Q.      Okay.  And so being factual.
18  This e-mail dated January 26th, 2018 is being
19  communicated to you that Ms. Andrews has asthma,
20  correct?
21          A.      Correct.
22          Q.      And that you responded something
23  about "I'm sure she's happy about that."  And your
24  testimony today is you don't recall the policy
25  change; is that fair?
```

53

```
 1          Q.    Was it within your scope of
 2   authority to tell Mr. Luecke to discipline Ms.
 3   Andrews for excessive tardiness?
 4          A.    We had regular conversations with
 5   Ms. Andrews.
 6          Q.    And you guys went through the
 7   formal disciplinary process at the times?
 8          A.    We would have verbal and we would
 9   do it in e-mail, which was written.  Did we
10   formally write her up?  I know that I participated
11   in a couple of write-ups for her tardiness.  Did
12   we ever take it as far as to fire her?  No, we did
13   not.
14          Q.    Did you -- did you consider the
15   -- the adjustment to her schedule to be a
16   reasonable accommodation under the AD- -- ADA?
17          A.    Yes.
18          Q.    Okay.  Did you see a Reasonable
19   Accomodation form completed for that?
20          A.    We had -- yes.  I mean, it wasn't
21   a specific ADA form.  Did we have a form that
22   changed her hours of -- in the office?  Yes, that
23   was a form that we completed, and we made a change
24   to it to accommodate her.
25          Q.    And when did you first learn that
```

1  Ms. Andrews was going to be terminated?
2           A.    As part of the RIF?
3           Q.    Uh-huh.
4           A.    I found out when everyone else
5  found out.
6           Q.    So it was announced that: We're
7  terminating Ms. Andrews?
8           A.    No. It was after -- after the
9  RIF happened. There was no foreknowledge to
10 anyone. It was between Lou, and that was really,
11 like, HR for making any sort of payroll
12 adjustments under California law.
13          Q.    Why under California law?
14          A.    Because California law, if you
15 RIF somebody, you have to pay them same day. So
16 the payroll has to be processed.
17          Q.    But I thought Andrews -- but
18 you're not specifically addressing Andrews?
19 You're just talking about the RIF that impacted a
20 couple --
21          A.    Well, because it was a group of
22 people. It wasn't just one person.
23          Q.    It's been a long day. Have we
24 introduced a document under the Protective Order
25 113 yet? Is that....

```
 1  If you don't recall....
 2          A.      That is what I think.
 3          Q.      Okay.  Was it a re- -- as part of
 4  the response to the Equal Employment Opportunity
 5  Commission?
 6          A.      I don't know.
 7          Q.      Who -- why were you forwarding it
 8  to Anna Miller?
 9          A.      Anna is my assistant.  She was
10  helping -- we had to do some sort of document
11  collection.  She was helping me --
12          Q.      Okay.
13          A.      -- as my assistant.
14          Q.      And so it looks here that you --
15  if you look back at this e-mail chain here, right?
16  If you go to page 114, you look at the top e-mail,
17  you see how you're a recipient on March 18 of this
18  e-mail?
19          A.      I do.
20          Q.      And you see -- did you not
21  understand by this e-mail that Ms. Andrews was
22  going to be terminated?
23          A.      I didn't know where Lou was
24  ending up on all terminations.  That's what she
25  wrote here, so I had to believe, but until it
```

```
 1  actually happened, things can always change.
 2          Q.      Okay.  So the decision, in your
 3  mind, wasn't final?
 4          A.      It wasn't final until Lou made
 5  the call.
 6          Q.      What do you mean?
 7          A.      Like, it actually happened.
 8  That's when it's final to me.
 9          Q.      When it's -- when the employee's
10  told that they've been terminated?
11          A.      Absolutely.
12          Q.      Because anything could change up
13  to that point?
14                  MS. SWAFFORD:  Object to the
15          form.
16                  THE WITNESS:  I wasn't -- I
17          wasn't in charge, so....
18  BY MR. ARCINIEGAS:
19          Q.      Have you ever seen the
20  work-from-home work paper referenced in this
21  e-mail?
22          A.      Referenced in this e-mail?  No.
23          Q.      Was the term -- were the terms
24  and conditions of the workforce -- work-from-home
25  work paper ever reviewed with you?
```

```
 1            A.     Just in my annual ethics --
 2            Q.     Okay.  Specifically on ADA.
 3            A.     -- required by CPA.
 4            Q.     Have there been any revisions to
 5   the handbook of -- for the company with respect to
 6   the ADA?
 7            A.     I do not know.
 8            Q.     This one's been marked.  You
 9   don't know Christie Adams either, do you?
10            A.     I do not.
11            Q.     Do you presume when it's -- do
12   you think it's a safe inference that when Ms.
13   Simpson writes Christie Adams, that she's
14   referring to Christie Andrews?
15            A.     Yes.
16            Q.     Can you go to Plaintiff's Exhibit
17   3?  Plaintiff's Exhibit 3.
18                   You're on this list, correct?
19            A.     I was only on the first e-mail.
20            Q.     Okay.  And so you never saw the
21   updated list?
22            A.     Correct.
23            Q.     Is that your testimony?
24            A.     Yes.
25            Q.     You have -- you remember
```

```
 1  left, did you have a conversation with her?
 2          A.    I did not.
 3          Q.    You worked for her -- with her
 4  for at least seven years; is that fair?
 5          A.    That is fair.
 6          Q.    And you didn't send her, like --
 7  or say:  It was nice working with you, or anything
 8  like that?
 9          A.    I did not.
10          Q.    Would you consider Ms. Andrews
11  for rehire?
12          A.    I would not.
13          Q.    Why not?
14          A.    The -- the difficulty in every,
15  single day work with Christie was too difficult to
16  want to rehire her.  It was problematic.  It was
17  hard.
18          Q.    Can you be more specific for me?
19          A.    She was not a good employee,
20  because she was unreliable, undependable for her
21  team.  We need people who are dependable.
22          Q.    Okay.  Any other reasons you
23  wouldn't consider her for employment?
24          A.    No.
25          Q.    Okay.  And have you ever seen a
```