```
 1    giving any -- given any directions, that you
 2    recall?
 3             A.    I was not.
 4             Q.    When did you first learn that
 5    there would be a reduction in force?
 6             A.    I don't recall.  It was sometime
 7    during that week.
 8             Q.    Sometime after the 16th?
 9             A.    Correct.
10             Q.    Do you think you learned on the
11    16th of the reduction in force?
12             A.    No.  If the 16th was Monday, no.
13             Q.    Why are you certain -- why -- why
14    are you certain about that it wasn't on Monday?
15             A.    Because Lou didn't come to the
16    office.
17             Q.    Where was Lou?
18             A.    Working from home.
19             Q.    When did Lou come to the office
20    for the first time that week?
21             A.    Tuesday.
22             Q.    And you -- you -- did you work
23    from home at all during that week?
24             A.    I did not.
25             Q.    Did you have a laptop?
```

```
 1              A.    I did.

 2              Q.    Was it VPN ready?

 3              A.    It was not.

 4              Q.    Did it already have VPN?

 5              A.    It did not.

 6              Q.    Did you take the laptop with you

 7   home on a regular basis?

 8              A.    I did.

 9              Q.    Did you have a company-issued

10   cell phone?

11              A.    I did.

12              Q.    Any other company-issued

13   electronic devices?

14              A.    No.

15              Q.    Tuesday, when you came to work,

16   do you recall if Lou came to work Wednesday?

17              A.    Yes.

18              Q.    And how about Thursday?

19              A.    Yes.

20              Q.    Friday?

21              A.    Yes.

22              Q.    Were people wearing masks at all

23   during that week?

24              A.    No.

25              Q.    When did the first -- when did
```

```
 1            A.     I did not.

 2            Q.     Did you ever have an asthma

 3    attack?

 4            A.     I did not.

 5            Q.     Did you know that Christie was a

 6    competitive cheerleader?

 7            A.     I did.

 8            Q.     How did you know that?

 9            A.     She talked about it often.

10            Q.     And you were a cheerleader as

11    well?

12            A.     I was.

13            Q.     Did you guys ever do any, like,

14    cheerleading together?

15            A.     I did not.

16            Q.     Did you ever see Christie

17    cheerlead -- cheerlead?

18            A.     Just what she would share on

19    social media.

20            Q.     Are you friends with Lou Taylor

21    in social media?

22            A.     I am.

23            Q.     What platforms?

24            A.     Instagram and Twitter.

25            Q.     When was your 30th birthday?
```

```
 1              A.      Yes.

 2              Q.      Okay.  There's been some

 3    discussion about, like, laptops and, like, who had

 4    them and who didn't, right?

 5              A.      (Witness moves head up and down.)

 6              Q.      You had a laptop.  Do you know if

 7    Peggy Stephens had a laptop?

 8              A.      I don't know if she had one then.

 9              Q.      The people who sat on these four

10    tops, did they have laptops?

11              A.      I don't recall.

12              Q.      Do you recall there being

13    desktops?

14              A.      I don't recall.

15              Q.      Do you recall there being lots of

16    desktops in other areas on the second floor?

17              A.      I mean, everyone had a computer.

18    I don't recall if they had a tower, if they had a

19    mini, or if they had a laptop.

20              Q.      Okay.  So let's kind of

21    establish.  So what do you mean by "mini"?

22              A.      It's a -- the old school towers

23    are this big (indicating).

24              Q.      Uh-huh.

25              A.      And then we have minis now.
```

```
 1              A.     That's all I recall.

 2              Q.     And was she a particular type of

 3    TC?

 4              A.     She was not.

 5              Q.     Was Chris- --

 6              A.     Well, business management.  Same

 7    as Christie.

 8              Q.     I know this may be a little

 9    challenging, but, like, do you recall who was in

10    Christie's team?

11              A.     Bryan Luecke.  And that's all

12    that I can confidently say was on her team at that

13    time.

14              Q.     That's -- that's fine.

15                     So he was business manager?

16              A.     That's correct.

17              Q.     And then if you can kind of break

18    down the organizational structure within that --

19    within the team.  Like, how does it work?

20              A.     There's a business manager,

21    occasionally an accounting manager, senior staff,

22    staff, and then a team coordinator.

23              Q.     And the team coordinator is kind

24    of a compliment to the group?

25              A.     That's correct.  It is a benefit
```

