**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | | |
|---|---|---|
| **CHRISTIE ANDREWS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CASE NO. 3:21-cv-00526** |
| | ) | |
| **v.** | ) | **Judge Eli J. Richardson** |
| | ) | **Magistrate Judge Jefferey S. Frensley** |
| **TRI STAR SPORTS AND** | ) | |
| **ENTERTAINMENT GROUP, INC.,** | ) | |
| | ) | **JURY DEMAND** |
| **Defendant.** | ) | |

---

**TRI STAR SPORTS AND ENTERTAINMENT GROUP, INC.'S RESPONSE TO**
**PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS**

---

Pursuant to Local Rule 56.01(c), Defendant Tri Star Sports & Entertainment Group, Inc. ("Tri Star" or "Defendant") responds to the Statement of Additional Facts filed by Plaintiff with her Response to Tri Star's Motion for Summary Judgment. (Doc. 47.) Tri Star generally objects to the Additional Facts as many of them contain multiple parts rather than a single sentence or are not material to the pending motion for summary judgment, as required by Local Rule 56.01. Of the 95 additional facts submitted by Plaintiff, only four and one part are disputed - ¶¶ 47, 51, 52, and 86, and part of ¶ 55.

1.    TriStar is a multifamily office, bill pay, financial statements, royalty reporting, tour reporting, house acquisitions, real estate, asset acquisitions, sales, contract management, and contract negotiations. [Taylor 19:14 20:04].

**RESPONSE:** Tri Star objects to this statement in that it is confusing and is not a complete sentence. For purposes of summary judgment only, it is undisputed that these are areas in which Tri Star provides services to its clients.

1

2.    TriStar is a multi-state private firm. [Taylor 29:18-30:04]. In 2020 TriStar had

approximately 110 clients. [Taylor 20:02-04]. TriStar provides business management

support clients that have businesses with employees in many states.  [Taylor 20:10-21:20;

TAAYLOR 30:16-31:06].

**RESPONSE:**  Undisputed for purposes of summary judgment only.

3.    Taylor understood an employer is not to discriminate against people who are disabled, was

aware that a staff member is to have conversation with the employee about their disability

and reasonable accommodation as part of the engage in the interactive process. (Taylor

27:02-28:01).

**RESPONSE:**  Undisputed for purposes of summary judgment only.

4.    On Monday March 16, 2020, HR Generalist Simpson told Taylor that Andrews has

submitted a request to work from home request. (Taylor 47:13- 48:07).

**RESPONSE:**  Undisputed for purposes of summary judgment only.

5.    On March 16, 2020, Taylor considered reasonable accommodations as part of the reduction

in force by having TriStar send a letter asking if people if they had a request for work from

home.

> However, we do realize that some of our employees may have needs arise out of their control that may require some flexibility in scheduling. We will review these requests on a case by case basis.  If you can be in the office, we ask that you come in to work.  In the event you feel that you need to work from home we ask that you speak with your Director and HR immediately.
>
> There are a few instances that will be given WFH preference which are:  School Closings and Employees or Spouse/Partner/Significant Others/Roommates with compromised immune systems. Those who are affected by either of these will be accommodated to the best of our ability.  An accommodation may include a change in schedule or the issuance of a Tri Star laptop.
>
> If you do end up working from home, please be aware that this is a benefit afforded to you which will prevent the use of Vacation or Sick Time. You are expected to work 8 hours each day as if you were in the office.  Please communicate with your supervisor if anything comes up that may prevent that.

(Plaintiff's Exhibit 29; Taylor 28:05-10).

**RESPONSE:**  Undisputed that the above email was sent on March 16, 2020.  However, it

was sent by Yolanda Simpson, not Ms. Taylor.  The document speaks for itself.

2

6.     Before the March 17, 2020, letter was sent out. Taylor was only aware of one person requesting to work from home and it was Andrews. (Taylor 47:13).

**RESPONSE:**  Undisputed for purposes of summary judgment only, assuming the letter Plaintiff refers to is the one sent on March 16, 2020 and referenced above in Fact No. 5.

7.     Taylor had HR provide e-mails tracking work for home requests and whether they were immune compromised or a doctor saying they needed to be home. (Taylor 43:19 – 44:03; Taylor 53:17-54:04).

**RESPONSE:**  Undisputed for purposes of summary judgment only.

8.     Kinder shepherded information between Taylor and Simpson. (Kinder 73:18 – 13). If Taylor needed something Kinder was the primary conduit to get it. (Kinder 47:18-24). Kinder would provide Taylor with printouts of e-mails Kinder received when asked. (Kinder 103:01-20).

**RESPONSE:**  Undisputed for purposes of summary judgment only.

9.     Simpson was providing Kinder updates on what people had made requests. (Simpson 73:25-04).

**RESPONSE:**  Undisputed for purposes of summary judgment only.

10.     Taylor admits understanding the interactive process involved having a dialogue with TriStar Human Resources with an employee when they bring up a health issue. (Taylor 110:09-111:05).

