# EXHIBIT A

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                  NASHVILLE DIVISION

 3
     CHRISTIE ANDREWS,                  )
 4                                      )
               Plaintiff,               )
 5                                      )
     vs.                                )  CASE NO.
 6                                      )  3:21-cv-00526
     TRI STAR SPORTS AND                )
 7   ENTERTAINMENT GROUP, INC.,         )
                                        )
 8             Defendant.               )
                                        )
 9   _____

10

11

12

13
     VIDEOTAPED DEPOSITION OF:
14
     LOU TAYLOR
15
     Taken on behalf of the Plaintiff
16
     August 24, 2022
17

18

19

20

21

22

23

24

25
                                                          1
```

```
 1   APPEARANCES:

 2   For the Plaintiff:

 3       **DANIEL ARCINIEGAS, ESQ.**
         Arciniegas Law
 4       1242 Old Hillsboro Road
         The Atrium Building
 5       Franklin, Tennessee 37069-9129
         629.777.5339
 6       Daniel@attorneydaniel.com

 7   For the Defendants:

 8       TARA SWAFFORD, ESQ.
         ELIZABETH "BETSY" HART
 9       The Swafford Law Firm, PLLC
         321 Billingsly Court
10       Suite 19
         Franklin, Tennessee 37067
11       615.599.8406
         Betsy@swaffordlawfirm.com
12       Tara@swaffordlawfirm.com

13   Also Present:

14       Peggy Stephens

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          Q.     Expenditure.
 2                 Was there any, like, preferential
 3   considerations during that process?
 4          A.     The essential staff with
 5   preferential treatment were defined in three
 6   categories:  Single parents or parents who had
 7   childcare needs, people who live with first
 8   responders.  I can't remember the third one.  Let
 9   me see.  Give me a minute.  Childcare needs,
10   people -- oh, who were immune compromised.
11          Q.     So when you had these three
12   categories of --
13          A.     Uh-huh.
14          Q.     -- preferential treat- --
15   consideration --
16          A.     Essential staff, uh-huh.
17          Q.     Okay.  So within the essential
18   staff, you have these preferential considerations.
19   You have these three categories, correct?
20          A.     (No audible response.)
21          Q.     And was -- you gave them in
22   order, but how -- they're -- that's not in the
23   order of ranking of importance or weight, right?
24          A.     No.  That's right.
25          Q.     Okay.  Were they treated equally,
```

```
 1              A.     Team coordinators.  I went
 2    through that already.
 3              Q.     Okay.  Do they -- are they
 4    primary contact points for clients or not?
 5              A.     Sometimes and sometimes not.
 6              Q.     Okay.  So some client -- or what
 7    do we call them, team coordinators --
 8              A.     That's right.
 9              Q.     -- would have established
10    relationships with their book of business; is that
11    fair?
12              A.     They don't have a book of
13    business.  They support the team.  But yes, they
14    would have communication with client staff,
15    sometimes clients, trusted advisors.
16              Q.     Right.
17              A.     Uh-huh.
18              Q.     And some -- some clients -- and
19    you -- well, let me -- let's kind of establish
20    something.  You have the main client, and then
21    they have employees that may communicate to your
22    business for their services?
23              A.     That's correct.
24              Q.     And so various levels of people
25    may be coming to y'all to address a client's
```

```
 1  issues; is that fair?
 2       A.   That's correct.
 3       Q.   And so they -- over time, they
 4  develop a certain rapport with certain individuals
 5  within your organization; is that fair?
 6       A.   That's correct.
 7       Q.   And then -- so some people may be
 8  more comfortable calling a team coordinator as
 9  opposed to the business manager?
10       A.   Probably not, but --
11       Q.   Okay.
12       A.   -- maybe.
13       Q.   Maybe?
14       A.   Depending on what it is.
15       Q.   Right.
16       A.   Yeah.
17       Q.   Like --
18       A.   They're not going to call a team
19  coordinator and talk about contract servicing or
20  taxes, you know.  They're going to call the team
21  coordinator and go:  My license plate didn't show
22  up.
23       Q.   Right.
24       A.   The dog walker didn't show up.
25  That's what they're going to call the team
```

```
 1   LogMeIn, Citrix, one of those.  I can't remember.
 2           Q.      Okay.  And so, generally, most
 3   employees at the time, did they desktops; is that
 4   what they're --
 5           A.      Yeah.
 6           Q.      Okay.
 7           A.      Uh-huh.
 8           Q.      But a certain subset of the
 9   employees had laptops; fair?
10           A.      Yeah, small.  I -- I -- I don't
11   know how many.  I didn't issue the computers.
12           Q.      Okay.  And can you think of a
13   reason why a team coordinator would be issued a
14   laptop?
15           A.      Only in an instance where
16   somebody needed to log in over the weekend or to
17   reset, you know, a password for something.  I -- I
18   don't know.
19           Q.      So there's a job position or
20   title that's being attributed to my client, AMEX
21   liaison.
22           A.      Uh-huh.
23           Q.      What is your understanding of
24   that position?
25           A.      I think at that point in time,
```

