# EXHIBIT B

```
     IN THE UNITED STATES DISTRICT COURT
    FOR THE MIDDLE DISTRICT OF TENNESSEE
              NASHVILLE DIVISION


CHRISTIE ANDREWS,                    )
                                     )
           Plaintiff,                )
                                     )
vs.                                  )  CASE NO.
                                     )  3:21-cv-00526
TRI STAR SPORTS AND                  )
ENTERTAINMENT GROUP, INC.,           )
                                     )
           Defendant.                )
_____      )




VIDEOTAPED DEPOSITION OF:

HEATHER KINDER

Taken on behalf of the Plaintiff

August 25, 2022
```

```
 1   APPEARANCES:

 2   For the Plaintiff:

 3        **DANIEL ARCINIEGAS, ESQ.**
          Arciniegas Law
 4        1242 Old Hillsboro Road
          The Atrium Building
 5        Franklin, Tennessee 37069-9129
          629.777.5339
 6        Daniel@attorneydaniel.com

 7   For the Defendant:

 8        **TARA SWAFFORD, ESQ.**
          **ELIZABETH "BETSY" HART**
 9        The Swafford Law Firm, PLLC
          321 Billingsly Court
10        Suite 19
          Franklin, Tennessee 37067
11        615.599.8406
          Betsy@swaffordlawfirm.com
12        Tara@swaffordlawfirm.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1         A.    She came on as a banking
 2   coordinator.
 3         Q.    All right.  So would -- tell me
 4   in your role as an executive assistant, and I
 5   guess it was in 2020 you would have been senior
 6   executive assistant, when the pandemic came --
 7         A.    Uh-huh.
 8         Q.    -- tell me about how your role
 9   was changed or challenged during that time.
10         A.    I think it's safe to say that
11   everyone changed during that time.
12         Q.    Uh-huh.
13         A.    And it was like drinking from a
14   fire extinguisher.  And the -- I, on a daily
15   average, already field about 400 e-mails in my
16   inbox, and we were being flooded with e-mails from
17   clients, staff, trusted advisors, everyone in full
18   panic mode.  And so I was basically -- it's like I
19   was holding a strainer trying to catch water for
20   about two months straight.
21         Q.    I like the visuals.  I appreciate
22   that.
23               The -- so you think that was
24   immediate?  Like --
25         A.    Immediate.
```

14

```
 1           A.       -- that our competitors do not
 2   offer.
 3           Q.       Okay.  So tell me -- that's where
 4   I think I lost you or you lost me.
 5                    What is the concierge service?
 6           A.       Our team coordinators.  They call
 7   the dog walkers, they renew driver's licenses,
 8   they renew passports, they turn on utilities, they
 9   go to the bank and pick up cash and meet the
10   client and give it to them.  Where if you were
11   with a competitor, you do all of that yourself, or
12   the accountant does it, and that's not the best
13   use of an accountant's time.
14           Q.       Are team coord- -- do team
15   coordinators bill?
16           A.       They do.
17           Q.       Did they bill in 2020?
18           A.       They did.
19           Q.       Do you -- can you give me an
20   estimate or a range of what they -- a team
21   coordinator was billed out to clients to?
22           A.       I -- maybe ■ an hour.
23           Q.       Okay.
24           A.       And probably ■ percent of their
25   time was billable.  But again, if a client was
```

54

```
 1  commission or on a retainer, it didn't matter.  It
 2  was -- it all rolled up.
 3          Q.      And do you know how much Christie
 4  was making in 2020?
 5          A.      I don't.
 6          Q.      Would you -- I mean, do you have
 7  any idea now what people make?
 8          A.      I do.
 9          Q.      Okay.  Are -- do you still have
10  team coordinators?
11          A.      We do.
12          Q.      And what's the high end of a team
13  coordinator in 20- -- 2022?
14          A.      In Nashville?  73-.
15          Q.      The AMEX liaison position, you're
16  aware of that?
17          A.      I am.
18          Q.      When did you first become aware
19  of the AMEX liaison position or vacancy?
20          A.      There never was a vacancy.
21          Q.      Okay.  When did the -- when did
22  you first become aware of there being an AMEX
23  liaison position being established?
24          A.      I don't recall.
25          Q.      Do you recall that an AMEX
```

```
 1  liaison position was actually established?
 2          A.      I know that Christie did the
 3  work.
 4          Q.      Did -- was Christie selected for
 5  that position or those responsibilities?
 6          A.      I don't know.
 7          Q.      You just know that she did the
 8  work?
 9          A.      That's correct.
10          Q.      Did she stop being a team
11  coordinator when she became the -- or started
12  doing the work of an AMEX liaison?
13          A.      She did not.
14          Q.      What -- what was the scope of
15  work for -- strike that.
16                  What was the scope of clientele
17  for the AMEX liaison?