Case 3:21-cv-00526   Document 49-8   Filed 12/09/22   Page 5 of 36 PageID #: 906

```
 1          A.    We had a Touring department at
 2    the time.
 3          Q.    Okay.  So did the TC have to
 4    coordinate with the Touring department?
 5          A.    Occasionally, but the Touring
 6    department ran point on all things touring and had
 7    their own admin team.
 8          Q.    Okay.  And what were the admin
 9    team called there?
10          A.    There was an executive assistant
11    to the touring director.
12          Q.    Okay.  Anybody else?
13          A.    Just Kristen Mir, that did the
14    HR.
15          Q.    Are what kind of HR stuff was she
16    doing?  I didn't really understand that.
17          A.    She ran payroll for all the
18    clients' tours, got them on payroll, made sure
19    they were paid, and that was pretty much it.
20    Full-time job at the time.
21          Q.    You heard Ms. Taylor talk about
22    there being some commission bases; is that fair?
23          A.    I wasn't in here for Lou's.
24          Q.    Oh.  Are you aware that touring
25    was based on -- or con- -- the touring services
```

43

1  2014.

2          Q.      And slowly, over time, you --

3  that -- the size of that department's grown?

4          A.      That's correct.

5          Q.      Now, there are -- so touring is

6  one service that y'all provide, but y'all make --

7  or Tri Star generates fees through providing other

8  services; is that right?

9          A.      That's correct.

10          Q.      What other services do they

11  provide?

12          A.      Business management.

13          Q.      All right.  What else?

14          A.      Royalties, tax, and concierge

15  family office services.

16          Q.      Anything else?

17          A.      That's it.

18          Q.      Business management, we've kind

19  of gotten the --the structure of the -- the teams,

20  but let's just kind of break down what the

21  accountants do.  What -- do the accountants look

22  at different revenue streams?

23          A.      They do.

24          Q.      What are some of the different

25  revenue streams that you're aware of?

```
 1              Q.    Was 2019 a good year or a bad
 2    year financially for Tri Star?
 3              A.    I am not aware of the financials.
 4              Q.    Were there layoffs in 2019?
 5              A.    I don't recall.
 6              Q.    Were there -- was there hiring in
 7    2019?
 8              A.    Yes.
 9              Q.    Going into 2020, y'all were
10    trying to fill a lot of positions, do you recall
11    that?
12              A.    I do.
13              Q.    Did you have -- like, as -- as an
14    executive assistant, I assume with being the
15    executive assistant to the CEO, that you also have
16    to cover a lot of areas; is that fair?
17              A.    Yes.
18              Q.    Whatever she deals with, you deal
19    with in some form or fashion?
20              A.    That's correct.
21              Q.    If she needs something, you're --
22    you're usually the primary conduit to get it; is
23    that fair?
24              A.    That's correct.
25              Q.    Your average day, is it -- are
```

```
 1   they longer than normal hours?
 2           A.      Yes.
 3           Q.      You can get calls at any point in
 4   the day; is that fair?
 5           A.      Correct.
 6           Q.      At night?
 7           A.      Correct.
 8           Q.      Did you have any understanding as
 9   to why y'all were -- Tri Star was hiring so much
10   at -- in 2019, or trying to hire?
11           A.      We were growing.
12           Q.      Were there any particular new
13   clients that came in?
14           A.      Yes.
15           Q.      Were they touring clients?
16           A.      I don't recall.
17           Q.      Are most of Tri Star's clients in
18   2019 touring?
19           A.      Touring made up a large
20   percentage of our clients.
21           Q.      But you don't know that with
22   respect to financials, do you?
23           A.      At the time, I did not.
24           Q.      So when you say touring was a
25   large percentage, you're saying -- what are you
```

```
 1   strong online presence, like TikTok or something

 2   like that, who generate, you know, so much for

 3   each posting, does that money come -- is that

 4   money that's managed by Tri Star?

 5            A.     It is, and depending on their

 6   structure, we would -- if it's -- if they're

 7   commission-based, we would commission off of that.

 8            Q.     There was something that you said

 9   that I wasn't -- I don't think I've heard about.

10   The concierge family office.

11            A.     Uh-huh.

12            Q.     Tell me about that.

13            A.     So, again, having a team

14   coordinator was a benefit of our firm.  Something

15   our competitors don't do.  And the team

16   coordinators offe- -- offered concierge services,

17   that either our competitors don't offer, or if

18   they do, the accountants are doing it.

19                   And so it's calling the dog

20   walker, setting up utilities, changing your

21   address, booking you an appointment at the DMV to

22   get your license renewed, for -- seeing through

23   the process of renewing your passport.  And that

24   is a concierge service that our competitors,

25   again, don't offer, but it is a benefit that we
```

```
1    offer our clients.  But not a necessity.
2            Q.    How long has that concierge
3    family office component or benefit, as you put it,
4    been a part of the Tri Star's business model?
5            A.    The concierge and family office
6    are two different things.
7            Q.    Oh, they're two separate things?
8            A.    Uh-huh.
9            Q.    I'm sorry, I missed the
10   distinction.
11           A.    Our concierge services have been
12   there since 20- -- at least 2012, when I started.
13           Q.    Okay.  And then the family
14   office?
15           A.    Family office is an -- a term
16   used for accounting to service high net worth
17   individuals.
18           Q.    And give me a basic -- basic
19   explanation of what a family office for high net
20   worth individuals entails with respect to
21   accounting.
22           A.    When you have a family with
23   extreme wealth, family offices services mean we
24   handle everything for them.  Everything you could
25   possibly think of that they touch, we handle.
```