**RESPONSE:**  Undisputed for purposes of summary judgment only.

11.     Taylor admits taking into account whether employees had an immune system issues. (Taylor 109:22 – 110:02).

**RESPONSE:**  Undisputed for purposes of summary judgment only.  However, this statement is misleading as it lacks context.  Ms. Taylor took into account whether individuals falling in

3

the "essential employee" category have immune system issues when determining if they would be permitted to work from home. She also took into account whether individuals had childcare issues related to the pandemic or lived with someone who was immunocompromised. These factors were all given equal weight. This was not a consideration in determining whether employees would be retained or included in the reduction in force and was not a consideration for non-essential employees like Plaintiff, as non-essential employees were not permitted to work from home on an indefinite basis. (Taylor Dep., attached as Ex. A, 41:4-42:9; 109:22-110:02; Taylor Dep., Doc. 40-2, 39:2-5; 45:19-21; 83:9-12; 141:11-13.)

12. Taylor claims she did not know considering immune system issue was an obligation under the law. (Taylor 109:22 – 110:05.)

   **RESPONSE:** Undisputed for purposes of summary judgment only. However, Ms. Taylor testified that she understands her obligations under the ADA. (Ex. A, Taylor Dep., 110.)

13. Taylor has never seen documentation from Andrews medical provider, or anyone else, and has never seen a TriStar reasonable accommodation request form – she relied on Yolanda for that information. (Taylor 146:23-147:09).

   **RESPONSE:** Undisputed for purposes of summary judgment only. The cited testimony does not refer to a reasonable accommodation request form.

14. Kinder stated that Taylor knows not to ask questions about what an employee's health issues are. (Kinder 110:02-06).

   **RESPONSE:** Undisputed that Ms. Kinder made this statement. However, this statement is inadmissible as it is not based on personal knowledge. Ms. Kinder also stated that this was an assumption she was making about Ms. Taylor's personal knowledge. (Kinder Dep., attached as Ex. B, 110:7-10.)

4

15. Kinder stated Taylor knows it is not her place to know everything about staff when it comes to medical reasons, if someone has medical issues the whole company does not have to know it, that's between the person and HR. (Kinder 108:23-110:01).

   **RESPONSE:** Undisputed that Ms. Kinder made this statement. However, this statement is inadmissible as it is not based on personal knowledge. Ms. Kinder also stated that this was an assumption she was making about Ms. Taylor's personal knowledge. (Ex. B, Kinder Dep., 110:7-10.)

16. Kinder understood it was not her place to have conversations about Andrews' health conditions. (Kinder 107:07-12).

   **RESPONSE:** Undisputed for purposes of summary judgment only. The deposition citation does not support this factual assertion.

17. On March 17, 2020, Kinder sent requesting an e-mail stating:

   > Once you have it ready, please send me an updated list of who is requesting to WFH and please include if they have provided appropriate documentation. Also, be sure to include if their director has approved.
   >
   > Once received, we will have Lou review and sign off and then start the process of figuring out if they need a laptop, or not.

   **RESPONSE:** This statement of fact contains no citation to the record as required by Local Rule 56.01 and, thus, requires no response. For purposes of summary judgment only, it is undisputed that an email containing this text was sent on March 17, 2020.

18. Simpson sent an e-mail to Kinder with subject line RE: Updated list that included an attachment listing Christie Adams (sic) as - Compromised immune system.

   **RESPONSE:** This statement of fact contains no citation to the record as required by Local Rule 56.01 and, thus, requires no response. For purposes of summary judgment only, it is undisputed that an email containing this information was sent.

5

19.   On March 17, 2020, Andrews spoke with TriStar HR Generalist about asthma. (Plaintiff's
      15).

      **RESPONSE:**  Undisputed for purposes of summary judgment only.

20.   On March 17, 2020, Andrews sent an e-mail to Bryan Luecke, Yolanda Simpson, Heather
      Kinder, Peggy Stephens with attachment from Andrews' health provider:

> Christie Andrews has been a patient at our office for several years. She has known asthma. Although well controlled, she would benefit from working at home due to the rising risk of COVID-19. If you have any questions or concerns, feel free to call our office.
>
> Thank You,
>
> *Autumn Nelson FNP-BC*
>
> Autumn Nelson, FNP-BC

      (Plaintiff's 15).

      **RESPONSE:**  Undisputed for purposes of summary judgment.

21.   On March 17, 2020, Peggy Stephens wrote

> Ugh – I know.  I do have to say that I know cleaning products do cause some people issues – Christy has so many "ailments" its just crazy.

      (Plaintiff's 16).  In response Kinder's e-mail Subj. FW: Christie, where Kinder stated:

> So now we are getting complaints about the cleaning products. What do people want!?!?!?!

      (Plaintiff's 16).

      **RESPONSE:**  Undisputed for purposes of summary judgment only that an email was sent

      containing these statements.  However, the statements are lacking context, as these statements

      were in response to Plaintiff's claim that she developed a cough from aerosol Lysol spray.

      The document speaks for itself.

6

22.    On March 17, 2020, Simpson sent an e-mail to Taylor with subject line WFH requests

       included Christie Adams (sic).