```
 1  Christie, you know, was the liaison.  So instead
 2  of having everything within the team hitting VIP
 3  Services at AMEX, Christie would open/close cards
 4  and talk to whoever that service representative
 5  was.
 6           Q.    Okay.  And that would not be
 7  limited to -- that would be firm-wide; is that
 8  fair?
 9           A.    I believe it was firm-wide,
10  uh-huh.
11           Q.    Okay.  Is there a job -- is there
12  an actual, like, written job description for that?
13           A.    For the AMEX liaison?  I don't
14  know.
15           Q.    Who would know that answer?
16           A.    Somebody in HR.
17           Q.    Okay.  Before Christie was AMEX
18  liaison, do you -- did you have anybody else
19  working as an AMEX liaison?
20           A.    I don't believe so.
21           Q.    And the AMEX liaison would be
22  responsible for, you know, those credit card
23  questions for -- for a client's employee as well,
24  right, if it's a business credit card?
25           A.    I don't know if it was so much
```

```
 1  questions.  I think she did the administrative
 2  function of opening the cards, closing them,
 3  reset.  You know, I -- I -- I really don't know
 4  what the detail was.
 5          Q.      Okay.  But you were involved with
 6  the decision to establish somebody as the
 7  designated AMEX liaison?
 8          A.      I don't know if I was.
 9          Q.      Okay.
10          A.      That doesn't sound like something
11  I'd be involved in.
12          Q.      Okay.  So without getting into
13  the details of the tech, you guys have your own
14  servers?
15          A.      We do.
16          Q.      And you can control the level of
17  access an individual can have to those serve --
18          A.      I -- you are talking to the most
19  tech-challenged person in the organization, so
20  good luck with this line of questioning.
21          Q.      Yeah.
22          A.      Have at it.  How long we going to
23  spend doing it, because it's going to be a short
24  section.
25          Q.      We can skip right over it.
```

```
 1   here:  "Just so you know, Christie has a laptop in
 2   the office.  It is not in her home, so we could
 3   get that set up straight away.  Christie has been
 4   asking for answers" --
 5           A.      Uh-huh.
 6           Q.      -- "so thank you for being
 7   sensitive to the timing."
 8           A.      Instead.
 9           Q.      What did you understand -- did
10   you have have a conversation with him about this?
11           A.      I do not.
12           Q.      What did you understand him to be
13   saying when he wrote this?
14           A.      That she had a laptop with her
15   and that she could work from home, and that he
16   wanted me to give consideration to her.
17           Q.      So he's asking for some
18   preferential consideration?
19           A.      That's right.
20           Q.      Okay.  Now, if you turn to the
21   136.
22           A.      Uh-huh.
23           Q.      So there's a work-from-home
24   paperwork that --
25           A.      Uh-huh.
```

```
 1   advisors or the clients.  It is -- it's a
 2   communications position.
 3              Q.     Right.  And communications
 4   position involved both offices; fair?
 5              A.     Uh-huh, it did.
 6              Q.     So people could communicate from
 7   -- with the West office and the East office?
 8              A.     That's right.
 9              Q.     Using e-mail and telephones,
10   right?
11              A.     It's not dividing the teams, and
12   that's not your decision to make.  It is my
13   decision --
14              Q.     I agree.
15              A.     -- as a firm that the information
16   for the clients would be in the firm, and either
17   you were working and supporting the team or you
18   were not.
19              Q.     Okay.
20              A.     That is a decision as a business
21   owner in America that I get to make.
22              Q.     And for -- for certain categories
23   of individuals, you took into account whether they
24   had an immune system issue; fair?
25              A.     Uh-huh.
```

```
 1              Q.    Correct?
 2              A.    Yeah, that's correct.
 3              Q.    Okay.  Did you understand that to
 4   be an obligation under the law?
 5              A.    I did not.
 6              Q.    Okay.  Is it your basic
 7   understanding not to take into -- or is it your
 8   basic understanding that -- well, let's go back.
 9                    Earlier, we talked about the
10   interactive process, right?
11              A.    Uh-huh.
12              Q.    You understood that?
13              A.    I do.
14              Q.    And your understanding is if
15   somebody brings up a health issue, then there's
16   supposed to be this dialogue; is that fair?
17              A.    That's correct.
18              Q.    It's not a dialogue that you
19   specifically engage in, but you expected people in
20   your employ --
21              A.    Uh-huh.
22              Q.    -- primarily the HR people to --
23              A.    That's right.
24              Q.    -- engaged in that dialogue; is
25   that fair?
```