18          A.      I don't understand the question.
19          Q.      What clients had acc- -- bas- --
20  what clients would need the services of an AMEX
21  liaison?  All your clients, a subsection of your
22  clients?
23          A.      Any client that had an AMEX.
24          Q.      And let's just say, just for the
25  sake of numbers, you have 100 clients, right?  Is
```

```
 1  it -- the number of AMEXes, is it just dependent
 2  on the number of clients, but also the number of
 3  people that work for them and the numbers in the
 4  family affair?
 5           A.    That's correct.
 6           Q.    So do most of your clients -- do
 7  most Tri Star clients have AMEXes?
 8           A.    I don't know.
 9           Q.    There had never been an AMEX
10  liaison person, as far as you know, until Ms.
11  Andrews, and there hasn't been one since?
12           A.    That's correct.
13           Q.    What do you know about the AMEX
14  liaison duties?
15           A.    I know that she -- if there was
16  an issue with someone's card, she's the one that
17  called AMEX.  And to my understanding, that's all
18  she handled as the AMEX liaison at the time.
19           Q.    So she did that for the seven
20  teams that you described?
21           A.    That's correct.
22           Q.    The seven business management
23  teams?
24           A.    That's correct.
25           Q.    So if the client or anybody's --
```

```
 1              copy for you.
 2                   MS. HART:  I got it.  Thank you.
 3   BY MR. ARCINIEGAS:
 4         Q.    So this is all about the space
 5   heater or the heating.  Is it called space heater
 6   -- a space heater in 2018.  Were you aware of the
 7   space heater issue in 2018?
 8         A.    I was.
 9         Q.    Do you recall what the policy
10   change was?
11         A.    The policy was changed because
12   space heaters were flipping our breaker.
13         Q.    Flipping?
14         A.    The breaker and killing all of
15   our computer power.
16         Q.    Okay.  And so how was the policy
17   changed, to get rid of them?
18         A.    The policy was to get rid of
19   them.
20         Q.    And then was it changed back to
21   allow them?
22         A.    Only in Christie's area.  And the
23   IT manager Mike moved the plug that it was plugged
24   into to a different circuit so it wouldn't blow
25   those computers.
```

```
 1  to do with accommodations?
 2          A.      No, it's not.
 3          Q.      Okay.  What do you understand
 4  accommo- -- you understand "accommodations" is
 5  kind of a -- has a legal term?
 6          A.      I do.
 7          Q.      For what statute?
 8          A.      Oh, I don't know that.
 9                  MS. HART:  Objection, calls for a
10          legal conclusion.
11  BY MR. ARCINIEGAS:
12          Q.      Are you aware that -- of
13  "accommodation" or "reasonable accommodation"
14  being a phrase in the Americans with Disabilities
15  Act?
16          A.      I am.
17          Q.      Okay.  And then No. 4 says:
18  "Discuss the seriousness of the situation with
19  your healthcare providers and build a support team
20  to help you manage any conditions that are
21  contributing to this behavior."
22                  Did you -- did you understand
23  that -- what health conditions were you aware of,
24  if any, at that time?
25          A.      I was aware that she had sleep
```

```
 1  issues.
 2         Q.    Okay.
 3         A.    She talked about it.  She had, I
 4  don't know if it was ADD or what, but she used
 5  Adderall and proudly talked about it in the
 6  office.
 7         Q.    Okay.
 8         A.    She had headaches.  But I also
 9  knew, again, based on my own research --
10         Q.    Uh-huh.
11         A.    -- that it wasn't my place to
12  have that conversation with her.
13         Q.    Sure.  I --
14         A.    Yeah.
15         Q.    I respect that.
16         A.    And that goes back to I didn't
17  have conversations with staff and I don't let
18  myself have conversations with staff, because I
19  know what's right and what's not right.
20         Q.    Okay.
21         A.    And so I would not divulge into
22  conversations with her like that.
23         Q.    Wait.  What do you mean
24  "divulge"?
25         A.    I know she would openly talk
```

```
 1  and HR.
 2         Q.    But what do you mean "Lou also
 3  knows that," or -- I think that's how you phrased
 4  it.
 5         A.    She knows that -- I mean, she's
 6  not going to ask what her health issues are.
 7         Q.    And that's something that she --
 8  Lou Taylor's communicated to you directly?
 9         A.    No, that is an assumption I have
10  made.
11         Q.    But that knowledge base is based
12  on your personal knowledge not to ask those type
13  of questions or not to -- to divulge that type of
14  information, is based on information you gleaned
15  from the Litmus training --
16         A.    I --
17         Q.    -- or somewhere else?
18         A.    I don't recall.
19         Q.    So it could be the Litmus
20  training?
21         A.    It could be.
22         Q.    Okay. And No. 5, it says: "In
23  the absence of any documented -- documented
24  condition, cont- -- continuing to arrive late to
25  work, i.e., outside the hours of 9:00 a.m. and
```