Case 3:21-cv-00526   Document 49-8   Filed 12/09/22   Page 11 of 36 PageID #: 912

1          A.      -- that our competitors do not

    2    offer.

    3          Q.      Okay.  So tell me -- that's where

    4    I think I lost you or you lost me.

    5                  What is the concierge service?

    6          A.      Our team coordinators.  They call

    7    the dog walkers, they renew driver's licenses,

    8    they renew passports, they turn on utilities, they

    9    go to the bank and pick up cash and meet the

   10    client and give it to them.  Where if you were

   11    with a competitor, you do all of that yourself, or

   12    the accountant does it, and that's not the best

   13    use of an accountant's time.

   14          Q.      Are team coord- -- do team

   15    coordinators bill?

   16          A.      They do.

   17          Q.      Did they bill in 2020?

   18          A.      They did.

   19          Q.      Do you -- can you give me an

   20    estimate or a range of what they -- a team

   21    coordinator was billed out to clients to?

   22          A.      I -- maybe ██ an hour.

   23          Q.      Okay.

   24          A.      And probably ██ percent of their

   25    time was billable.  But again, if a client was

```
 1   commission or on a retainer, it didn't matter.  It
 2   was -- it all rolled up.
 3              Q.    And do you know how much Christie
 4   was making in 2020?
 5              A.    I don't.
 6              Q.    Would you -- I mean, do you have
 7   any idea now what people make?
 8              A.    I do.
 9              Q.    Okay.  Are -- do you still have
10   team coordinators?
11              A.    We do.
12              Q.    And what's the high end of a team
13   coordinator in 20- -- 2022?
14              A.    In Nashville?  73-.
15              Q.    The AMEX liaison position, you're
16   aware of that?
17              A.    I am.
18              Q.    When did you first become aware
19   of the AMEX liaison position or vacancy?
20              A.    There never was a vacancy.
21              Q.    Okay.  When did the -- when did
22   you first become aware of there being an AMEX
23   liaison position being established?
24              A.    I don't recall.
25              Q.    Do you recall that an AMEX
```

1    liaison position was actually established?

2              A.      I know that Christie did the

3    work.

4              Q.      Did -- was Christie selected for

5    that position or those responsibilities?

6              A.      I don't know.

7              Q.      You just know that she did the

8    work?

9              A.      That's correct.

10             Q.      Did she stop being a team

11   coordinator when she became the -- or started

12   doing the work of an AMEX liaison?

13             A.      She did not.

14             Q.      What -- what was the scope of

15   work for -- strike that.