> The following employees have requested to work from home based on compromised immune
> systems.  I have received doctor's notes from each person listed validating that they do have valid
> concerns.

[Plaintiff's Exhibit 17].

**RESPONSE:**  Undisputed for purposes of summary judgment.  This document speaks for

itself.

23.    In March 2020 TriStar classified Andrews as having a compromised immune system.

       [Plaintiff's Exhibit 9, 17,19, 20). TriStar has a list including Christie Adams as

       "compromised immune system" and Taylor admits not knowing an employee by that name,

       and without prompting asks if that is Christie Andrews. (Taylor 99:15-100:06). TriStar used

       "Preferential consideration" for single parent or parents who had childcare needs, people

       who live with first responders, and who were immune compromised. (Taylor 41:02 – 10).

       **RESPONSE:**  Undisputed for purposes of summary judgment only that Andrews was

       categorized as claiming to have a compromised immune system.  However, this was not a

       medical opinion or diagnosis.  Undisputed for purposes of summary judgment only that Tri

       Star gave certain categories of employees "preferential consideration" to determine whether

       they would be permitted to work from home.  However, the last sentence in Fact No. 23 lacks

       context which makes it misleading.  Preferential consideration was only used for essential

       employees.  It was not a factor in determining whether employees would be retained or

       included in the reduction in force and was not a consideration for non-essential employees

       like Plaintiff, as non-essential employees were not permitted to work from home on an

       indefinite basis.  (Ex. A, Taylor Dep., 41:4-42:9; 109:22-110:02; Taylor Dep., Doc. 40-2,

       39:2-5; 45:19-21; 83:9-12; 141:11-13.)

24. On March 18, 2020, TriStar HR Yolanda was reporting that "the following employees have requested work from home based on compromised immune systems and that TriStar had received doctors' notes validating that they had valid concerns, and listed Christie Andrews for consideration. (Taylor 113:11-114:02; 117:03-07; 119:14-21).

    **RESPONSE:** Undisputed for purposes of summary judgment that Yolanda Simpson provided this information by email. The statement that she "listed Christie Andrews for consideration" is misleading, as Ms. Simpson was merely delivering information she had received from employees requesting to work from home and was not a decisionmaker on that issue. The cited testimony does not state that Ms. Simpson was listing employees "for consideration". (Simpson Dep., attached as Ex. C, 70:5-11; 77:18-78:8.)

25. March 19, 2020, is the first time Taylor tells anyone Andrews will be laid off, and the first time it is communicated that all non-essential staff on WFH is being laid off. (Plaintiff's Exhibit 20). The layoffs were not effectuated until March 20, 2020. (Taylor 115:14-20).

    **RESPONSE:** Undisputed for purposes of summary judgment only.

26. Taylor admits that at first TriStar there were doing projections for eight weeks of cash shortage, and "we all thought we were going to be in this eight weeks." (Taylor 92:09-19).

    **RESPONSE:** Undisputed for purposes of summary judgment only.

27. The reduction-in-force was an evolving process, there was no written plan, there was no consulting what TriStar was going to do, it was all Taylor. (Taylor 42:10 43:02).

    **RESPONSE:** Undisputed for purposes of summary judgment only.

28. TriStar submitted a separation notice to the state of Tennessee stating the reason for separation was "Lack of Work."

    **RESPONSE:** This statement of fact contains no citation to the record as required by Local Rule 56.01 and, thus, requires no response. It is undisputed for purposes of summary judgment

8

that Tri Star checked the "lack of work" box on the State of Tennessee Separation Notice for Ms. Andrews, which meant lack of revenue.  (Taylor Dep., 198:5-9 (Doc. 40-2, p. 48).)

29.    Non-essential Team Coordinators who were able to report to work were needed because of TriStar had an "increased workload" there was lots of work done, it was chaos. (Taylor 54:20- 55:07).

RESPONSE:  Undisputed for purposes of summary judgment only.

30.    The increased work load involved – business management work, support work, client communication – "A millions of times. Over and over and over again" with concerns about the pandemic. (Taylor 55:12-19).

RESPONSE:  Undisputed for purposes of summary judgment only.

31.    Team Coordinators, formerly clients' services specialists, were points of contacts for clients, and Client's trusted advisors and employees. (Taylor 57:23 – 58:08).

RESPONSE:   Undisputed for purposes of summary judgment only.   However, Team Coordinators were not primary points of contact for clients.  (Ex. A, Taylor Dep., 58:3-5; 59:7-12.)

32.    Team Coordinators' duties and services are not separated by East and West office. (Taylor 66:01-24).

RESPONSE:  Undisputed for purposes of summary judgment only.

33.    Team Coordinators were the equivalent to assistants to the accounting or business manager who would assist by providing to do lists, direct client communication, garnering internal resources for client needs, trusted advisor needs, running the team meetings, tracking the teams' open deliverables that need to be completed either internally for the firm, externally to the trusted advisor, or the client. (Taylor 12:18-13:12).

RESPONSE:  Undisputed for purposes of summary judgment only.