16                     What was the scope of clientele

17   for the AMEX liaison?

18             A.      I don't understand the question.

19             Q.      What clients had acc- -- bas- --

20   what clients would need the services of an AMEX

21   liaison?  All your clients, a subsection of your

22   clients?

23             A.      Any client that had an AMEX.

24             Q.      And let's just say, just for the

25   sake of numbers, you have 100 clients, right?  Is

```
 1    it -- the number of AMEXes, is it just dependent

 2    on the number of clients, but also the number of

 3    people that work for them and the numbers in the

 4    family affair?

 5             A.    That's correct.

 6             Q.    So do most of your clients -- do

 7    most Tri Star clients have AMEXes?

 8             A.    I don't know.

 9             Q.    There had never been an AMEX

10    liaison person, as far as you know, until Ms.

11    Andrews, and there hasn't been one since?

12             A.    That's correct.

13             Q.    What do you know about the AMEX

14    liaison duties?

15             A.    I know that she -- if there was

16    an issue with someone's card, she's the one that

17    called AMEX.  And to my understanding, that's all

18    she handled as the AMEX liaison at the time.

19             Q.    So she did that for the seven

20    teams that you described?

21             A.    That's correct.

22             Q.    The seven business management

23    teams?

24             A.    That's correct.

25             Q.    So if the client or anybody's --
```

```
 1   or any client's, whatever dependent, let's put it
 2   that way, needed some help with the AMEX, they
 3   were directed to Christie?
 4              A.     They were not directed to
 5   Christie.
 6              Q.     How was it handled, then?
 7              A.     Internally.  That client would
 8   reach out to their contact within the firm, and
 9   that firm -- person, internally, would talk to
10   Christie.
11              Q.     Why -- what did you see the
12   benefit?  Do you -- why add that step?  Why
13   couldn't that per- -- person or con- -- point of
14   contact handle the AMEX?
15              A.     At the --
16              Q.     Or why is it -- why was that
17   inefficient, I guess?
18              A.     At the time, we had a contact at
19   AMEX that was easy to get ahold of, and Christie
20   had the relationship with him.
21              Q.     What was that?
22              A.     His name was David Rothman.
23              Q.     Rossman [sic]?
24              A.     Rothman.
25              Q.     Rothman.
```

```
 1                    What was the relationship?  I
 2    don't understand the relationship.  Do you know?
 3            A.      She had his phone number.
 4            Q.      And why was that beneficial for
 5    Tri Star?
 6            A.      Well, it was beneficial that she
 7    had a relationship with him.
 8            Q.      But how -- okay.  Well, how did
 9    that benefit translate to a benefit for Tri Star
10    and Tri Star's clients?
11            A.      She could easily call AMEX and
12    get someone to pick up the phone and unfreeze a
13    card.  However, that relationship was transitioned
14    to every single team coordinator when she left and
15    everyone was given the opportunity to speak with
16    David, including myself.
17            Q.      What do you mean including
18    yourself?
19            A.      If I needed to call him and say:
20    Can you help me with Lou's card, he would pick up
21    the phone.  So we were all privy to his
22    relationship.
23            Q.      So is it -- is it -- I think I
24    heard some -- some reference to VIP Services with
25    AMEX.  Are you familiar with that phrase?
```

```
 1                    MS. HART:  Object to form.
 2    BY MR. ARCINIEGAS:
 3            Q.    You agree with that?
 4            A.    Yeah, I don't think it was of
 5    substance, which is why it was dispersed to the
 6    teams.
 7                    MR. ARCINIEGAS:  How long we been
 8            going?
 9                    THE COURT REPORTER:  Right at an
10            hour.
11                    MR. ARCINIEGAS:  You guys want to
12            take a break?
13                    MS. HART:  Sure, if you need a
14            break.
15                    MR. ARCINIEGAS:  Yeah, we can
16            take a break.  Let's just take ten
17            minutes.
18                    (Brief recess observed.)
19    BY MR. ARCINIEGAS:
20            Q.    All right.  We're back on the
21    record.
22                    There are some clients that are
23    nontouring; is that fair?
24            A.    Yes.
25            Q.    Okay.  What are some of the
```

```
 1  nontouring clients?

 2            A.      We have actors.

 3            Q.      Okay.

 4            A.      Actresses, models and high net

 5  worth families.

 6            Q.      In 2020, who were some of the

 7  high net worth families that you know to be

 8  disclosed to the public?

 9            A.      I'm not sure I can share that

10  with my Confidentiality Agreement.

11                  MS. HART:  I'm going to object to

12              relevance of that.  Why does it matter

13              who the clients are?

14                  MR. ARCINIEGAS:  Well, the

15              defense here has been talking about how

16              there was a loss of touring income as

17              the -- you know, without getting --

18              otherwise, I mean, it kind of opens the

19              door for looking at financial

20              information, requesting it or, you know.

21              But I don't want to do that.  I'm trying

22              to get just, like, a basic overall

23              picture of the company in terms of who

24              are high net worth individual families.

25                  MS. HART:  You want to know the
```