9

34. Team Coordinators essential job functions – manage the team deliverable and track open deliverables – projects assigned by the team. (Taylor 157:16-23).

**RESPONSE:** Undisputed for purposes of summary judgment only.

35. Taylor states that clients are not going to talk to Team Coordinators about contract servicing or taxes. Rather about a license plate, the dog walker (Taylor 59:17- 60).

**RESPONSE:** Undisputed for purposes of summary judgment only.

36. Team Coordinator is a benefit that TriStar offers to TriStar Clients, it allows accounting team to focus on accounting and team coordinators can do administrative functions such as managing task lists, managing checklists, scheduling team meetings, preparing items for clients to pick up, tracking spreadsheets, tracking renewals, updating addresses. (Kinder 39:22-40:14).

**RESPONSE:** Undisputed for purposes of summary judgment only.

37. Team Coordinators provided concierge services to clients and this was a benefit that TriStar competitors did not offer. It could include calling the dog walker, setting up utilities, changing your address, booking an appointment at the DMV, passport renewals. (Kinder 50:08-51:01; 54:05-13).

**RESPONSE:** Undisputed for purposes of summary judgment only.

38. Team coordinators bill their time. (Kinder 54:14-22).

**RESPONSE:** Undisputed for purposes of summary judgment only that Team Coordinators bill a portion of their time. (Ex. B, Kinder Dep., 54:14-55:2.)

39. Andrews served as the Amex Liaison for the entire firm for the clients, clients' family and businesses. (Taylor 76:19 - 77:10; 77:21 - 78:04).

**RESPONSE:** Undisputed for purposes of summary judgment only.

10

40.     Andrews did the Amex Liasion work for any client, client's employees that had an Amex. (Kinder 55:25 – 57:05). If there was an issue with an Amex Card for any of the clients managed by the 7 business management team, then Andrews would call up Amex and handled the issue. (Kinder 57:13-24). Andrews had a relationship with the Amex liaison. (Kinder 59:04-07).

       **RESPONSE:** Undisputed for purposes of summary judgment only.

41.     There is no job description for the Amex Liaison, Taylor did not know the details of the position. (Taylor 77:20 – 78:04).

       **RESPONSE:** Undisputed for purposes of summary judgment only that there is no official job description for the AmEx Liaison position. Disputed that Ms. Taylor did not know the details of the position. Ms. Taylor testified regarding the job duties related to this position. (Ex. A, Taylor Dep., 76:19-78:4.) However, Ms. Taylor's knowledge of this position is not material to the pending Motion for Summary Judgment.

42.     Taylor did not interact with Andrews on a day-to-day basis. (Taylor 21:20).

       **RESPONSE:** Undisputed for purposes of summary judgment only.

43.     Andrews had a laptop so she could handle Amex emergencies at night or weekends. (Kinder 93:13-21). Andrews was allowed to have a laptop and transport it from the office to home each day. (Kinder 94:07-17).

       **RESPONSE:** Undisputed for purposes of summary judgment only.

44.     In 2019 there was an adjustment to Andrews scheduled start time. (Kinder 105).

       **RESPONSE:** Undisputed for purposes of summary judgment only.

45.     Kinder understood that "accommodation" is associated with ADA. (Kinder 107:12-16).

       **RESPONSE:** Undisputed for purposes of summary judgment only. Ms. Kinder was an executive assistant when the pandemic began, so her understanding is not material. Further,

this line of questioning pertained to Plaintiff's ADHD and has nothing to do with asthma, which is the subject of this case. (Ex. B, Kinder Dep., 14:3-7; 107:25-108:6.)

46. In 2019 the HR's e-mail provided "discuss the seriousness of the situation with your healthcare providers and build a support team to help manage any conditions that are contributing to this behavior" and Kinder knew Andrews was having sleep issues and had headaches. (Kinder 107:17 – 108:12).

**RESPONSE:** Undisputed for purposes of summary judgment only. Ms. Kinder was an executive assistant when the pandemic began, so her understanding is not material. Further, this line of questioning pertained to Plaintiff's ADHD and has nothing to do with asthma, which is the subject of this case. (Ex. B, Kinder Dep., 14:3-7; 107:25-108:6.)

47. Taylor understood that Andrews already had a laptop, that her manager said could be set up right away, that Andrews could work from home, that Andrews wanted to work from home, and that Luecke wanted Taylor to provide preferential consideration. (Taylor 104:25-105:19).

**RESPONSE:** Disputed. This misstates Ms. Taylor's testimony, which is her interpretation of an email sent by Plaintiff's manager, Bryan Luecke, not her own understanding of the situation. Ms. Taylor testified that she understood that Plaintiff's manager, Bryan Luecke, was saying, in an email written by him, that Ms. Andrews had a laptop with her and that she could work from home:

> Q. What did you understand him to be saying when he wrote this?
> A. That she had a laptop with her and that she could work from home, and that he wanted me to give consideration to her.
> Q. So he's asking for some preferential consideration?
> A. That's right.