1          A.      Typically, the spring and summer.

2          Q.      Okay.  What were some of the big

3    tours that y'all lost?

4          A.      ████████████████████  was the

5    biggest.

6          Q.      Okay.  And so that was

7    prospective income y'all were losing; fair?

8          A.      That's correct.

9          Q.      Okay.

10         A.      Well, it was planned income.

11         Q.      I'm sorry?

12         A.      It was planned income that we

13   were losing.

14         Q.      Sure.  And Florida Georgia --

15   Georgia Line had a very good 2019; is that fair?

16         A.      I don't recall.  I'm sure they

17   did.

18         Q.      Because I -- I just Googled it,

19   and it says, like, ████████████████  made,

20   like, 55 million, something like that, in touring

21   revenue in 2019, right?

22         A.      I'm sure they did.  I don't know.

23         Q.      So that -- when they make money

24   in 2019, when does Tri Star make their cut?

25         A.      It depends on how the contract's

1    structured.

2              Q.      Okay.

3              A.      Or the agreement, I should say,

4    between us and the client.

5              Q.      And so without getting into the

6    particulars of a client, that structure could be,

7    like, at the end of the tour?

8              A.      It could be at the end of the

9    tour, it -- it's really dependent on when they get

10   the money and then how our agreement reads with

11   them.

12             Q.      But isn't that part of what the

13   business management group and tour management

14   groups are supposed to do, collect that money?

15             A.      The Touring team is, yes.

16             Q.      Yeah.

17             A.      But it depends on when the venues

18   pay them out and the show promoters.

19             Q.      I mean, most of your clients,

20   isn't it fair to say, want to get paid when they

21   do the shows or before they do the shows?

22             A.      Everyone wants to get paid on

23   time.  It depends on the contract with the show

24   promoter.

25             Q.      So let me ask you this.  Like,

```
 1              Q.     I mean, that's what high net

 2   worth people have, they have multiple teams that

 3   interact with each other; fair?

 4              A.     That's correct.

 5              Q.     I got a bigger version of what we

 6   marked as Plaintiff's Exhibit 1 to the first

 7   deposition.  We're just going to continue

 8   numbering from that point.  But this is just that

 9   same exhibit, just bigger?

10                   MR. ARCINIEGAS:  Do you guys want

11         a copy?

12                   MS. HART:  Sure.  That would be

13         great.  Thank you.

14   BY MR. ARCINIEGAS:

15         Q.     So have you seen what I put in

16   front of you as Plaintiff's Exhibit 1?

17         A.     I have.

18         Q.     Okay.  When did you first see

19   that document?

20         A.     April 2020.

21         Q.     Why did you see it in April of

22   2020?

23         A.     Because I would shepherd

24   information between Lou and Yolanda.

25         Q.     Why were you shepherding this
```

```
1    Starlinks.

2                    And that's -- those systems are

3    distinct from Litmus?

4              A.    Litmus is a training platform.

5              Q.    Okay.  That's all it is?

6                    Other than Ms. Andrews, can you

7    think of any other team coordinators that had

8    laptops in 2020?

9              A.    I do not.

10                   MS. HART:  Object to the form.

11             She didn't say Ms. Andrews had a laptop.

12   BY MR. ARCINIEGAS:

13             Q.    Were you aware that Ms. Andrews

14   had a laptop in 2020?

15             A.    I was.  For emergencies.

16             Q.    What type of emergencies?

17             A.    AMEX.

18             Q.    Why did she -- Ms. Andrews need a

19   laptop for AMEX emergencies?

20             A.    In case there was an emergency on

21   a night -- on a night or weekend.

22             Q.    And so --

23             A.    So she could e-mail David.

24             Q.    But is it your understanding that

25   the limit of what Ms. Andrews did for people was
```

Case 3:21-cv-00526   Document 49-8   Filed 12/09/22   Page 23 of 36 PageID #: 924

1    just sending e-mails through the AMEX?