(Ex. A, Taylor Dep., 105:12-19.) Ms. Taylor's interpretation of Mr. Luecke's email is not material to the pending summary judgment motion and Ms. Taylor was the sole decisionmaker

12

as to who would be permitted to work from home indefinitely.  (Ex. C, Simpson Dep., 70: 5-11.)  Further, Plaintiff does not dispute that Team Coordinators were categorically not permitted to work from home on a permanent or indefinite basis.  (Plaintiff's Response to Statement of Facts, Doc. 47, ¶ 5; *see also* Taylor Declaration, Doc. 40-3, ¶¶ 3-8.)

48.    Amber Baker was a team coordinator for the business management team, like Andrews. (Kinder 39:02 – 07).

   **RESPONSE:**  Undisputed for purposes of summary judgment only.  The correct spelling of Ms. Baker's first name is "Ambra".

49.    Andrews was diagnosed with Asthma when she was 14 or 15 years of age by an ear, nose and throat doctor and asthma specialist – that she was referred to after wearing a 24 hour heart monitor with irregularities that didn't present as a cardio but a respiratory issue. (Andrews 100:25 - 101:24).

   **RESPONSE:** Undisputed for purposes of summary judgment only.

50.    Andrews deals with her asthma every day to keep it well-controlled. (121:02 - 122:07). Andrews is prescribed Singulair (daily), Flonase (daily), and Zyrtec (daily) to manage allergies and asthma. (Andrews 115:14 - 116:09 116:13 - 116:23; 117:10 - 117:24). Andrews carries her rescue inhaler, Xopenx, all the time and she uses it before exercising so that her asthma is kept under control. (Andrews 116:21 – 23; 118:03 - 118:15).

   **RESPONSE:**  Undisputed for purposes of summary judgment only.

51.    Andrews 'asthma is debilitating because it gets in the way of Andrews day to day activities, after an attack, if she does not get over it then she can end up with bronchitis or pneumonia, it can also limits her movement due to shortness of breathe. Andrews to get sick more often. Andrews also choose not to do a lot of things because she knows it might be problem. Andrews also has anxiety about the asthma. (Andrews 121:09 - 122:07; 125:20 - 126:23).

13

**RESPONSE:** Disputed that Plaintiff's asthma is debilitating within the meaning of the ADA. This is a misleading interpretation of Plaintiff's own testimony. Plaintiff testified that if she does not get over an "attack" within a few days, she *might* end up with bronchitis or pneumonia, and that the bronchitis or pneumonia *might* get in the way of her day to day and cause her to have shortness of breath if she is up and moving around. Plaintiff did not testify that her asthma gets in the way of her day to day activities or that it limits her movements due to shortness of breath. (*See* Andrews Dep., attached as Ex. D, 122:15-123:8.) Plaintiff's asthma is and always has been well-controlled and has not prevented her from participating in strenuous workouts, cheerleading, dancing and gymnastics. (Andrews Dep., Doc. 40-1, 157:3-14, 182:18-183:7.) Plaintiff's primary care provider, Autumn Nelson, agrees that Plaintiff's asthma is well-controlled. (Andrews Dep., Doc. 40-1, 156:12-157:14, 187:13-25, March 17, 2020 Medical Note, Exh. 16 to Andrews Dep; *see also* Plaintiff's Response to Tri Star's Statement of Undisputed Facts, Doc. 47, ¶¶ 22-25.)

52. Andrews has regular asthma attacks, which include any sort of event requiring the use of her rescue inhaler. (Andrews 112:04 - 113:23). In 2016 Andrews was hospitalized for an asthma attack after being exposed to a carbon monoxide. (Andrews 113:25 - 114:18).

**RESPONSE:** Disputed. Plaintiff defines an asthma "attack" as any time she uses her inhaler, including proactive uses meant to *prevent* an asthma attack in the first place. For purposes of summary judgment only, it is undisputed that Plaintiff uses her inhaler regularly, including proactive or preventative uses. Plaintiff's asthma is and always has been well-controlled and has not prevented her from participating in strenuous workouts, cheerleading, dancing and gymnastics. (Andrews Dep., Doc. 40-1, 157:3-14, 182:18-183:7.) Plaintiff's primary care provider, Autumn Nelson, agrees that Plaintiff's asthma is well-controlled. (Andrews Dep., Doc. 40-1, 156:12-157:14, 187:13-25, March 17, 2020 Medical Note, Exh. 16 to Andrews

14

Dep; *see also* Plaintiff's Response to Tri Star's Statement of Undisputed Facts, Doc. 47, ¶¶ 22-25.) It is undisputed for purposes of summary judgment only that the last time Plaintiff was hospitalized related to her asthma was in 2016. This was not an overnight hospitalization. (Andrews Dep., Doc. 40-1, 113:7-114:18.)

53. When Andrews is exposed to a triggers wind blowing in her face then she would not be able to breath, or the cold cause everything to constrict – Andrews did not know this was an asthma attack she thought it was something everyone experienced. Andrews had serious attacks when running, and she would have to coach herself back into breathing. (102:02 - 103:15). Synthetic fog is a trigger that will immediately require the rescue inhaler.