2              A.    That is my understanding.

3              Q.    Okay.  But it might be?  Could

4    she also have been accessing their actual

5    accounts?

6              A.    I don't know.

7              Q.    When you say "only for

8    emergencies," did that mean that she was allowed

9    to take it so in the event of an emergency?

10             A.    That's correct.

11             Q.    So she was allowed to have a

12   laptop at the office and transport it each day to

13   home; fair?

14             A.    That's correct.

15             Q.    And same with you at that time;

16   fair?

17             A.    That's correct.

18             Q.    And when you took your laptop

19   home, would you be able to access Starlinks?

20             A.    I don't recall.

21             Q.    Or OTP?

22             A.    Definitely not OTP.

23             Q.    Were you part of the Starlinks

24   beta group?

25             A.    I was.

```
 1              copy for you.

 2                   MS. HART:  I got it.  Thank you.

 3  BY MR. ARCINIEGAS:

 4         Q.     So this is all about the space

 5  heater or the heating.  Is it called space heater

 6  -- a space heater in 2018.  Were you aware of the

 7  space heater issue in 2018?

 8         A.     I was.

 9         Q.     Do you recall what the policy

10  change was?

11         A.     The policy was changed because

12  space heaters were flipping our breaker.

13         Q.     Flipping?

14         A.     The breaker and killing all of

15  our computer power.

16         Q.     Okay.  And so how was the policy

17  changed, to get rid of them?

18         A.     The policy was to get rid of

19  them.

20         Q.     And then was it changed back to

21  allow them?

22         A.     Only in Christie's area.  And the

23  IT manager Mike moved the plug that it was plugged

24  into to a different circuit so it wouldn't blow

25  those computers.
```

```
 1              Q.      Okay.  The information that you

 2      received in April of 2019, you then shared with

 3      Lou Taylor?

 4              A.      I'm sure I did.

 5              Q.      And when you shared information

 6      like this, will you also present Lou with a copy

 7      of the e-mail?

 8              A.      If she asks for it.

 9              Q.      Do you recall if she asked for

10      this e-mail chain?

11              A.      I do not remember.

12              Q.      And if she asked for an e-mail,

13      would you print it or forward it to her?

14              A.      It depended on where she was and

15      what she wanted.

16              Q.      So you could have presented Lou

17      Taylor this e-mail, Plaintiff's Exhibit 22, in

18      print format without having to ever forwarded it

19      to her, correct?

20              A.      Yes.

21              Q.      Is there any particular, like,

22      situation where she would prefer it being printed

23      than forwarded, that you can think of?  Like, is

24      there, like, a pattern here?

25              A.      No.
```

```
 1   or less?
 2          A.      I see that, yes.
 3          Q.      What was the arrival time before
 4   that, do you know?  Like, generally, what's the
 5   expectation?
 6          A.      I don't know.  I believe that the
 7   time -- the expectation was that we were all there
 8   by 9:00.
 9          Q.      Okay.  Something like that?
10          A.      Yeah.
11          Q.      And here it says:  "Any delay
12   beyond 9:30 requires communication via company
13   e-mail identifying an expected time of arrival, as
14   well as any other pertinent information."
15                  Did -- beyond what I just read,
16   do you know, like, the details of what types of
17   pertinent information needed to be provided, if
18   any?
19          A.      Yes.
20          Q.      What type?
21          A.      When she planned to arrive.
22          Q.      Okay.  Thank you.
23                  But I mean, like, the type of --
24   what -- other than the time of arrival, what other
25   information could qualify as pertinent?  Did --
```

```
 1   to do with accommodations?
 2            A.    No, it's not.
 3            Q.    Okay.  What do you understand
 4   accommo- -- you understand "accommodations" is
 5   kind of a -- has a legal term?
 6            A.    I do.
 7            Q.    For what statute?
 8            A.    Oh, I don't know that.
 9            MS. HART:  Objection, calls for a
10            legal conclusion.
11   BY MR. ARCINIEGAS:
12            Q.    Are you aware that -- of
13   "accommodation" or "reasonable accommodation"
14   being a phrase in the Americans with Disabilities
15   Act?
16            A.    I am.
17            Q.    Okay.  And then No. 4 says:
18   "Discuss the seriousness of the situation with
19   your healthcare providers and build a support team
20   to help you manage any conditions that are
21   contributing to this behavior."
22            Did you -- did you understand
23   that -- what health conditions were you aware of,
24   if any, at that time?
25            A.    I was aware that she had sleep
```

```
 1   issues.
 2          Q.     Okay.
 3          A.     She talked about it.  She had, I
 4   don't know if it was ADD or what, but she used
 5   Adderall and proudly talked about it in the
 6   office.
 7          Q.     Okay.
 8          A.     She had headaches.  But I also
 9   knew, again, based on my own research --
10          Q.     Uh-huh.
11          A.     -- that it wasn't my place to
12   have that conversation with her.
13          Q.     Sure.  I --
14          A.     Yeah.
15          Q.     I respect that.
16          A.     And that goes back to I didn't
17   have conversations with staff and I don't let
18   myself have conversations with staff, because I
19   know what's right and what's not right.
20          Q.     Okay.
21          A.     And so I would not divulge into
22   conversations with her like that.
23          Q.     Wait.  What do you mean
24   "divulge"?
25          A.     I know she would openly talk
```

```
 1    about health issues with people.

 2              Q.    Right.

 3              A.    I never got into those

 4    conversations with her because I didn't think it

 5    was appropriate.

 6              Q.    Okay.  That's fine.  I just

 7    didn't understand what you meant.

 8                    But -- so are you saying that you

 9    wouldn't divulge that information to Lou Taylor?

10              A.    No.  It's not my place.  That's

11    HR's job, if necessary.

12              Q.    I'm sorry, where are you

13    pointing?

14              A.    I'm just saying --

15              Q.    Oh, okay.  Sorry.

16              A.    If H- -- if it's necessary for

17    Lou to know, HR would tell them.  But Lou also

18    knows it's not her place to know everything about

19    staff when it comes to medical reasons.

20              Q.    What do you mean by that?

21              A.    It's --

22              Q.    That, I'm confused by.

23              A.    If someone has medical issues,

24    it's not the company -- the whole company doesn't

25    have to know about it.  That's between the person
```