   **RESPONSE:** Tri Star objects to this statement of fact in that it contains multiple statements and incomplete sentences. Subject to and without waiving this objection, it is undisputed for purposes of summary judgment only that Plaintiff identified the listed events as triggers for her asthma. Plaintiff described having a "serious" attack while running in high school, which she was able to "coach" herself out of. (Ex. D, Andrews Dep., 102:21-103:9.)

54. High humidity, stress, exercise. Andrews' allergies exacerbate her asthma but is not an immediate trigger. Cleaning products that hang in the air are a big trigger. Strong smells, perfumes. (Andrews 110:21 - 111:20).

   **RESPONSE:** Tri Star objects to this statement of fact in that it contains multiple statements and incomplete sentences. For purposes of summary judgment only, it is undisputed that Plaintiff has identified the above listed things as "triggers" for her asthma.

55. Because Andrews carried Xopenx inhaler levalbuterol everywhere Andrews believed her asthma was common knowledge at TriStar. (Andrews 105:12 - 107:11; 107:15 - 108:05).

   **RESPONSE:** Undisputed that Plaintiff believed this to be true. However, Plaintiff's belief is not a fact. It is disputed that Plaintiff's asthma was common knowledge at Tri Star. (Taylor

15

Dep., Doc. 40-2, 52:12-14; Stephens Dep., attached as Ex. E, 20:10-11.) Whether this was common knowledge is not material to the pending summary judgment motion.

56. On August 20, 2014, Andrews completed and submitted the TriStar Emergency contact form she had asthma, no albuterol (will induce vomiting), Xopenex inhaler. (Exhibit #) (Amdrews 103:01 - 103:15).

   **RESPONSE:** Undisputed for purposes of summary judgment only.

57. Stephens testified she does not recall knowing Andrews ever having asthma. (Stephens 20:08-14). However, Stephens did receive an e-mail from Stephen Krell where he stating Andrews had sent a message "being cold and her asthma acting up" and responding, "she changed policy, so I'm sure she is happy about that!" (Stephens 52:05-53:03). Stephens acknowledged that it is being communicated that Andrews has asthma. (Stephens 53:17-21).

   **RESPONSE:** Undisputed for purposes of summary judgment only.

58. Andrews discussed her Asthma with TriStar management during the heater issue because Andrews' asthma would manifest itself when she was cold, starting with coughs and progressing to chest tightness, requiring her to focus on controlling her breathing, using her rescue inhaler, otherwise she would be in trouble. Andrews 'rescue inhaler does not relieve the coughing, it just opens the bronchial tubes, and causes a ramp up in production in mucus, which will last a couple of days after an event. (Andrews 108:20 - 110:17).

   **RESPONSE:** The cited deposition testimony does not support this factual assertion. There is no evidence in the record that Plaintiff discussed her asthma with this level of detail with any member of Tri Star management. Whether she did is not material to the pending summary judgment motion, as this conversation would have occurred in 2018, two years before her employment ended. (*See* Ex. B, Kinder Dep., 96:4-7; Taylor Dep., Doc. 40-2, 52:12-14; Ex. E, Stephens Dep., 20:10-11.)

16

59. Kinder was aware of the space heater situation in 2020. Steve e-mailed the HR director being cold affected Andrews' asthma. (Kinder 96:04-98:03).

   **RESPONSE:** Undisputed for purposes of summary judgment only, except the "space heater situation" occurred in 2018. Ms. Kinder was an executive assistant at this time, so her knowledge is not material. (Ex. B, Kinder Dep., 14:3-7.)

60. On March 16, 2020, Andrews had an episode that required her to use her rescue inhaler. Someone was using Lysol spray, it was hanging in the air, and triggered her asthma, causing coughing, she tried regulating her breathing, she felt chest tightness, and it reached a point that she went to bathroom to use inhaler. (Andrews 127:06 - 127:22).

   **RESPONSE:** Undisputed for purposes of summary judgment.

61. Stephens considered Andrews a good employee when she showed up and focused on her job. (Stephens 17:23 – 07). In July 2019 Andrews was being recommended for a raise, and that the loyalty raise was being skipped. (Kinder 125:21-126:07). Kinder only knows of performance raises and loyalty raises. (Kinder 126:22-127:01).

   **RESPONSE:** Undisputed for purposes of summary judgment only. Ms. Kinder was an executive assistant during this time period, so her knowledge is not material. (Ex. B, Kinder Dep., 14:3-7.)

62. Andrews spoke to her healthcare provider because she was concerned after hearing reports that steroids for asthma could make her more susceptible to catching the virus because it depleted her immune system. Andrews asked if she should change the way she took her medication, and other general guidance. (Andrews 061:23 - 063:07). Andrews' steroid medication was her rescue inhaler, and Flonase. (Andrews 063:11 - 063:19).

   **RESPONSE:** Undisputed for purposes of summary judgment only.

17

63. Andrews believed that asthma posed a big risk for COVID based on news reporting and CDC information. (Andrews 139:01 - 139:16). Andrews' healthcare provider instructed her to continue taking her daily medication. Andrews also spoke with family members and family friends who were healthcare professionals that recommended Andrews stay at home (Andrews 063:23 - 065:12; 065:21 - 066:08; 066:15 - 067:01).