1    and HR.
        2            Q.    But what do you mean "Lou also
        3    knows that," or -- I think that's how you phrased
        4    it.
        5            A.    She knows that -- I mean, she's
        6    not going to ask what her health issues are.
        7            Q.    And that's something that she --
        8    Lou Taylor's communicated to you directly?
        9            A.    No, that is an assumption I have
       10    made.
       11            Q.    But that knowledge base is based
       12    on your personal knowledge not to ask those type
       13    of questions or not to -- to divulge that type of
       14    information, is based on information you gleaned
       15    from the Litmus training --
       16            A.    I --
       17            Q.    -- or somewhere else?
       18            A.    I don't recall.
       19            Q.    So it could be the Litmus
       20    training?
       21            A.    It could be.
       22            Q.    Okay.  And No. 5, it says:  "In
       23    the absence of any documented -- documented
       24    condition, cont- -- continuing to arrive late to
       25    work, i.e., outside the hours of 9:00 a.m. and

else, like: Oh, she's running something for a
client or doing something for a client?

      A.    He would tell me -- if she was
doing something for a client, he would have told
me.

      Q.    Right. That's what I'm asking.

      A.    But nine out of -- nine times out
of ten, it's because she had personal issues that
couldn't get her to work on time.

      Q.    So you think you asked about this
ten times, or more?

      A.    I don't recall.

      Q.    Okay. So what you're saying is
-- the things you do recall is that she had some
sort ter- -- personal issue when you asked
Mr. Luecke, right?