**RESPONSE:** Undisputed for purposes of summary judgment.

64. Andrews has a history of difficulty sleeping, it was exacerbated with concerns over the pandemic, at the time the CDC and media were saying that people with asthma were at risk of severe complications from COVID. Andrews had concerns of being exposed and being hospitalized. (Andrews 061:23 - 063:07).

**RESPONSE:** Undisputed for purposes of summary judgment only that this was Plaintiff's belief. There is no admissible proof in the record of what the CDC or media were communicating about asthma and Covid-19.

65. On March 20, 2020, Andrews went to urgent care to confirm it was not COVID and have them listen to Andrews lungs to confirm she did not have bronchitis or something of that nature.(Andrews 119:03 - 120:05; 120:14 - 120:24)

**RESPONSE:** Undisputed for purposes of summary judgment only.

66. TriStar's policy that if an employee advises Human Resources the need for accommodation, and Human Resources will provide a request for accommodation form. (Plaintiff's Exhibit 3; Taylor 137:04-11). TriStar's policy says that the accommodation request will be discussed with the employee and the employee's managers." (Plaintiff's Exhibit 3; Taylor 137:19-25). TriStar's policy says employer may be required to provide documentation supporting a disability, including all certification." (Plaintiff's Exhibit 3; Taylor 138:10-14).

**RESPONSE:** Undisputed for purposes of summary judgment only. The policy speaks for

itself.  (Doc. 48-1, p. 17.)

67.   TriStar's policy "if a reasonable, appropriate accommodation is readily available the request will be approved and the accommodation implemented." (Plaintiff's Exhibit 3; Taylor 138:10-139:04).

**RESPONSE:**  Undisputed for purposes of summary judgment only.  The policy (Doc. 48-1, p. 17), speaks for itself.

68.   TriStar's policy states "and when accommodation is not readily ascertainable, the matter will be pursued further with the assistance of appropriate external resources." (Plaintiff's Exhibit 3; Taylor 139:05-09).

**RESPONSE:** Undisputed for purposes of summary judgment only.  The policy (Doc. 48-1, p. 17), speaks for itself.

69.   Taylor does not know what is meant by "appropriate external resources" but HR is expected to know what that meant and they have access to both labor lawyers. (Plaintiff's Exhibit 3; Taylor 139:10-18).

**RESPONSE:**  Undisputed for purposes of summary judgment only.

70.   According to TriStar policy "(a)ll requests for accommodation need to be approved by the CEO." (Plaintiff's Exhibit 3; Taylor 139:25-05).

**RESPONSE:**  Undisputed for purposes of summary judgment only.  The policy (Doc. 48-1, p. 17), speaks for itself.

71.   TriStar states "TriStar will consider the requests but reserves the right to offer its own accommodation, to the extent permitted by law." (Plaintiff's Exhibit 3; Taylor 140:22-141:01).

**RESPONSE:** Undisputed for purposes of summary judgment only.  The policy (Doc. 48-1, p. 17), speaks for itself.

19

72. Taylor admits that she is not HR person for TriStar, but there has always been a professional and then counsel for drafting a policy, review, or what gets extended. (Taylor 142:24-143:06).

    **RESPONSE:** Undisputed for purposes of summary judgment only.

73. Taylor is responsible for the policies in the Employee handbook. (Plaintiffs exhibit 8; Taylor 132:12-17).

    **RESPONSE:** Undisputed for purposes of summary judgment only.

74. Yolanda Simpson was TriStar's Human Resources Generalist. Simpson was TriStar HR generalist starting in February 2020 and until she was terminated September 31, 2020. (Defendant's Initial Disclosures p. 1; Simpson 9:1-04; 16:03-09).

    **RESPONSE:** Undisputed for purposes of summary judgment only.

75. Simpson's understanding of the ADA's interactive process is that once you're made aware of a need for an accommodation or potential need for accommodation, that you have a conversation with the employee and get appropriate documents to validate that a need is justified. (Simpson 27:08-17).

    **RESPONSE:** Undisputed for purposes of summary judgment only.

76. Simpson's understanding of reasonable accommodation request under the ADA is if an employee needs their job modified on some medical need, that as long as it doesn't cause a hardship on the employer, and it considered reasonable, then that's something they would grant." (Simpson 26:25-27:07).

    **RESPONSE:** Undisputed for purposes of summary judgment only.

77. Simpson does not recall ever engaging in the interactive process as an HR generalist for TriStar. (Simpson 102:17-20).

    **RESPONSE:** Undisputed for purposes of summary judgment only.

78. Simpson never saw a reasonable accommodation form while working for TriStar. (Simpson 29:08-11).

    **RESPONSE:** Undisputed for purposes of summary judgment only.

79. Simpson does not recall having any conversation with Taylor regarding COVID-19 work accommodations. (Simpson 70:05-11).

    **RESPONSE:** Undisputed for purposes of summary judgment only.

80. Simpson does not recall ever engaging in the interactive process while as an HR generalist for TriStar. (Simpson 102:17-20).