      A.    That's correct.

      Q.    Did you ask what type of personal
issue?

      A.    Yes.

      Q.    Okay. And what type of personal
issues were you told?

      A.    She slept in.

      Q.    Okay.

      A.    She forgot to set her alarm. She

```
 1              A.      For this.

 2              Q.      Okay.  And the documents you

 3    gathered, did you ever give them to Lou Taylor?

 4              A.      No.

 5              Q.      Who did you give them to?

 6              A.      To Tara Swafford.

 7              Q.      Okay.  Before you delivered them

 8    to counsel, did you -- is there -- is there a set

 9    that you -- is kept on the server still?

10              A.      I don't remember.

11              Q.      So in December of 2021, you were

12    sending these to Ms. Swafford?

13              A.      I was gathering documents as

14    requested.

15              Q.      Yeah, I -- I get that part.

16              A.      So I gathered them, and I had to

17    organize them, and then send them to Tara.

18              Q.      Okay.  And here it says:  "I want

19    to take Christie to 52,5-," right, as of July

20    2019; is that fair?

21              A.      Yes.

22              Q.      And that's Ms. Stephens making

23    that recommendation?

24              A.      That's correct.

25              Q.      So do you know what is meant here
```

```
 1    in -- on page 161 where it says:  "With her

 2    anniversary date being in August, please add the

 3    paragraph about the loyalty being skipped."

 4                    Do you know what the "loyalty

 5    being skipped" is?

 6              A.    At the time, we received loyalty

 7    raises every year.

 8              Q.    Okay.  So they were skipping the

 9    loyalty raises for Ms. -- for who in this one, do

10    you know?

11              A.    I don't know if they're talking

12    about Christie or ████████

13              Q.    Can you tell by the next

14    sentence, the context of the -- his payroll or

15    anything like that or you'd be guessing?

16              A.    Well, I know that they're talking

17    about Christie in that sentence --

18              Q.    Right.

19              A.    -- but I don't know what they're

20    talking about in the first -- or who they're

21    talking about in the first sentence.

22              Q.    So other than loyalty raises,

23    what other types of raises are you aware of?

24              A.    Performance raises.

25              Q.    Okay.  Any other types of raises?
```

126

```
 1          A.      Not that I know of.
 2          Q.      All right.  Let's take a
 3   ten-minute break if that's okay.
 4                  (Brief recess observed.)
 5   BY MR. ARCINIEGAS:
 6          Q.      Ms. Kinder, do you recall
 7   Mr. Luecke ever telling you that some of Ms.
 8   Andrews' absences were related to allergies?
 9          A.      I don't recall.
10          Q.      But if there's e-mails to the --
11   show that he sent them to you, you wouldn't
12   dispute those, correct?
13          A.      That's correct.
14          Q.      Now, do you recall that after Ms.
15   Andrews was terminated, that she -- there was some
16   exchange between her and Ms. Simpson about whether
17   she had quit or whether she had been part of --
18   terminated, or anything like that?
19          A.      I don't recall.
20          Q.      Okay.  Do you recall having any
21   conversations with Lou at that time?
22          A.      About Christie?
23          Q.      Yes.
24          A.      I did not.
25          Q.      How is it that you think that
```

```
 1   Christie was able to keep her job so long out any

 2   -- with all these performance issues she was

 3   having?

 4              A.      You want to know what I think?

 5              Q.      Yeah.

 6              A.      So in my opinion?

 7              Q.      Yeah.

 8              A.      In my opinion, the company was

 9   very gracious to her.  In my opinion, we liked her

10   personally, myself included.  And in my opinion,

11   we wanted the best for her, and we made every

12   single effort we could to help her perform to her

13   highest ability and to make accommodations for her

14   so that she could perform to her highest ability.

15              Q.      So other than tardiness and

16   absence, what was the problem with her -- with Ms.

17   Andrews' job performance?

18              A.      Because of her tardiness and

19   absences, she would miss deliverables and

20   deadlines.

21              Q.      And where is that documented, if

22   anywhere?

23              A.      It would be documented in her

24   work product or someone taking over and finishing

25   something for her.
```