    **RESPONSE:** Undisputed for purposes of summary judgment only.

81. [Number 81 was left blank in Plaintiff's original filing.]

82. Business management services is TriStar's profit center – its accounting and financial services – they were all intertwined. (Taylor 50:06-20).

    **RESPONSE:** Undisputed for purposes of summary judgment only.

83. TriStar compensation structure includes commissions, monthly retainers, or fee-based. (Kinder 43:24-44:18; 46:17-25).

    **RESPONSE:** Undisputed for purposes of summary judgment only.

84. TriStar generates fees by providing services other than touring, including: Business management, royalties, tax, and concierge family office services. (Kinder 45:05-15; 48:08-14).

    **RESPONSE:** Undisputed for purposes of summary judgment only.

85. TriStar has clients that are nontouring – actors, actresses, models and high net worth families. (Kinder 62:20-63:05).

    **RESPONSE:** Undisputed for purposes of summary judgment only.

86.     Taylor decision to terminate non-essential employees with work-from-home requests were in the first round was not based on dollar and cents. (Taylor 39:06-14).

        **RESPONSE:** Disputed. This was purely an economic decision, as was the overall reduction in force. It is undisputed that Tri Star lost 25% of its revenues because of the Covid-19 pandemic. (Taylor Dep., Doc. 40-2, 40:3-16; 117:10-12; *see* Plaintiff's Response to Tri Star's Statement of Undisputed Facts, Doc. 47, ¶ 9.)

87.     Nonessential employees who needed to work from home were terminated in the first round, while nonessential employees who were at the office kept their jobs. (Taylor 83:07-12).

        **RESPONSE:** Undisputed for purposes of summary judgment only.

88.     TriStar had an entire touring department that had no work. (Taylor 36:24 - 37: 09).

        **RESPONSE:** Undisputed for purposes of summary judgment only.

89.     Taylor admits that they retained individuals in TriStar's Touring department and allowed some to work from home if they were determined to be essential. (Taylor 84:14-85:06).

        **RESPONSE:** Undisputed for purposes of summary judgment only.

90.     Taylor states that TriStar generates revenue from touring through commissions and gave the example that if a $14 million tour was set for eight weeks, and the commission is 5% then that would be $700,000 lost. (Taylor 93:16-24).

        **RESPONSE:** Undisputed for purposes of summary judgment only.

91.     TriStar may receive touring income at the end of the tour or when the venue pays the artist. (Kinder 67:05-17).

        **RESPONSE:** Undisputed for purposes of summary judgment only.

92.     According to a post dated October 10, 2019 LouTaylor.net – her clients included Florida Georgia Line that according to an article dated October 30, 2019 Pollstar.com finished a $50 million tour. (Plaintiff's Exhibits 48 and 49).

22

**RESPONSE:** Tri Star objects to this statement of fact as it is based on two inadmissible blog posts that Tri Star has moved to strike from the record and that should not be considered on summary judgment. There is no admissible proof in the record supporting this factual assertion. Further, Tri Star's touring clients or revenue in 2019 are immaterial to the pending motion for summary judgment.

93. The touring income that disappeared was "planned income" or "prospective income." (Kinder 66:06-13).

    **RESPONSE:** Undisputed for purposes of summary judgment only.

94. Going into 2020 TriStar was looking to fill a lot of positions, because they were goring. (Plaintiff's Exhibit 28 Kinder 47:06-12).

    **RESPONSE:** Undisputed for purposes of summary judgment only, assuming "goring" is supposed to "growing".

95. As of March 23, 2020, TriStar had open requisitions for numerous positions including Team Coordinators including Nashville. (Plaintiff's Exhibit 28).

    **RESPONSE:** Undisputed for purposes of summary judgment only. However, these were job postings that were made prior to the start of the Covid-19 pandemic. (Doc. 48-3, p. 3 (job posting made "30+ days ago"; Doc. 48-2, pp. 34-38.) It is undisputed that Tri Star laid off 25% of its workforce due to the Covid-19 pandemic. (*See* Plaintiff's Response to Tri Star's Statement of Undisputed Facts, Doc. 47, ¶ 17.)

Respectfully Submitted,

/s/ Elizabeth G. Hart
THE SWAFFORD LAW FIRM, PLLC
Tara L. Swafford BPR # 17577
Thomas Anthony Swafford, BPR # 17578
Elizabeth G. Hart, BPR # 30070
321 Billingsly Court, Suite 19
Franklin, Tennessee 37067
Telephone: (615) 599-8406
Facsimile: (615) 807-2355
tara@swaffordlawfirm.com
tony@swaffordlawfirm.com
betsy@swaffordlawfirm.com

*Attorneys for Tri Star Sports & Entertainment Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served via the Court's Electronic Filing System on:

Daniel Eduardo Arciniegas
Arciniegas Law
1242 Old Hillsboro Road
The Atrium Building
Franklin Tennessee 37069
Daniel@attorneydaniel.com

on this 11th day of January 2023.

/s/     Elizabeth G. Hart
        Elizabeth G. Hart

24